## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| *IN RE FARFETCH LIMITED SECURITIES LITIGATION* | Master File No. 1:19-cv-08657-AJN<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## CONSOLIDATED AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page(s)**

I.      PRELIMINARY STATEMENT ........................................................................................ 1

PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934 .................... 7

II.     JURISDICTION AND VENUE ..................................................................................... 7

III.    THE EXCHANGE ACT PARTIES.................................................................................. 7

       A.      Lead Plaintiffs ....................................................................................................... 7

       B.      Defendants ............................................................................................................. 8

              1.      Farfetch ................................................................................................... 8

              2.      The Officer Defendants............................................................................ 9

IV.     BACKGROUND AND NATURE OF THE FRAUD ..................................................... 11

       A.      Farfetch's Background And Operations ............................................................... 11

       B.      Farfetch's IPO Value Is Based On Its Third-Party Marketplace Platform, Which Promised Explosive Growth Potential Without Inventory Risk .............. 12

       C.      Farfetch Lays The Groundwork For An IPO, Promising Incredible Growth Without Inventory Risk....................................................................................... 17

       D.      Farfetch Launches A Wildly Successful IPO Based On Its Unique Marketplace Platform And Achievement Of KPI Growth Targets ...................... 20

              1.      Farfetch Announces The IPO To Significant Fanfare .............................. 20

              2.      Defendants Neves And Jordan Embark On A Two-Week International Roadshow To Increase Investor Demand............................ 22

              3.      The IPO Exceeds Expectations, And Farfetch's Valuation Tops $8 Billion ..................................................................................................... 26

              4.      Analysts Embrace Farfetch's $8 Billion Valuation Based On Its Third-Party Marketplace Platform Model And Positive Key Performance Indicators .............................................................................. 32

       E.      Defendant Neves Retains Control Over Farfetch, With Stock Valued Over $1.2 Billion ......................................................................................................... 35

i

F.  Post-IPO, Defendants Continue To Represent That Farfetch's Marketplace Platform Model Is The Key To Its Growth Strategy And Financial Performance ........................................................................................................ 37

G.  Unknown To Investors, Defendants Misrepresented Farfetch's Business Model And Growth Strategy ................................................................................ 48

    1.  Defendants Misled Investors By Consolidating Farfetch's First-Party And Third-Party Businesses Into One Operating Segment ............. 49

    2.  Defendants Planned To Use The IPO Proceeds For Acquisitions That Were Inconsistent With Farfetch's Third-Party Marketplace Platform Model ........................................................................................ 57

H.  Unknown To Investors, Defendants Manipulated The Company's Key Performance Indicators To "Protect" Them From Deterioration And To Conceal A Constant Stream Of Promotions And Discounts ................................ 58

I.  Unknown To Investors, Defendants Converted Cash Bonuses To Improper Short-Term Stock Options To Inflate Adjusted EBITDA In 2019 ...................... 67

J.  Investors Suffer Losses When The Relevant Truth Emerges .............................. 70

K.  The Officer Defendants Reaped Up To $68 Million In The Final Months of the Class Period ...................................................................................................... 78

L.  Defendants Neves And Robb Engaged In Insider Trading In Violation Of Section 20A, Selling Millions Of Dollars In Farfetch Stock While In Possession Of Material Non-Public Information .................................................. 84

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................................................ 86

A.  Defendants Deliberately Misled Investors By Causing Farfetch To Violate Segment Reporting Requirements ....................................................................... 87

B.  The Offering Materials ........................................................................................ 94

C.  September 21, 2018 *Bloomberg.com* Interview With José Neves ...................... 106

D.  November 8, 2018 Third Quarter Earnings Release And Conference Call ........ 108

E.  December 10, 2018 Goldman Sachs Talks: José Neves: Moving Fashion Forward With Technology .................................................................................... 113

F.  February 28, 2019 Fourth Quarter And Full Year 2018 Earnings Release ........ 114

G.  March 1, 2019 Form 20-F 2018 Annual Report ................................................. 118

|  | H. | April 17, 2019 *Luxus+ Magazine* Interview With Defendant Robb .................. 126 |
|  | I. | May 15, 2019 First Quarter Earnings Release ..................................................... 127 |
|  | J. | May 16, 2019 JPMorgan Global Technology, Media And Communications Conference .......................................................................................................... 132 |
|  | K. | June 12, 2019 Deutsche Bank dbAccess Global Consumer Conference............ 133 |
| VI. | | SUMMARY OF SCIENTER ALLEGATIONS ............................................................. 135 |
|  | A. | The Officer Defendants Reaped Up To $68.8 Million From Insider Sales ........ 135 |
|  | B. | The Officer Defendants Engaged In A Deliberate Campaign To Hide Farfetch's Reliance On First-Party Retail Sales ................................................. 137 |
|  | C. | Defendants Had Longstanding Plans To Use The IPO Proceeds To Fund Acquisitions, Yet Made False And Misleading Statements Suggesting Otherwise ........................................................................................................... 138 |
|  | D. | The Officer Defendants Concealed The Effects Of Promotions On Farfetch's KPIs By Manipulating Reported Take Rates And Platform Services Revenue ................................................................................................. 139 |
|  | E. | The Officer Defendants Manipulated Adjusted EBITDA And Income By Revoking Cash Bonuses And Issuing Short Term RSUs ................................... 140 |
|  | F. | Farfetch's Marketplace Platform Growth Strategy And Its Targeted KPIs Were The Most Important Factors Informing the Company's Valuation........... 141 |
|  | G. | Defendants Fielded Questions About Farfetch's Business Strategy, Growth Model, And KPIs On Each Conference Call, And Held Themselves Out As Knowledgeable On Those Subjects .................................................................... 142 |
|  | H. | Defendant Neves And The Other Officer Defendants Controlled Farfetch ....... 143 |
|  | I. | The Suspicious Timing Of The Departures Of Defendant Robb And Chief Marketing Officer Veichmanis ........................................................................... 144 |
|  | J. | The Proximity In Time Between Defendants' Misleading Statements And The Revelation Of Their Falsity ........................................................................ 144 |
| VII. | | PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ............................... 145 |
| VIII. | | ADDITIONAL LOSS CAUSATION ALLEGATIONS ............................................... 146 |
| IX. | | INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................................................... 147 |

X.      CLASS ACTION ALLEGATIONS ............................................................................. 148

XI.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................... 150

COUNT I .............................................................................................................................. 150

COUNT II ............................................................................................................................. 153

COUNT III............................................................................................................................ 154

PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933....................................... 156

XII.    SECURITIES ACT CLAIMS..................................................................................... 156

XIII.   JURISDICTION AND VENUE .................................................................................. 157

XIV.    SECURITIES ACT PARTIES..................................................................................... 158

        A.      Securities Act Plaintiffs ..................................................................................... 158

        B.      Securities Act Defendants................................................................................... 159

                1.      Farfetch ................................................................................................. 159

                2.      The Officer Defendants.......................................................................... 159

                3.      The Director Defendants........................................................................ 161

                4.      The Underwriter Defendants.................................................................. 163

XV.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS IN THE OFFERING MATERIALS......................................................... 166

        A.      The Offering Materials Contained Material Misstatements and Omissions....... 166

                1.      Misstatements And Omissions Relating To Farfetch's Segment
                        Reporting............................................................................................... 166

                2.      Misstatements And Omissions Relating To Farfetch's Business
                        Model And Growth Strategy.................................................................. 171

                3.      Misstatements And Omissions Relating To Farfetch's Adjusted
                        Platform Revenue And Third-Party Take Rate KPIs.............................. 174

                4.      Material Omissions Relating To Items 303 And 105 ............................. 177

        B.      The Securities Act Defendants Failed To Exercise Reasonable Care Or
                Conduct A Reasonable Investigation In Connection With The IPO ................. 178

XVI.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......................................... 180

COUNT IV ................................................................................................................................. 180

COUNT V .................................................................................................................................. 182

COUNT VI ................................................................................................................................. 184

XVII.   PRAYER FOR RELIEF ................................................................................................ 185

XVIII. JURY DEMAND ........................................................................................................... 185

Lead Plaintiffs the International Association of Machinists and Aerospace Workers National Pension Fund ("IAMNPF") and Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters," and, together with IAMNPF, "Plaintiffs" or "Lead Plaintiffs"), by and through their attorneys, and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which included, but was not limited to, a review and analysis of: (i) public filings with the United States Securities and Exchange Commission ("SEC") made by Defendant Farfetch Limited ("Farfetch" or the "Company") and/or its subsidiaries; (ii) research reports by securities and financial analysts; (iii) articles published by the news media; (iv) transcripts of Farfetch's earnings conference calls and industry conferences; (v) Farfetch's publicly-available investor presentations; (vi) Farfetch's press releases and media reports; (vii) economic analyses of Farfetch's securities movement and pricing data; (viii) consultations with relevant experts; (ix) information obtained from former Farfetch employees throughout the course of counsel's investigation; and (x) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is ongoing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and/or discovery.

I.      **PRELIMINARY STATEMENT**

1.      This federal securities class action, which asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"), arises from Defendants' materially false and misleading statements and omissions to investors concerning Farfetch's business model, growth

strategy, and financial performance throughout the Class Period (September 20, 2018 through August 8, 2019, inclusive).

2.      Farfetch is a London-based technology company that sells luxury goods to consumers worldwide.  The Company was founded in 2008 by Defendant José Neves, who serves as Farfetch's Chief Executive Officer ("CEO") and co-Chairman of its Board.  Defendant Andrew Robb, Farfetch's former Chief Operations Officer ("COO"), joined the Company in 2010, and Defendant Elliot Jordan joined as Chief Financial Officer ("CFO") in 2015.  As set forth below, Defendants took Farfetch public in September 2018 based on the misleading story that the Company was a unique, online third-party ("3P") marketplace platform that carried little inventory and none of the risks of a more traditional first-party ("1P") e-commerce wholesale or retail seller. Based on this 3P marketplace platform, Defendants sold investors on a strategy of exponential growth akin to the growth achieved by platforms like Uber and Amazon. Defendants also asked investors to measure the Company's success against a slew of "Key Performance Indicators" ("KPIs"), self-defined financial metrics that were tailored to Farfetch's unique characteristics and business model.

3.      Investors and analysts praised the Farfetch model, and cited it as a great differentiator from other luxury market sellers who owned the product that they sold.  For example, in the lead up to the IPO, *Fortune* noted that "[w]hat makes Farfetch's business model appeal is that it ***does not own the inventory sold on its website***, but instead offers the website to help the brands sell."[1] Similarly, a respected luxury fashion industry publication, *The Business of Fashion*, wrote that Farfetch's "priority is going to be basically a platform, ***a dedicated provider of***

---

[1] Emphasis is added unless otherwise noted.

*technology and services*," which is "where the margin is the highest and potential growth is the highest as well."

4.      Defendants' representations to investors, made during a two-week international roadshow and in the Offering Materials (defined below), led to a wildly successful IPO that raised over $1 billion and led to an $8 billion valuation for Farfetch, despite that fact that the Company had never made a profit in its ten-year existence and had  less than $400 million in revenue in 2017.  Overnight, the IPO made Defendant Neves a billionaire—and the fourth richest person in Portugal—and made multi-millionaires out of Defendants Jordan and Robb.  Over the next ten months, Neves, Jordan, Robb, and the Company made numerous additional representations confirming to investors that Farfetch's success was rooted in the Company's inventory-light, third-party marketplace platform model.  This model, according to Defendants, resulted in consistent year over year growth in Platform Gross Merchandise Value ("GMV")—the total dollar value of orders processed through Farfetch's online marketplace platform—and Platform Services Revenue, the key measure of amount of revenue generated from the marketplace Platform.  Defendants also explained that the Company took a steady and far-above-average commission, or "take rate," of 30-32% on its third-party orders, which translated directly into the Company's reported revenue.  While making these rosy assurances, the Officer Defendants cashed in during the second quarter of 2019, selling up to $68 million of their personal stock holdings, mostly during periods  when other insiders were barred from trading.

5.      Ten months after the IPO and just weeks after many of the Officer Defendants' stock sales, Defendants' carefully curated portrayal of Farfetch—as a revolutionary third-party marketplace that would see exponential organic growth—collapsed in the face of a series of unexpected disclosures.  After the close of trading on August 8, 2019, the Company made several

announcements in two separate press releases, which were then discussed during Farfetch's second quarter 2019 earnings call later that day.  First, the Company surprised analysts and investors by revealing that it was acquiring New Guards Group, an Italian luxury fashion producer and first-party seller, for $675 million—an amount greater that Farfetch's revenue for all of 2018, and more than three-fourths of the entire sum the Company raised in its blockbuster IPO.

6.      The Company also disclosed significant quarterly losses and sharply-reduced guidance and margins—despite the fact that the new guidance included sales from New Guards and two other, smaller companies the Company had acquired since going public.  Specifically, the Company revealed substantially lowered Platform GMV growth guidance for the third quarter of between 30% and 35%—down from the 44% growth reported in the second quarter, the 40% guidance confirmed the prior quarter, and the over 60% growth reported in 2018—as well as wider than expected second quarter losses of nearly $90 million.  Defendants blamed these losses and lowered guidance on "unprecedented promotional activities" in the second quarter of 2019, i.e., on the fact that the Company was forced to offer sales, discounts and promotions that dramatically cut into its bottom line.  Finally, the Company disclosed that Defendant Robb, the Company's COO, had resigned after nine years with Farfetch and less than one year following the IPO.  No explanation was given for his unexpected departure, which came just two months after the Company's Chief Marketing Officer had unexpectedly resigned.

7.      These disclosures stunned investors and analysts, prompting questions about whether the Company's revealed first-party acquisition strategy was designed to conceal a lack of organic growth in the third-party marketplace.  During the August 8, 2019 conference call, a leading analyst in the luxury market asked whether Farfetch's "original model is not working and not producing enough of a profitability so that you have to complement it with other activities."

While Defendants responded that the Company's "strategy . . . has not changed," this response was largely questioned and rejected by analysts who saw the New Guards acquisition as a clear shift away from the strategy the Company had stated in its Offering Materials and other public statements.  Moreover, while Defendants painted the Company's increase in promotional activity as a recent and reactionary response to the promotional activities of its competitors, analysts immediately called that explanation into question, with several noting that Farfetch appeared to be *leading* the promotional activity and not following its competitors, and that there was no indication that the luxury retail market had increased promotions to nearly the degree Defendants claimed.

8.      As a result of these disclosures, Farfetch shares plummeted by nearly *45%*, from $18.25 per share closing price on August 8, 2019 to close at $10.13 on August 9, 2019, eliminating two billion dollars of shareholder equity in a single day, on heavy trading. At the same time, numerous analysts dramatically cut their price targets, frequently by 40% to 50%.

9.      In reality, as described herein, Defendants had engaged in a deliberate campaign to conceal from investors Farfetch's historical and planned reliance on first-party retail business for significant revenues. Indeed, acquisitions of first-party retailers like New Guards Group were always part of the Officer Defendants' planned uses of the IPO proceeds. But even prior to the New Guards acquisition, Farfetch was heavily reliant on a first-party, inventory-heavy business through its ownership of the London-based Browns boutiques.  As Defendants knew, had these facts been known at the time of the IPO and thereafter, they would have resulted in a far lower valuation and stock price.  Defendants were so eager to push the narrative that Farfetch was a revolutionary, third-party platform business, and to hide their dependence on Browns-generated first-party revenue, that they manipulated the Company's operating segment, reporting in violation

5

of applicable accounting standards—so that they could claim the bulk of the Browns first-party revenue as revenue from their platform marketplace business.

10.     Moreover, as described herein, Defendants' second quarter 2019 losses and lowered guidance were not the result of outside market forces, but were the direct result of the Company's "constant" implementation of promotions and discounts in order to artificially and inorganically increase reported GMV.  While Defendants repeatedly represented that Farfetch used promotions only "periodically," the Company began to offer a constant stream of discounts and promotions in the months leading up to the IPO and after.

11.     Although these promotions did prop up the Company's Platform GMV in the first few quarters following the IPO, Defendants misleadingly told only half of the story. Defendants focused the market's attention on revenue and take rate metrics that Defendants carefully engineered.   For example, Defendants directed investors to rely upon Farfetch's "Adjusted Platform Revenue" (later called "Platform Services Revenue") as the metric that "best represents the economic value being generated by the platform." Farfetch's Third-Party Take Rate was calculated from that metric. But, as Farfetch's former Senior Manager for Financial Reporting, who worked directly with the Officer Defendants, explained, these metrics were "protected" from the effects of discounts and promotions because Adjusted Platform Revenue and Platform Services Revenue did not reflect the reduced take rate Farfetch would often receive on discounted products, even though discounts plainly reduced the "economic value being generated by the platform." Defendants deliberately buried the costs of discounts and promotions elsewhere, in a shipping- and customs-related figure the Company actively downplayed as a mere "pass-through." These tactics concealed the deleterious impact of Farfetch's promotions on the Company's KPIs, while

also allowing the Company to report a consistently high take rate, even though the promotions directly and negatively reduced the actual take rate Farfetch earned.

12.    Through this action, Plaintiffs seek to recover the damages that Plaintiffs and other Class members have suffered as a result of Defendants' wrongful acts and omissions.

## PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934

## II.    JURISDICTION AND VENUE

13.    The Exchange Act claims asserted in this Part One arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this Judicial District under Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Farfetch's securities trade on the New York Stock Exchange ("NYSE"), located within this Judicial District.

16.    In connection with the acts, conduct and other wrongs alleged in this Part One, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of a national securities exchange, the NYSE.

## III.    THE EXCHANGE ACT PARTIES

### A.    Lead Plaintiffs

17.    Lead Plaintiff IAMNPF is a defined-benefit pension plan that provides retirement, disability, and survivor benefits to members of the International Association of Machinists and Aerospace Workers and their families, and has done so for over 55 years. IAMNPF oversees approximately $13 billion in assets on behalf of approximately 100,000 active participants. As

7

stated in its previously filed Certification (ECF No. 25-1) and the Certification submitted herewith, IAMNPF purchased a significant amount of Farfetch common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this action.

18.     Lead Plaintiff Oklahoma Firefighters is a public pension fund headquartered in Oklahoma City, Oklahoma that was founded in 1980 to provide retirement, disability and survivor benefit programs to active and retired firefighters in the State of Oklahoma. Oklahoma Firefighters is responsible for the retirement income of these employees and their beneficiaries. Oklahoma Firefighters manages more than $3 billion in assets for the benefit of over 25,000 members and beneficiaries. As stated in its previously filed Certification (ECF No. 25-1) and the Certification submitted herewith, Oklahoma Firefighters purchased a significant amount of Farfetch common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this action.

### B.     Defendants

#### 1.     Farfetch

19.     Defendant Farfetch operates an online e-commerce platform that launched in 2008 to connect luxury fashion brands and boutique sellers with luxury consumers worldwide. Farfetch is incorporated under the laws of the Cayman Islands and has corporate headquarters in London, United Kingdom. Farfetch became a publicly traded company through an IPO conducted on or about September 20, 2018.  The IPO was conducted pursuant to a registration statement (as amended) that was filed with the SEC on September 19, 2018 and declared effective on September 20, 2018, and an incorporated Prospectus dated September 20, 2018 (collectively the "Offering Materials") that registered over 256,000,000 shares of Farfetch Class A ordinary shares and 42,858,080 Class B Ordinary Shares.  In the IPO, Defendant Farfetch, together with certain selling

shareholders, sold a total of 50,880,331 Class A ordinary shares of common stock (comprised of 44,243,749 shares plus 6,636,562 shares sold as part of the underwriters' overallotment) for proceeds of over $1 billion, at an opening price of $20 per share.  Farfetch common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "FTCH".

### 2.    The Officer Defendants

20.    Defendant Neves launched Farfetch in 2008 and was, at all relevant times, CEO and a Co-Chair of Farfetch's Board of Directors.  Neves signed or authorized the signing of the Offering Materials, the March 1, 2019 Form 20-F for the year ended December 31, 2018, and the Forms 6-K attaching press releases announcing the Company's "Third Quarter 2018 Results" (November 8, 2018); "Fourth Quarter and 2018 Results" (February 28, 2019);  and "First Quarter 2019 Results" (May 15, 2019).;  Each of those documents filed with the SEC contained false and misleading statements and omissions.  Moreover, Defendant Neves actively participated in the IPO Roadshow held between September 6-19, 2018 in the UK and U.S.A.  Neves also participated in conference calls with securities analysts, and interviews with analysts and media, during which Neves made additional false and misleading statements.

21.    Defendant Neves is a controlling person of Farfetch through his position as CEO and Co-Chairman, and his ownership of the majority voting rights of Farfetch.  As acknowledged by the Company, "Neves controls Farfetch through ownership of 100% of the Class B [voting] common stock."  Neves "holds approximately 76.6% of the aggregate voting power of our company" giving him "considerable influence over important corporate matters due to his ownership of [the Company]" such as "approving material mergers, acquisitions or other business combination transactions."  As Farfetch explains in its SEC filings, the Company's Board of Directors "will not be able to form a quorum without Mr. Neves for so long as Mr. Neves remains a director."  The Company also explained that "[b]ecause Mr. Neves beneficially owns more than

50% of the voting power of the Company, the Company is a 'controlled company' within the meaning of the rules of the NYSE."

22.     Defendant Jordan joined Farfetch in 2015 and was, at all relevant times, CFO of Farfetch.  Jordan signed or authorized the signing of the Offering Materials and the March 1, 2019 Form 20-F for the year ended December 31, 2018, which contained false and misleading statements, and actively participated in the IPO Roadshow to institutional investors held between September 6-19, 2018 in the UK and U.S.A.  Jordan also signed certifications included in the March 1, 2019 Form 20-F for the year ended December 31, 2018.  Jordan also participated in conference calls with securities analysts, and interviews with analysts and media, during which Jordan made additional false and misleading statements.

23.     Defendant Robb was, at all relevant times, the Company's COO. Robb joined Farfetch in July 2010, and was responsible for the Company's marketing, operations, and overall customer strategy.  Robb participated in interviews with media, during which Robb made  false and misleading statements and omissions.  Robb unexpectedly announced his resignation on August 8, 2019, less than one year after the IPO and the last day of the Class Period. According to Robb's Linkedin.com entry, Robb "[s]caled Farfetch from early stage through its $6bn IPO"  and "[b]uilt the Farfetch team from 30 to 3,000 and lead the business through the different phases of growth." Moreover, Robb stated that, as COO, he was "responsible for marketing, operations, international, our Private Client business and overall customer strategy."

24.     Defendants Neves, Jordan, and Robb (collectively, the "Officer Defendants"), because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of Farfetch's operations, including its accounting and reporting functions, possessed and exercised the power and authority to control the

contents of Farfetch's SEC filings, press releases, and other market communications; and were privy to confidential information concerning Farfetch and its business, operations and financial statements, and strategy. The Officer Defendants were directly involved in controlling the content and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, that the false and misleading statements and omissions were being issued, and approved or ratified these misstatements and omissions in violation of the federal securities laws.

25.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the contrary representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements and omissions pleaded herein under the Exchange Act.

IV.     **BACKGROUND AND NATURE OF THE FRAUD**

A.     **Farfetch's Background And Operations**

26.     E-commerce, which enables a firm or individual to conduct business over the internet, revolutionized shopping. E-commerce is a type of business model that dates back to the 1960s. The first sales channel that set the path for modern e-commerce was the Electronic Mall introduced in 1984 by CompuService, a network that used to provide home online users with chat rooms. Once the industry created secured online transactions for both seller and purchaser and established third-party credit card processors, the first secure online purchase occurred in 1994. After this first online purchase, e-commerce developed significantly, due in large part to companies like Amazon and eBay, which codified full business models, laying the groundwork for modern e-commerce.

27.     Online clothing sales became the top e-commerce product by 2015.  However, the luxury clothing industry was slow to embed digital sales into its business model. Mark Tungate, a branding specialist and author of "Fashion Brands: Branding style from Armani to Zara," wrote "Luxury brands have been slower than most to unlock the potential of e-retail. They have struggled to overcome the challenge of making their digital environments as alluring as their stores." At the time of the Farfetch IPO, the luxury market remained highly fragmented, consisting of many private and family-owned brands and boutiques that have historically been reluctant to sell online.

28.     Farfetch describes itself as the "the leading global platform for the luxury fashion industry." The Company was founded in 2007 by Defendant Neves, and launched in October 2008 "as an e-commerce marketplace for luxury boutiques around the world," offering "products from 25 boutiques in 5 countries." This number more than doubled by 2010, when the Farfetch marketplace offered products from "over 64 boutiques." By 2014, its "partner network . . . include[d] over 300 boutiques in 35 countries." As of June 30, 2018, Farfetch reported it "had 989 luxury sellers on our Marketplace, of which 614 were retailers and 375 are brands."  Farfetch defined "luxury sellers" as "the retailers and brands which whom we have a direct contractual relationship to display and sell their products on the Farfetch Marketplace," i.e., third-party, or 3P, sellers.

**B.      Farfetch's IPO Value Is Based On Its Third-Party Marketplace Platform, Which Promised Explosive Growth Potential Without Inventory Risk**

29.     From its inception, Farfetch heralded its unique business model in which the Company provided a platform that boutiques and brands could utilize to sell their own goods to consumers around the world, allowing Farfetch to avoid taking on any inventory (and hence, risk)— entirely unlike its competitors. In the IPO Roadshow Presentation, discussed further below, Defendant Neves explained the Farfetch business model:

> *Farfetch exists to connect the world of fashion, really, to connect the curators, the creators and the consumers of fashion all around the world*. . . . In 2007, I was really looking for creating something that had an impact in the industry I love, in fashion.  And back then *it seemed clear to me that the industry needed a marketplace, a platform.*  That business model had not been applied to luxury fashion.

30.     In this sense, Farfetch was different than an ordinary retailer selling goods online. Farfetch's value lay in its ability to take advantage of the relatively recent e-commerce "platform" business model that had quickly dominated numerous industries. A platform is described by the authors of the book, <u>Modern Monopolies: What it Takes to Dominate the 21st-Century Economy</u> (2016), as:

> [A] business that connects two or more mutually dependent groups in a way that benefits all sides. Platforms are a *radical departure* from traditional business operations, most of which grew out of a twentieth-century mind-set that couldn't have imagined the level of connectedness we have today. In plain English, platforms allow consumers and producers to connect with each other and exchange goods, services, and information. By doing this, these businesses create new markets.

31.     The authors provide examples of innovative platform companies, such as eBay, Uber, and Airbnb, explaining that "[a]ll of these platforms created new markets and were able to grow their networks and businesses *to a size that was impossible* until very recently. The platform business model is now the key to some of the most successful companies on the planet."  Another author described how "The platform's overarching purpose: to consummate matches among users and facilitate the exchange of goods, services, or social currency, thereby enabling value creation for all participants." Parker, Geoffrey G., et al., <u>Platform Revolution: How Networked Markets Are Transforming the Economy and How to Make Them Work for You</u> (2016).

32.     Essential to Farfetch's marketplace platform model was the fact that Farfetch was the *facilitator* of sales between luxury consumers, on the one hand, and luxury boutiques or brands, on the other, but carried *no inventory*—and therefore incurred *little financial risk*.  The way

Farfetch earned money through its marketplace was by taking a percentage commission from each sale—a "take rate." Historically, Farfetch reported take rates of between 30% and 32%. This take rate was notably higher than those of many other platform businesses, such as Uber or Amazon. Based on this unique business model and Farfetch's role as a disruptive innovator in the fast-growing luxury fashion industry, between 2008 and 2018, Farfetch raised hundreds of millions of dollars in multiple series of private venture capital funding. Farfetch used that capital to maintain its original platform model while developing a broader suite of technology platform solutions for the boutiques and brands that sold products on its site.

33.     In March 2015, Farfetch was valued at $1 billion after receiving $86 million in a round of private funding.  This investment meant that Farfetch joined the "Unicorn Club"—according to *Vogue*, "an elite group of businesses that were started since 2003 and are valued at over $1 billion by public or private investors."  As reported in *International Business Times* in 2013, technology venture capitalist Aileen Lee coined the term "unicorn" to refer to start-ups achieving valuations at or above $1 billion "'because . . . these are very rare companies in the sense that there are thousands of startups in tech every year, and only a handful will wind up [with such a valuation]. They're really rare.'"

34.     Two months later, in May 2015, Farfetch acquired Browns (South Moulton Street) Limited ("Browns"), a London-based luxury boutique with two physical retail locations plus an online sales presence. Browns had sold its products on Farfetch's website for three years prior to the acquisition.  The acquisition was paid for in shares valued at just over $10 million. Farfetch painted the acquisition as consistent with its marketplace platform business model, describing the acquisition of a single boutique as a means to develop and test new retail and "omni-channel" technologies before rolling them out across the online platform's network of boutiques.  Farfetch

described the acquisition in a press release as an opportunity "to create a retail-tech incubator in which to develop innovative customer experiences." This communicated to investors that Farfetch's intent with the Browns acquisition was to test out new ideas and strategies, with the first-party retail sales Browns offered only a secondary benefit (and burden). Thus, Defendants described Farfetch's acquisition of Browns—and the market interpreted it—as an exception that did not evince a shift in strategy.

35.    Following the Browns acquisition, Farfetch enhanced its marketplace platform model with two additional business units:  (a) Farfetch Black & White Solutions, a service for luxury brands where Farfetch makes use of its platform to build another website and deploy whatever services or infrastructure the brand wants to use; and (b) Farfetch Store of the Future, a suite of connected in-store technologies to provide a digitally enabled, personalized physical shopping experience.  These businesses were designed as services for Farfetch's luxury third party sellers.

36.    Industry analysts and observers enthusiastically endorsed Farfetch's third-party marketplace platform model, with experts describing how the inventory-free model was vastly superior to (and likely to win out over) Farfetch's competitors.

37.    In February 2017, for example, *The Business of Fashion*[2] published an article written by influential luxury industry analysts Luca Solca and Simon Bowler—respectively the heads of luxury goods and general retail at investment bank BNP Exane Paribas—entitled "The Trouble with Yoox Net-a-Porter." In the article, Solca and Bowler compared the business model of Farfetch with that of its top online competitor, Yoox Net-a-Porter ("YNAP"), a "traditional

---

[2] *The Business of Fashion* is an influential online and print publication that, according it its website, is "recognised around the world for its authoritative, analytical point of view on the $2.5 trillion global fashion industry. Our mission is simple: build fashion's global membership community to open, inform and connect the industry."

wholesale business model that echo[s] traditional department stores, buying and pushing out merchandise to customers." Solca and Bowler determined that, in contrast to YNAP, Farfetch offered a "[n]ew model[] . . . that potentially fit[s] better with the strategies of luxury brands" because:

> Unlike established aggregator peers, *Farfetch is a platform player, aggregating the inventory of its boutique partners without holding any inventory itself*. Instead, Farfetch's algorithm directs orders to boutiques that hold the inventory and are linked to a local fulfilment network. An order placed by a customer is directed to a boutique based on proximity, cost of delivery and the boutique's fulfilment record.

> For the customer, there is very little immediate difference between using the Farfetch platform and the Net-a-porter platform. However, by partnering with boutiques — currently more than 400 — Farfetch is able to offer a wider selection of brands. At the same time, it benefits from the buying expertise of its boutique partners in effectively curating a relevant range. *With no inventory to manage, the cost of bringing new boutiques on board is minimal, restricted essentially to image processing and data mapping*.

38.     Farfetch's online platform continued to grow throughout 2017.  On June 13, 2017, *The Business of Fashion* reported that one of Farfetch's early investors, Conde Nast, closed its own fashion e-commerce site Style.com in order to forge a new strategic partnership with Farfetch. In return for an undisclosed sum (reported to be $12 million worth of Farfetch privately-held shares), Farfetch acquired Style.com's trademark, intellectual property and customer database.  In addition, Jonathan Newhouse, Chairman and CEO of Conde Nast, joined the Farfetch Board of Directors. Defendant Neves discussed the Style.com deal in an interview with *The Business of Fashion*, stating: "*It's a progression of the same strategy*; a strategy that aims to connect the best content in the world with the best commerce in the world.  *We see ourselves as a platform company*. *We're a technology platform and our aim is to connect the best people in this industry*."

39.     In early 2017, the news media reported that Farfetch was starting to seriously prepare for an IPO. On February 28, 2017, Natalie Massenet, the founder of Farfetch competitor Net-a-Porter (by this time, YNAP), announced that she was joining Farfetch as a non-executive co-Chairman. *The Business of Fashion* reported that "Massenet's appointment comes at a critical time for Farfetch, which is reported to be preparing for an IPO."  In an interview, Massenet explained Farfetch's progression from the YNAP model, concluding: "***In order to succeed in e-commerce today you have to be more of a platform***. And rather than starting something from scratch, it's much better to join the expert in the area."

40.     In December 2017, *The New York Times* published an article about the growth of online retail in the luxury fashion space entitled "Death of Retail? 2017 Was All About the Empire of Luxury E-Tail." *The New York Times* reported that Defendant Neves, in creating Farfetch, "chose to create an online marketplace platform helping smaller brick-and-mortar stores enter the digital world and taking a commission on each purchase, ***freeing himself from the need to take on the significant inventory risk and working capital requirements of a traditional store*** (and Yoox Net-a-Porter)."  Neves explained the Farfetch business model to *The New York Times* and how Farfetch set itself apart from other retail stores and YNAP: "***What makes us different is that everyone else is operating on a retail model, but we are a platform, not a shop, an enabler not a competitor, and are reaping all the advantages that such a position entails***. ***We believe we are the only global luxury platform at scale.***"

## C.     Farfetch Lays The Groundwork For An IPO, Promising Incredible Growth Without Inventory Risk

41.     In early 2018, as plans for an IPO solidified, more analysts began to value Farfetch by comparing it to its close competitor in the online luxury industry, YNAP. In January 2018, YNAP's largest shareholder, luxury goods holding group Richemont SA, made a public tender

offer to acquire the outstanding shares of YNAP at a total company valuation of approximately $6 billion. In light of the announcement, the news media closely assessed Farfetch and YNAP's business models as they related to valuation. For example, in a February 22, 2018 article titled "Luxury e-retailer Net-A-Porter doubles down on editorial content[,]" *Digital Commerce 360* wrote: "Unlike Net-A-Porter, Farfetch does not own any of the merchandise it sells, but rather provides an online platform where brands and fashion boutiques can sell. ***That means Farfetch takes on less risk than Net-A-Porter, which owns the merchandise it sells***." A key luxury partner of Farfetch stated that Farfetch was more of a technology company—and a very formidable one— than a fashion retailer: "Those people are the best in technology," she says. "It's like fighting against Amazon in fashion."

  42. A month later, on March 20, 2018, *Forbes* published an article entitled "Digital Luxury Fashion Marketplace Farfetch Is On A Roll To An IPO." The article noted that "Farfetch . . . is often compared to Yoox Net-a-Porter" and was "said to be headed toward a US IPO pegging its $6b valuation on that of Yoox Net-a-Porter," but noted: "The comparison of Farfetch and Net-A-Porter makes sense on the surface, but in digging a little deeper, ***the two companies have very different business models and strategies***." Specifically, *Forbes* explained:

> While both Farfetch and Yoox Net-A-Porter offer multi-branded luxe fashion selections, ***YNAP is a pure ecommerce retailer***, that controls the entire value chain, from the customer relationship, the product inventory and fulfillment and the digital presentation of the brands.

*****

> ***By contrast, Farfetch operates as a marketplace***, forging partnerships primarily with independent retailers that post selections on the Farfetch marketplace with the retailers handling fulfillment. Once products are sold, Farfetch takes a commission on sales.

> The difference with Net-A-Porter is marked. "It is important to think of Farfetch as more of a technology company than as a retailer," says Katie Smith of EDITED, the retail data analytics firm. "***They don't hold any stock, but are an aggregator.***

18

*It's a great point of difference in the market which enables them to have a huge assortment without the risks involved*."

43.     The article also quoted Mickey Alam Khan, editor in chief of *Luxury Daily*: "Since Farfetch drop-ships through its retail partners to most major cities worldwide, *it has no need for storing inventory, like a retailer. All it has to focus on is its marketing and building on its customer acquisition and retention, as well as technology*."

44.     Commentators noted that Farfetch's future success was ***dependent*** on the Company's adherence to its "capital light" marketplace third-party platform model where revenue was generated solely through commissions. On April 30, 2018, *Bloomberg* published an article entitled "Farfetch's Farfetched Valuation." The article explained how Farfetch was potentially seeking to launch its IPO at a valuation of $6 billion, and noted that the Company's marketplace platform—and associated "capital-light way of tapping into the fast-growing online luxury market"—were key to that valuation:

> [YNAP] apes a traditional department store. It buys stock and holds it until it is sold to customers. In contrast, the majority of Farfetch's business is selling products on behalf of boutiques, which pay it a commission on every item it shifts.
>
> \*\*\*\*\*
>
> At a possible valuation of up to 5 billion euros ($6 billion), ***investors would certainly be betting on [Farfetch] being capital light***. Gross merchandise value, orders and services including tax and shipping, was 550 million pounds ($757.7 million) in 2016, the most recent accounts available. If that rose to 1 billion pounds in 2017 -- not an unreasonable assumption given that GMV increased 82 percent in 2016 -- that implies an enterprise value to trailing sales of 4.3 times. That's well above YNAP's 2.4 times.

45.     The article specifically called out the risks to Farfetch's valuation from first-party sales where Farfetch would itself hold the inventory, questioned whether Farfetch's Browns acquisition in 2015 was a problem for the Company because the acquisition gave Farfetch "the same old problem of getting stuck with inventory." However, *Bloomberg* accepted Farfetch's

characterization of the Browns acquisition as an experiment to aid the development of its core marketplace platform model because it would "create a test bed for a division"—Farfetch Black & White—"that helps physical retailers use its technology." The article also observed favorably that Farfetch had "no plans to hold any more stock right now," i.e., had no plans to acquire any more first-party products for sale.

### D.    Farfetch Launches A Wildly Successful IPO Based On Its Unique Marketplace Platform And Achievement Of KPI Growth Targets

#### 1.    Farfetch Announces The IPO To Significant Fanfare

46.    On August 20, 2018, Farfetch filed with the SEC a Form F-1 preliminary prospectus in connection with plans to conduct an initial public offering of Class A shares. The filing indicated an expected deal size of $100 million, which was widely understood to be a placeholder amount while Defendants gauged the market's demand. In a press release filed the same day, Farfetch identified Defendants Goldman Sachs, J.P. Morgan, Allen & Company, and UBS as the lead book-running managers for the offering, Credit Suisse, Deutsche Bank, and Wells Fargo, joint bookrunners for the offering, and Cowen and BNP Paribas as co-managers.

47.    The announcement immediately received significant attention. On August 20, 2018, *Tech Crunch* reported that "Farfetch, the UK-based marketplace for high-end fashion and other luxury goods, has confirmed its plans to go public" and noted that expected valuations ranged from $6 billion to "as high as $8.37 billion after it lists." That same day, *Fortune* published an article discussing the IPO, noting that Farfetch is "gunning for an IPO that would value it at $5 billion." *Fortune* compared this valuation to that of Macy's—a company valued at $12 billion despite having revenues 60 times greater than Farfetch—and concluded that Farfetch's extraordinary valuation was based on the Company's identity as a technology platform for sales between third parties, not a first-party retailer:  "***That means Farfetch's IPO is being marketed***

*as that of a technology company, rather than a retailer. Indeed, the company describes itself as such in its prospectus*."

48.     Like numerous members of the news media before it, *Fortune* touted Farfetch's third-party inventory-free marketplace platform as providing unique appeal for the investment community: "***What makes Farfetch's business model appeal is that it does not own the inventory sold on its website, but instead offers the web site to help the brands sell.*** That means Farfetch is spared from the complexities of inventory management that can include dealing with overstocks."

49.     Also on August 20, 2018, *The Business of Fashion* reported on Farfetch's IPO plans, explaining that, while Farfetch's preliminary prospectus revealed that "its losses . . . appear to be widening" and its "[c]ustomer acquisition costs . . . rising," Farfetch was poised for growth, in particular because it was "investing heavily in upgrading its technology, ranging from data analytics to services retailers can deploy in stores to ease transactions and improve customer service." *The Business of Fashion* quoted an analyst who explained Farfetch's focus on its platform business: "'***Their priority is going to be basically a platform, a dedicated provider of technology and services***. That's where the margin is the highest and potential growth is the highest as well.'" The article also discussed insights from another analyst:

> Farfetch may not be profitable now, ***but the company's marketplace model should eventually pay off***, said Forrester analyst Sucharita Kodali. She pointed to Amazon, which is reporting consistently higher profits after years of losses.
>
> "***Marketplaces tend to be lucrative***, especially with the high margins in luxury fashion," she said. With traditional retailers that buy merchandise at wholesale value, brands themselves are left with a slim profit margin on their products. ***Farfetch, on the other hand, charges only a commission, therefore allowing brands to keep the bulk of their margin***.
>
> Despite its losses now, "there are plenty of opportunities for Farfetch to maintain growth," she added, ***as long as the retailer keeps its marketing costs down***.

## 2. Defendants Neves And Jordan Embark On A Two-Week International Roadshow To Increase Investor Demand

50.     On September 5, 2018, Farfetch filed an amendment to its earlier preliminary prospectus, which allowed the Company to begin its "roadshow" to market the IPO in a series of meetings, primarily with groups of institutional investors. The roadshow launched on September 6 and 7, 2018 in London, then turned to the United States, including New York, Boston, Chicago, Los Angeles and Kansas City, between September 10-19, 2018, ahead of pricing on September 20. During the roadshow, Defendants Neves and Jordan—Farfetch's two most senior executives—made presentations and answered investor questions.

51.     Farfetch's IPO roadshow was one of the most important parts of its IPO process because it was a principal way that Farfetch and the lead underwriters were able to market the IPO directly to institutional investors, and thereby increase investor demand for the Company's stock. Generally, to track demand for the Company's stock, during the roadshow, the lead underwriters built the "book" of orders for the IPO. The book contained the number of shares that each institutional investor wanted to purchase, as well as the price that each investor was willing to pay for the stock. Based on the orders in the book, at the end of the roadshow, Farfetch and the lead underwriters determined how many shares to sell in the IPO and the price per share. These determinations not only set the value of the IPO, but they also set Farfetch's initial market value as a company.

52.     In connection with its two-week long roadshow, Farfetch produced a video and slide deck for potential investors in which senior Farfetch executives, early investors, and brand partners described the business and its prospects (the "Roadshow Presentation").

53.     During the Roadshow Presentation, Defendants Neves and Jordan promoted the IPO by assuring investors that Farfetch's value was premised on the growth of its marketplace

platform. For example, Defendant Jordan stated that the Company was "*focus[ed] on being a technology platform for existing retailers*" with "*low inventory*," and Defendant Neves explained that Farfetch has "*a considerable advantage in terms of our competitive position [because] [i]t's very rare that a $300 billion industry has only one marketplace. Everyone else is a retailer*." Defendants also emphasized Farfetch's historic success and growth story through its KPIs, financial metrics that are markers for Farfetch's successful platform growth. These KPIs were directly related to the Company's third-party marketplace platform, and included its larger-than-average take rate (the commission it received from facilitating a sale between a brand or boutique and a luxury consumer); Platform GMV (the dollar value of all goods sold on the platform); Adjusted Platform Revenue (the revenue earned by Farfetch for the sale of goods on the platform); and Adjusted EBITDA (a non-GAAP metric that is primarily used to indicate a company's profitability).

54.     Defendant Neves began the Roadshow Presentation by explaining:

Farfetch exists to connect the world of fashion, really, to connect the curators, the creators and the consumers of fashion all around the world. . . . *[T]he industry needed a marketplace, a platform*. That business model had not been applied to luxury fashion. And to really cater for this industry, we had to build a platform with deep knowledge of technology, but also a deep love for fashion.

55.     Defendant Jordan spoke extensively on the Roadshow Presentation about Farfetch's business model and the Company's plans for future growth. Jordan emphasized the Company's focus on the technology used to fuel the marketplace platform business as the key to its success, and specifically described how Farfetch's third-party marketplace platform model imposed little inventory risk and required only a small amount of capital expenditure. He stated, unequivocally, that: "Farfetch is obviously a technology business, and the financial model, as you will see from the numbers, is all about investing in that technology and delivering growth within the luxury industry for our sellers."

56.     Jordan described how Farfetch's business model was focused on its take rate, and

faced *de minimis* traditional retail inventory risk:

> So, the model works in that as a luxury seller on our platform makes a transaction
> with our end consumer, Farfetch captures a revenue share of that, a take rate. ***So,
> our revenue is generated from connecting sellers and consumers together in a
> successful transaction***. For the time being the sort of ***primary driver of revenue
> within Farfetch is our platform, farfetch.com*** that now has over 2 million
> customers and close to a thousand sellers participating on the platform.
>
> *****
>
> Last year, the Farfetch platform grew to $894 million worth of GMV, and of that
> ***we took close to a 33 percent take rate to drive our revenues. So, the Farfetch
> business is very much focused on being a technology platform for existing
> retailers as they grow their sales online via Farfetch. This business model is low
> inventory***. ***The only inventory we take on is for the brands boutique. So again, a
> small portion of inventory, meaning no inventory risk across our third-party
> sellers***. That also means ***low CapEx***.

57.     Jordan specifically downplayed Farfetch's 2015 acquisition of Browns, which was

—referred to as the Company's "Stores" operating segment, characterizing that retail element to

be limited and immaterial to Farfetch's plans: "***There's no Stores to continue to develop or roll

out***. ***There's no growth in Stores within the plans for Farfetch and very little CapEx associated

because there's no warehouses and no fixtures and fittings on the back of that***."

58.     Jordan presented the following slide, which he described as "the Farfetch financial

strategy [that] has five very simple but very effective points"



59.     Jordan focused on improving the Company's EBITDA (which reflected that the Company was operating at a loss) as a key component of Farfetch's financial strategy, explaining that "the finance strategy, of course, is about delivering EBITDA growth," and noting that with "a business model that has negative working capital, as we receive funds from consumers on average 45 days before we remit them to our sellers, we have an ability to deliver a very strong free cash flow as the business becomes EBITDA positive in future years." Jordan concluded "EBITDA will be a primary driver of free cash flow moving forward."

60.     Jordan summarized the Farfetch financial strategy as being directly related to the Company's core KPIs—growth to the Company's currently negative EBITDA, increased GMV growth and sustained, high take rates. Jordan noted that: "*the industry can sustain the take rates at 30 percent for Farfetch*."

61.     In the Roadshow Presentation, Defendant Neves directly contrasted Farfetch and its third-party marketplace platform business with its retailer competitors in the luxury fashion space. In detailing Farfetch's unique value proposition and  lack of competition, Neves explained: "I believe the Farfetch model is extremely difficult to replicate. It took us 10 years to build the relationships we've built, to create the technology, the logistics, the data platforms that drive our business and to reach the scale we've reached."

62.     Farfetch featured Anna Wintour—artistic director of Conde Nast, a major Farfetch investor, and the well-known editor-in-chief of renowned fashion and lifestyle magazine *Vogue*— in the Roadshow Presentation.  Wintour compared Farfetch to two of the leading platform businesses in the world: Uber and Apple: "When we look at businesses like Farfetch, it's almost like electricity. It's a product that's incredibly useful. *I look at Uber or [] Apple, and to me, they're the same as Farfetch*."

63.     Defendant Neves ended the Roadshow Presentation by emphasizing the Farfetch

marketplace platform opportunity:

> Let's imagine this industry in 10 years' time. In 10 years' time, it will be at least a
> $450 billion dollar industry. We know that online sales are going to be at least 25
> percent of the market, from 9 percent today. This means that an incredible, very,
> very large opportunity is ahead of us, an opportunity just in online luxury of well
> over $100 billion. ***Who is going to take this $100 billion? Is it going to be a***
> ***retailer? Is it going to be a department store? Is it going to be a single brand or a***
> ***conglomerate of brands? At Farfetch, we believe it's going to be a platform and***
> ***at Farfetch we believe deeply that it is the destiny of this company to be the***
> ***category leader in this industry.***

### 3.      The IPO Exceeds Expectations, And Farfetch's Valuation Tops $8 Billion

64.     On September 19, 2018, the day the roadshow concluded, Farfetch filed a second

amendment to its registration statement.  Farfetch increased the number of shares being offered

for sale, from approximately 43 million shares to nearly 51 million shares, and increased the

expected pricing of the IPO to a maximum of $19 per share, in contrast to the maximum $17 price

listed prior to the roadshow. As reported that same day in *International Financing Review*, the

changes came "[a]mid heavy oversubscription levels[.]"

65.     The registration statement, as amended, was declared effective on September 20,

2018 (the "Registration Statement"). Farfetch's prospectus, dated September 20, 2018, was filed

with the SEC on September 24, 2018 (the "Prospectus" and collectively with the Registration

Statement, the "Offering Materials"). On September 20, 2018, Farfetch issued a press release

announcing that its initial public offering of 44,243,749 Class A common stock (33,609,891 shares

offered by Farfetch and 10,633,858 shares offered by certain selling shareholders) would be sold

for ***$20.00 per share***, far higher than the initial targeted price range of $15 to $17 per share.

Farfetch noted that the IPO's underwriters had a 30-day option to purchase up to an additional

6,636,562 Class A ordinary shares from Farfetch at the IPO price. According to the Company's

March 1, 2019 Form 20-F, the Underwriter Defendants did exercise that option, bringing the total number of shares sold in the offering to 50,880,311, valued at $1,017,606,220 at the offering price of $20 per share. The Offering Materials disclosed that following the IPO, Farfetch would have 256,637,577 Class A ordinary shares outstanding (including the underwriters' overallotment), and 42,858,080 Class B ordinary shares outstanding (owned solely by Defendant Neves).   The Company also announced that Farfetch's shares would trade on the NYSE starting on September 21, 2018 and the IPO would close on September 25, 2018.

66.     The Offering Materials echoed and expanded on the representations made in the Roadshow Presentation, and included several critically-important representations for investors seeking to understand Farfetch's marketplace platform business model and the sustainability and growth potential for its KPIs.

67.     In alignment with the Roadshow Presentation, the Offering Materials focused on Farfetch's marketplace platform, stating: "*We are a technology company at our core and have created a purpose-built platform for the luxury fashion industry*."  The Prospectus included a letter to investors from Defendant Neves, in which Neves described "[a] ten year journey to build the platform for luxury fashion," and concluded that "the luxury fashion industry needed a platform" and "[t]oday, *Farfetch is the only at-scale, global technology platform for luxury*."

68.     Farfetch reports its business and operations under International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board (the "IASB"). IFRS 8 provides instruction on how a public company must report its "Operating Segments" to investors. IFRS 8 Operating Segment disclosures help users of financial statements better understand a company's performance, better assess its prospects for future net cash flows, and make more informed judgments about the public entity as a whole. IFRS 8 also allows investors

27

to evaluate the nature and financial effects of the different business activities in which a company engages and the different economic environments in which it operates.

69.     Farfetch reported in the Offering Materials that the Company had divided its operations into four Operating Segments, as required by IFRS 8, based on information that was "reported to [Defendant Neves] for the purpose of assessing segmental performance and resource allocation." These four segments were: "the Marketplace (which operates the Farfetch.com marketplace website and app), Farfetch Black & White (a white-label website solution for luxury brands), Stores (operation of the Browns luxury boutiques) and Store of the Future (provision of technology solutions to retail outlets)." Farfetch stated: "The Marketplace represents over 90% of the Group's revenue, results and assets. As such the Group has presented only one reportable segment." This meant Farfetch would aggregate and consolidate all of its operations into one set of revenues, profits and losses, assets and liabilities, depreciation and amortization.

70.     Farfetch specifically described in the Offering Materials how its "marketplace business model . . . allows us to offer the broadest and deepest selection of luxury fashion available online globally, *while incurring minimal inventory risk and without capital-intensive retail operations*." It further explained that the model "allows for *low capital expenditures, favorable working capital dynamics, minimal inventory holding and an ability to drive stronger future margins than traditional inventory-taking business models*."

71.     Relatedly, Farfetch also touted its performance with respect to several of its KPIs and revenue-generating processes that were directly tied to its platform business. Specifically, Defendants described the importance of GMV, Adjusted Platform Revenue (later called Platform Services Revenue), Adjusted EBITDA, and take rates, to investors. The Company described certain KPIs as follows:

28

- "Gross Merchandise Value, or GMV, means the total dollar value of orders processed. GMV is inclusive of product value, shipping and duty. It is net of returns, value added taxes and cancellations. GMV does not represent revenue earned by us, although GMV and revenue are correlated."

- "Adjusted Revenue means revenue less Platform Fulfilment Revenue."

- "Adjusted Platform Revenue means Adjusted Revenue less Browns In-Store Revenue."

- "Platform Fulfillment Revenue means revenue from shipping and customs clearing services that we provide to our consumers, net of consumer promotional incentives, such as free shipping and promotional codes." (Later in the Offering Materials, Defendants stated: "To facilitate and grow our platform, we provide fulfilment services to Marketplace consumers and receive revenue from the provision of these services, which is by and large a pass-through cost with no economic benefit to us, and therefore we calculate our Adjusted Revenue excluding Platform Fulfilment Revenue.")

- "Third-Party Take Rate means Adjusted Platform Revenue excluding revenue from first-party sales, as a percentage of GMV excluding GMV from first-party sales and Platform Fulfilment Revenue."

- "Adjusted EBITDA[,] [defined] as loss after tax before net finance costs/(income), income tax expense/(credit) and depreciation and amortization, further adjusted for share based compensation expense, other items and share of results of associates. We define Adjusted Revenue as revenue less Platform Fulfilment Revenue."

72.    The Company reported financial results for these historical KPIs for 2015, 2016, 2017 and the 6 months ended June 30, 2018 and June 30, 2017:

| | Six months ended June 30, | | Year ended December 31, | | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2015 | 2016 | 2017 |
| | | (in thousands, except as otherwise noted) | | | |
| **Selected Other Data(1):** | | | | | |
| **Consolidated Group:** | | | | | |
| GMV | $394,506 | $631,235 | $381,809 | $585,842 | $909,826 |
| Revenue | 172,571 | 267,508 | 142,305 | 242,116 | 385,966 |
| Adjusted Revenue(2) | 138,811 | 216,957 | 113,688 | 193,605 | 311,784 |
| Adjusted EBITDA(2) | (13,972) | (49,075) | (47,375) | (53,380) | (58,079) |
| Adjusted EBITDA Margin(3) | (10.1%) | (22.6%) | (41.7%) | (27.6%) | (18.6%) |
| **Platform:** | | | | | |
| Platform GMV | $387,175 | $624,044 | $374,915 | $573,174 | $894,392 |
| Adjusted Platform Revenue(2) | 131,480 | 209,766 | 106,794 | 180,937 | 296,350 |
| Platform Gross Profit(4) | 90,494 | 133,587 | 69,355 | 111,762 | 196,581 |
| Platform Order Contribution Margin(4) | 46.7% | 44.0% | 33.0% | 35.0% | 43.0% |
| Third-Party Take Rate | 33.7% | 31.7% | 30.0% | 31.3% | 32.9% |

73.     The above results reflected a robust and consistent take rate of at least 30%, and Adjusted Revenue and Platform GMV that had more than doubled between 2015 and 2017.

74.     Farfetch also made representations communicating to investors that the Company's growth would be organic and the result of its superior technology, marketing and Farfetch brand, and would not come through short-term promotions and discounts. The use of promotions and discount codes were heavily scrutinized in the luxury market given the rarefied quality of the goods.  Consulting firm Accenture wrote in a 2011 article "that luxury retailers still face many potential pitfalls in their pursuit of growth. *While promotions and discounting can boost their financial performance, especially in the short term, there are dangers in using these tools haphazardly*. Loss of margin and prestige among more traditional luxury shoppers, for instance, are a real concern."  Accenture warned that "[t]he losers in this recession will be the ones who destroyed their brand through the discount model."

75.     Aware of these pitfalls, the Company stressed that it offered only periodic discounts and promotions. The Offering Materials stated that "[p]romotional incentives, which include basket promo-code discounts, may *periodically* be offered to end consumers," and further: "Promotional incentives may be *periodically* offered to consumers. *When we bear the costs of promotional incentives, these costs are recognized as deductions to revenue.*"

76.     Farfetch credited its marketplace platform model as providing a unique value proposition for consumers—with the implication that such features would insulate the Company from pricing pressures and the need for more than "periodic" sitewide promotions. For example, in his letter included in the Prospectus, Defendant Neves contrasted Farfetch's process of attracting consumers via "[c]uration" to the "price-driven" practices of its competitors. Indeed, Farfetch listed *"[c]uration of supply*" as one of four key "[b]enefits for [o]ur [c]onsumers" in the Prospectus

30

summary—along with "[g]lobal access to an unparalleled range of luxury merchandise," "[l]uxury consumer experience," and "[p]ersonalization and inspiration."

77.     Similarly, Farfetch claimed that it had "cultivated [its] consumer base and [had] strong customer loyalty," and further that it would "[a]ttract[] new consumers" by offering them "global access to luxury products that are tailored to local market trends and tastes"—with particular emphasis on the emerging luxury goods market in China. Farfetch also claimed, among other things, that the online personal luxury goods market in which it operated was "[l]arge, stable and resilient" (meaning it had grown rapidly and would continue to do so), and that the Company's wide-ranging relationships with luxury sellers "act[ed] as a significant barrier to entry" against competition.  Farfetch also noted that it had "created a significant competitive advantage and economies of scale" through its proprietary logistics network that "provide[d] an unparalleled luxury experience." As Farfetch explained: "Consumers choose our Marketplace because they trust we will deliver a consistent, high-quality experience from start to finish, while being able to access [thousands of] different brands."

78.     Farfetch stated that it intended to "use the net proceeds from this offering and the concurrent private placement for working capital, to fund incremental growth and other general corporate purposes, including possible acquisitions." However, the Prospectus stated that the Company "[did] not currently have any definitive or preliminary plans with respect to the use of proceeds for such purposes." Taken together with Defendant Jordan's Roadshow Presentation statement that "[t]here's no growth in stores within the plans for Farfetch," the Company led investors to believe that there were no plans to increase Farfetch's  first-party retail sales through acquisitions like the earlier Browns acquisition in 2015, which Farfetch indicated was an outlier meant to support development of its retail technology.

79.     Rather, in his letter, Defendant Neves explained: "*We plan to continue investing aggressively in R&D. That, and growing our brand across geographies and categories, will be the focus of our investments in 2019 and beyond*." Consistent with Neves' statement, the Offering Materials detailed how the "key elements of [Farfetch's] growth strategies" were expanding the platform and deepening Farfetch's investment in technology.

80.     On September 21, 2018, Farfetch began trading. It opened at $27 per share, and traded as high as $30.60 per share—*53%* higher than the offering price—before closing at $28.45, approximately 43% above the offering price announced the day prior. Including the underwriters' overallotment, the IPO raised over $1 billion at the offering price, and those shares were valued at approximately $1.45 billion by the close of trading on September 21, 2018. At that price, Farfetch's total valuation, taking into consideration all of the Company' outstanding shares, reached *above $8 billion*.

### 4.     Analysts Embrace Farfetch's $8 Billion Valuation Based On Its Third-Party Marketplace Platform Model And Positive Key Performance Indicators

81.     Press coverage of Farfetch's IPO was universally positive. For example, *CNBC.com* reported on September 21, 2018 that "[s]hares of London-based luxury online marketplace Farfetch surged as much as 53 percent in their market debut as investors placed their bet on the company's technology and unique niche in high-end luxury." *CNBC* explained: "With a $6.2 billion market price [based on the $20 IPO price] and $385 million in 2017 revenue, Farfetch is trading at a richer valuation than Amazon, JD.com as well as other traditional retailers." It further attributed Farfetch's generous valuation to its marketplace platform model, stating that "'[m]arketplace' companies often trade at a higher premium than traditional retailers, because they don't carry the risk [of] being stuck with unwanted product" and that Farfetch's "marketplace business model *alleviates its inventory risk*[.]"

32

82.     That same day, *Forbes* published an article praising Farfetch's value as an inventory-free platform in an article titled "Is Farfetch Founder Neves The Jeff Bezos of Fashion?" *Forbes* wrote that, unlike Amazon, which had to "build mammoth physical warehouses and infrastructures," "Neves' Farfetch is a ***pure-play platform*** where its value is based upon creating 'value by facilitating exchanges between two or more independent groups, usually consumers and producers.'" *Forbes* described how "***Farfetch never takes physical control of the products it sells***" and stated that it "[foresaw] great possibilities for Farfetch in the future. ***[Its] platform business model is the key to that success***."

83.     Several analysts initiated coverage of the Company once the post-IPO "quiet period" expired. Citing the economics of Farfetch's "disruptive" low-inventory platform, analysts overwhelmingly issued "buy" recommendations with price targets near Farfetch's $28.45 day-one closing price—even though Farfetch had never turned a profit during its ten years of existence. These analysts attributed Farfetch's success and growth potential to the same factors that were touted by Defendants in the Roadshow Presentation and Offering Materials: (a) Farfetch's model as a marketplace platform without inventory risk, setting it apart from wholesale or retail luxury vendors; (b) Farfetch's high, sustained take rates, which directly impacted Adjusted Platform Revenue; (c) Farfetch's explosive Platform GMV growth; and (d) the Company's plan to improve its Adjusted EBITDA, a key indicator of profitability, over the following year.

84.     For example, in an analyst report on October 16, 2018, entitled "FTCH: When E-Comm Meets Luxury, Initiating At Outperform," analysts from Wells Fargo explained: "FTCH appears to be extremely well positioned in the market today, as digital is beginning to transform the luxury space and there currently is not (but likely will need to be) a global platform for curated aggregation of the best luxury brands/retailers."   Among other things, Wells Fargo praised

33

Farfetch's high GMV growth rate and accelerating market-share gains, and explained that, while Farfetch was losing money at the time, "***the economics surrounding their marketplace model . . . present very compelling long-term margin opportunities***." Specifically, Wells Fargo described how third-party sales—which comprised the "vast majority of FTCH's transactions"—provided the Company "an extremely high-margin revenue stream (***since FTCH does not own the inventory and does not record the [cost of goods sold] related to the merchandise***)." It further explained that, "[e]ven when factoring in the slightly dilutive first-party . . . transactions, the Farfetch Platform generates a [gross margin] in excess of 60% (which we believe can rise to 70% over time)."

85.    In an October 16, 2018 Cowen and Company ("Cowen") analyst report entitled "Initiate: Farfetch Shares Would Look Luxurious in the Portfolio," Cowen set a price target of $27 and explained that "FTCH, a leading tech platform for global luxury fashion, is well positioned via its marketplace to consolidate the fragmented $300BN luxury market." Cowen explained how "[t]he Marketplace model allows Farfetch to offer the greatest global selection of online luxury fashion, ***with small inventory risk and without capital intensive retail operations***." The report also emphasized Farfetch's high take rates, gross profit margins, and average order value. Cowen directly compared Farfetch to competitors like YNAP, writing that Farfetch's minimal inventory risk and ability to easily scale set it apart:

| FARFETCH Vs. | NET-A-PORTER M'ODA 'OPERANDI  |
|---|---|
| Minimal inventory risk | Owns 100% inventory |
| More breadth and depth | Curated assortment |
| Easily scalable | Focused and disciplined growth |
| Global fulfillment network | Localized services |
| Network effects | Core consumer engagement |

86.     Analysts at UBS likewise initiated coverage with a "Buy" rating on October 16, 2018.  UBS set a $28 price target, explaining that Farfetch's economics were consistent with a "flywheel" marketplace platform model—"whereby scale begets more scale (i.e., Amazon, online travel agencies, Uber, Airbnb, etc.)" UBS also explained that, while "Farfetch periodically offers discounts or promotions on items to drive sales," the use of such promotions to drive sales would *decline*, stating: "[I]ncreased brand awareness"—i.e., the exact initiative Farfetch stated it would undertake in its Offering Materials—"and effective marketing & customer acquisition spend *should reduce the need for promotional activity over time which in the past has often been tied to new customer acquisition*[.]"

### E.     Defendant Neves Retains Control Over Farfetch, With Stock Valued Over $1.2 Billion

87.     Farfetch has a dual-class share structure that allows Defendant Neves to retain complete control of the Company.  As documented in the Offering Materials, Neves owned all of the Company's 42,858,080 shares of Class B stock through an Isle of Man holding company.  Each Class B share enjoys 20 times the voting rights of Class A shares—giving Neves super-majority control, with more than 77.4% voting power over Farfetch—and yet remain liquid because they are convertible to Class A common stock at Neves' discretion.  Valued at the first-day closing

price of $28.45 per share, Neves' Class B shares were worth $1,219,312,376, nearly the entire value of the shares offered to the public.  Neves was also awarded 875,000 Class A shares through the IPO, meaning he had, in total, a 14.8% ownership interest over the Company.

88.     At the close of the IPO, Defendants Jordan and Robb, along with certain Board Members and related parties, owned 73.6% of the Company and held 19.3% of the voting power.  Public shareholders, by contrast, owned 11.6% of the Company with only 3.1% of the voting power:



89.     *Bloomberg* reported on September 21, 2018 that Neves, "[t]he founder of online luxury goods hub Farfetch Ltd.[,] has bagged a billion-dollar fortune"—which placed him in a rarefied group alongside select fashion billionaires like Bernard Arnault (of LVMH) and Amancio Ortega (of Zara). On July 2, 2019, *Forbes* announced that Neves was by then considered the fourth richest person in Portugal.

90.     Defendant Neves was not the only Executive Defendant to become incredibly wealthy from the IPO.  Defendants Robb and Jordan owned 1,757,971 and 701,528 shares of Class

A common stock at the close of the IPO.  Based on the opening day closing price, these shares were valued at $50,014,275 and $19,958,471 respectively, on September 21, 2018.

**F.      Post-IPO, Defendants Continue To Represent That Farfetch's Marketplace Platform Model Is The Key To Its Growth Strategy And Financial Performance**

91.      On the first day of trading following the IPO, Defendant Neves spoke to the media to promote Farfetch's marketplace platform and emphasize that Farfetch carried ***no inventory***. In a video interview with *Bloomberg* that was embedded in a September 21, 2018 article published on *Bloomberg.com*, titled "Online Luxe Goods Hub Farfetch Climbs After $855 Million IPO," Neves explained Farfetch's inventory-light business model, stating: "[T]he idea is as we expand our network of brands and boutiques is really to leverage Farfetch's distributed inventory model because ***we are not a retailer – we don't own inventory***."  Neves also went on *CNBC* on September 21, 2018, and described how the Company was going to continue building out its marketplace platform: "We've been . . . over 10 years building a platform for luxury fashion, for boutiques, for brands and for consumers, ***and that's what we are going to continue to do***."  And Farfetch Director (and Securities Act Defendant) Danny Rimer appeared on *Bloomberg Business* to discuss the IPO on September 21, 2018.  During that interview, he responded to the question "Are you actually holding inventory or are you just connecting with the actual sellers?" by unequivocally stating: "***There is no inventory in the case of Farfetch***."

92.      In the months that followed the IPO, Defendants continued to press the narrative of Farfetch's focus on its platform-based marketplace model and the "flywheel" effect it would have on growth.  Defendant Neves summarized this concept at the start of the Company's first earnings conference call on November 8, 2018:

> ***A key differentiator of Farfetch is the self-reinforcing network effect of our marketplace***. The more brands, boutiques, and department stores we have in our marketplace, the more consumers turn to us; which, in turn, generates increased

sales for our sellers, attracting additional sellers and supply points to the platform, and so on. ***This is a powerful flywheel that we believe will enable us to be the category leader in a winner-takes-most market over the long term***.

93.    In the Company's third quarter earnings release, filed with the SEC on November 8, 2018, and during its conference call that same day, Farfetch reported positive financial results and KPIs for the third quarter, including:

| **KPI** | **Third-Quarter 2018** |
|---|---|
| GMV | $309,973[3] |
| Platform GMV | $305,884 |
| Platform GMV Growth (YOY) | 52.7% |
| Revenue | $132,179 |
| Platform Fulfillment Revenue | $21,799 |
| Adjusted Revenue | $110,380 |
| Browns in-store Revenue | $4,090 |
| Platform Services Revenue | $106,290 |
| Platform Services Revenue Growth (YOY) | 60.7% |
| Third Party Take Rate | 31.9% |
| Adjusted EBITDA | ($32,211) |
| Adjusted EBITDA Margin | (29.3%) |

94.    Defendant Jordan discussed the Company's performance in his opening remarks on the November 8, 2018 call, highlighting what he called "strong momentum in platform GMV," which increased 53% year-over year, and reiterating that the Company "continue[d] to expect

---

[3] Dollar figures in thousands, unless otherwise noted.

strong order growth." An analyst from J.P. Morgan asked Defendant Neves to comment on potential uses for the IPO capital and "highlight the top three investments as you're going into 2019." Neves responded that the Company's top investments were (a) "investments in technology"; (b) "build[ing] the Farfetch brand"; and (c) customer "retention and loyalty." Neves made no mention of acquisitions of any kind, or growth of the Company's first-party business, as uses of IPO capital or components of Farfetch's growth strategy.

95.     While Defendants did not report first-party sales numbers to investors, on the third quarter earnings call, Defendant Jordan did mention that Farfetch had "delivered remarkable growth on the platform from our first-party business . . . . During the third quarter, these sales grew at about 3 times the platform average from a small base." A Wells Fargo analyst picked up on that statement, and asked specifically about the interplay between the increase in first-party sales and the decrease in the Company's gross margin. In response, Defendant Jordan was quick to downplay the first-party business, stating: "Now, obviously, it's still quite small when you compare it to the overall marketplace." He further explained: "Over the longer term, [first-party sales are] going to moderate back to 5% overall. And the growth rates will return back in line with the overall growth rates of the platform."

96.     Analysts and the media credited Defendants' representations. In response to Farfetch's third-quarter 2018 earnings release, analysts from Wells Fargo issued a report on November 9, 2018, titled "So Far(fetch), So Good; GMV Momentum Continues in Q3," which reiterated their "Outperform" rating and $30 price target. In the report, the analysts touted Farfetch's "very strong results that demonstrate the momentum in the business, the strength of their operating model and the robust long-term opportunities available to the company"— including "remarkable" GMV growth and the attraction of a "large number of new customers"—

and concluded: "we continue to believe that FTCH has extremely compelling long-term opportunities (both in terms of GMV growth and generating solid margins)[.]" J.P. Morgan likewise reiterated its "Overweight" rating and $27 price target, citing, among other things, "FTCH's marketplace leadership position," "upside in both GMV & revenue," and "better than expected take rate."

97.     Investors also reacted positively to Defendants' third quarter results.  In response to the release and conference call, Farfetch's stock rose over 5.5%, from a close of $22.05 per share on November 8, 2018 to close at $23.27 per share on November 9, 2018, on heavy trading volume.

98.     A little over three months later, on February 28, 2019, Farfetch released its fourth quarter and full year 2018 results. In the press release, the Company projected both first quarter and full year 2019 Platform GMV to "grow approximately 40%" year-over-year. On the Company's earnings call with investors and analysts that same day, after the market closed, Defendant Jordan touted fourth quarter and full year 2018 Platform GMV growth rates of 51% and 56%, respectively, with Defendant Neves extolling Farfetch's "*unwavering execution of our growth strategy*." Neves also highlighted that "Farfetch is growing faster than any other company in luxury." Neves then indicated that "recent milestone achievements represent an acceleration of that strategy in 2019 to deliver even higher, more sustainable growth in 2020 and beyond." Finally, Neves credited the Company's "superior" business model for the growth, stating that "[t]he sustained high growth at scale is *a function of the network effects enjoyed by our superior Marketplace model*."  Farfetch's Form 20-F filed the following day likewise touted the Company's "[p]owerful network effects" and discussed the "self-reinforcing, mutually beneficial network effect" between growth in the numbers of consumers and unique sellers on the Marketplace.

Defendant Jordan also stated that Farfetch had "more active customers than . . . previously anticipated as we exit 2018," and that "[l]ooking at revenues derived from our Platform GMV, *our Q4 platform services revenue, which excludes fulfillment revenue and Browns in-store revenue, grew 68% year-on-year as a result of the stronger GMV growth and a stable third-party take rate of 32%.*"

99.     In the Company's fourth quarter and year-end earnings release and subsequently filed Form 20-F for 2018, filed with the SEC on February 28, 2019 and March 1, 2019, respectively, and on the Company's February 28, 2019 earnings call, Farfetch reported positive financial results and KPIs for the fourth quarter and year-end, including:

| **KPI** | **Fourth-Quarter 2018** | **Full-Year 2018** |
|---|---|---|
| GMV | $466,490 | $1,407,698 |
| Platform GMV | $462,176 | $1,392,104 |
| Platform GMV Growth (YOY) | 50.6% | 55.6% |
| Revenue | $195,533 | $602,384 |
| Platform Fulfillment Revenue | $25,444 | $97,794 |
| Adjusted Revenue | $170,089 | $504,590 |
| In-store Revenue | $4,314 | $15,595 |
| Platform Services Revenue | $165,775 | $488,995 |
| Platform Services Revenue Growth (YOY) | 67.9% | 65% |
| Third Party Take Rate | 32% | 32% |
| Adjusted EBITDA | ($14,575) | ($95,960) |
| Adjusted EBITDA Margin | (8.6%) | (19.0%) |

100.    On December 12, 2018, less than three months after the IPO, Farfetch announced its acquisition of Stadium Goods—a consignment reseller of rare and limited-edition sneakers and streetwear products—for $250 million, payable in a mix of cash and shares. That acquisition closed in January 2019. In a separate press release filed with the SEC on February 28, 2019, the same day Farfetch announced its fourth-quarter and full-year 2018 results, the Company revealed yet another acquisition: the purchase of Toplife from JD.com (China's largest retailer, and indirectly a large Farfetch shareholder) for $50 million, which was pegged as an "expansion of [Farfetch's] strategic partnership" with JD.com.

101.    During the February 28, 2019 earnings call, Defendants discussed Farfetch's acquisitions of Stadium Goods and Toplife, and analysts began to question how Farfetch's recent acquisitions of Stadium Goods and Toplife related to (and might impact) its organic growth strategies.  On the February 28, 2019 earnings call, when asked specifically whether he could "quantify" the "Stadium Goods timing and contribution" for 2019 growth, Defendant Jordan refused to answer, stating that "we're not going to [break out] the numbers, it's included within that 40% year-on-year GMV growth that I talked about earlier on."  When further pressed regarding "how much of the upside in GMV you're seeing is through your own efforts," Defendant Neves responded indirectly, stating that "we're focusing the teams on really capturing this opportunity and using our strength, our technology, our product mix, our customer acquisition proficiency, to really deliver what is I think incredible growth."

102.    These acquisitions and the Company's increase in reported first-party revenue led a Wells Fargo analyst to inquire once more into Farfetch's commitment to its prior-stated "philosophy on 1P" that that business would occupy at most 5% of sales long-term. In response, Defendant Neves yet again downplayed the Company's reliance on first-party business revenue,

42

painting Farfetch's recent uptick in first-party sales as an aberration and explaining that Farfetch's philosophy was to use its small first-party sales as a "surgical tool" to "create buzz in the Marketplace" and to garner "a wealth of data on what's happening in the Marketplace."  Neves also reaffirmed that "long term[,] [first-party sales] will be single digits" and Farfetch would "be [a] 90%-plus third-party business."

103.    Based on Defendants' representations, analysts had a strong positive reaction to Farfetch's 4Q and full-year 2018 results. For example, Wells Fargo issued an analyst report on March 1, 2019, reiterating its "Outperform" rating and $30 price target, noting that "the company generated exceptionally strong top-line results that handily beat expectations" and noting that "luxury shoppers are migrating to the site in an extremely rapid manner (active customers +45% YoY . . . )," which Wells Fargo attributed to "FTCH's unique positioning as the only global, curated marketplace for luxury goods." For its part, J.P. Morgan reiterated its "Overweight" recommendation on March 1, 2019, and raised its price target by more than 10%, from $27 to $30, noting that "Farfetch posted strong 4Q results" and that the Company's GMV, Platform Services Revenues, and take rates all beat J.P. Morgan's expectations. And Deutsche Bank reiterated its "Buy" rating on March 1, 2019, increasing its price target from $28 to $31 and noting that "Farfetch delivered a strong quarter, and guided to stronger than expected growth in 2019." Deutsche Bank explained its upwards forecast revision on grounds that Farfetch was "a unique asset" because it was "the ***only pure-play luxury marketplace with global scale***, long-standing brand/boutique relationships within a fragmented market that give it a large supply advantage, and a compelling business model ***with healthy take-rates*** and LTV/CAC unit economics."

104.    Investors once again reacted positively to Defendants' fourth quarter and year end 2018 earnings.  In response to the release and conference call, Farfetch's stock rose over 21.1%,

from a close of $24.50 per share on February 28, 2019 to close at $28.82 per share on March 1,

2019, and up to $29.69 on the next trading day, March 4, 2019.  These increases all occurred on

heavy trading volume.

105.    Defendants continued to assure investors of Farfetch's commitment to its third-

party marketplace platform business model and growth strategy throughout the second quarter of

2019.  Indeed, Defendant Robb went so far as to state unequivocally that Farfetch bought no

products—i.e., carried ***no inventory***.  On April 17, 2019, in an interview with Defendant Robb

published in *Luxus+ Magazine*, Robb was asked: "What makes Farfetch so successful?"  He

responded: "***Our approach is different to traditional e-Commerce or offline retailer.  For***

***instance, we do not buy any products***, but instead, we aim to connect the world's existing supply

of luxury fashion with the demand anywhere in the world."

106.    On May 15, 2019, the Company reported its first quarter 2019 results. Defendants

painted a largely positive picture. In the Form 6-K press release, Defendant Neves stated:

> Farfetch enjoyed excellent growth in first quarter 2019, with Platform GMV rising
> 44% to $415 million, or approximately 50% growth on a constant currency basis.
> This outpaced both our expectations and, by some distance, growth in the online
> personal luxury goods sector as we continued to gain market share.

107.    Defendant Jordan stated:

> I am very pleased with the strong start we have made to the year, with the first
> quarter 2019 results demonstrating a well-executed quarter. Our rapid growth,
> which far exceeds the growth of the online luxury industry, enables our continued
> investment in both nearer-term customer engagement and longer-term platform
> development, underpinning our continued future growth. Moreover, we also
> delivered Adjusted EBITDA margin in line with expectations.

108.    Defendants' earnings release raised some questions about the Company's ability to

sustain growth without the contribution of first-party retail revenue, however.  During the May 15,

2019 conference call, Defendant Jordan revealed that Farfetch's first party GMV "grew over 76%

year-on-year," due primarily to "the Browns first-party business and the inclusion of Stadium

Goods first-party sales for the first time." During the conference call, Defendant Neves further announced a "new business model," "1PO," centered around Stadium Goods' in-house brand. Neves explained that Farfetch would "invest[] behind the Stadium Goods brands and launch it as a streetwear brand in its own right," but stressed the small size of that line of business.

109. In the Company's first quarter 2019 earnings release, filed with the SEC on May 15, 2019, and during the Company's conference call that same day, Farfetch reported positive financial results and KPIs for the third quarter, including:

| KPI | First-Quarter 2019 |
|---|---|
| GMV | $419,273 |
| Platform GMV | $414,737 |
| Platform GMV Growth (YOY) | 43.7% |
| Revenue | $174,064 |
| Platform Fulfillment Revenue | $27,690 |
| Adjusted Revenue | $146,374 |
| In-store Revenue | $4,536 |
| Platform Services Revenue | $141,838 |
| Platform Services Revenue Growth (YOY) | 43.2% |
| Third Party Take Rate | 30% |
| Adjusted EBITDA | ($30,236) |
| Adjusted EBITDA Margin | (20.7%) |

110. Analysts largely credited Defendants' positive representations about the Company's GMV and other top-line results, as well as the robustness of Farfetch's growth

45

opportunities due to its stated business model. For example, UBS reported that "we view FTCH's Q1'19 earnings report as *reinforcing a few key narratives* - FTCH continues to produce upside to GMV/rev estimates as its *platform scales* and *marketing investments yield an uptick in new and retained customer activity*," and specifically called out Farfetch's Platform GMV growth, increase in active customers, and "[p]ositive mgmt. commentary on strategic initiatives . . . driving higher customer retention and engagement."

111.    Other analysts had similar reactions. Oppenheimer noted that Farfetch's "EBITDA beat consensus views," and cited, among other strengths, Farfetch's "[f]irst-quarter 2019 GMV" which "exceeded Street expectations that were above the high end of the guidance," concluding: "In our view, FTCH mgmt. has several levers to continue impressive growth and improve on its market-leader position." Similarly, Deutsche Bank maintained its "Buy" rating and price target based on a "premium EV/revenue multiple [that] reflects the company's industry-leading top-line growth and durable competitive advantages in the online luxury space." J.P. Morgan reiterated its "Overweight" rating and $30 price target on account of Farfetch's "strong" Platform GMV growth and its view that "FTCH is a unique asset with a significant growth opportunity, multi-year first-mover advantage with multiple barriers to entry . . . [and] *30%+ take rate* that supports leverage at scale." And Wells Fargo explained that, "[a]t a high-level, *the model continues to work*, as industry-leading top-line (+50% GMV grown in [constant currency]) is being fueled by robust investment back into their customer base (FTCH's active users grew a remarkable +64% in 1Q)"— concluding that "*we see the scalability of the model that can develop over time*" and "[w]e reiterate FTCH as a 'Top Pick' in our space and remain very bullish on the company's growth prospects."

112.    In the days and weeks following the May 15, 2019 earnings release, Defendants continued to emphasize the purported strength of Farfetch's business model, growth strategy and achievement of its KPIs. For example, during the May 16, 2019 J.P. Morgan Global Technology, Media and Communications Conference, in response to a questions from an analyst asking "how [Farfetch] compare[s] to Yoox Net-a-Porter," Defendant Neves explained that a comparison of the two companies was "*really a retailer versus marketplace situation*." Neves differentiated Farfetch as having a "completely a different business model" because the brands selling on Farfetch sell "their [own] inventory," which allows the brands to be "in control of pricing and markdown cadence[.]"  Neves emphasized that, *unlike with "[Yoox Net-a-Porter who] will place orders on wholesale . . . over 95% of our revenue comes from Marketplace. And so essentially, it's completely a different business model*."

113.    On June 12, 2019, less than two months before the end of the Class Period, Defendant Jordan spoke at the Deutsche Bank dbAccess Global Consumer Conference.  Jordan spoke extensively about Farfetch's "growth strategy."  Farfetch also distributed a slide presentation to accompany Jordan's appearance.  In his speech and accompanying presentation, Jordan identified four aspects to the Company's "growth strategy," each of which used Farfetch's "Platform As An Enabler." These strategies included:

- "Continuing to invest in new technologies and innovation," including primarily for "Third Party Marketplaces;"

- "Building Farfetch Brand Awareness;"

- "Increasing product supply and our luxury seller base," by "Adding brands, retailers, department stores, other partner;" and

- "Leverage strong consumer economics" through "Demand generation" and "customer retention."

47

114.    Defendant Jordan also spoke about the recent Stadium Goods acquisition and integration, and noted how it was consistent with Farfetch's core marketplace platform model, and did not reflect a shift to a heavier focus on "1P" selling.  Specifically, Jordan emphasized that both Farfetch and Stadium Goods "operate under predominantly 3P business" with only "small 1P businesses within each marketplace." Jordan also explained that Farfetch's "pure economics are probably the most appealing" because "[a] *brand will pay us a 30% take rate*" whereas "a retailer, that business will want 50% gross margins on the products, minimum," "so the brand keeps 20% of the ticket price more selling via Farfetch than selling via one of our competitors online."

115.    Jordan further explained one of Farfetch's strengths was its appeal to luxury brands who wanted to protect their products from markdowns by traditional retailers: "[B]ecause [the brand] own[s] the product under the 3P model, *the brand can set the price on our website is what they want to sell it for, including when they go to markdown and how much that markdown might be*"—but that "[o]nce they've sold to one of the online retailers, they lose full control over that because the online retailer owns the product and can set price and the markdown schedule."

## G.    Unknown To Investors, Defendants Misrepresented Farfetch's Business Model And Growth Strategy

116.    While Defendants planned for the IPO for at least 18 months, Farfetch concealed that revenues derived from the Browns luxury boutiques had become an increasingly important part of the Company's overall financials. Indeed, revenue generated from the Company's Browns retail business secretly totaled *one-sixth* of the Company's total revenues in 2017, and shot up to *nearly one-fifth* of those revenues in 2018.

117.    Defendants misled investors about Farfetch's reliance on first-party sales, however, because that first-party business had limited growth potential and carried with it inherent risks related to gross margins, inventory, capital expenditures, and cost of goods—and therefore was

antithetical to the third-party marketplace platform vision that Defendants marketed to investors. Indeed, Farfetch's reliance on first-party retail revenue, as well as the likelihood that Farfetch would increasingly rely on Browns and other first-party retail revenue in order to meet financial targets, posed a serious threat to the successful launch and valuation of its IPO. In response to this threat and in order to appeal to tech investors whose demand would pump up the IPO offering price and subscription levels, Defendants decided to not only minimize and misrepresent the significance of the Browns retail business, but also to mislead investors by concealing that Defendants intended to use IPO proceeds to ***increase*** Farfetch's reliance on first party, inventory-heavy businesses after the IPO—as another means of masking its stagnating organic marketplace platform growth.

### 1.   Defendants Misled Investors By Consolidating Farfetch's First-Party And Third-Party Businesses Into One Operating Segment

118.   Farfetch's former Senior Manager of Financial Reporting, who served in that position at Farfetch's London headquarters from March 2017 through November 2019 ("FE-1"), was a member of Farfetch's eight-person IPO working group that worked on the IPO from March 2017 through its launch in September 2018. FE-1 worked directly with Defendants Jordan and Neves, as well as with the Board of Directors, lead underwriters (Goldman Sachs and J.P. Morgan), and Farfetch's accounting firm, PricewaterhouseCoopers LLP. FE-1 witnessed—and, at Defendants' direction, helped implement—several misleading statements and omissions contained within the Offering Materials and Roadshow Presentation. These misrepresentations and omissions, discussed herein, were made at the instruction of, or at the very least with the knowledge of, the Officer Defendants, including Defendant Robb, who FE-1 stated was in charge of "implementing [José] Neves' vision," and who was a statutory officer of Farfetch UK Ltd and aware of all major decisions impacting the Company.

119.     FE-1 recounted that the Company had already started preparing for an IPO when FE-1 began working at Farfetch in March 2017.  As the Senior Manager of Financial Reporting, FE-1 was personally involved in drafting the Offering Materials and Roadshow Presentation, and worked "hand in hand" on those documents with Defendants Neves and Jordan.  FE-1 explained that, by the time of the IPO, due largely to the revenue generated by the Browns retail business, "[f]irst party sales ha[d] increased and increased, which is at odds with what Farfetch was about." This was a problem because, according to FE-1, "Farfetch was selling its IPO to tech investors and they are interested in the company being inventory-less and focused on the tech platform."

120.     FE-1 explained that there were numerous reasons why the Officer Defendants took steps to ensure that they did not to dilute the representations that the company was inventory-light by revealing that Farfetch had a significant retail component.  FE-1 described how analysts and investors are not interested at all in the retail business model, and would discount any retail, as opposed to marketplace, revenue from the valuation of the Company at IPO and thereafter. For example, in the world of technology-based company valuation, companies that are involved in first-party retail sales receive far lower valuations from investors because of the inherent risks of holding inventory, capital expenditures and debt carried in connection with the retail business.

121.     This was noted by analysts and market observers, as discussed above. For example, Macy's retail business—with *60 times the revenues of Farfetch*—was valued at roughly $12 billion in comparison to Farfetch's $8 billion at the time of the IPO.  Similarly, YNAP (Farfetch's closest competitor) reported approximately $2.6 billion of revenue in 2017—i.e., *nearly 7 times Farfetch's revenue*—yet was assigned a *lower* valuation when it was purchased in 2016.

122.     In response to this conflict between Farfetch's marketplace platform model and the Company's evolving retail business model, Farfetch and the Officer Defendants chose to avoid

nearly all discussion of the Browns and other first-party business in the Offering Materials and public statements.  To the extent they did discuss Browns, the 2015 acquisition was downplayed as a nominal and unique part of the Company that was used as an incubator for retail technologies and a "surgical tool for us to create [a buzz] in the Marketplace," as Defendant Neves described it in Farfetch's February 28, 2019 conference call.

123.    Further, the Officer Defendants directly misrepresented Farfetch's marketplace platform model and growth strategy through Farfetch's designation of Operating Segments, as required by IFRS 8, in the Offering Materials and repeated in the March 1, 2019 Form 20-F Annual Report.

124.    The core principle of IFRS 8, *Operating Segments*, demands that:

An entity shall disclose information to enable users of its financial statements to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates.

125.    IFRS 8 essentially mirrors the approach of the U.S. Generally Accepted Accounting Principles ("GAAP") accounting rules, codified in FASB Statement no. 131, *Disclosures about Segments of an Enterprise and Related Information*. To comply with IFRS 8, a company must first define its Operating Segments, and then determine whether each Operating Segment is a Reportable Segment (generally, one that contributes 10% or more of a company's revenues), and, if so, report financial and operational information about each Reportable Operating Segment. Defendants violated IFRS 8 by misleadingly crafting its Operating Segments so that Farfetch would not report its Browns retail business as a distinct Operating Segment.  This served to obscure information about the Company's significant first-party retail business and mislead investors about the Company's reliance on first-party sales and the stagnating historic growth and growth potential of its heralded third-party marketplace platform business model.

126.    Farfetch provided limited information about Browns in the Offering Materials, and painted the two London boutiques as a small, experimental component of the Company's dominant marketplace platform. Farfetch noted that, "[i]n May 2015, Farfetch acquired Browns, an iconic British fashion and luxury goods boutique. Browns operates two retail stores in London and also leverages applications on our platform. Ownership of Browns enables us to understand the luxury fashion ecosystem through the lens of a boutique."  Farfetch also described how Browns "serves the critical mission of pioneering innovations developed under our Augmented Retail strategy, including providing a luxury fashion boutique environment to test Farfetch Store of the Future technology."  In reality, however, FE-1 stated that the Browns retail business was "growing at an alarming rate," something that Defendants Neves and Jordan could see in the monthly and quarterly reports they were sent reflecting Browns' revenue.

127.    FE-1 described how Defendants Neves and Jordan caused Farfetch to artificially manipulate Farfetch's segment reporting to hide Farfetch's exposure to first-party retail sales from scrutiny.  It was FE-1's responsibility to draft much of the Offering Materials and, as part of that responsibility, FE-1 determined that the Browns retail business—both in-store and online sales— should be reported as a separate Operating Segment under IFRS 8.  FE-1 described how the Browns retail business clearly met the definition of an operating segment that should have been reported separately from the Company's third-party marketplace business.  The Browns first-party retail business segment had very different "economic characteristics" than the Company's third-party business, the most notable of which was the fact that the two segments exhibited very different "long-term average gross margins." Indeed, the Company itself noted that the Company's first-party sales "have a different gross margin profile than our third-party business" in its February 28, 2019 Fourth Quarter and Year End 2018 Release. Thus, the Browns first-party retail business

and the Company's third-party business should have been reported as two distinct operating segments under IFRS 8 in Farfetch's Offering Materials and other financial statements (which the Company did not do)—and they should not have been aggregated at all for the purposes of reporting in light of the disparate "economic characteristics" of the two businesses.  FE-1 confirmed that this violation of IFRS 8 was of heightened import because the Browns retail business had become an increasingly significant component of the Farfetch growth story.

128.    Indeed, Browns' own separate annual filings with the UK government, discussed below, each signed by either Defendant Neves or Jordan, who were both Board members of the subsidiary, revealed that the Browns retail business generated approximately 16% and nearly 20% of Farfetch's total revenue for 2017 and 2018, respectively.  There can be no doubt that Defendant Neves—the "chief operating decision maker" under the terms of IFRS 8—regularly reviewed the Browns retail business as a singular separate segment, assessed its performance, and was aware of its exponential growth.  This is demonstrated not only by the fact that Defendants Neves and Jordan sat on Browns' Board and signed Browns' annual UK financial statements, but also because Neves appointed Holli Rogers as the Browns CEO who reported directly to Neves at the time of the IPO and thereafter.  FE-1 described the fact that Rogers served as CEO for the entire Browns entity and reported directly to Neves, who, together with Jordan, also received monthly, quarterly, and annual financial statements for the entire Browns entity, as the "smoking gun" that demonstrated that Browns was truly a separate Operating Segment that should have been reported separately from the core third-party marketplace business.

129.    FE-1 received strong opposition to the determination to report the Browns retail business as a separate Operating Segment.  FE-1 recalled how Defendants Neves and Jordan did not want to report the Browns and other first party retail revenue separately because bringing

attention to first-party retail business would result in a lower valuation than that of a pure platform where Farfetch connects sellers and consumers without taking on any of the retail risks. Neves and Jordan wanted the focus of the Offering Materials to be on the growth of the third party business, and to make it appear as if the Company's GMV, Platform GMV, and revenues were growing organically through the platform "flywheel." Separating out the Browns business would reveal that, while Farfetch's overall business was growing quickly, its third- party marketplace platform was lagging that performance significantly. For example, while the Company's keystone Adjusted Platform Revenue (later Platform Services Revenue) metric grew *65%* from 2017 to 2018, that growth was disproportionally driven by the Browns online business, and Adjusted Platform Revenue growth not including Browns was materially lower, at only 53%.

130.    FE-1 was ultimately instructed to remove the standalone Browns retail operating segment and to combine all of the Browns retail business that involved online sales with the Company's third-party marketplace platform business. As a compromise, Browns' two physical retail locations, that generated well under 10% of total Company revenues, were designated as a "Stores" Operating Segment but were not reported since they did not meet the quantitative requirements of a Reportable Segment under IFRS 8. The remainder of Browns first-party sales— which comprised $46.2 million in revenue in 2017 and $99.5 million in revenue in 2018—were mixed in with the Marketplace Operating Segment and not reported separately in the Company's financial statements. FE-1 relayed that Defendants Neves and Jordan were "absolutely" involved in the decision to add Browns back into the marketplace. Consolidating the Browns business with Marketplace was discussed at the Board level and Neves and Jordan were involved in the Board discussion. According to FE-1, it was a very "artificial" thing to do because you had to split Browns (one thing) into two. Without taking that action, Defendants would not have been able to

say that 90% of Farfetch's business was Marketplace, and would have had to separately report and

account for Farfetch's first-party retail sales.

131.    FE-1 recounted working on a response to a June 29, 2018 SEC comment letter to

Defendant Neves inquiring into the decision to have only one reportable segment:

> We note that you have identified four operating segments of (1) Farfetch Marketplace, (2) Farfetch Black & White, (3) Farfetch Store of the Future and (4) Browns Stores. We further note your disclosure that as Farfetch Marketplace represents over 90% of revenue, results and assets and you have presented one reportable segment with all operating segments included. Please tell us if these other segments meet most or all of the criteria in IFRS 8 paragraph 12 to be aggregated with each other or the Farfetch Marketplace, respectively. See IFRS 8 paragraph 14. Please also explain why you believe it is more appropriate to aggregate with the Farfetch Marketplace as opposed to presentation as "all other" category as contemplated in IFRS 8 paragraph 16.

132.    According to FE-1, the SEC was not provided with any of the available financial

data concerning Browns revenue, and did not question whether Browns first-party sales were

greater the 10% of revenue (they were), or whether Browns revenue was reported separately to

Defendants Neves and Jordan (it was).  Moreover, as FE-1 confirmed, Farfetch's July 11, 2018

response letter incorrectly stated that the different operating segments shared the same "economic

characteristics" when, in reality, first-party and third-party sales have very different gross margins,

the prime marker under IFRS 8 whether a business has disparate economic characteristics.

133.    As can be seen in the below chart, reporting the Browns first-party retail business

would have resulted in a smaller Farfetch Marketplace Operating Segment that generated only

80% of revenues in 2018, and a Browns retail business well over 10% of total revenue:

| Segment | 2017 Revenue | % of Total Revenue | 2018 Revenue | % of Total Revenue |
|---|---|---|---|---|
| Total | $385,966,000 | | $602,384,000 | |
| As reported: | | | | |
| Farfetch (as reported minus Stores revenue) | $370,532,000 | 96% | $586,789,000 | 97% |
| Stores | $15,434,000 | 4% | $15,595,000 | 3% |
| If properly reported: | | | | |
| Farfetch (minus Browns) | $324,320,214 | 84% | $487,233,010 | 81% |
| Browns[4] | $61,645,786 | *16%* | $115,150,989 | *19%* |

134.    Complying with IFRS 8 would not only have accurately communicated to investors the Company's current and increasing dependence on traditional first-party sales, but would have directly and negatively impacted several of Farfetch's closely-watched KPIs relied on by the Company to show its platform's supposed flywheel organic growth potential.  For example, if Browns retail had been properly identified and reported as an Operating Segment, the Marketplace would be limited largely to Farfetch's third-party platform revenue.  This would have dramatically reduced several of the KPIs, as well as their growth rates. For example, as the following chart demonstrates, Farfetch's improper inclusion of Brown's online revenues in its Marketplace metrics caused it to dramatically overstate its keystone Platform Service Revenue metric in 2017, and to do so to an even greater degree in 2018.

| | Platform Services Revenue (as reported) | Platform Services Revenue (minus Browns' online) | Percent Overstatement |
|---|---|---|---|
| **2017** | $296,350,000 | $250,138,214 | 19% |
| **2018** | $488,995,000 | $389,439,010 | 26% |

[4] Browns reports its financials in pounds sterling.  These figures were converted to dollars using the conversion rate as of the date of filing for Browns' Annual Reports: September 20, 2018 (1 Pound Sterling = $1.3272) and September 30, 2019, respectively (1 Pound Sterling = $1.2293).

2.     **Defendants Planned To Use The IPO Proceeds For Acquisitions That Were Inconsistent With Farfetch's Third-Party Marketplace Platform Model**

135.     During the Roadshow Presentation and in the Offering Materials, Defendants set out a five-point financial strategy (¶ 58, *supra*) that made no mention of acquisitions of any kind— let alone acquisitions of first-party retailers. This growth strategy emphasized how the Farfetch marketplace platform thrived because it carried little to no inventory, and Defendant Jordan specifically represented during the Roadshow Presentation that there was "no growth in stores within the plans for Farfetch."   In reality, however, current growth at Browns, as well as acquisitions of companies with significant first-party retail sales, such as Stadium Goods and New Guards—both of which were already significant platform sellers and well-known to the Officer Defendants—were always part of the Defendants' future plans.

136.     FE-1 described that there was a deliberate decision made by Defendants Neves and Jordan to "avoid calling attention to first party sales" in the Offering Materials.  As a result, "the focus in the Prospectus was purely on the marketplace business and they [Neves and Jordan] did not want to dilute that impression by talking about how Farfetch had a retail component."

137.     According to FE-1, there was a ban of all acquisitions in the year prior to the IPO to avoid the due diligence that would involve.   However, target acquisitions were considered during this time, and demand internally for acquisitions built up until the IPO. FE-1 described how it was clear internally that acquisitions and mergers would commence after the IPO.  For example, the Company hired numerous people and built up their corporate finance and strategy teams in the lead up to the IPO, which reflected a clear "intent to be acquisitive."   Moreover, FE-1 noted that acquisition targets were considered before the IPO closed.

138.     FE-1's account is corroborated by a review of certain statements made to the press in mid-2019.  For example, in April 2019, *Glossy* published an interview with one of Stadium

Goods' co-founders, John McPheters, who confirmed that talks between Stadium Goods and Farfetch started in early 2018 at the latest, claiming: "[W]e had a bunch of incredible conversations with the Farfetch guys going back more than a year prior."

139.    FE-1 recalled numerous internal discussions, including those with Defendants Neves and Jordan, about how to avoid investor questions about the growing first-party retail business in the run up to the IPO and thereafter. FE-1 understood, based on his conversations and interaction with Defendants Neves and Jordan, that in order to increase Farfetch's GMV and revenue and to meet their growth targets for the Company, Farfetch would have to engage in acquisitions.  Indeed, not only were these acquisitions likely at the time of IPO, FE-1 explained that *no acquisitions* of the scale of the New Guards acquisition could have happened *without* the successful IPO proceeds.

140.    FE-1 noted that the Stadium Goods $250 million acquisition due diligence, which FE-1 personally worked on, commenced immediately after the close of the IPO in September 2018. This timing meant that it was an intended acquisition at the same time as Defendants assured investors that no acquisitions were even "preliminar[il]y" planned.  Moreover, FE-1 noted that due diligence on the New Guards acquisition, which FE-1 also personally worked on, began in February 2019, and talks leading to that acquisition naturally began before the due diligence period.

### H.    Unknown To Investors, Defendants Manipulated The Company's Key Performance Indicators To "Protect" Them From Deterioration And To Conceal A Constant Stream Of Promotions And Discounts

141.    Defendants also devised a complicated web of carefully-defined KPIs to paint a picture of organic marketplace growth, the calculation of which relied on multiple misleading and counter-intuitive inputs and terms.  According to FE-1, this confusing system of cross-references

and illogical connections was intentional, and served to disguise the fact that some KPIs were easily manipulated to improve (or disguise) poor performance metrics.

142.    For example, both "Platform Services Revenue" (called "Adjusted Platform Revenue" in the Offering Materials) and "Third Party Take Rate" were defined in such a way that these metrics would not be negatively impacted by any discounts, sales or promotions paid for in full or in part by Farfetch. The Company represented in the Offering Materials and Form 20-F Annual Report for 2018 that discounts and promotions were only extended "***periodically***" during mid-year and year-end sales. This was consistent with the larger luxury market, where markdowns and discounts (other than typical sales around the holiday season and the beginning of summer) could weaken a brand and a market known for exclusivity.  However, according to other former employees at Farfetch, described below, months before the IPO, Farfetch commenced a campaign to offer "constant," large, sitewide promotions that increased its reported GMV numbers but, in reality, hurt the Company's revenue and take rate.  This was unknown to investors because in the IPO and thereafter, Defendants defined Platform Services Revenue (formerly Adjusted Platform Revenue) and Third Party Take Rate to conceal the significant, negative impact this undisclosed onslaught of promotions had on the Company's actual revenue and take rate—while telling investors that Platform Services Revenue "best represents the economic value being generated by the platform."

143.    Numerous former employees confirm that the Company's approach to promotions changed in advance of the IPO, and that this change continued throughout the Class Period such that promotions were not periodic, but constant.  FE-2, a Customer Service Advisor at Farfetch's offices in Portugal from 2017 through June 2019, noted that when FE-2 started in 2017, there were just two sales per year: the summer sale and Christmas sale. However, FE-2 stated that large

percentage off promotions, such as 20% or 30% off, started to pick up after June 2018, in the leadup to the IPO.  After the 2018 summer sale, the promotions just kept going, such that there were constant sitewide promotions on the Farfetch website from August 2018 through at least when FE-2 departed in June 2019.  FE-2 stated that "there was basically some kind of promotion all the time."  FE-2 recalled that Farfetch employees joked internally that Farfetch "had become like Alibaba's AliExpress," an international Amazon-equivalent.  FE-2 noted that these constant promotions were confusing, because it was unclear whether Farfetch actually wanted people to buy costly luxury goods, or whether they wanted to sell luxury goods for the price of average goods.

144.    FE-3, a Customer Service Manager out of Los Angeles from April 2018 through April 2019, managed a team of 70 people and oversaw the entire North American service team. FE-3's group reported through the North American President to Defendant Robb.  Consistent with FE-2's recollection, FE-3 stated that when FE-3 started at Farfetch in April 2018, Farfetch offered two promotions per year.  However, right before the IPO, there was an unexpected promotion, and then there were promotions every month. FE-3 reported that, with regard to promotions, "the frequency sky-rocketed."

145.    FE-3 was directly impacted by these promotions because the Customer Service department would receive a higher volume of calls when promotions were launched.  When the promotions were twice per year, as expected, FE-3 would staff the Customer Service team appropriately and train the staff in advance of the anticipated higher volume of work.  However, with the constant influx of promotion—so many of them that FE-3 was not given advance warning of the size and nature or the promotions—FE-3 lacked the staff sufficient to manage the call volume and Customer Service performance was negatively impacted.

146.    FE-3 described the parade of promotions that began in advance of the IPO as having been initiated by Farfetch, and not the boutiques or brands.  These promotions included large basket percentage-off promotions (i.e., 20% or 30% off the entire purchase), as well as offers of free shipping.  FE-3 also stated that as the promotions increased, they were paid for by Farfetch. It was FE-3's opinion that these promotions were driven by the c-suite, who could use promotions to boost revenue if Farfetch was not meeting targets.

147.    FE-4, a senior product executive who worked in the Product Department's Loyalty Program for the entire Class Period explained that Farfetch's aggressive promotion campaign that started before the IPO was not undertaken in response to any promotions offered by Farfetch's luxury competitors.  Indeed, FE-4 opined that the biggest difference between Farfetch and YNAP was the fact that Farfetch was constantly pushing promotions and discounts, whereas competitors pushed promotions only occasionally.  FE-4 remarked that it was hard to find any other retailer with consistent promotions like Farfetch.  FE-4 noted how these constant promotions must have impacted Farfetch's gross margins because "[p]eople were only purchasing discounted items."

148.    These promotions should have directly and negatively impacted Farfetch's revenues and bottom line because, as discussed above, when Farfetch initiated a promotion not specifically provided for in advance (such as mid-year and end-of-year sales), Farfetch would cover all or part of that discount through a direct reduction to its take rate.  But Defendants took steps, through their carefully crafted web of KPI defined terms set forth in the Offering Materials, that "protected," as FE-1 put it, these KPI's from the negative impact of promotions. This obscured the impact of this constant stream of atypical, unreported promotions, and materially misstated KPIs including, specifically, Third Party Take Rate and Platform Services Revenue.

61

149.    FE-1 explained that some sales were initiated by the brand or boutique and were "fully funded" such that Farfetch would take its full take rate commission from the sale price and the brand or boutique absorbed the discount.  Other sales were agreed to be partly funded, such that Farfetch would cover a portion, generally 50%, of the discount. And, especially post-IPO, where, according to FE-2, FE-3 and FE-4, Farfetch initiated many of the promotions and discounts, the discount were more likely to be "unfunded" or partially funded, such that Farfetch would compensate the seller for the deducted discount. FE-1 described how, when Farfetch launched a planned promotion (such as the historical "periodic" mid-year and end-of-year sales), the third party brands and boutiques would often agree in advance to partially fund some of the costs of the promotion at an agreed upon proportion.

150.    According to FE-1, Farfetch's "share" of the costs of a promotion would be deducted directly from the Company's agreed-upon take rate.  Should the Company offer a 20% discount on an item for which it was responsible, for example, it would deduct those costs from its take rate, meaning that Farfetch would only take a 10% commission, approximately, for that sale. However, according to FE-1, the Company would still report a 30% Third Party Take Rate.  It could do this because of the manner it buried promotional costs in another revenue bucket.  FE-5, a former Farfetch E-Commerce Solutions Client Services Associate in Farfetch's California office from March 2017 through August 2019, confirmed that Farfetch took a smaller percentage from the sale of discounted items to account for the reduction.

151.    This deliberately opaque process is likely best viewed through an example:



Assuming that (a) this Fendi dress sold at full price, (b) $10 was charged for shipping, and (c) Farfetch had the right to a 30% take rate, Farfetch would record the following KPIs:

| KPI | Reported |
|---|---|
| GMV | $2400 ($2390 + $10) |
| Platform GMV | $2400 ($2390 + $10) |
| Platform Fulfillment Revenue | $10 |
| Platform Services Revenue /Adjusted Platform Revenue | $717 (30% of $2390) |
| Third Party Take Rate | 30% |

152.    Under the above scenario, the total revenue earned by Farfetch was $727 ($717 plus $10), and the actual take rate was 30%. However, these numbers change dramatically when Farfetch offers a 30% or 20% discount at checkout off the full price, when the Company must pay for the entire costs of the discount. This is because Defendants excluded the "costs" of promotions from the Third Party Take Rate, even though, in reality, the "costs" of the discounts were deducted directly from Farfetch's actual take rate:

| KPI for Single Item | No discount | 30% Discount | 20% Discount |
|---|---|---|---|
| As reported: | | | |
| GMV | $2400 | $1683 | $1922 |

| KPI for Single Item | No discount | 30% Discount | 20% Discount |
|---|---|---|---|
| | [$2390 + $10] | [$1673 + $10] | [$1912 + $10] |
| Platform GMV | $2400 [$2390 + $10] | $1683 [$1673 + $10] | $1922 [$1912 + $10] |
| Platform Fulfillment Revenue[5] | $10 | ($491.90) [$10 - $501.90] | ($372.40) [$10 - $382.40] |
| Platform Services Revenue (Adjusted Platform Revenue in Offering Materials) | $717 [30% of $2390] | $501.90 [30% of $1673] | $573.60 [30% of $1912] |
| Third Party Take Rate | 30% | 30% | 30% |
| **Actual Financial Impact From Discount:** | | | |
| Total Revenue from the Sale (excluding pass-through shipping and customs) | $717 (30% take rate) | $0 (30% take rate reduced by 30% for discount) | $191.20 (30% take rate reduced by 20% for discount) |
| Actual take rate after Discount | 30% | 0% | 10% |

153.    As the above chart shows, even when Farfetch took no commission for a sale because the cost of a 30% off promotional discount was not shared by the selling brand or boutique, the Company still recorded Platform Services Revenue as if the Company had taken its full commission, and thus a Third-Party Take Rate of 30%, and concealed the fact that it took no revenue (or actual take rate) in the Platform Fulfillment Revenue KPI.  FE-1 explained that the reductions to revenue from the promotions was largely absorbed by the large pass-through revenues generated from shipping and customs duties. As a result, the Company reported a low Platform Fulfillment revenue each quarter because of the promotional reductions hidden in that figure. This is how Farfetch deceptively created a "protected KPI" in the Third-Party Take Rate.

154.    FE-1 explained how the decision to lump the costs of promotions into the Platform Fulfillment Revenue was "an incredibly sensitive change."  FE-1 stated that in the Company's originally proposed financial reports, *all* promotional costs were excluded from the Company's

---

[5] Also included in Platform Fulfillment Services are pass-through revenue from customs and duties

reported revenue and were initially recorded in the Company's "S, G & A" (Selling, General & Administrative Expenses), together with items related to salaries, operating expenses and overhead. Farfetch's outside auditor, Pricewaterhouse Coopers, prohibited that approach and instructed Defendants to deduct promotional costs from revenue. The "compromise" was that promotional costs would be deducted from Platform Fulfillment Revenue, a line item that should have nothing to do with promotional costs as it primarily accounts for "pass-through" revenue from shipping and customs. Deducting promotional costs from shipping revenues and not from platform services revenue was a tactic that was, according to FE-1, intended so that the effect was zero impact on the take rate, a KPI that is significantly higher for Farfetch than for other tech platforms, such as Uber or UberEats, and is a key differentiator and marker of Farfetch's success to investors. FE-1 believes that this practice of creating a "protected KPI" was "misleading" because "the take rate is consistently high because it excludes promotions" and "Farfetch is obviously not putting everything into the take rate that someone might expect them to."

155. FE-1 explained that the Company's misleading reporting of take rates and marketplace platform services revenues were efforts to make the Company seem more successful and promising that it actually was. In addition to hiding the impact of its first-party sales revenue and constant promotional offerings intended to attract new customers that were not shopping with Farfetch absent a discount or promotion, FE-1 described how the Officer Defendants demanded that employees in the marketing group, headed through most of the Class Period by Chief Marketing Officer ("CMO") John Veichmanis until his unexpected resignation in early June 2019, "buy" GMV at quarter-end so that Farfetch would match its projected GMV growth rates, even if those efforts raised demand generation expenses and did not attract customers with any long term value (LTV)—i.e., were not likely to be repeat customers. FE-1 recounted how Farfetch could go

and "buy" GMV by buying site traffic because the Company devised a model that works out how much GMV they can buy using marketing. However, there is a limit to how much you can buy before it starts negatively affecting EBITDA. Moreover, FE-1 noted that the more marketing you use to get new customers and site traffic, the more GMV you will have, but you risk getting "low value" customers, meaning customers who only visit the site and buy something once. FE-1 added that you can quickly buy low value customers with marketing, but Farfetch told investors that the Company knew how to wisely use its technology to find and identify repeat customers.

156.    According to FE-1, GMV was such a big deal in the Farfetch offices that the GMV numbers were posted as a live ticker on a big screen in nearly every corporate office after the IPO. With everyone hyper-aware of GMV quarterly targets, towards the end of the quarter, great and "desperate" efforts were made to fill the shortfall between actual GMV and targeted GMV.  FE-1 provided an example of how Farfetch accomplished this.  During the second quarter 2019, there was such a substantial difference between actual GMV and the GMV that had been targeted for investors that the marketing team worked in 24 hour shifts and worked all-nighters prior to close of the second quarter to ensure that GMV projections were met. FE-1 stated that this was an "incredibly desperate time" because marketing employees were all working late nights and early mornings and there was always some kind of marketing coverage day and night. FE-1 confirmed that Neves and Jordan were "more than aware" of these efforts.  FE-1 added that CMO John Veichmanis left during this period in the second quarter 2019 around that time after he grew increasingly frustrated with his position and the insufficient resources being devoted to organic marketing growth.

## I. Unknown To Investors, Defendants Converted Cash Bonuses To Improper Short-Term Stock Options To Inflate Adjusted EBITDA In 2019

157. According to numerous former Farfetch employees, Farfetch historically provided cash bonuses to qualified employees. These bonuses were an expected component of an employee's total compensation, and the Company took provisions against income throughout the year in anticipation of year-end bonuses. Following the IPO, however, Defendants concealed poor fourth quarter 2018 and first quarter 2019 performance by unexpectedly revoking cash bonuses, and replacing them with artificially short-term restricted stock units (RSUs), all done in order to avoid reporting a disastrous Adjusted EBITDA.

158. It is generally accepted by the investor community that EBITDA is a Company's measure of profitability, and, according to FE-1, the Company was heavily focused on that EBITDA number. Indeed, one of the key initiatives described during the Roadshow Presentation and thereafter was to "deliver platform-level EBITDA margins, with favorable WC [working capital] dynamic and low capital expenditure." The payment of cash bonuses is reflected by an accounting charge that results in a deduction from EBITDA in the period made. However, stock options are reported below the EBITDA line on a company's financials, due to their longer vesting period, which typically results in an accounting charge taken in a period other than when they are issued. Thus, their issuance will not reduce EBITDA in the period issued.

159. FE-1 explained how cash bonuses that had been paid every year were taken away unexpectedly in March 2019, not because the Company lacked the cash to pay them, but because the Company needed to prop up its EBITDA metric. Former employees corroborate FE-1's account of a sudden and unexpected switch from cash bonuses to extremely short-term RSUs. For example, FE-3 recalled how employees were told at their year-end reviews that cash bonuses would be paid out before the fourth quarter 2018 earnings release at the end of February 2019.

Two days before the payout was scheduled in February, Farfetch employees received a sudden communication that cash bonus payments were delayed to March 2019 because the quarter needed to be closed out before the Company could make the payments.  Then, in March 2019, in "a very untasteful fashion," according to FE-3, Defendant Jordan told employees at an all-hands meeting that the Company had failed to meet certain fourth quarter financial metrics and, as a result, no one would receive a cash bonus. FE-3 confirmed that employees were offered RSUs in place of cash.

160.    FE-5, a former Farfetch E-Commerce Solutions Client Services Associate in Farfetch's California office from March 2017 through August 2019, confirmed that the Company offered short-term RSUs that vested in August as an attempt to circumvent cash bonuses.  FE-5 recalled that the Company told employees after the end of 2018 that the Company did not meet its internal KPIs for 2018—a statement that seemed to FE-5 to be contrary to what the Company was telling the market.

161.    FE-1 was directly involved in implementing Defendant Jordan's decision to revoke cash bonuses.  In exchange, the Company offered restricted stock units that vested in August 2019, just months after they were issued in March 2019. FE-1 explained that the ethics of offering a slew of short term RSUs instead of cash was "extremely questionable" and "misleading" because it dilutes shareholder value, "deliberately inflates the EBITDA measure," and was "done solely to avoid a cash bonus expense." The Company had plenty of cash and means to pay the cash bonuses, but instead it diluted shareholder value by issuing RSUs that vested the following quarter so that employees could sell quickly the stocks they were issued and get the cash bonus they were originally due, without having to report the cash expense and reduce EBITDA sooner.

68

162.    FE-1 stated that he was alarmed by this and expressed his concerns directly to Defendant Jordan.  FE-1 explained that while longer-term stock options go below the EBITDA line for a reason—because they vest over a long time and the accounting charge doesn't go into the period that they are issued—the RSUs issued by Farfetch in March 2019 vested so soon that it was misleading to put those below the EBITDA line. FE-1 said that after he expressed his serious concerns to Defendant Jordan, Jordan acknowledged FE-1's alarm, but said they didn't have a choice and were going to do it anyway.

163.    FE-1 stated that the issuance of short term RSUs in place of cash bonuses was aggressive financial reporting targeted to achieve a specific result. While FE-1 noted that other companies issue RSUs when they can't afford cash bonuses, Farfetch's March 2019 issuance of RSUs was misleading because, while they could afford the cash bonuses, they used this mechanism to artificially increase income and EBITDA while essentially still giving their staff the cash bonuses by awarding them the short vesting stocks, with none of the normal long-term incentives inherent to RSUs.  FE-1 explained that this was a clear example of "having your cake and eating it too."

164.    This deceptive exercise allowed the Company to conceal increasing losses resulting from its stagnating sales and influx of promotions and increased, related marketing expenses, in the first quarter of 2019 and through the second quarter of 2019.  On May 15, 2019, while Farfetch announced a large decline in its Adjusted EBITDA, down 28% year over year to -$30,236,000 from -$23,657,000, Defendants were able to soften the blow of this decline because the Adjusted EBITDA Margin (calculated by taking Adjusted EBITDA as a percentage of Adjusted Revenue) was slightly better year over year, improving to -20.7% from -22.9%.  Unknown to investors, however, the Company's Adjusted EBITDA for the first quarter of 2019 was heavily inflated by

the last minute revocation of cash bonuses and issuance of improper short-term RSUs.  While the Company reported the large and atypical issuance of share-based compensation totaling $38,714,000, an increase of $32,147,000, or 489.5%, year-over-year in first quarter 2019, Defendants falsely claimed that this increase was legitimately due to "the award of employee incentives following the Stadium Goods acquisition, key-contributor grants as part of the Farfetch annual compensation scheme as well as employment tax expenses related to option exercises."  In reality, as described above, share based compensation increased exponentially in order to help the company stay in line with expectations and hide that it had simply failed to meet its growth targets. Indeed, if the Company had not issued millions of dollars of extremely short-term RSUs, and assuming share based compensation would be on par with first quarter 2018, Farfetch would have reported negative Adjusted EBITDA of approximately *-$62,383,000*, with a negative Adjusted EBITDA Margin of *-42.6%* in the first quarter of 2019.  This would have been viewed as a serious deterioration and indication of decreased profitability potential for investors.

### J.   Investors Suffer Losses When The Relevant Truth Emerges

165.   On August 8, 2019, after the market closed, Farfetch released two press releases to the public and hosted its second quarter 2019 earnings call.  These disclosures revealed that (i) Farfetch had acquired New Guards Group, a first-party brand incubator and retailer in a cash-and-stock transaction worth $675 million, nearly twice the group's annual revenue and seven times its earnings before taxes; (ii) through the New Guards Group acquisition, Farfetch had turned away from its third-party marketplace platform business model and growth strategy; and (iii) the Company's previous reports of steady organic growth in Platform GMV and other key KPIs were illusory and were, in fact, inflated by Farfetch's use of heavy and undisclosed sitewide promotions and excessive demand generation costs.

70

166.    *First*, in a press release titled "Farfetch Acquires Brand Platform New Guards Group, Advancing its Strategy to be the Global Technology Platform for the Luxury Fashion Industry," the Company announced the acquisition of New Guards, a brand incubator and retail company that had sold on Farfetch's marketplace platform for years, for $675 million—a sum greater than the Company's revenue for all of 2018. This acquisition was far from the "incremental investment" or investments in "technology" directly related to the Company's keystone marketplace platform that Farfetch executives continuously discussed pursuing in the IPO and thereafter.

167.    Analysts immediately reacted to the New Guards acquisition with questions and concern during the call.  In response, Defendants attempted to paint the New Guards acquisition as consistent with the Company's foundational organic growth strategies, even though the acquisition resulted in the creation of an entirely new business division and set of company activities.  When a Goldman Sachs analyst asked Defendant Neves to explain what the "new dimension of strategy" "actually means in principle," Neves claimed that "our strategy has not changed," and that the acquisition was just an instance of expanding the Company's "platform vision upstream"—even though the Company admitted the new business was undeniably different than the core, two-sided "marketplace" approach the Company had touted in its IPO and after, by touting it as a new "Brand Platform" business line. Later in the August 8, 2019 call, analyst Luca Solca noted that Farfetch had "been laying up a very long list of acquisitions, starting with Stadium Goods, Toplife, New Guards Group and others" and stated that "this is making your business model more complicated" as compared to the "original idea building an Uber of luxury and fashion[.]" He asked whether the "original model is not working and not producing enough of a profitability so that you have to complement it with other activities?" Defendant Neves

unconvincingly repeated that "our strategy . . . has not changed," and that "[w]e always said M&A was only one of the tools in the toolbox."

168.     *Second*, the Company announced disappointing financial results.  After the market closed, Farfetch announced its second quarter 2019 financial results, disclosing a loss of $89.6 million. The Company blamed the disappointing results on competitive pressures from increased promotional pricing and discounting of luxury goods by competitors, despite previously touting "barriers to entry" and the Company's allegedly "superior" platform.

169.     Additionally, after previously predicting that the Company's Platform GMV metric would grow 41% year-over-year (and announcing better-than-expected Second Quarter Platform GMV growth of 44% following similar 44% growth in Q1, with both quarters beating Farfetch's guidance of 40%), the Company announced that it now expected only 30% to 35% year-over-year Platform GMV growth for third quarter 2019, and only 37% to 40% year-over-year Platform GMV growth for full year 2019.  This lowered guidance *included* the expected uptick in GMV from previous acquisitions, including an earlier-than-expected Toplife integration, which was anticipated to create growth in China, indicating that expected ***organic*** GMV growth had plummeted. This revised platform GMV guidance more accurately reflected Farfetch's actual and previously undisclosed reliance on first-party retail sales.

170.     Farfetch also announced dramatically deteriorated Platform Order Contribution (the Company's gross profit after deducting demand generation expense), which actually ***fell*** by approximately $3 million year-over-year even though Platform GMV had ***grown*** by approximately $150 million (or 44%) over that period, as well as Platform Order Contribution Margin of just 28.1%, as compared to 45.3% the year prior, which was due in part to a "charge . . . taken to write-down and clear excess end-of-season inventory within the first-party business." Finally, Farfetch

72

announced wider than expected second quarter losses, reporting a second quarter loss of $89.6 million versus $17.6 million in the prior-year period.  Defendants blamed the shortfall on "unprecedented promotional activities" during the quarter.

171.    Analysts reacted with severe concern to these disclosures on the call, and the lowered guidance and reasons for Farfetch's poor results were discussed at length. While Defendants tried to assuage concerns, they refused to provide clarity on certain issues and also revealed several surprising additional facts. For example, when Douglas Anmuth of J.P. Morgan asked Defendant Jordan to help the market "understand the pressures" Farfetch faced in light of the reduced second-half 2019 guidance, Jordan claimed that Farfetch had seen "a substantial step-up in the promotional environment" from competitors, and that the Company decided to likewise promote to prevent its customers from "being tempted away by these competitors' promotions." Jordan admitted that the Company took down its second-half 2019 guidance dramatically because the above-40% growth to which it had previously guided would, in fact, only be achievable "at the cost of very, very heavy promotions." And when John Ryan Blackledge of Cowen & Company asked Jordan to "call out . . . what [Stadium Goods had] added to the Platform GMV growth in the second quarter," Jordan flatly refused.

172.    Farfetch also announced the surprise resignation of Chief Operating Officer, Defendant Andrew Robb, after only ten months as a public company.  Robb had served nine *years* at Farfetch.

173.    These disclosures stunned investors and analysts, and as a result, Farfetch's stock price dropped significantly following the August 8, 2019 disclosures, falling nearly *45%*, a decline of $8.12 per share, and ***erasing nearly $2 billion of shareholder equity in a single day***.  A total of

*33.5 million* shares of Farfetch common stock traded on August 9, 2019, an increase from just 4.4 million shares traded on August 8, 2019.

174.    In sharp contrast to the consistently laudatory coverage piled on the Company from its IPO onwards, analyst reports issued in the wake of Farfetch's second quarter earnings report reflected the market's negative reaction to the Company's disclosures concerning Farfetch's abrupt reversal from its marketplace platform business model, its deteriorating results, and the negative impacts of its secret promotional campaign.

175.    For example, Wells Fargo issued a scathing report on August 9, 2019, titled "FTCH: Bull Case now 'Far'ther away, Shares Headed for Penalty Box." In the report, Wells Fargo cut its price target by almost 50%, and discussed "incremental sources of confusion" that had arisen in each post-IPO earnings call, including: growing 1P revenues, "which runs counter to the company's core 'asset-light' business model"; deterioration in order contribution margin, "which brought into question the scalability of the business"; and Farfetch's numerous acquisitions, "which added significant complexity to the model."

176.    Wells Fargo explained that, "[u]nfortunately, the 2Q print raised far more questions than answers, both in terms of the fundamentals of the core business, as well as another acquisition whose benefits are not immediately clear." It further stated:

> What was supposed to be a simple investment thesis (industry leading top-line growth with structural industry tailwinds) has become increasingly complicated and controversial over the past few months — and FTCH's 2Q print was disappointing and, more importantly, ratcheted up the complexity by several notches. Simply put, this was a highly-surprising print on multiple fronts.

177.    Wells Fargo discussed the hyper-promotional environment driving 2Q 2019 results, explaining that "the deterioration of fundamentals seen in 2Q (and embedded in 2H guidance) was unlike anything we've seen in FTCH's short trading history." The analysts called out the 17% decline in margin, noting that it was "attributed to an extremely high level of promotional activity

that weighed extremely heavily on GM," and further explained: "Making matters worse, the hyper-promotional activity didn't even drive that much on the top line . . . . To put it into perspective, platform GMV increased by $150 million YoY, but contribution profits actually declined by $4 million YoY." Wells Fargo called the "aggressive promotional activity in 2Q . . . a major head-scratcher," including because its independent research "suggests that luxury is a little bit choppy today, but not nearly to the extent that FTCH management portrayed on the call," and "given how small FTCH is today . . . we're surprised that they are so susceptible to competitive pressure this early" because "they should be able to grow just from brand awareness and channel dynamics alone[.]"

178. Wells Fargo also called Farfetch's second half 2019 guidance "very disappointing," noting that—because it included upside from Stadium Goods and Toplife—it showed that "organic growth is decelerating significantly." Wells Fargo explained: "[F]or a story whose core tenet was that there was a huge [total addressable market] opportunity to be unlocked (which would drive multiple years of elevated top-line growth), the fact that they seem to be rapidly hitting a wall (and resorting to aggressive promotional activity) is very concerning in our view."

179. Finally, Wells Fargo discussed management turnover, noting that Robb's departure followed closely on the heels of the departure of John Veichmanis, Farfetch's chief marketing officer, and explaining that "the fact that high-level executives are leaving the company so soon post-IPO is not likely to alleviate any investor concerns[.]"

180. Other analysts issued similar, strongly negative reports. BTIG cut its price target dramatically to $17 on August 9, 2019, and explained that "FTCH made two major announcements"—lowered Platform GMV guidance and the New Guards acquisition—"neither of which were well-received by investors." The report called the guidance "disappointing" and

explained that "[g]iven 1H growth of 44%," Farfetch's reduced full-year guidance "implies deceleration in 2H to 30-35%, which includes the inorganic contribution of New Guards Group." BTIG also stated that the New Guards deal "***adds a lot of non-marketplace characteristics to FTCH stock*** including fashion risk, potential channel conflict and future key man risk," and discussed the deteriorating margin metrics, noting that they were explained by "[i]ncreasing promotions . . . [,] inventory write-downs[,] and customer engagement initiatives." In an article published on *CNBC.com* on August 9, 2019 titled "*Why luxury online retailer Farfetch's stock cratered despite acquisition of megabrand*," BTIG analyst Martin Fong expanded on his reaction to the August 8, 2019 news, stating: "The original idea of buying into the IPO of Farfetch was that . . .play on e-commerce in the luxury space, driven by how under-penetrated online sales were in the space." Fong continued, "Investors were eager to buy into a business that was simply a marketplace for goods — asset-light, with not much inventory or design risk," concluding that the New Guards "deal has 'sprung investors for a loop.'"

181.    Similarly, analysts from Cowen slashed their price target by more than 50% on August 9, 2019, from $33 to $16. Cowen discussed the Company's margins, noting that gross profits were 15% below Cowen's pre-print estimate, and also noted that Farfetch's "Platform order contribution margin was 28.1% vs. 34.9% in 1Q19 and ~46% in 2Q18 on i) Promotions, ii) Investments in Loyalty & Farfetch Communities, and iii) Digital Media spend[,]" and that the Company's EBITDA was significantly worse than expectations and prior performance.

182.    Deutsche Bank analysts also questioned the New Guards acquisition, stating that the Company was "strategically moving further outside the core marketplace strategy" and that "[n]ot only did the company take down its Platform GMV [for year 2019] [year over year] outlook at the midpoint by 150bps, it failed to disclose the contribution from Stadium Goods, raising

questions around the underlying Farfetch Marketplace GMV growth rate." The analyst further explained that "it is hard to understand what is organic vs. inorganic here based on what the company disclosed. As such, it is hard to get comfortable with underwriting the future growth of the business when a potential outsized amount of the growth may be inorganic." Deutsche Bank analysts called the changes a "move away from the high margin asset light marketplace concept."

183. On August 29, 2019, Luca Solca—who had issued a strong articulation of the value proposition of Farfetch's inventory light, marketplace model before the Company conducted its IPO (*see* ¶ 37)—published an article in *Business of Fashion* about Farfetch that reviewed the disappointing news issued by the Company earlier in the month. The article included a significant discussion of the challenges the Company faced, as well as a blistering take on the New Guards acquisition. Specifically, Solca explained that "Farfetch has been hyperactive on M&A and its latest deal, the acquisition of New Guards Group (NGG), seems to hint at a change of business model." Solca contrasted the New Guards acquisition "bolt-on moves like the acquisition of streetwear marketplace Stadium Goods for $250 million" and "moves aimed at supporting geographic expansion like the acquisition of JD.com's luxury platform Toplife for $50 million," stating that "acquiring New Guards for an enterprise value of $675 million, is a completely different matter." Solca further questioned, "why should the market believe that Farfetch has the skills required to create brands, when its core business is distributing them online?"

184. Solca also challenged Defendants' defense and explanation of their 2019 promotional increase, noting that:

> It is ironic that Farfetch, in its results, cited a highly promotional retail environment as part of its rationale for committing more resources to promotions. ***Our analyses indicate that Farfetch has been leading the promotions game***. And therein lies the rub: ***promotions have certainly helped Farfetch drive rapid growth***, but along with its lack of geo-pricing discipline, they have also put the platform on a collision course with many of its brand partners (as well as with its original multi-brand

77

boutiques). . . . [T]he notion that the market will be less promotional in a few quarters sounds more like a hope than a plan. Hence, ***Farfetch has to abandon the concept of a winner-takes-all-platform built on the lowest prices***.

***But this has implications for growth, and a maturing growth profile will have to go hand-in-hand with more sanguine prospects for profit***. It's not surprising, then, that more muted GMV growth guidance coupled with timid profit forecasts have been taken badly by the market.

### K. The Officer Defendants Reaped Up To $68 Million In The Final Months of the Class Period

185.    The senior-most leaders of the Company—Officer Defendants Neves, Robb, and Jordan—engaged in a series of suspicious stock transactions, reaping at least ***$46.8 million***, and likely over ***$68 million***, during the four months immediately before the truth about Defendants' fraud was laid bare in August 2019 and Farfetch's stock fell precipitously as a result—strong evidence that Defendants were financially motivated to maintain the fraud during the Class Period.

186.    After the IPO in September 2018, Neves owned 1,692,478 Class A shares, Jordan owned 714,547 Class A shares, and Robb owned 1,746,942 Class A shares.

187.    Neves, Jordan and Robb were subject to a 180-day lockup on selling shares after the IPO, which expired on or around March 20, 2019. However, according to FE-1 and Defendant Jordan himself during the June 12, 2019 Deutsche Bank's 16th Annual dbAccess Global Consumer Conference in Paris, France, the Officer Defendants and other insiders and employees were barred from sales until the Company's first quarter earnings were announced on May 15, 2019.  Defendant Jordan also represented at that same conference that insiders—which included specifically the Officer Defendants—were further barred from normal trading from June 7, 2019 through the end of the Class Period.  Nevertheless, from April 8, 2019 through August 1, 2019—while Farfetch's stock price remained artificially inflated by Defendants' materially false and misleading statements in the Company's Offering Documents and other Class Period misrepresentations and omissions—Neves, Jordan and Robb collectively sold over ***three million*** of their personally held, artificially

inflated shares, two million of which were confirmed sales through Forms 144 filed with the SEC, and another million of which were filed as intended sales on Forms 144 that presumptively occurred shortly thereafter.  These insider share sales, nearly all made at or above the IPO price, netted Neves at least *$23.7 million* (and likely over *$44.3 million*, counting two additional large share sale slated to be executed in July 2019 per two Forms 144 filed by Neves), Robb *$20.5 million* (and likely over  *$21.3 million*, counting an additional share sale slated to be executed in August 2019 per a Form 144 filed by Robb), and Jordan roughly *$2.4 million* (and over *$3 million*, counting an additional share sale slated in late June 2019 indicated on a Form 144 filed by Jordan). Neves, Robb and Jordan effectuated these sales with dizzying speed:  Neves reaped his proceeds in multiple sales over a period of less than three months; Robb, in multiple sales across less than four months; and Jordan, in multiple sales in just under one week in late June 2019.

188.    Neves' trades ostensibly were made pursuant to 10b5-1 trading plans he entered into in March 2019—*during* the 180-day lockup period—or in May 2019.  Specifically, as reported on his Form 144s, Neves entered into a 10b5-1 trading plan on March 6, 2019, and later, entered into another 10b5-1 trading plan dated May 24, 2019.  According to the Form 144s, his trades of Farfetch stock were "Sales under 10b5-1 plan" or were slated to be "made in connection with a selling plan dated [March 6, 2019 or May 24, 2019] that is intended to comply [sic] rule 10b5-1(c)."  Jordan's Forms 144 reflect the date of  May 22, 2019 as the "date of plan adoption or giving of instructions, if relying on Rule 10b5-1." Similarly, Robb's Forms 144 reflect dates of March 7, 2019, during the lock-up period, or on May 24, 2019 as the "date of plan adoption or giving of instructions, if relying on Rule 10b5-1."

189.    To the extent the Officer Defendants' trades were actually done pursuant to 10b5-1 plans, these plans enabled the Officer Defendants to rapidly offload millions of dollars' worth

of shares at a massive profit as soon as the lock-up expired, and just before the Company's August earnings disclosure revealed the truth and sunk Farfetch's stock price.

190.    Neves personally sold nearly a million shares between April and June 2019, reaping nearly *$24 million* in proceeds.  In July 2019, Neves announced his intention to sell another 103,430 shares with a market value of approximately $2,169,392 (on July 1, 2019) and 972,551 shares, with a market value of approximately *$20 million* (on July 17, 2019).  Neves' Class Period sales are reflected in the table below:

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 4/18/2019 | 50,000 | 23.6856 | $1,184,281.31 |
| 4/22/2019 | 50,000 | 22.5487 | $1,177,436.73 |
| 4/23/2019 | 50,000 | 24.3148 | $1,215,738.41 |
| 4/24/2019 | 43,850 | 24.3819 | $1,069,144.82 |
| 5/1/2019 | 50,000 | 25.0617 | $1,253,086.53 |
| 5/2/2019 | 50,000 | 25.0107 | $1,250,535.41 |
| 5/3/2019 | 50,000 | 25.4004 | $1,270,020.74 |
| 5/6/2019 | 50,000 | 25.2983 | $1,264,913.51 |
| 5/7/2019 | 50,000 | 25.3384 | $1,266,920.45 |
| 5/8/2019 | 50,000 | 24.3237 | $1,216,182.73 |
| 5/9/2019 | 50,000 | 23.8998 | $1,194,990.00 |
| 5/10/2019 | 50,000 | 23.6947 | $1,184,735.62 |
| 5/13/2019 | 50,000 | 23.0208 | $1,151,041.94 |
| 5/14/2019 | 50,000 | 23.2667 | $1,163,333.22 |
| 5/15/2019 | 50,000 | 24.0144 | $1,200,721.27 |
| 5/16/2019 | 43,850 | 22.7129 | $995,961.01 |
| 6/17/2019 | 50,000 | 22.3494 | $1,117,468.07 |
| 6/18/2019 | 50,000 | 22.8151 | $1,140,752.61 |
| 6/19/2019 | 50,000 | 22.7124 | $1,135,620.42 |
| 6/20/2019 | 50,000 | 22.3198 | $1,115,990.32 |
| 6/21/2019 | 10,110 | 22.0170 | $222,591.54 |
| 7/1/2019 | 103,430 | 21.1988 | $2,169,392 |
| 7/17/2019 | 869,121 | 21.1988 | $18,424,365 |
| **TOTALS** | **1,970,361** | | **$44,385,233.86** |

191.    Through these sales, Neves unloaded the vast majority of his personal Farfetch Class A holdings as of January 31, 2019, as disclosed by the Company in its Form 20-F dated March 11, 2019.  In particular, Neves sold 997,810 shares—or 59%—of his 1,696,377 disclosed Class A shares, in dispositions between April 18 and June 21, 2019. Neves proposed to sell another 103,430 shares on July 1, 2019, and 426,227  shares on July 17, 2019—sales that would push his aggregate sales between April and July 2019 to approximately 84% of his disclosed holdings. Also on the July 17, 2019 Form 144 he filed, Neves proposed to sell 442,894 additional shares that he just acquired that month.  Counting the 997,810 shares he disclosed selling and the 972,551 shares he disclosed an intent to sell in July 2019 in his SEC filings, Neves sold a total of 1,970,361 shares during the Class Period.

192.    Robb sold hundreds of thousands of his personally held shares between April and August 2019. Indeed, in July 2019 alone, just prior to Farfetch's August announcement of its $89.6 million second-quarter loss and the pursuit of a much different business model—and the plummeting share prices that followed—Robb netted at least ***$20.6 million*** in proceeds through a rapid succession of share sales, and also announced his intention to sell an additional $752,584 worth of stock on August 1, 2019, as follows:

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 4/8/2019 | 71,545 | 25.4159 | $1,818,380.57 |
| 4/9/2019 | 65,954 | 25.2538 | $1,665,589.13 |
| 4/10/2019 | 77,373 | 24.9364 | $1,929,400.08 |
| 4/11/2019 | 24,481 | 24.7704 | $606,404.16 |
| 4/12/2019 | 136,366 | 25.5665 | $3,486,401.34 |
| 4/15/2019 | 60,357 | 25.1189 | $1,516,101.45 |
| 4/16/2019 | 13,924 | 25.0361 | $348,602.66 |
| 5/14/2019 | 62,500 | 23.3378 | $1,458,612.50 |
| 6/3/2019 | 664 | 20.0377 | $13,305.03 |
| 6/6/2019 | 13,670 | 20.0191 | $273,661.10 |

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 6/7/2019 | 12,000 | 20.0824 | $240,988.80 |
| 6/10/2019 | 6,736 | 20.0173 | $134,836.53 |
| 6/11/2019 | 29,430 | 20.3486 | $598,859.30 |
| 6/24/2019 | 138,189 | 21.0835 | $2,913,507.78 |
| 6/25/2019 | 61,811 | 20.4214 | $1,262,267.16 |
| 7/1/2019 | 62,500 | 20.8599 | $1,303,743.75 |
| 7/19/2019 | 3,207 | 22.0039 | $70,566.51 |
| 7/23/2019 | 27,202 | 22.0070 | $598,634.41 |
| 7/24/2019 | 2,412 | 22.0006 | $53,065.45 |
| 7/26/2019 | 11,400 | 22.0059 | $250,867.26 |
| 7/29/2019 | 1,000 | 22.0040 | $22,004.00 |
| 8/1/2019 | 37,128 | 20.2700 | $752,584.00 |
| **TOTALS** | **919,849** | | **$21,318,383.79** |

193.     Through these twenty-one different sales, Robb offloaded the vast majority of his personally held Farfetch shares, as disclosed in the Company's March 2019 Form 20-F.   In particular, Robb sold 882,721—or 49%—of the 1,812,910 shares the Company disclosed. Assuming Robb's final noticed sale of 37,128 shares was effectuated, Robb sold over 50% of his Farfetch shares in a matter of several months in advance of extremely negative financial news and a disclosure that the Company's fundamental business model was a ruse.

194.     Jordan also personally sold at least one hundred twenty thousand shares in less than a week during the Class Period, reaping at least *$2.4 million* in proceeds, and proposed to sell an additional 30,000 shares, worth approximately $624,000, as follows:

| Transaction Date | Shares Disposed | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 6/24/2019 | 30,000 | 21.0447 | $631,341 |
| 6/25/2019 | 30,000 | 20.2448 | $607,344 |
| 6/26/2019 | 30,000 | 19.8573 | $595,719 |
| 6/27/2019 | 30,000 | 20.9186 | $627,558 |
| 6/28/2019 | 30,000 | 20.8000 | $624,000 |
| **TOTALS** | **150,000** | | **$3,085,962** |

195.    In four sales from June 24-27, 2019, Jordan sold 120,000—or 16%—of the 733,435 shares he held according to the Company's March 2019 Form 20-F. Jordan also proposed to sell an additional 30,000 shares on or about June 28, 2019, for total sales of 150,000 shares or 20% of his disclosed holdings.

196.    In addition to the large volume of their sales, the timing of the Officer Defendants' Class Period sales of Farfetch stock is highly suspicious.  This condensed selling activity occurred shortly before Defendants' disclosure of Farfetch's faltering revenues and newly reoriented business model, and the predictable stock price decline it precipitated.  This evidences the Officer Defendants' desire to profit from the artificial, fraud-related inflation in Farfetch's stock price before the inevitable corrective.

197.    Moreover, Defendant Jordan mislead investors as to Defendants' ability to sell shares. On June 12, 2019, Defendant Jordan delivered a presentation at Deutsche Bank's 16th Annual dbAccess Global Consumer Conference in Paris, France. During that presentation, Jordan stated that insiders were barred from selling their Farfetch shares, except during a brief period of time between May 16 through June 7, 2019, and noted that, "of the major holders now," including specifically, Defendant Neves, "we're locked up again until the next trading window." This was, of course, not true, and Jordan concealed that Defendants Neves had entered into trading plans to circumvent the lockup.

198.     Furthermore, after the Officer Defendants' onslaught of large insider sales just before the Company's August 2019 disclosure, they did not sell any of their personally held shares during the rest of 2019.  Specifically, the Company continued to grant its employees stock awards, and by December 31, 2019, it had awarded nearly 14 million additional tranches of options and restricted stock units to all employees.  Thus, by January 31, 2020, Neves owned 2,191,076 Class A shares and Jordan owned 725,836.  Notably, after Farfetch's stock's precipitous drop in August 2019, neither Neves, Jordan nor Robb (who had left the Company) sold *a single share* of their personally held stock for at least another five months.  None of them sold another share until *after* the stock price began to rebound in late January 2020.

### L.     Defendants Neves And Robb Engaged In Insider Trading In Violation Of Section 20A, Selling Millions Of Dollars In Farfetch Stock While In Possession Of Material Non-Public Information

199.     As detailed above, while in possession of material, nonpublic information regarding Farfetch's true organic growth and growth strategies, Officer Defendants Neves, Robb, and Jordan unloaded over two million shares of stock and made at least *$46 million*, and likely over *$68 million*, during the four months immediately before the truth about Defendants' fraud was revealed in August 2019.  The bulk of these shares were sold by Neves and Robb.

200.     Prior to each sale, the Officer Defendants possessed material, nonpublic information regarding the Company, including, *inter alia*: (i) Farfetch's financial dependence on traditional first-party retail sales, including through its violation of IFRS 8; (ii) Farfetch's growth strategy and, specifically, Farfetch's undisclosed plans to engage in expensive inorganic acquisitions of first-party retail assets to drive growth; and (iii) Farfetch's manipulation of certain KPIs, including Platform GMV, Third Party take rates, and Adjusted EBITDA, to meet projected performance targets.

201.     The Officer Defendants learned these facts and were in possession of such material, nonpublic information through, among other ways: (i) their positions of control and authority as senior executive officers; (ii) their personal knowledge or receipt of information reflecting the true facts regarding Farfetch; and (iii) attendance and participation in investor conferences and on Company earnings calls.  Indeed, Neves, Robb and Jordan are alleged to have made false or misleading statements and/or signed Farfetch's SEC filings in which facts were misstated and omitted.

202.     None of this material, nonpublic information was disclosed to investors, including Plaintiffs, until the truth was revealed on August 8, 2019.

203.     Contemporaneous with many of Defendants Neves' and Robb's insider sales, Plaintiffs IAMNPF and Oklahoma Firefighters purchased 228,182 shares and 16,702 shares, respectively, of Farfetch common stock at artificially inflated prices.

204.     Specifically, including Defendant Neves' proposed sales on July 17, 2019, as reported on a Form 144, contemporaneous with Plaintiffs' purchases, Defendant Neves sold over 1 million shares, amounting to over $42 million in proceeds, and Defendant Robb sold over 900,000 shares, amounting to over $21 million in proceeds, as reflected in the chart below.

205.     Upon information and belief, thousands of other Class members also purchased shares contemporaneously with Robb and Neves' sales.  As alleged in this Complaint, at the time of these Defendants' sales and the purchases by Plaintiffs and the other Class members, the price of Farfetch's common stock was artificially inflated by the Defendants' material misstatements and omissions.

| Defendants' Sales | | | | | Plaintiffs' Purchases | | |
|---|---|---|---|---|---|---|---|
| Insider | Date | Shares Disposed | Price Per Share | Gross Proceeds | Date | IAMNPF Shares Purchased | Oklahoma Firefighters Shares Purchased |
| **May 2019** | | | | | | | |
| Neves | 5/10/2019 | 50,000 | 23.6947 | $1,184,735.62 | | | |
| Neves | 5/13/2019 | 50,000 | 23.0208 | $1,151,041.94 | 5/16/2019 | 81,323 | 40,847 |
| Neves | 5/14/2019 | 50,000 | 23.2667 | $1,163,333.22 | 5/17/2019 | 49,908 | 25,067 |
| Robb | 5/14/2019 | 62,500 | 23.3378 | $1,458,612.50 | 5/20/2019 | 27,663 | 13895 |
| Neves | 5/15/2019 | 50,000 | 24.0144 | $1,200,721.27 | | | |
| Neves | 5/16/2019 | 43,850 | 22.7129 | $995,961.01 | | | |
| **June 2019** | | | | | | | |
| Robb | 6/3/2019 | 664 | 20.0377 | $13,305.03 | 6/4/2019 | 4903 | 2462 |
| | | | | | 6/5/2019 | 17,559 | 8822 |
| | | | | | 6/6/2019 | 19871 | 9984 |
| Robb | 6/11/2019 | 29,430 | 20.3486 | $598,859.30 | 6/11/2019 | 20,826 | 10,458 |
| | | | | | 6/12/2019 | 5,965 | 2,996 |
| **July 2019** | | | | | | | |
| Neves | 7/17/2019 | 869,121 | 21.1988 | $18,424,365 | 7/17/2019 | 25 | 334 |
| | | | | | 7/18/2019 | 139 | 1,837 |

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

206.    As summarized in detail herein and below, throughout the Class Period, Defendants Farfetch, Neves, Jordan and Robb each made materially false and misleading statements and omissions concerning, among other things: (i) Farfetch's financial dependence on traditional first-party retail sales, including through its violation of IFRS 8; (ii) Farfetch's growth strategy and, specifically, Farfetch's undisclosed plans to engage in expensive inorganic acquisitions of first-party retail assets to drive growth; (iii) Farfetch's manipulation of certain KPIs, including Platform GMV, Adjusted Platform Revenue/Platform Services Revenue, Third Party Take Rates, and Adjusted EBITDA, to meet projected performance targets; and (iv) Farfetch's use of constant promotions and discounts throughout the Class Period, the financial impact of which were concealed from investors.

A.      **Defendants Deliberately Misled Investors By Causing Farfetch To Violate Segment Reporting Requirements**

207.    To provide investors with meaningful information about the financial condition of an entity, the International Accounting Standards Board, as set forth in IFRS 8, requires that financial results be presented for separate operating segments within an entity. The objective of presenting disaggregated information about segments of a business entity is to produce information sufficient to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates.

208.    IFRS 8, therefore, requires the presentation of segment information that assists financial statement users to understand an entity's performance, assess its economic characteristics, and make informed decisions about the entity.

209.    Pursuant to IFRS 8, ¶5, an "operating segment" is a component of an entity:

(a)     That engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same entity);

(b)     [W]hose operating results are regularly reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance, and

(c)     [F]or which discrete financial information is available.

210.    "Reportable segments" are operating segments that meet the criteria for separate reporting under IFRS 8. Pursuant to IFRS 8, ¶11(b) and ¶13, an operating segment is a reportable segment if *any* of the following quantitative criteria is met:

(a)     Its reported revenue, including both sales to external customers and intersegment sales or transfers, is 10 per cent or more of the combined revenue, internal and external, of all operating segments.

(b)     The absolute amount of its reported profit or loss is 10 per cent or more of the greater, in absolute amount, of (i) the combined reported profit of all

operating segments that did not report a loss and (ii) the combined reported loss of all operating segments that reported a loss.

(c)    Its assets are 10 per cent or more of the combined assets of all operating segments.

211.    In the Offering Materials and in the Company's Form 20-F for 2018, Farfetch identified four operating segments:

**Segment Reporting**

We have determined our operating segments *on the same basis that we use to evaluate performance internally*. Our operating segments are: (1) Farfetch Marketplace, (2) Farfetch Black and White, (3) Farfetch Store of the Future and (4) Browns Stores. *Farfetch Marketplace represents over 90% of revenue*; therefore, we are presenting only one reportable operating segment being the consolidated view of all operating segments noted above.

212.    The Offering Materials contained an additional statement about the reportable operating segments:

**Segmental and geographical information**

The Group has identified four operating segments. *This assessment is based on information reported to the Group's Chief Executive for the purpose of assessing segmental performance and resource allocation*.

These are the Marketplace (which operates the Farfetch.com marketplace website and app), Farfetch Black & White (a white label website solution for luxury brands), Stores (operation of the Browns luxury boutiques) and Store of the Future (provision of technology solutions to retail outlets). *The Marketplace represents over 90% of the Group's revenue, results and assets*. As such the Group has presented only one reportable segment.

213.    The above statements in ¶¶ 211-12 were false and misleading and failed to disclose material information throughout the Class Period, because Farfetch's segment reporting during the Class Period violated IFRS.  The Browns retail business (e-commerce and in-store) was an independent, separate operating segment under IFRS, and it should not have been artificially divided into two, with the physical locations grouped as "Stores" and the significant remainder of the revenue lumped together with Farfetch's Marketplace platform commission-based segment.

Instead, separate segment information was required to be reported for the Browns' segment and the Marketplace segment (minus the Browns' revenue).  Moreover, as FE-1 described in Section IV.G.1, *supra*, the Browns first-party retail business was viewed separately internally, filed its own financial statements in the UK, and had its own CEO, who reported directly to Defendant Neves.

214.    Investors, including Plaintiffs and members of the proposed class, were misled by Farfetch's improper segment reporting. Had Farfetch complied with IFRS 8, investors would have been alerted to Farfetch's reliance on the Browns first-party retail business to prop up its reported GMV, Adjusted Platform Revenue (after the IPO, called Platform Services Revenue), and other KPIs and financial metrics, and therefore, the related fact that Farfetch's marketplace platform business model was not providing the explosive, organic growth promised by Defendants. Moreover, investors would have been alerted to the inventory risk posed by Farfetch's reliance on first-party sales and the negative impact such risk had on the Company's financial results.  This knowledge would have directly impacted Farfetch's IPO and share value.

215.    As illustrated by the following facts and those set forth above, *see* Section IV.G.1, *supra*, among others, Browns retail business was a discrete "operating segment" as defined in IFRS 8, ¶5.

216.    Following Farfetch's 2015 acquisition of Browns and throughout the relevant Class Period, Browns operated as a distinct subsidiary business entity that engaged in retail sales activities—both online and in-store—which generated revenues and incurred expenses.  Browns' "economic environment" was vastly different from the marketplace platform touted by Farfetch because its revenues and costs of doing business were derived from direct, first-party sales for which Browns carried inventory, whereas Farfetch's marketplace platform's revenues and costs

were derived from the facilitation of transactions between third party sellers and consumers in exchange for a percentage commission, where no inventory was ever held by Farfetch.

217.    Evidence that Browns should have been reported as a separate operating segment that satisfies each element of IFRS 8, ¶5, is overwhelming.  Indeed, Browns filed a stand-alone Annual Report with the United Kingdom's registrar of companies for the years 2015-2019, a fact not disclosed in Farfetch's SEC filings, and had its own CEO who reported directly to Defendant Neves.

218.    Each Browns Annual Report was "presented" by Browns' Board of Directors, which included Defendants Neves and Jordan for the relevant period.  Indeed, Defendant Neves signed the Browns Annual Report for 2015, 2016 and 2017 on behalf of the entire Board, and Defendant Jordan signed the Annual Report for 2018 on behalf of the entire Board.

219.    In each Annual Report, Defendant Neves and Defendant Jordan, respectively, wrote: "The principal activity of [Browns] was that of retailing ladies' and mens' wear.  The directors anticipate this activity will continue." No distinction was made between Browns' in-store business and e-commerce business.

220.    Each Annual Report disclosed "discrete financial information" for the Browns retail business (both in-store and e-commerce), including revenue, cost of sales, gross profit, other operating income, and loss.  Moreover, unlike Farfetch, with its several pages of highly technical (and confusing) KPIs, Browns' business proposition and measure of success (or failure) was much more straightforward:

**Key performance indicators (KPIs)**

The directors monitor revenue and profits or losses as set out in the statement of profit or loss on page 10. The directors are of the opinion that disclosing additional key performance indicators, other than those above, is not necessary to understand the development, performance and position of the business.

221.    Farfetch began reporting its financial results in the Offering Materials using just one reportable operating segment: Farfetch Marketplace, and continued to do so throughout the Class Period. While the Company did identify how much of the total GMV was revenue from Browns' physical stores, it did not provide information on the amount of GMV provided by Browns' e-commerce sales.

222.    Farfetch's segment reporting during the Class Period violated IFRS 8 because Browns retail business was a separate operating segment under the clear terms of IFRS, as described above. The Browns retail business should have been disclosed as a separate operating segment, as described in IFRS 8, ¶5.  Instead, Defendants stripped out sales made in the two Browns physical boutiques from sales made (from the same inventory of goods) online through the Farfetch platform or through Browns' own website. The reason Defendants did this was clear: if the entire Browns retail business were viewed as a whole, revenue from that operating segment accounted for *far more* than 10% of all of Farfetch's revenue, and would have been a mandatory operating and reporting segment under IFRS ¶11.

223.    A comparison of Browns' UK-filed Annual Reports for 2017 and 2018 and Farfetch's Offering Materials and Form 20-F for 2018 reveals just how much of Farfetch's revenue was due to the Browns Retail business:

| Segment | 2017 Revenue | % of Total Revenue | 2018 Revenue | % of Total Revenue |
|---------|--------------|--------------------|--------------|--------------------|
| Total | $385,966,000 | | $602,384,000 | |
| As reported: | | | | |
| Farfetch (as reported minus Stores revenue) | $370,532,000 | 96% | $586,789,000 | 97% |
| Stores | $15,434,000 | 4% | $15,595,000 | 3% |
| If properly reported: | | | | |
| Farfetch (minus Browns) | $324,320,214 | 84% | $487,233,010.40 | 81% |
| Browns[6] | $61,645,786 | *16%* | $115,150,989.60 | *19%* |

224.    Browns Retail business also met another test for "reportable segment," because it accounted for more than 10% of Farfetch's reported gross profits during the Class Period.

| Segment | 2017 Gross Profits | % of Gross Profits | 2018 Gross Profit | % of Gross Profits |
|---------|--------------------|--------------------|-------------------|--------------------|
| As reported: | | | | |
| Farfetch | $204,766,000 | 100% | $298,450,000 | 100% |
| If properly reported: | | | | |
| Farfetch | $172,752,608.80 | 84% | $247,898,725.40 | 80% |
| Browns[7] | $32,013,391.20 | *16%* | $50,551,274.60 | *20%* |

225.    As alleged above, Farfetch's former Senior Manager for Financial Reporting, FE-1, described how Defendants Neves and Jordan made the decision to conceal the contribution of Brown's retail first-party sales by artificially separating Browns' physical stores and e-commerce first-party revenue in order to conceal Farfetch's reliance on first-party retail sales.

226.    FE-1 recalled how Defendants Neves and Jordan did not want to report the first party revenue in the Prospectus because you will not get the same kind of multiple Farfetch

---

[6] Browns reports its financials in pounds sterling.  These figures were converted to dollars using the conversion rate as of the date of filing for Browns' Annual Reports: September 20, 2018 (1 Pound Sterling = $1.3272) and September 30, 2019, respectively (1 Pound Sterling = $1.2293).

[7] Browns reports its financials in pounds sterling.  These figures were converted to dollars using the conversion rate as of the date of filing for Browns' Annual Reports: September 20, 2018 (1 Pound Sterling = $1.3272) and September 30, 2019, respectively (1 Pound Sterling = $1.2293).

ultimately got in the IPO with traditional retail. The Defendants expressed that they wanted the focus of the Offering Materials to be on the growth of the third party platform business, and to make it look as if were growing organically. FE-1 explained that the most deliberate way that Defendants avoided discussing first party sales dependence was through the way they crafted the segment reporting in the financials.

227.    FE-1, in his role as Senior Manager of Financial Reporting, was responsible for making an initial determination that Browns Retail *was* a separate segment under the IFRS. As can be seen in the above chart, this made the Farfetch Marketplace smaller and Browns Retail well over 10% of total revenue. FE-1 relayed that Defendants Neves and Jordan were "absolutely" involved in the decision to make that change adding Browns back into the marketplace. It was discussed at the Board level and they were involved in the Board discussion. According to FE-1, it was a very "artificial" thing to do because you had to split Browns (one thing) into two. Without taking that action, Defendants would not have been able to say that 90% of Farfetch's business was Marketplace.

228.    During the Class Period, defendants selectively and misleadingly disclosed information about Browns. They deliberately failed to provide complete or meaningful information about Browns' retail business in order to avoid disclosing or drawing attention to the facts that (i) the Company's carefully curated identity as a truly unique global marketplace platform without any significant inventory or costs was untrue and, in fact, Farfetch was becoming increasingly tied to first-party sales revenue, and (ii) Defendants intended to use some (or all) of the IPO Proceeds to acquire additional retail companies that further diverged from Farfetch's professed business model and growth strategy.

229.    Defendants misled investors by failing to identify Browns' retail business as a separate reportable operating segment pursuant to IFRS 8.  Defendants' failure to comply with the clear language of IFRS 8 rendered all of Farfetch's stated financial results to be false and misleading because they failed to properly report and account for the increasing impact of Farfetch's first-party retail business on the Company's operations, business model, and growth strategy.  This would have dramatically reduced several of the KPIs, as well as their growth rates.  For example, as the following chart demonstrates, Farfetch's improper inclusion of Brown's online revenues in its Marketplace metrics caused it to dramatically overstate its keystone Platform Service Revenue metric in 2017, and to do so to an even greater degree in 2018:

|  | Platform Services Revenue (as reported) | Platform Services Revenue (minus Browns' online) | Percent Overstatement |
|---|---|---|---|
| **2017** | $296,350,000 | $250,138,214 | 19% |
| **2018** | $488,995,000 | $389,439,010 | 26% |

230.    This information was highly material to Farfetch investors, whose assessment and valuation of the Company depended in large part on the Company's representations that it was "obviously a technology company" that carried "no inventory" or "low inventory" and whose "revenue is generated from connecting sellers and consumers together in a successful transaction." *See* Sections IV.B-D, F, *supra*.

### B.    The Offering Materials

231.    On or about September 21, 2018, Farfetch and certain selling insiders sold 50,880,311 shares of Class A common stock at a price of $20.00 per share. The IPO was conducted pursuant to numerous SEC filings, including a Registration Statement (No. 333-226929) that was filed with the SEC on September 19, 2018 and declared effective on September 20, 2018 (as amended), and a Prospectus dated September 20, 2018 (the "Offering Materials").  Through the

IPO, 205,757,266 additional shares of Class A common stock were registered and were held by the Officer Defendants, certain Farfetch Board Members, and other insiders and related parties. The Prospectus disclosed that, following the IPO, Farfetch would have 256,637,577 Class A common stock outstanding (including the underwriters' overallotment), and 42,858,080 Class B ordinary shares outstanding (that were owned in full by Defendant Neves). The Class A common stock shares that were not offered to the public through the IPO were freely tradeable following a lockup period of approximately 180 days (subject to any internal restrictions on insider sales). Defendants Neves and Jordan signed the IPO Registration Statement. In addition, Defendants Neves and Jordan marketed the IPO to institutional investors through a roadshow that included a video and presentation slides addressing Farfetch's platform business model and growth strategy (the "Roadshow Presentation"). Farfetch common stock began trading on the NYSE on September 21, 2018.

232.     Defendants made numerous false and misleading statements and omissions in the Roadshow Presentation and Offering Materials. *First*, Defendants made false and misleading statements and omissions about Farfetch's third-party marketplace platform model and growth strategy that misled investors by concealing the Company's significant and growing reliance on its first-party retail business.

233.     In the Roadshow Presentation, Defendant Jordan stated that "***Farfetch is obviously a technology business, and the financial model, as you will see from the numbers, is all about investing in that technology and delivering growth within the luxury industry for our sellers***." Jordan described Farfetch's marketplace platform business model: "So, the model works in that as a luxury seller on our platform makes a transaction with our end consumer, Farfetch captures a

revenue share of that, a take rate. ***So, our revenue is generated from connecting sellers and consumers together in a successful transaction***." Jordan also stated that:

Last year, the Farfetch platform grew to $894 million worth of GMV, and of that we took close to a 33 percent take rate to drive our revenues. ***So, the Farfetch business is very much focus[ed] on being a technology platform for existing retailers as they grow their sales online via Farfetch***. ***This business model is low inventory***. The only inventory we take on is for the brands boutique. ***So again, a small portion of inventory, meaning no inventory risk across our third-party sellers***. That also means low CapEx.

234.    Defendants echoed these representations in the Offering Materials, stating:

***We are a technology company at our core*** and have created a purpose-built platform for the luxury fashion industry. Our platform consists of three main components: applications, services and data.

**\*\*\*\*\***

Aggregating a large number of luxury sellers requires long and careful relationship building and acts as a significant barrier to entry. We have carefully nurtured these relationships for a decade. ***Our Marketplace model allows us to offer the broadest and deepest selection of luxury fashion available online globally, while incurring minimal inventory risk and without capital-intensive retail operations***.

235.    The Offering Materials described Farfetch's "marketplace business model" as one of its "Strengths" because "Our model allows us to offer the broadest and deepest selection of luxury fashion available online globally, ***while incurring minimal inventory risk and without capital-intensive retail operations***. This allows for low capital expenditures, favorable working capital dynamics, minimal inventory holding and ***an ability to drive stronger future margins than traditional inventory-taking business models***." Defendants also explained that "We generate income from transactions conducted on our platform, which, together with Browns In-Store Revenue, represents our GMV. ***We primarily operate a revenue-share model where we retain commissions and related income from these transactions***."

236.    In the Roadshow Presentation, Defendant Neves directly contrasted Farfetch, as a

platform business, with its retailer competitors in the luxury fashion space. In detailing Farfetch's

unique value proposition, Defendant Neves explained:

> I believe the Farfetch model is extremely difficult to replicate. It took us 10 years
> to build the relationships we've built, to create the technology, the logistics, the
> data platforms that drive our business and to reach the scale we've reached. ***And
> we have really what is a considerable advantage in terms of our competitive
> position. It's very rare that a $300 billion industry has only one marketplace.
> Everyone else is a retailer***.

237.    Defendant Neves closed the Roadshow Presentation by explaining how Farfetch's

marketplace platform model would allow the Company to differentiate from "retailers" and take

the "lion's share" of the $100 billion dollar online luxury market:

> Let's imagine this industry in 10 years' time. In 10 years' time, it will be at least a
> $450 billion dollar industry. We know that online sales are going to be at least 25
> percent of the market, from 9 percent today. This means that an incredible, very,
> very large opportunity is ahead of us, an opportunity just in online luxury of well
> over $100 billion. Who is going to take this $100 billion? Is it going to be a retailer?
> Is it going to be a department store? Is it going to be a single brand or a
> conglomerate of brands? ***At Farfetch, we believe it's going to be a platform and at
> Farfetch we believe deeply that it is the destiny of this company to be the category
> leader in this industry.***

238.    The statements above in ¶¶ 233-37 were materially false and misleading because

Defendants (i) misleadingly characterized the Company as a third-party "platform" business and

concealed and downplayed its crucially-important first-party business, when in fact the Company

was heavily dependent on its first-party business, including for driving its purported "platform"

performance,  to the extent that the first-party retail business was 16% of the Company's revenue

(and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the

Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); (ii) touted the

Company's "minimal inventory risk" and "low inventory risk," when in fact the Company was

subject to significant inventory risk because of its concealed dependence on first-party sales; and

(iii) failed to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business, as their statements suggested.

239.    These statements were highly material to investors and analysts, who noted that Farfetch's value lay in its role as a platform that "aggregate[ed] the inventory of its boutique partners without holding any inventory itself" (¶ 37). An article in *Forbes* prior to the IPO noted that Farfetch's lack of inventory "is a great point of difference in the market which enables them to have a large assortment without the risk involved." *Fortune* similarly remarked that "What makes Farfetch's business model appeal is that it does not own the inventory sold on its website, but instead offers the web site to help the brands sell. That means Farfetch is spared from the complexities of inventory management that can include dealing with overstocks." On September 21, 2018, the day that Farfetch common stock began trading, and the offering price of $20 per share skyrocketed up to close at $28.45 per share, *Forbes* reiterated its assessment of Farfetch's value, publishing an article that described how "Farfetch never takes physical control of the products it sells" and that "its platform business model is the key to [its] success."

240.    *Second*, Defendants made false and misleading statements and omissions concerning the Company's **financial growth strategy and use of the hundreds of millions of dollars of IPO proceeds**.

241.    During the Roadshow Presentation, Defendant Jordan described "the Farfetch financial strategy [that] has five very simple but very effective points plans post-IPO:"

> ✓ DRIVE GMV GROWTH AND CONTINUE TO CAPTURE MARKET SHARE AS THE CATEGORY LEADER
>
> ✓ CONTINUE TO DRIVE ATTRACTIVE UNIT ECONOMICS IN OUR CONSUMER BASE

✓ SCALE THE BUSINESS TO DRIVE OPERATING LEVERAGE

✓ INVEST IN TECHNOLOGY AND MARKETING TO DELIVER SUSTAINABLE GROWTH WITH A CLEAR PATH TO LONG-TERM PROFITABILITY

✓ DELIVER PLATFORM-LEVEL EBITDA MARGINS, WITH FAVORABLE WC DYNAMIC AND LOW CAPITAL EXPENDITURE

242. Defendant Jordan tied the success of Farfetch's growth strategy to the Company's KPIs—increased GMV, Adjusted Platform Revenue (later changed to Platform Services Revenue), sustained, high take rates, and improvements to the Company's negative Adjusted EBITDA:

> [A]s we follow the first four points of the investment strategy by growing the top line [GMV] in a sustainable way, expanding unit economics and of course, leveraging the fixed cost base while investing in technology, we will continue to see expanding EBITDA margins and we will strive for those expanding EBITDA margins in the near term.  The luxury fashion industry is characterized by very strong gross margins, with the costs of product generally being 15 to 20 percent of the end retail price. . . . ***When you therefore compare these margins to the intended 30 percent take rate of Farfetch and the level of services we provide, from production through to customer service and delivery, you can see that the industry can sustain the take rates at 30 per cent for Farfetch***.

243. The IPO Offering Materials also described the "key elements" of Farfetch's "Growth Strategies:"

- "Improving consumer economics and growing our consumer base;"

- "Increasing product supply and our luxury seller base;"

- "Investing in new technologies and innovation;" and

- "Building the Farfetch brand."

244. While Farfetch stated that it intended to "use the net proceeds from this offering and the concurrent private placement for working capital, to fund incremental growth and other general corporate purposes, including possible acquisitions," the Offering Materials stated that the Company "[did] not currently have any definitive or preliminary plans with respect to the use of

proceeds for such purposes." Rather, in his letter to investors included in the Offering Materials, Defendant Neves explained: *"We plan to continue investing aggressively in R&D. That, and growing our brand across geographies and categories, will be the focus of our investments in 2019 and beyond."*

245.    Moreover, while the Offering Materials identified potential future acquisitions as a "Risk Factor," stating that "[w]e have acquired, and may continue to acquire, other companies or technologies, which could divert management's attention and otherwise disrupt our operations and harm our operating results," Defendants had assured investors during the Roadshow Presentation that "There's no Stores to continue to develop or roll out. *There's no growth in Stores within the plans for Farfetch* and very little CapEx associated because there's no warehouses and no fixtures and fittings on the back of that."

246.    Defendants' representations in ¶¶ 241-45 were materially false and misleading and omitted material facts. As set forth above, Defendants' statements created the false and misleading impression that the Company could and would achieve its growth targets by investing in its third-party technology platform business and growing that business organically, and omitted that it planned to grow through increasing Farfetch's risky and capital-intensive first-party business through inorganic acquisitions of existing third-party partners Stadium Goods and New Guards, and through the use of extensive promotions.  Investors understood from these representations that Farfetch could grow explosively, because it was purportedly pursuing a platform strategy (which Defendants touted as having the capability for self-reinforcing or self-accelerating growth), and that this growth would not require large capital expenditure, the assumption of large inventory risk, or offering heavy promotional discounts. They also understood that Farfetch planned to pursue growth by investing in its core technology offering, and not by pursuing acquisitions and

growing the first-party business, Indeed, as FE-1 explained, Defendants knowingly engaged in a concerted effort to obscure the contribution of Farfetch's first-party business in the run-up to the IPO, to the point of artificially dividing up Brown's business on Farfetch's balance sheet in order to group Browns' first-party online sales with those on the core third-party marketplace, and they also had (but actively concealed) that they already had plans to expand and to conduct acquisitions. Further, by the time of the IPO, several former employees have relayed that Defendants had set out on a course to pursue growth for Farfetch by offering "constant" discounts, which they failed to disclose.

247.    As shown by the reports of numerous analysts and commentators in the run-up to Farfetch's IPO, the market relied on Defendants' representations in the IPO Offering Materials and Roadshow Presentation, and Farfetch would not have been able to conduct its IPO, or would only have been able to raise a materially smaller amount than it did, had Defendants not made these representations.

248.    Defendant Jordan's statement in ¶ 245, above, was also materially misleading because there was, in fact, significant growth in Browns' first-party retail plans.  As reflected above, in ¶¶ 223-24, Browns doubled its revenues between the end of 2017 and the end of 2018, increasing from $61,645,786 to $115,150,989.60, and jumping from roughly 16% of Farfetch's revenues to nearly 20%.  The growth in Browns' first-party retail revenue was so significant to Farfetch's bottom line that, had Farfetch properly reported Browns as a separate operating segment, Farfetch's Adjusted Platform Revenue (later Platform Services Revenue) would have dropped dramatically, by approximately 19% in 2017 and approximately 26% in 2018.

249.    Further, the Risk Factor described above in ¶ 245 was materially misleading, as it omitted material facts and violated the requirements of Item 105 of Regulation S-K. As FE-1

explained, to increase Farfetch's GMV and revenue and to meet their growth targets for the Company, Farfetch would have to engage in acquisitions, and Defendants planned to pursue this strategy at the time of the IPO. Indeed, not only were these acquisitions likely at the time of IPO, FE-1 explained that no acquisitions of that scale could have happened without the successful IPO proceeds. Thus, the need and plan to conduct acquisitions was already realized, rather than a mere possibility, rendering the above "Risk Factor" false and misleading when made.

250.    *Third*, Defendants made false and misleading statements and omissions concerning the Company's ability to grow organically by ***devising key performance indicators and financial metrics that were "protected" from anticipated deterioration from promotions***.

251.    The IPO Offering Materials represented to investors that "Promotional incentives, which include basket promo-code discounts, may ***periodically*** be offered to end consumers" and that the promotions "are treated as a deduction to revenue." Defendants further noted that "Cash is collected by the Group from the end consumer using payment service providers" and "Within two months of the transactions, this is remitted to the relevant seller (net of commission and recoveries)." The IPO Offering Materials similarly stated that "Promotional incentives may be ***periodically*** offered to consumers. When we bear the costs of promotional incentives, these costs are recognized as deductions to revenue."

252.    The statements above in ¶ 251 were false and misleading, and failed to disclose material information. Specifically, the Company's "promotional incentives" were not offered "periodically," because, since no later than June 2018, the Company had begun offering promotional incentives and site-wide discounts "constantly" in order to inorganically inflate sales and attract new customers. *See* ¶¶ 143-47. This constant stream of promotions was a marked departure from the Company's historic practice of offering discounts only twice a year during

summer and end of year. *See* ¶ 142.  These materiality of these misrepresentations was underscored by the fact that, while the Company's brand and boutique partners would often equally share the costs of the historical twice-annual sales and promotions, the brand and boutique sellers required Farfetch to cover the costs of all or most of these new, "constant" promotions by deducting the costs of the promotions from Farfetch's take rate, or commission.  *See* ¶ 149.

253.     The Prospectus described as a "risk factor" the fact that "***Retailers and brands set their own prices for the products they make available on our Marketplace, which could affect our ability to respond to consumer preferences and trends***."  The IPO Prospectus went on to describe that Farfetch "***do[es] not control the pricing strategies of our retailers and brands*** (other than Browns)."

254.     The statements above in ¶ 253 were materially false and misleading, omitted material facts, and violated the requirements of Item 105 of Regulation S-K. As set forth above (¶¶ 142-49), Farfetch exerted significant control over pricing and pricing strategies for transactions occurring on the Farfetch platform, specifically in the form of discounts that it offered to customers to attract and retain them. These discounts were significant in scope, and were initiated by Farfetch—not by its retail and brand partners.

255.     The Company identified "key operating and financial metrics" in the Prospectus:

| | Six months ended June 30, | | Year ended December 31, | | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2015 | 2016 | 2017 |
| | | (in thousands, except as otherwise noted) | | | |
| **Selected Other Data(1):** | | | | | |
| **Consolidated Group:** | | | | | |
| GMV | $394,506 | $631,235 | $381,809 | $585,842 | $909,826 |
| Revenue | 172,571 | 267,508 | 142,305 | 242,116 | 385,966 |
| Adjusted Revenue(2) | 138,811 | 216,957 | 113,688 | 193,605 | 311,784 |
| Adjusted EBITDA(2) | (13,972) | (49,075) | (47,375) | (53,380) | (58,079) |
| Adjusted EBITDA Margin(3) | (10.1%) | (22.6%) | (41.7%) | (27.6%) | (18.6%) |
| **Platform:** | | | | | |
| Platform GMV | $387,175 | $624,044 | $374,915 | $573,174 | $894,392 |
| Adjusted Platform Revenue(2) | 131,480 | 209,766 | 106,794 | 180,937 | 296,350 |
| Platform Gross Profit(4) | 90,494 | 133,587 | 69,355 | 111,762 | 196,581 |
| Platform Order Contribution Margin(4) | 46.7% | 44.0% | 33.0% | 35.0% | 43.0% |
| Third-Party Take Rate | 33.7% | 31.7% | 30.0% | 31.3% | 32.9% |

256.    The Offering Materials stated that "Adjusted Platform Revenue . . . *best represents the economic* value *being generated by the platform*," and further explained: "we provide fulfilment services to Marketplace consumers and receive revenue from the provision of these services, *which is by and large a pass-through cost with no economic benefit to us, and therefore we calculate our Adjusted Revenue excluding Platform Fulfilment Revenue*." Further, as set forth in the Offering Materials, Third-Party Take Rate was calculated based on Adjusted Platform Revenue.

257.    The metrics reported above in ¶¶ 255-256 were materially false and misleading and omitted material facts. The Revenue metric and the others reported above were materially false and misleading because it they reflected improper consolidation in violation of IFRS 8, as described in detail above. *See* ¶¶ 207-30.

258.    Further, the statement in ¶ 256 that Adjusted Platform Revenue "best represents the economic value being generated by the platform" was materially false and misleading, because Adjusted Platform Revenue did not accurately reflect the "constant" promotions being offered that reduced the economic value of the transactions being conducted on the platform, and because it omitted the fact that Adjusted Platform Revenue failed to accurately reflect the economic effect of promotions. In addition, the statement in ¶ 256 that Platform Fulfillment Revenue was "by-and-large a pass-through cost" was materially misleading, because Platform Fulfillment Revenue included deductions for promotions that directly and negatively impacted reported revenue.

259.    The Company's scheme to "protect" its Adjusted Platform Revenue (later called Platform Services Revenue) and Third-Party Take Rate metrics from reflecting the deduction in revenue from the Company's constant and undisclosed promotional practices resulted in false and misleading Third-Party Take Rate and Platform Services Revenue metrics in the Offering

Materials and thereafter throughout the Class Period.  The impact of these misstatements was revealed at the end of the Class Period, when the Company finally disclosed that it had engaged in large promotional activity in 2019, and further disclosed that it would significantly reduce its projected GMV growth rate from 40% to 30-35% for the second half of 2019 to account for its anticipated termination of its heavy promotional efforts.

260.    *Fourth*, Farfetch's IPO Offering Materials, and all filings incorporated by reference therein, failed to disclose information required to be disclosed therein by Item 303 (17 C.F.R. §229.303). Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

261.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future." Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

262.    Therefore, Item 303 required disclosure of: (1) Farfetch's increasing dependence on traditional first-party retail sales for its financial performance; (2) Defendants' undisclosed plans to use the IPO proceeds for acquisitions of additional first-party retail businesses; and (3) the Company's recent and undisclosed use of promotions and discounts to drive GMV and revenue, while "protecting" the Company's take rates and Adjusted Platform Revenue from deterioration.   Indeed, after marketing Farfetch as a low-inventory third-party marketplace platform in order to achieve the maximum IPO valuation, Farfetch's inability to achieve growth through the third-party marketplace platform, and need to rely on existing and increasing exposure to traditional first-party retail business revenue and risks, had a material unfavorable impact on the Company's valuation and business prospects. Farfetch's campaign of aggressive promotions and discounts, needed to boost GMV and revenues while the Company's third-party marketplace platform failed to provide the organic growth described in the Roadshow Presentation and Offering Materials, was a known trend and uncertainty that would have a material unfavorable impact on the Company's business and revenues, and was concealed from investors.  Farfetch's Offering Materials filed with the SEC failed to disclose this information and thus failed to comply with Item 303.

### C.    September 21, 2018 *Bloomberg.com* Interview With José Neves

263.    On September 21, 2018, *Bloomberg.com* posted an article titled "Online Luxe Goods Hub Farfetch Climbs After $855 Million IPO." Embedded in the article was a video interview with Defendant Neves. In that interview, Defendant Neves responded to a question about Farfetch's localized approach to shopping:  "So the idea is to, as we expand our network of brands and boutiques, is really to leverage the Farfetch distributed inventory because ***we are not a retailer – we don't own inventory***. ***We connect physical stores to consumers through logistics and technology***."

264.    The statement above in ¶ 263 was materially false and misleading because Defendant Neves (i) misleadingly characterized the Company as fundamentally a third-party "platform" business and concealed and downplayed its crucially-important first-party business, when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance,  to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); (ii) touted that the Company "[didn't] own inventory," when in fact the Company had significant inventory and was subject to significant inventory risk because of its concealed dependence on first-party sales; and (iii) failed to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business, as Defendant Neves' statement suggested.

265.    These statements were highly material to investors and analysts, who noted that Farfetch's value lay in its role as a platform that "aggregate[ed] the inventory of its boutique partners without holding any inventory itself." An article in *Forbes* prior to the IPO noted that Farfetch's lack of inventory "is a great point of difference in the market which enables them to have a large assortment without the risk involved." *Fortune* similarly remarked: "What makes Farfetch's business model appeal is that it does not own the inventory sold on its website, but instead offers the web site to help the brands sell. This means Farfetch is spared from the complexities of inventory management that can include dealing with overstocks."  On September 21, 2018, the day that Farfetch common stock began trading and the offering price of $20 per share

skyrocketed up to close at $28.45 per share, *Forbes* reiterated its assessment of Farfetch's value with an article that described how "Farfetch never takes physical control of the products it sells" and that "[i]t's platform business model is the key to that success."

### D.     November 8, 2018 Third Quarter Earnings Release And Conference Call

266.     On November 8, 2018, Farfetch filed a Form 6-K, signed by Defendant Neves, attaching a press release announcing Farfetch's Third Quarter 2018 Results ("Third Quarter Earnings Release").   In the Third Quarter Earnings Release, the Company announced that "Platform GMV Growth Continued to Outpace Online Personal Luxury Goods Market with 53% Year-Over-Year Increase in Q3 2018," and "Q3 2018 Revenue Grew 52% with Platform Services Revenue Up 61% Year-Over-Year."  Defendant Jordan was quoted as stating: "I am delighted with our performance in the third quarter of 2018, and our delivery of strong Gross Merchandise Value and revenue growth during the period. This growth, coupled with attractive unit economics and improving operating efficiencies allows us to make further investments to continue to capture market share into the future."  In the Third Quarter Earnings Release and the conference call that same day, the Company reported the following KPI and other financial metrics:

| KPI | Third-Quarter 2018 |
|---|---|
| GMV | $309,973[8] |
| Platform GMV | $305,884 |
| Platform GMV Growth (YOY) | 52.7% |
| Revenue | $132,179 |
| Platform Fulfillment Revenue | $21,799 |
| Adjusted Revenue | $110,380 |

[8] Dollar figures in thousands, unless otherwise noted.

| KPI | Third-Quarter 2018 |
|---|---|
| Browns in-store Revenue | $4,090 |
| Platform Services Revenue | $106,290 |
| Platform Services Revenue Growth (YOY) | 60.7% |
| Third Party Take Rate | 31.9% |
| Adjusted EBITDA | ($32,211) |
| Adjusted EBITDA Margin | (29.3%) |

267.    The metrics reported above in ¶ 266 were materially false and misleading and omitted material facts. The Revenue metric and the others reported above were materially false and misleading because they reflected improper consolidation in violation of IFRS 8, as described in detail above. *See* ¶¶ 207-30. In addition, the Platform Services Revenue, Platform Fulfillment Revenue, and Third-Party Take Rate metrics described above in ¶ 266 were materially misleading. The reported Platform Services Revenue metric included the price of goods without accurately reflecting Farfetch's constant discounting, and the costs of promotions were instead deducted from Platform Fulfillment Revenue, which the Company misleadingly claimed was "by and large a pass-through cost" even though it included the effects of the Company's constant and significant promotional activity.  In addition, the Company based its reported Third-Party Take Rate on the misleading Platform Services Revenue and Platform Fulfillment Revenue metrics. Accordingly, both the Platform Services Revenue and Third-Party Take Rate metrics reported by Defendants in the Third Quarter Earnings Release were misleading, for failing to incorporate the effects of the Company's constant promotions.

268.     On November 8, 2018, after the close of business, Defendants Neves and Jordan

participated in the Company's November 8, 2018 earnings call (the "Third Quarter Conference

Call").  During the Third Quarter Conference Call, Defendant Neves described what set Farfetch

apart from its other luxury online competitors—the third party marketplace platform:

> A key differentiator of Farfetch is the ***self-reinforcing network effect of our
> marketplace***. The more brands, boutiques, and department stores we have in our
> marketplace, the more consumers turn to us; which, in turn, generates increased
> sales for our sellers, attracting additional sellers and supply points to the platform,
> and so on. ***This is a powerful flywheel that we believe will enable us to be the
> category leader in a winner-takes-most market over the long term***.

269.     Following the Officer Defendants' prepared remarks, financial analysts on the

November 8, 2018 call asked questions about the Company's growth strategy and use of the IPO

proceeds for 2019.  For example, a J.P. Morgan analyst asked, "if you can just highlight the top

three investments in the business as you're thinking about them into 2019."  In response, Defendant

Neves focused on "investments in technology," "brand marketing," and "customer retention," but

made no mention of acquisitions or expanding the first-party retail business:

> I think in terms of the broad areas of investment, I expect to see a continuation of
> what is in Q3. With ***investments in technology***, we are seeing incredible benefits
> and very fast return on investment. The conversion rate, for example, of our China
> app is double digits above the previous app. But we're seeing, across all the literally
> dozens of products that we are launching every month, we are seeing every good
> return on investment. So we see this as an area where we will continue to invest.

> Other areas include the brand: we believe ***there's a big opportunity to build the
> Farfetch brand***. As you know, brand marketing sits in our SG&A cost line. And
> there will be some investment in that area potentially in 2019, depending on the
> results of the current investments we're doing in the brand marketing area.

> And finally, ***retention and loyalty***. As you could see in Q3, we are seeing very
> strong results in terms of investing in our best customers: rewarding them with free
> shipping, rewarding them with strong loyalty programs. And this is something that
> has a positive effect on demand generation, because existing customers cost less in
> terms of demand generation, obviously, than the new customers. And so deploying
> some of the efficiencies back into customer retention is something that is resulting
> well, and we will probably continue on that path.

270.    The statements above in ¶¶ 268-69 were materially false and misleading because Defendant Neves (i) misleadingly characterized the Company as fundamentally a third-party "platform" business that would grow organically (i.e., through the "self-reinforcing network effect of [Farfetch's] marketplace," which served as a "powerful flywheel") and concealed and downplayed its crucially-important first-party business, when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); (ii) failed to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business, as Defendant Neves' statements suggested; and (iii) misleadingly touted plans to "build the Farfetch brand" and "invest[] in our best customers" through "free shipping" and "loyalty programs," while omitting that Farfetch in fact had driven growth of the platform by offering a "constant" stream of promotions and discounts, including percentage basket-wide discounts, by August 2018.  While those discounts directly impacted the Company's revenues and take rate, Defendants concealed the impact of those discounts and promotions through their "protected" KPIs.

271.    Also during the Third Quarter Conference Call, an analyst from Wells Fargo noted an increase in first party sales during the quarter and asked whether that "really, really strong 1P growth" was "exceptionally high" in Q3. Defendant Jordan downplayed the first-party results, claiming that "*it's still quite small when you compare it ot the overall marketplace*, and further

explained: "Long-term, I would expect the 1P business to settle down at around 5% of our overall GMV."  He continued: "***So, 5% to 10% of our overall GMV, short-term, is probably where you can expect the 1P business. Over the longer term, that's going to moderate back to 5% overall. And the growth rates will return back in line with the overall growth rates of the platform***."

272.    The statements above in ¶ 271 were materially false and misleading because Defendant Jordan (i) misleadingly characterized the Company as fundamentally a third-party "platform" business that would grow organically, including by claiming that the first-party business would "settle down" and its "growth rates will return back in line with the overall growth rates of the platform," while concealing and downplaying its crucially-important first-party business, when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); and (ii) failed to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business, as Defendant Jordan's statements suggested.

273.    As a result of Farfetch's and the Officer Defendants' statements on November 8, 2018, the price of Farfetch's stock increased by over 5%, from a closing price of $22.05 on November 8, 2018 to a closing price of $23.27 on November 9, 2018.

E.      **December 10, 2018 Goldman Sachs Talks: José Neves: Moving Fashion Forward With Technology**

274.   On December 10, 2018, José Neves was interviewed at a "Goldman Sachs Talk,"

which was then posted on the Goldman Sachs website:

> **Clif Marriott, Goldman Sachs:**  And the platform that you wanted to create? What was the special ingredient for Farfetch versus some of these other players?

> **José Neves**:  The thinking was very simple. *What if I could create a platform and* I could sign up to this platform, the most beautiful boutiques and, and the best brains and *operate on a zero inventory, you know, platform real time on demand platform that connected all these businesses with fashion levels, from all around the world*. . . . it was intuitive for me is why is no one thinking about applying the marketplace model to fashion? It seems, you know, such an, a simple idea and, and that was it. So that's around that time, I thought this is an idea. I will never forgive myself if I don't, if I don't try. So I had to go with it.

> **Clif Marriott, Goldman Sachs**: Let's talk about two points you raised there. You use the word marketplace and platform interchangeably.

> **José Neves**: I think, you know, the marketplace is for me, they, they have very rigid rules. And platforms -- *the mark of a platform is a company that enables other businesses to build their own brands and even new business models on top of what is a common infrastructure*. So, to simplify, Facebook is a platform because you can build Farmville on Facebook and Mark Zuckerberg never thought of Farmville. So it's a completely different idea and a game built on top of a platform. eBay, although they do have some platform extensions, but it's much more of a marketplace. So if you want to be on eBay, there's a set of rules, that's it. And you participate in the marketplace with a very rigid set of rules. That's it, right. *So, so Farfetch is a platform because we have the marketplace.* And if you want to be on farfetch.com or on the Farfetch app, there's a certain, the typical marketplace, you know, set of rules,  either if you were a buyer or seller, and engage with the marketplace in those boundaries. *But we're also a platform, because we  -- any company, well, not any company, but third parties can use our API and our common logistics, data and API library to build their websites, to build new business models, completely new ideas on, on what is the Farfetch platform*.

275.   The statements above in ¶ 274 were materially false and misleading because

Defendant Neves (i) misleadingly characterized the Company as fundamentally a third-party

"platform" business and concealed and downplayed its crucially-important first-party business,

when in fact the Company was heavily dependent on its first-party business, including for driving

its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); (ii) touted that the Company aimed to "operate . . . a zero inventory . . . platform," when in fact the Company had significant inventory and was subject to significant inventory risk because of its concealed dependence on first-party sales; and (iii) failed to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses.

### F. February 28, 2019 Fourth Quarter And Full Year 2018 Earnings Release

276. On February 28, 2019, Farfetch filed a Form 6-K, signed by Defendant Neves, attaching a press release announcing Farfetch's Fourth Quarter and Full Year 2018 Results ("Fourth Quarter/Full Year Earnings Release"). In the Fourth Quarter/Full Year Earnings Release, the Company announced that

> Revenue increased by $69.1 million year-over-year from $126.5 million in fourth quarter 2017 to $195.5 million in fourth quarter 2018, representing growth of 54.6%. ***The increase was primarily driven by higher platform services revenue. Platform services revenue increased by $67.1 million or 67.9% year-over-year, reflecting increased Platform GMV, with higher growth in first-party as compared to third-party GMV. Third-Party Take Rate remained relatively flat year-over-year.***

277. On February 28, 2019, after the close of business, Defendants Neves and Jordan participated in the Company's earnings call (the "Fourth Quarter/Year End Conference Call"). During that call, Defendant Jordan expanded on the Company's 68% year-on-year growth in Platform Services Revenue and "stable third-party take rate of 32%":

> Looking at revenues derived from our Platform GMV, ***our Q4 platform services revenue, which excludes fulfillment revenue and Browns in-store revenue, grew 68% year-on-year as a result of the stronger GMV growth and a stable third-party***

114

> **take rate of 32%**. This take rate highlights the level of value-added services we are providing to our sellers on our platform. And whilst we are seeing strong growth from larger lower commission sellers, we have been improving underlying commission rates and charging for additional B2B services, such as advertising and media solutions as well as website booth and management fees, which has resulted in blended take rates remaining at similar levels to Q4 '17 and Q3 2018.

278.   The metrics reported above in ¶¶ 276-77 were materially false and misleading and omitted material facts. The Revenue metric and the others reported above were materially false and misleading because they reflected improper consolidation in violation of IFRS 8, as described in detail above. *See* ¶¶ 207-30. In addition, the Platform Services Revenue and Third-Party Take Rate metrics described above in ¶¶ 276-77 were materially misleading. The reported Platform Services Revenue metric included the price of goods without accurately reflecting Farfetch's constant discounting, and the costs of promotions were instead deducted from Platform Fulfillment Revenue, which the Company misleadingly claimed was "by and large a pass-through cost" even though it included the effects of the Company's constant and significant promotional activity.  In addition, the Company based its reported Third-Party Take Rate on the misleading Platform Services Revenue and Platform Fulfillment Revenue metrics. Accordingly, both the Platform Services Revenue and Third-Party Take Rate metrics reported by Defendants in the statements above were misleading, for failing to incorporate and disclose the effects of the Company's constant promotions.

279.   In his prepared remarks, Defendant Neves also stated that the Company's "Chapter 2 strategy has 4 pillars: growing our consumer base and improving consumer economics; increasing product supply and our luxury seller base; invest in technology and innovation; and finally, building the Farfetch brand."  Neves continued:

> We are extremely happy with our execution against our strategy. In fact, recent milestone achievements represent an acceleration of that strategy in 2019 to deliver even higher, more sustainable growth in 2020 and beyond. We've begun advancing through Chapter 2 at increased speeds.

115

280.   Defendant Neves also represented that the Company's record GMV growth "underscores our unwavering execution of our growth strategy," while Defendant Jordan stated that the Company was "investing in the long-term strategy we laid out at our IPO."

281.   The statements above in ¶¶ 279-80 were materially false and misleading because Defendants Neves and Jordan (i) misleadingly asserted that the Company's results were due to its "execution" of growth strategies focused on the Company's third-party "platform" business, while concealing and downplaying its reliance on promotions and crucially-important first-party business, when in fact the Company was heavily dependent on promotions as well as its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); and (ii) misleadingly claimed that the Company's future growth strategies would be focused on growing the third-party platform business organically, while failing to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of organically growing the third-party platform business, as the statements suggested.

282.   Defendant Neves downplayed the Company's reliance on first-party business revenue, painting Farfetch's recent uptick in first-party sales as an aberration, and Farfetch's philosophy was to use its small first-party sales as a "surgical tool" to "create [a buzz] in the Marketplace" and to garner "a wealth of data on what's happening in the Marketplace."  Neves also reaffirmed that "long term, [first-party sales] will be single digits" and Farfetch would "be [a] 90%-plus third-party business."

283.    Specifically, following the prepared remarks, a Wells Fargo analyst asked:

I want to focus on the 1P business. Just . . . a couple of questions for you. So I think it's the second quarter in a row where your 1P business was up 150%-plus. About 6 months ago you had talked about maybe 5% of sales is the right way to think about that business. Has your philosophy changed on that? It sounds like you're [sic] commentary on next year is it should continue to ramp. Just trying to understand your philosophy on 1P and how we should be thinking about that going forward.

284.    Defendant Neves responded, explaining "why we think having a 1P business is absolutely strategic for Farfetch":

So what does it do for us? So first of all, ***we have a wealth of data on what's happening in the Marketplace***. So we know in terms of range, product, strength, price architectures, and the 1P business ***allows us to react surgically and very, very quickly*** without necessarily having to wait for our boutique partners or brand partners to listen to us and then make the merchandise available and all of that. So speed to market is important. The second thing is qualitative. So having a 1P business allows us to do collaborations with brands, for example, we did an Off-White exclusive collaboration with Browns. Off-White is a wholesale -- it's predominately a wholesale brand so it's much easier for them to do a 1P deal. I think another great example is the collaboration we've done with Reformation. It's just a tool that allows us to be in front of a brand and get excited about an idea and say, you know what, we'll buy it. And it doesn't need inspiration, it doesn't need a complicated and lengthy negotiation. What it produces is 2 things. It's a halo effect. ***So although it's only 8% of the offer right now, it definitely, we see it creating a qualitive, excitement buzz, halo effect around the rest of the catalog***. And this is why we're excited about it. It is growing fast because of that. ***It's on single digits, and long term it will be single digits. It's -- temporarily it hits double digits, it will depend on strategics how we want to play it. But long term, we will be 90%-plus third-party business***. But we are --when we see these opportunities, ***we are going to leverage this 1P business, it's a really interesting surgical tool for us to create [a buzz] in the Marketplace***.

285.    The statements above in ¶¶ 282-84 were materially false and misleading because Defendant Neves (i) misleadingly characterized the Company as fundamentally a third-party "platform" business that was growing organically, including by stating that "long term, we will be 90%-plus third-party business," that the first-party business was "only 8% of the offer right now" and was merely a "surgical tool for us to create [a buzz] in the Marketplace," and that Farfetch's growth was due to its "unwavering execution" of its stated, third-party platform-focused "growth

strategy, when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); and (ii) misleadingly stated that further increases in the first-party business would only be "temporar[y]," while failing to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party business, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business, as Defendant Neves' statements suggested.

286.    As a result of Farfetch's and the Officer Defendants' statements on February 28, 2019, the price of Farfetch's stock increased by 21.1%, from a closing price of $24.50 on February 28, 2019 to a closing price of $28.82 on March 1, 2019.

### G.    March 1, 2019 Form 20-F 2018 Annual Report

287.    On March 1, 2019, Farfetch filed a Form 20-F, which was its Annual Report for 2018.

288.    In the Form 20-F, Farfetch identified four operating segments: "the Marketplace (which operates the Farfetch.com marketplace website and app), Farfetch Black & White Solutions (a white label website solution for luxury brands), Stores (operation of the Browns luxury boutiques) and Store of the Future (provision of technology solutions to retail outlets)."  Farfetch explained that "[t]he Marketplace represents over 90% of [Farfetch's] revenue, results and assets. As such [Farfetch] has presented only one reportable segment."

289.    The 20-F reported 2018 revenue as $602,384,000, with only 2.6% of that coming from store revenue.  However, if properly reported, revenue attributable to the Marketplace alone would have been only $487,233,010, or 81% of Farfetch's revenue overall.  Similarly, it reported

gross profit at $298,450,000 while failing to accurately report that 19% of that profit was separately attributable to Browns. *See* ¶¶ 223-24.

290.    The above statements were false and misleading and failed to disclose material information throughout the Class Period, because Farfetch's segment reporting during the Class Period violated IFRS.  As set forth above (*see* ¶¶ 207-30), the Browns retail business (e-commerce and in-store) should have been reported as a separate operating segment under IFRS 8, and it should not have been artificially divided into two, with the physical locations grouped as "Stores," and the significant remainder of the revenue lumped together with Farfetch's Marketplace platform commission-based segment. Instead, separate segment information was required to be reported for the Browns' segment and the Marketplace segment (minus Browns' online revenue).

291.    The Form 20-F also contained false and misleading statements and omissions about Farfetch's third-party marketplace platform model and growth strategy that misled investors by concealing the Company's significant and growing reliance on its first-party retail business. The 20-F described the "key elements" of Farfetch's "Growth Strategies" as follows:

- "Improving consumer economics and growing our consumer base;"

- "Increasing product supply and our luxury seller base;"

- "Investing in new technologies and innovation;" and

- "Building the Farfetch brand."

292.    The Form 20-F further described Farfetch's "marketplace business model" as one of its "Strengths" because "Our model allows us to offer the broadest and deepest selection of luxury fashion available online globally, ***while incurring minimal inventory risk*** and without capital-intensive retail operations. This allows for low capital expenditures, favorable working capital dynamics, ***minimal inventory holding*** and ***an ability to drive stronger future margins than***

*traditional inventory-taking business models*."  In explaining its reported revenue, the 20-F stated: "We generate income from transactions conducted on our platform, which, together with In-Store Revenue [*i.e.* revenue generated from Browns retail stores], represents our GMV. *We primarily operate a revenue-share model where we retain commissions and related income from these transactions*."

293.    The statements above in ¶¶ 291-92 were materially false and misleading because Defendants (i) misleadingly characterized the Company as a third-party "platform" business and concealed and downplayed its crucially-important first-party business, when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits in 2018 (*see* ¶¶ 223-24); (ii) touted the Company's "minimal inventory risk" and "minimal inventory holding," contrasting the Company to "traditional inventory-taking business models," when in fact the Company was subject to significant inventory risk and operated an inventory-taking business model because of its concealed dependence on first-party sales; and (iii) failed to disclose that Defendants intended to increase, rather than decrease, Farfetch's first-party business, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business, as their statements suggested.

294.    In addition, the 20-F represented to investors that "Promotional incentives, which include basket promo-code discounts, may *periodically* be offered to end consumers" and that the promotions "are treated as a deduction to revenue."  Defendants further noted that "Cash is collected by the Group from the end consumer using payment service providers" and "Within two

months of the transactions, this is remitted to the relevant seller (net of commission and recoveries)." It further stated that "Promotional incentives may be ***periodically*** offered to consumers. When we bear the costs of promotional incentives, these costs are recognized as deductions to revenue."

295. The above statements in ¶ 294 were materially false and misleading, and failed to disclose material information. Specifically, the Company's "promotional incentives" were not offered "periodically," because, since no later than June 2018, the Company had begun offering promotional incentives and site-wide discounts "constantly" in order to inorganically inflate sales and attract new customers. *See* ¶¶ 143-47. This constant stream of promotions was a marked departure from the Company's historic practice of offering discounts only twice a year during summer and end of year. *See* ¶ 142. These materiality of these misrepresentations was underscored by the fact that, while the Company's brand and boutique partners would often equally share the costs of the historical twice-annual sales and promotions, the brand and boutique sellers required Farfetch to cover the costs of all or most of these new, "constant" promotions by deducting the costs of the promotions from Farfetch's take rate, or commission. *See* ¶ 149.

296. The 20-F described as a "risk factor" the ability for "***Retailers and brands set their own prices for the products they make available on our Marketplace, which could affect our ability to respond to consumer preferences and trends***." The 20-F went on to describe that Farfetch "***do[es] not control the pricing strategies of our retailers and brands*** (other than Browns)."

297. The statements above in ¶ 296 were materially false and misleading, omitted material facts, and violated the requirements of Item 105 of Regulation S-K. As set forth above (¶¶ 142-49), Farfetch exerted significant control over pricing and pricing strategies for transactions

occurring on the Farfetch platform, specifically in the form of discounts that it offered to customers to attract and retain them. These discounts were significant is scope, and were initiated by Farfetch—not by its retail and brand partners.

298.   The Company identified "key operating and financial metrics" in the Forms 6-K and 20-F, filed with the SEC on February 28, 2019 and March 1, 2019, respectively, and on the Company's February 28, 2019 earnings call:

| KPI | Fourth-Quarter 2018 | Full-Year 2018 |
|---|---|---|
| GMV | $466,490 | $1,407,698 |
| Platform GMV | $462,176 | $1,392,104 |
| Platform GMV Growth (YOY) | 50.6% | 56% |
| Revenue | $195,533 | $602,384 |
| Platform Fulfillment Revenue | $25,444 | $97,794 |
| Adjusted Revenue | $170,089 | $504,590 |
| In-store Revenue | $4,314 | $15,595 |
| Platform Services Revenue | $165,775 | $488,995 |
| Platform Services Revenue Growth (YOY) | 67.9% | 65% |
| Third Party Take Rate | 32% | 32% |
| Adjusted EBITDA | ($14,575) | ($95,960) |
| Adjusted EBITDA Margin | (8.6%) | (19.0%) |

299.   The metrics reported above in ¶ 298 were materially false and misleading and omitted material facts. The Revenue metric and the others reported above were materially false and misleading because they reflected improper consolidation in violation of IFRS 8, as described

in detail above. *See* ¶¶ 207-30. In addition, the Platform Services Revenue, Platform Fulfillment Revenue, and Third-Party Take Rate metrics described above in ¶ 298 were materially misleading. The reported Platform Services Revenue metric included the price of goods without accurately reflecting Farfetch's constant discounting, and the costs of promotions were instead deducted from Platform Fulfillment Revenue, which the Company misleadingly claimed was "by and large a pass-through cost" even though it included the effects of the Company's constant and significant promotional activity. In addition, the Company based its reported Third-Party Take Rate on the misleading Platform Services Revenue and Platform Fulfillment Revenue metrics. Accordingly, both the Platform Services Revenue and Third-Party Take Rate metrics reported by Defendants in the Third Quarter Earnings Release were misleading, for failing to incorporate the effects of the Company's constant promotions.

300.    In addition, the 20-F stated that "Platform Services Revenue . . . *best represents the economic value being generated by the platform*," and further explained: "we provide fulfilment services to Marketplace consumers and receive revenue from the provision of these services, *which is by and large a pass-through cost with no economic benefit to us, and therefore we calculate our Adjusted Revenue excluding Platform Fulfilment Revenue*." Further, as set forth in the 20-F, Third-Party Take Rate was calculated based on Platform Services Revenue and Platform Fulfillment Revenue.

301.    The statement in ¶ 300 that Platform Services Revenue "best represents the economic value being generated by the platform" was materially false and misleading, because Platform Services Revenue did not accurately reflect the "constant" promotions being offered that reduced the economic value of the transactions being conducted on the platform, and because it omitted the fact that Platform Services Revenue failed to accurately reflect the economic effect of

promotions. In addition, the statement in ¶ 300 that Platform Fulfillment Revenue was "by-and-large a pass-through cost" was materially misleading, because Platform Fulfillment Revenue included deductions for promotions that directly and negatively impacted reported revenue.

302.    The Company's scheme to "protect" its Platform Services Revenue and Third Party Take Rate metrics from reflecting the deduction in revenue from the Company's constant and undisclosed promotional practices resulted in false and misleading Third-Party Take Rate and Platform Services Revenue metrics in the Offering Materials and thereafter throughout the Class Period.  The impact of these misstatements was revealed at the end of the Class Period, when the Company finally disclosed that it had engaged in large promotional activity in 2019, and further disclosed that it would significantly reduce its projected GMV growth rate from 40% to 30-35% for the second half of 2019 to account for its anticipated termination of this heavy promotional environment.

303.    In addition, Farfetch's 20-F, and all filings incorporated by reference therein, failed to disclose information required to be disclosed therein by Item 303 (17 C.F.R. §229.303). Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

304.    Therefore, Item 303 required disclosure of: (1) Farfetch's increasing dependence on traditional first-party retail sales for its financial performance; (2) Defendants' undisclosed plans to conduct acquisitions of additional first-party retail businesses; and (3) the Company's undisclosed use of promotions and discounts to drive GMV and revenue, while "protecting" the

Company's take rates and Platform Services Revenue from deterioration.  Indeed, Farfetch's inability to achieve growth through the third-party marketplace platform, and need to rely on existing and increasing exposure to traditional first-party retail business revenue and risks, had a material unfavorable impact on the Company's valuation and business prospects. Farfetch's campaign of aggressive promotions and discounts, needed to boost GMV and revenues while the Company's third-party marketplace platform failed to provide the organic growth Defendants repeatedly touted, had a material unfavorable impact on the Company's business and revenues, and was concealed from investors through Defendants' manipulation of the reported Third Party Take Rate and Platform Services Revenue.  Farfetch's 20-F filed with the SEC failed to disclose this information and thus failed to comply with Item 303.

305.    Further, Form 20-F listed the following Risk Factor: "We have acquired, and may continue to acquire, other companies or technologies, which could divert management's attention and otherwise disrupt our operations and harm our operating results." This Risk Factor was materially misleading, as it omitted material facts and violated the requirements of Item 105 of Regulation S-K. As FE-1 stated, to increase Farfetch's GMV and revenue and to meet their growth targets for the Company, Farfetch would have to engage in retail acquisitions, and Defendants planned to pursue this strategy as early as the time of the IPO.  Thus, the need to conduct acquisitions was already realized, rather than a mere possibility, rendering the above "Risk Factor" misleading when made.

306.    In addition, the 20-F contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Specifically, Defendants Neves and Jordan certified pursuant to SOX Section 302, in Exhibits 12.1 and 12.2 to the 20-F, respectively, that each had "reviewed [the] annual report on Form 20-F of Farfetch Limited," and that, based on their knowledge: (i) the "report does not

125

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and (ii) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report." In addition, Defendants Neves and Jordan certified pursuant to SOX Section 906, in Exhibits 13.1 and 13.2 to the 20-F, respectively, that, to the best of their knowledge, "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

307.    The statements in the SOX Certifications attached to the 20-F set forth above in ¶ 306 were materially false and misleading. As set forth above, the 20-F contained numerous materially false and misleading statements, and omitted material facts necessary to make the statements made within it not misleading, and did not "fairly present in all material respects the financial condition [and] results of operations" for the Company, including because Defendants purposefully and improperly reported only a single reporting segment in violation of IFRS 8, presented materially misleading KPIs that were protected from promotions, and made materially misleading statements about the Company's business strategies and risks. Moreover, as set forth above and in further detail below (*see* Sections IV, VI), Defendants Neves and Jordan knew that numerous statements in the 20-F were materially false and misleading when made.

### H.    April 17, 2019 *Luxus+ Magazine* Interview With Defendant Robb

308.    On April 17, 2019, an interview with Defendant Robb was published on *Luxus+ Magazine*, titled "5 Questions to Ask Andrew Robb, Chief Operating Officer at Farfetch."  In that interview, Robb was asked, "What makes Farfetch so successful?"  He responded that "*[o]ur approach is different to traditional e-Commerce or offline retailer.  For instance, we do not buy*

*any products*, *but instead, we aim to connect the world's existing supply of luxury fashion with the demand anywhere in the world*."

309.    The statement above in ¶ 308 was materially false and misleading, because the Company had adopted an approach akin to that of an e-Commerce retailer and did "buy products" and hold inventory. Indeed, Farfetch's first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and was increasing rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018. Moreover, Robb's statement concealed that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of first-party retail business New Guards, an acquisition that was already underway and undergoing due diligence when Robb's statement was made.

## I.    May 15, 2019 First Quarter Earnings Release

310.    On May 15, 2019, Farfetch filed a Form 6-K, signed by Defendant Neves, attaching a press release announcing Farfetch's First Quarter Results ("First Quarter Earnings Release"). In the First Quarter Earnings Release, the Company announced that "Q1 2019 Revenue Grew 39% with Platform Services Revenue Up 43% Year-Over-Year" Defendant Jordan was quoted in the release, stating:

> I am very pleased with the strong start we have made to the year, with the first quarter 2019 results demonstrating a well-executed quarter. Our rapid growth, which far exceeds the growth of the online luxury industry, enables our continued investment in both nearer-term customer engagement and longer-term platform development, underpinning our continued future growth. ***Moreover, we also delivered Adjusted EBITDA margin in line with expectations***.

311.    The First Quarter 2019 Earnings Release discussed the Company's Adjusted EBITDA in more detail:

**Adjusted EBITDA and Adjusted EBITDA Margin**

Adjusted EBITDA loss increased by $6.6 million, or 27.8%, year-over-year in first quarter 2019, to $30.2 million. Adjusted EBITDA Margin improved from (22.9%) to (20.7%) over the same period, primarily due to the impact of adopting IFRS 16 in first quarter 2019, as described above.

312.    The First Quarter Earnings Release also specifically discussed Farfetch's reported

revenue for the first quarter of 2019:

**Revenue**

Revenue increased by $48.4 million year-over-year from $125.6 million in first quarter 2018 to $174.1 million in first quarter 2019, representing growth of 38.6%. ***The increase was primarily driven by 43.2% growth in Platform Services Revenue to $141.8 million, 22.9% growth in Platform Fulfilment Revenue to $27.7 million and 12.8% growth in In-Store Revenue to $4.5 million***.

The increase in Platform Services Revenue was driven by 43.7% growth in Platform GMV, partially offset by lower Third-Party Take Rate; as well as growth in first-party GMV, which is included in Platform Services Revenue at 100% of the GMV.

Platform Fulfillment Revenue is derived from the pass-through of delivery and duties charges incurred by our global logistics solutions. ***The growth of Platform Fulfilment Revenue represents the increase year-over-year of these costs due to the increase in the number of orders, offset by an increase in the number of orders qualifying for free-shipping through our customer incentives***.

313.    Further, in the Company's first quarter 2019 earnings release, filed with the SEC

on May 15, 2019, and during the Company's conference call that same day, Farfetch reported

positive financial results and KPIs for the third quarter, including:

| **KPI** | **First-Quarter 2019** |
|---|---|
| GMV | $419,273 |
| Platform GMV | $414,737 |
| Platform GMV Growth (YOY) | 43.7% |
| Revenue | $174,064 |
| Platform Fulfillment Revenue | $27,690 |

| KPI | First-Quarter 2019 |
|---|---|
| Adjusted Revenue | $146,374 |
| In-store Revenue | $4,536 |
| Platform Services Revenue | $141,838 |
| Platform Services Revenue Growth (YOY) | 43.2% |
| Third Party Take Rate | 30% |
| Adjusted EBITDA | ($30,236) |
| Adjusted EBITDA Margin | (20.7%) |

314.    The metrics reported above in ¶ 310-13 were materially false and misleading and omitted material facts. The Revenue metric and the others reported above were materially false and misleading because they reflected improper consolidation in violation of IFRS 8, as described in detail above. *See* ¶¶ 207-30. In addition, the Platform Services Revenue, Platform Fulfillment Revenue, and Third-Party Take Rate metrics described above in ¶¶ 312-13 were materially misleading. The reported Platform Services Revenue metric included the price of goods without accurately reflecting Farfetch's constant discounting, and the costs of promotions were instead deducted from Platform Fulfillment Revenue, which the Company misleadingly claimed was "by and large a pass-through cost" even though it included the effects of the Company's constant and significant promotional activity.  In addition, the Company based its reported Third-Party Take Rate on the misleading Platform Services Revenue and Platform Fulfillment Revenue metrics. Accordingly, both the Platform Services Revenue and Third-Party Take Rate metrics reported by Defendants in the Third Quarter Earnings Release were misleading, for failing to incorporate the effects of the Company's constant promotions. Further, the Adjusted EBITDA and Adjusted

EBITDA Margin metrics referenced in ¶ 311 and ¶ 313 were materially false and misleading because, as set forth above in ¶¶ 157-64, the Company falsely improved these metrics by revoking cash bonuses and replacing them with extremely short-term RSUs, which should have been accounted for like cash bonuses, but were not.

315.    On May 15, 2019, after the close of business, Defendants Neves and Jordan participated in the Company's earnings call (the "First Quarter 2019 Conference Call"). Defendants painted a largely positive picture, tempered by some deteriorating KPIs that the Company explained away.  During the earnings call, Defendant Neves claimed that Farfetch had "had an excellent Q1, where we continue[d] to successfully execute on our plan, and we met important strategic milestones," and touted Platform GMV growth of 44%—50% adjusted for foreign exchange issues—and GMV reaching $1.5 billion. Neves also touted a 64% increase in active consumers, and reported that the integration of Toplife into Farfetch was expected to go live—and start yielding bottom-line benefits for the Company—by the end of Q2 2019, well ahead of schedule.

316.    The statements above in ¶ 315 were materially misleading because Defendants Neves (i) misleadingly asserted that the Company's results were due to its "execut[ion]" of growth strategies focused on the Company's third-party "platform" business, while concealing and downplaying its reliance on promotions and crucially-important first-party business, when in fact the Company was heavily dependent on promotions as well as its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and had increased rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); and (ii) misleadingly failed to disclose that the Company and the Officer

Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of organically growing the third-party platform business, as the statements suggested.

317.    During First Quarter 2019 Conference Call, Defendant Jordan revealed that Farfetch's first party GMV "grew over 76% year-on-year," due primarily to "the Browns first-party business and the inclusion of Stadium Goods first-party sales for the first time."  During the conference call, Defendant Neves further announced a "new business model," "1PO," centered around Stadium Goods' in-house brand. Neves explained that Farfetch would "invest[] behind the Stadium Goods brands and launch it as a streetwear brand in its own right," but stressed the small size of that line of business.

318.    These statements above in ¶ 317 were materially false and misleading because Defendants Neves and Jordan (i) misstated and concealed the financial contribution and impact of its non-marketplace platform business—specifically, its Browns' first-party retail business—by consolidating Farfetch's first-party and third-party business, in violation of IFRS 8; (ii) concealed and downplayed Farfetch's crucially-important first-party business, when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and had increased rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018 (*see* ¶¶ 223-24); and (iii) failed to disclose that the Company and the Officer Defendants had ***always*** intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses.

J.     **May 16, 2019 JPMorgan Global Technology, Media And Communications Conference**

319.     On May 16, 2019, Defendant Neves spoke at the J.P. Morgan Global Technology, Media and Communications Conference.  An analyst at the conference asked Neves: "For context, can you help me understand how you compare to Yoox Net-a-Porter?"  Neves responded that Farfetch was "a completely different business model" because they were not a "retailer" who "will then buy the inventory":

> So we are -- so compared with -- so Yoox is an outlet -- operating the outlet market, so not in the in-season luxury. Net-a-Porter is what you would see as a direct competitor of Farfetch. ***It's really a retailer versus marketplace situation***. So they're a retailer. So they will place orders on wholesale -- at the wholesale level with brands. They will then buy the inventory. They will stock it in 3 distribution centers at present and sell it to the consumer. ***We operate -- over 95% of our revenue comes from Marketplace. And so essentially, it's completely a different business model. So when the brands sell on Farfetch, it is their inventory. And for the brands, this is crucial because they are in control of merchandising of what they want to sell to the consumer. They're in control of pricing and markdown cadence and this is something they completely lose control in the context of the retailer such as Net-a-Porter***.

320.     The statements above in ¶ 319 were materially false and misleading because the Company had adopted a retail business approach akin to that of an e-Commerce retailer like YNAP and did "buy the inventory" itself.  Indeed, Farfetch's first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and had increased rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits) in 2018.  Moreover, Neves' statement concealed that Defendants intended to increase, rather than decrease, Farfetch's first-party business through the inorganic acquisition of certain first-party retail businesses, and did not intend to primarily pursue a strategy of growing the third-party platform business.

321.     Further, the statement in ¶ 319 above that brands operating on the Farfetch marketplace were "in control of pricing and markdown cadence and this is something they completely lose control in the context of the retailer such as Net-a-Porter" was materially false and

misleading, and omitted material facts. As set forth above (¶¶ 142-49), Farfetch exerted significant control over pricing and pricing strategies for transactions occurring on the Farfetch platform, specifically in the form of discounts that it offered to customers to attract and retain them. These discounts were significant in scope, and were initiated by Farfetch—not by its retail and brand partners.

### K.    June 12, 2019 Deutsche Bank dbAccess Global Consumer Conference

322.    On June 12, 2019, Defendant Jordan spoke at Deutsche Bank's 16th Annual dbAccess Global Consumer Conference in Paris, France. Farfetch also distributed a slide presentation to accompany Defendant Jordan's appearance.  In his speech and accompanying presentation, Jordan identified four aspects to the Company's "growth strategy," each of which used Farfetch's "Platform As An Enabler." These strategies included:

- "Continuing to invest in new technologies and innovation," including primarily for "Third Party Marketplaces;"

- "Building Farfetch Brand Awareness;"

- "Increasing product supply and our luxury seller base," by "Adding brands, retailers, department stores, other partner;" and

- "Leverage strong consumer economics" through "Demand generation" and "customer retention."

323.    Defendant Jordan also spoke about the recent Stadium Goods acquisition and integration, and noted how it was consistent with Farfetch's core marketplace platform model. Specifically, Jordan emphasized that both Farfetch and Stadium Goods "operate under predominantly 3P business" with only "small 1P businesses within each marketplace."

324.    The statements above in ¶¶ 322-23 were materially false and misleading because Defendant Jordan (i) misleadingly characterized the Company as "predominantly" a third-party "platform" business and concealed and downplayed its crucially-important first-party business,

when in fact the Company was heavily dependent on its first-party business, including for driving its purported "platform" performance, to the extent that the first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and had increased rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits in 2018 (*see* ¶¶ 223-24); and (ii) failed to disclose that the Company and the Officer Defendants intended to increase, rather than decrease, Farfetch's first-party retail exposure and inventory risks, including through the inorganic acquisition of certain first-party retail businesses—most specifically, the New Guards acquisition that would be announced shortly—and did not intend to primarily pursue a strategy of growing the third-party platform business, as his statements suggested.

325.    In addition, during the conference, an analyst asked Defendant Jordan to "comment on" the fact that, "[s]ince the release of 1Q, the long-term Board members, investors of Farfetch can now sell freely their shares." In response, Jordan stated that the "first" "3-week trading window after the Q1 results" had "closed on Friday [June 7, 2019]" and that there would not "be any more movement from those on the Board or the affiliates at the moment." He further explained those on the Board (including Defendant Neves) were "now locked up again until the next sort of open trading window" and "of the major holders now, we're locked up again until the next trading window"—i.e., after Farfetch announced its Second-Quarter 2019 results.

326.    The statements in ¶ 325 were materially false and misleading when made. As set forth above (*see* Section IV.K), Defendants Neves, Jordan, and Robb made numerous sales between June 7, 2019 and the end of the Class Period—i.e., after the end of the "open trading window" Defendant Jordan described, but before the beginning of the next "open trading window." Moreover, these sales were planned in March and May 2019, and so it was materially false and misleading for Defendant Jordan to assert that there would not "be any more movement from those

on the Board . . . at the moment" when in fact the Officer Defendants imminently planned to make stock sales.

## VI.    SUMMARY OF SCIENTER ALLEGATIONS

327.    A host of facts, including and in addition to those discussed above, support a strong inference that Defendants Farfetch, Neves, Jordan and Robb knew, or, at minimum, were severely reckless in not knowing, the true undisclosed facts when they made their false or misleading representations to investors.    The information in this section summarizes certain of the allegations—that are set forth more fully above—that detail the Defendants' scienter.  All of these allegations must be considered holistically in evaluating the Exchange Act Defendants' scienter. The cumulative knowledge of all members of Farfetch's senior management team, including the Officer Defendants, regarding the matters addressed herein is properly imputed to Farfetch.

### A.    The Officer Defendants Reaped Up To $68.8 Million From Insider Sales

328.    Defendants' suspicious stock sales support an inference that Defendants had the motive and opportunity to commit fraud and inflate the price of Farfetch stock, and that Defendants' false and misleading statements were knowingly made. At all relevant times, Farfetch's Code of Conduct provided:

INSIDER TRADING

Trading on inside information is a violation of law. Farfetchers in possession of material non-public information about Farfetch…must abstain from trading…in [Farfetch]'s shares from the time that they obtain such inside information until adequate public disclosure of the information.

Material information is information of such importance that it can affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or as a tip to others, including family members, who might make an investment decision based on this information is not only unethical but also illegal.

329.     As discussed in detail above in Section IV.K, *supra*, in violation of Farfetch's Code of Conduct and in violation of the Exchange Act, Defendants Neves, Robb, and Jordan sold over 3 million shares of Farfetch stock for proceeds of roughly $68.8 million in the few months prior to the disastrous August 8, 2019 disclosure concerning the acquisition of New Guards Group in clear contravention of the Company's much-hyped business model and growth strategy, and reduced guidance and nearly $90 million of losses related to previously undisclosed promotional activities that Defendants had consistently represented happened only "periodically" and not constantly.  In total, in four months at the end of the Class Period, (i) Defendant Neves sold at least $23.7 million—and likely $44.3 million—of Class A common stock; (ii) Defendant Robb sold $18.8 million—and likely over $21.3 million—of Class A common stock; and (iii) Defendant Jordan sold $2.4 million—and likely over $3 million—of Class A common stock.  As discussed in Section IV.K, *supra*, these sales were suspicious in timing, constituted abnormally large percentages of these Defendants' holdings, ceased once the truth was known to the market, and evince a clear motive and opportunity to inflate Farfetch's stock price.

330.     The SEC recognizes the establishment of a 10b5-1 trading plan as a potential, but not absolute, defense to accusations of insider trading when it is entered into by an insider "[b]efore becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. 17 CFR § 240.10b5-1(c)9ii0. Here, while the insider trades of Defendants Neves (and possibly those of Defendants Robb and Jordan) were made pursuant to 10b5-1 trading plans, those plans were purportedly entered into in March and May 2019, while Defendants engaged in their illicit scheme and possessed material nonpublic information.  Therefore, the existence of those plans provide no affirmative defense. Moreover, Defendant Jordan, likely knowing that these rash of insider sales at a time when no other insider

could trade, lied about Neves, Robb and Jordan's ability and intention to trade on June 12, 2019 (¶¶ 197, 325-26) while insider sales were otherwise banned.

## B.   The Officer Defendants Engaged In A Deliberate Campaign To Hide Farfetch's Reliance On First-Party Retail Sales

331.   Defendants' purposeful attempts to mislead investors also demonstrates scienter. As described above in Section IV.G.1, FE-1, Farfetch's Senior Manager for Financial Reporting, had the responsibility to draft much of the IPO Offering Materials. As part of that responsibility, FE-1 determined that the Browns should be reported as a single Operating Segment under IFRS 8—based on the different economic characteristics of a retail as opposed to platform business model, combined with the fact that the Browns' retail business had become an increasingly significant part of the Farfetch growth story.

332.   However, FE-1 reported that FE-1 received strong opposition to the determination to report the Browns retail business as a separate Operating Segment.  FE-1 was ultimately instructed to remove the Browns retail operating segment and to combine all of the Browns retail business that involved online sales with the Company's third-party marketplace platform business, despite the different economic characteristics of first-party and third-party sales.  As a "compromise", Browns' physical retail locations, which generated well under 10% of total Company revenues, were designated as a "Stores" Operating Segment that would not be separately reported. FE-1 recalled how Defendants Neves and Jordan did not want to report the Browns and other first party retail revenue because bringing attention to that business would result in a lower valuation than that of a pure platform where Farfetch connects sellers and consumers without taking on any of the retail risks.  FE-1 reported Defendants Neves and Jordan were "absolutely" involved in the decision to make that change adding Browns back into the marketplace.  It was discussed at the Board level and they were involved in the Board discussion.

333.    FE-1's testimony is further bolstered by the fact that, as set forth above in Section IV.G.1, Farfetch's market segmentation contravened the plain requirements of IFRS 8 and contradicted the Company's U.K. financial reporting.

334.    In addition, throughout the Class Period, Defendants made misleading statements to investors emphasizing the marketplace model and downplaying or denying the Company's 1P business—including very late into the Class Period, when Defendants must have at least been exploring the business model-altering New Guards acquisition. For example, at the JPMorgan Global Technology, Media and Communications Conference on May 16, 2019, Defendants Neves said that Farfetch was "a completely different business model" from Yoox Net-a-Porter because Farfetch was a "marketplace"—not a "retailer" who "will . . . buy inventory" like Yoox Net-a-Porter was. Similarly, at the June 12, 2019 Deutsche Bank dbAccess conference, Defendant Jordan touted growth strategies focusing solely on the marketplace, with no mention of any attempt to build out a "brand platform" business line, while simultaneously emphasizing that Stadium Goods and Farfetch were both "predominantly 3P business[es]," and that the 1P business in each was only a "small" component.

335.    Defendants Neves and Jordan's deliberate attempts to manipulate financial reporting to obscure Farfetch's dependence on first party sales and their facially misleading statements about Farfetch's business towards the end of the Class Period (when they must have known about facts rendering those statements misleading) is direct evidence of scienter.

**C.    Defendants Had Longstanding Plans To Use The IPO Proceeds To Fund Acquisitions, Yet Made False And Misleading Statements Suggesting Otherwise**

336.    As discussed above in Section IV.G.2, during the Roadshow Presentation and in the Offering Materials, Defendants set out a growth strategy that made no mention of acquisitions of any kind—let alone of first-party retailers. *See* ¶¶ 135-37. This growth strategy emphasized how

the Farfetch marketplace platform thrived because it carried little to no inventory, and specifically represented that there was "no growth in stores within the plans for Farfetch"—but rather that growth could be expected given the nature of the third-party marketplace, where (Defendants suggested) growth is self-accelerating.  In reality, however, as reported by FE-1 based on his conversations and interaction with Defendants Neves and Jordan, Defendants were well-aware that, in order to increase Farfetch's GMV and revenue and to meet their growth targets for the Company, Farfetch would have to engage in acquisitions—and further that acquisitions like those Farfetch conducted could not have happened without the successful IPO proceeds.  That Defendants knew facts directly contradicting their contrary public statements establishes scienter.

### D. The Officer Defendants Concealed The Effects Of Promotions On Farfetch's KPIs By Manipulating Reported Take Rates And Platform Services Revenue

337.    Defendants' intentional design and reporting of KPIs to "protect" them from deterioration based on the Company's promotional activities—in conjunction with misleading supporting statements about how to interpret the KPIs—buttresses the inference of scienter.

338.    As set forth above in Section IV.H, although Farfetch stated that "Platform Services Revenue" (called "Adjusted Platform Revenue" in the Offering Materials) "best represents the economic value being generated by the platform" and calculated "Third-Party Take Rate" based on that metric, both were in fact designed purposely such that they would not reflect the effects of discounts Farfetch provided—which were instead captured as a charge to Platform Fulfillment Revenue, a de-emphasized line item that Defendants described as "by and large a pass-through cost." Moreover, as numerous former Farfetch employees explained, Defendants in fact used promotions heavily, particularly once Farfetch became a public company, and the Company disproportionally paid for those promotions as they became more frequent, instead of sharing the costs with suppliers on the platform. *See* ¶¶ 146, 148-50. This implies that Farfetch earned a far

lower percentage commission, on lower-valued sales, than was reflected in the reported Platform Services Revenue and Third-Party Take Rate metrics.

339.     FE-1 explained how the decision to lump the costs of promotions into the Platform Fulfillment Revenue was "an incredibly sensitive change."   FE-1 stated that originally, *all* promotional costs were excluded from the Company's financials, but Farfetch's outside auditor, Pricewaterhouse Coopers, prohibited that approach.   The "compromise" was that promotional costs would be deducted from Platform Fulfillment Revenue.   FE-1 reported that the entire reason for deducting promotional costs from shipping revenues and not from platform services revenue was so that the effect was zero impact on the take rate.   FE-1 believes that this practice of creating a "protected KPI" was "misleading" because "the take rate is consistently high because it excludes promotions" and "Farfetch is obviously not putting everything into the take rate than someone might expect them to."

340.     Defendants' purposeful construction of misleading Platform Services Revenue and Third-Party Take Rate KPIs strongly supports an inference of scienter.

### E.     The Officer Defendants Manipulated Adjusted EBITDA And Income By Revoking Cash Bonuses And Issuing Short Term RSUs

341.     Defendants also directly and purposefully manipulated Farfetch's Adjusted EBITDA and Adjusted EBITDA Margin. As set forth above, Farfetch's Senior Manager of Financial Reporting, FE-1, who was directly involved in the Company's decision, testified that, although cash bonuses had been paid every year and were expected by Farfetch personnel, they were taken away unexpectedly in March 2019 because the Company could no longer tolerate the effect on the EBITDA metric. FE-1 explained that, in exchange for the revoked cash bonuses, the Company issued RSUs that vested within months. This switch inflated Adjusted EBITDA in two ways. First, it allowed the Company to reverse amounts that had been reserved previously for cash

bonuses, thereby directly increasing income. Second, the RSUs were not reported as a cash expense reducing EBITDA, but rather as an expense "below the EBITDA line"—accounting treatment that made sense in connection with long-term RSUs, but not for the short-term ones the Company issued. FE-1 further explained that the ethics of offering a slew of short term RSUs instead of cash was "extremely questionable" and "misleading" because it dilutes shareholder value, "deliberately inflates the EBITDA measure," and was "done solely to avoid a cash bonus expense."

342.    As discussed above in Section IV.I, numerous other former Farfetch employees confirmed the sudden and unexpected switch from cash bonuses to extremely short-term RSUs. FE-3 recalled that Defendant Jordan told employees at an all-hands meeting that the Company had failed to meet certain fourth quarter financial metrics and, as a result, no one would receive a cash bonus. FE-3 confirmed that some employees were offered RSUs in place of cash. FE-5 recalled that the Company told employees after the end of 2018 that the Company did not meet their internal KPIs for 2018—a statement that seemed to FE-5 to be contrary to what the Company was telling the market.

343.    Defendants' Neves and Jordan's deliberate attempts to manipulate the Adjusted EBITDA metric constitute further direct evidence of scienter.

## F.    Farfetch's Marketplace Platform Growth Strategy And Its Targeted KPIs Were The Most Important Factors Informing the Company's Valuation

344.    The inference of scienter is also bolstered by the importance of the representations at issue. As set forth above in Sections IV.B-D., F., *supra*, Defendants' statements touting Farfetch as a third-party-focused, platform-style business were critical to analysts and investors who sought to value the Company during its IPO and after.

345.    For example, when Farfetch filed its preliminary IPO prospectus, *Fortune* compared Farfetch's $6 billion valuation to that of Macy's, which was only valued at $12 billion even though its revenues were 60 times as large as Farfetch's, and concluding: "***That means Farfetch's IPO is being marketed as that of a technology company, rather than a retailer. Indeed, the company describes itself as such in its prospectus***." Similarly, in an initiating coverage report issued after the IPO, Wells Fargo analysts explained that "***the economics surrounding their marketplace model . . . present very compelling long-term margin opportunities,***" and that third-party sales provided the Company "an extremely high-margin revenue stream (since FTCH does not own the inventory and does not record the [cost of goods sold] related to the merchandise)," contrasting such sales to "dilutive first-party . . . transactions."

346.    Numerous other analysts issued similar reports. For example, J.P. Morgan called Farfetch a "Unique & Disruptive Asset at the Intersection of Technology & Luxury Retail," and contrasted Farfetch's low-inventory model with that of Yoox Net-a-Porter, explaining: "We believe YNAP's inventory model will prove more difficult to scale over time." Similarly, Cowen emphasized Farfetch's high take rates, gross profit margins, and average order value, and Credit Suisse issued an "Outperform" rating with a $28 price target based on a review of Farfetch's marketplace model and the valuation "methodology we use for our Internet sector coverage universe."

347.    The evident importance of these topics supports the inference that Defendants were, at minimum, deliberately reckless in making their false and misleading statements to investors.

### G.    Defendants Fielded Questions About Farfetch's Business Strategy, Growth Model, And KPIs On Each Conference Call, And Held Themselves Out As Knowledgeable On Those Subjects

348.    Relatedly, that investors were acutely focused on these issues was underscored by the fact that, during each Class Period conference call, Defendants fielded numerous questions

from analysts about the Company's growth strategies and the trends in its KPIs, including its GMV, take rate, and first-party sales. Indeed, when certain of the metrics Defendants touted deteriorated, analysts immediately asked pointed questions about them. For example, when Defendants announced increasing first-party sales following the Stadium Goods acquisition during Farfetch's 4Q and FY 2018 conference call on February 28, 2019, a Wells Fargo analyst immediately asked about whether it signaled a shift in Farfetch's "philosophy on 1P" sales or suggested that Defendants' prior projects of approximately 5% 1P sales at Farfetch were changing.

349. Defendants issued detailed responses to such questions. For example, in response to the Wells Fargo analyst's question, Defendant Neves stated that Farfetch's philosophy was to use its small first-party sales as a "surgical tool" to "create buzz in the Marketplace" and to garner "a wealth of data on what's happening in the Marketplace." Neves also reaffirmed that "long term, [first-party sales] will be single digits" and Farfetch would "be [a] 90%-plus third-party business."

350. Knowledge that analysts and investors were acutely focused on the question of Farfetch's growth strategy and KPIs—including because Defendants fielded questions on the subjects continuously throughout the Class Period—renders Defendants' materially false and misleading statements on those topics deliberately reckless, at minimum.

## H. Defendant Neves And The Other Officer Defendants Controlled Farfetch

351. As the Company acknowledges, Defendant Neves "controls Farfetch through ownership of 100% of the Class B [voting] common stock," which held super-voting rights, and in fact held at all relevant times a supermajority of the voting power of the Company. Farfetch further acknowledged that this control gave Defendant Neves "considerable influence over important corporate matters due to his ownership of [the Company]" such as "approving material mergers, acquisitions or other business combination transactions." Moreover, Farfetch had only

three officers: Defendants Neves, Robb, and Jordan. These three individuals created and drove Farfetch's operational business strategy both before and after the IPO.

352. The Officer Defendants' control over Farfetch supports the inference that they knew the truth about their statements concerning its business and operations.

## I. The Suspicious Timing Of The Departures Of Defendant Robb And Chief Marketing Officer Veichmanis

353. Farfetch's lack of organic growth and true growth strategy also lead to the abrupt and unexplained resignation of Defendant Robb. On the very same day that the truth emerged about Farfetch's lack of organic growth and true growth strategy, Defendant Robb resigned. As noted above, *see* ¶¶ 172, 179*,* Robb's resignation was seen as a significant development in light of the fact that he had been Farfetch's COO for more than nine years, and also was leaving the Company less than a year after its IPO, and at the same time as it announced disappointing results.

354. In addition, approximately two months before the truth was revealed, on June 11, 2019, Farfetch announced that its Chief Marketing Officer, John Veichmanis, was stepping down. The press release announcing the personnel change offered no explanation for the sudden departure. FE-1 explained, however, that Veichmanis left because he became frustrated with the quality of the resources he was being given to attract new customers through technology and marketing.

355. These unexplained resignations further strengthen the inference of scienter.

## J. The Proximity In Time Between Defendants' Misleading Statements And The Revelation Of Their Falsity

356. The short time period transpiring between Defendants' false and misleading statements and the revelation of the truth further supports the inference of scienter. The truth was revealed less than one year after Defendants' first false and misleading statements in Farfetch's Offering Materials, and indeed Defendants made false and misleading statements touting the

Company's 3P-focused business model as late as May 2019 (Neves) and June 2019 (Jordan), even though the Company announced a radical departure from that model in August 2019, with the acquisition of New Guards.

357.    The temporal proximity of Defendants' statements to the revelation of true facts showing them to be false and/or misleading supports the inference that Defendants knew the truth about their statements (or were at least deliberately reckless) when making them.

*        *        *        *        *

358.    The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Defendants' scienter.

## VII.    PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

359.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

> (a)    Defendants made public misrepresentations or failed to disclose material acts;
>
> (b)    the omissions and misrepresentations were material;
>
> (c)    the Company's stock traded in an efficient market;
>
> (d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and
>
> (e)    Plaintiffs and the other members of the Class purchased Farfetch common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

360.    At all relevant times, the market for Farfetch's common stock was efficient for the following reasons, among others:

> (a)    as a regulated issuer, Farfetch filed periodic public reports with the SEC;
>
> (b)    Farfetch regularly communicated with public investors via established market communication mechanisms, including through regular

dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Farfetch's stock traded on the NYSE, an efficient market.

361.    As a result of the foregoing, the market for Farfetch's securities promptly digested current information regarding Farfetch from all publicly available sources and reflected such information in Farfetch's stock price. Under these circumstances, all purchasers of Farfetch's securities at relevant times suffered similar injury through their purchases of Farfetch's securities at artificially inflated prices, and a presumption of reliance applies.

362.    In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## VIII.  ADDITIONAL LOSS CAUSATION ALLEGATIONS

363.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, Farfetch's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions.

364.    As alleged above, on August 8, 2019, Farfetch (i) announced the surprise $675 million acquisition of first-party brand incubator and retailer New Guards Group, a dramatic shift from the Company's asset- and inventory-light strategy; (ii) announced declines in Order Contribution Margins due to a hyper-promotional competitive environment; (iii) revised its guidance and called for a deceleration in Platform GMV growth to 30%-35%, from approximately 45% growth in the first half of 2019 and over 60% growth in 2018, due to the Company's increased promotional activity and despite the Company's three acquisitions in 2019 (Stadium Goods,

Toplife and New Guards); and (iv) announced the surprising departure of Defendant Robb, less than one year after the IPO.

365.    In response to the truth about the Company's reliance on and growth strategy based on traditional first-party retail and wholesale sales and the disclosure of poor results reflecting the impact of the Company's previously undisclosed promotional activities and sales environment described above, Farfetch's stock fell nearly 45%, from a close of $18.25 per share on August 8, 2019, to a close of $10.13 per share on August 9, 2019, on unusually heavy trading volume of nearly 33.5 million shares.

366.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Farfetch securities. Thus, the stock price decline described above was directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

367.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward- looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or

that the forward-looking statement was authorized and/or approved by an executive officer of Farfetch who knew that those statements were false when made.

## X.      CLASS ACTION ALLEGATIONS

368.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired Farfetch common stock (1) in or traceable to the IPO; or (2) on the open market during the period from September 20, 2018 through and including August 8, 2019, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, other officers and directors of Farfetch at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

369.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Farfetch common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Farfetch or its transfer agent(s) and may be notified of the pendency of this action by publication or mail, using the form of notice similar to that customarily used in securities class actions.

370.    The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.  At all relevant times, Farfetch had over 250 million shares of stock registered for sale, of which over 50 million shares were offered at the start of the Class Period through the IPO, which were owned publicly by at least hundreds of persons and entities.

371.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew, or recklessly disregarded, that their statements were false and misleading;

(e)    whether the price of Farfetch common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

372.    Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

373.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

374.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against Farfetch and the Officer Defendants)**

375.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

376.    This Count is asserted on behalf of all members of the Class against Farfetch and Defendants Neves, Jordan and Robb for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

377.    These Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (b) cause Plaintiffs and the other members of the Class to purchase Farfetch securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

378.    During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

379.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Farfetch securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

380.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Farfetch as specified herein.

381.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse nonpublic information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Farfetch's value and performance and continued substantial growth, which included the making of, or participation in the making of, false statements of material facts and omitting to state material facts necessary in order to make the statements made about Farfetch and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Farfetch securities.

382.    As described above, these Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's results and growth prospects, thereby artificially inflating the price of its securities. As demonstrated by these Defendants' omissions and misstatements of the Company's business strategy, these Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

383.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Farfetch securities was artificially inflated. In ignorance of the fact that market prices of Farfetch's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by these Defendants, but not disclosed in public statements by Defendants, Plaintiffs and the other members of the Class acquired Farfetch securities at artificially high prices and were, or will be, damaged thereby.

384.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased, or otherwise acquired, their Farfetch securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

385.    By virtue of the foregoing, these Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

386.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

387.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

388.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

389.     Plaintiffs assert this Count pursuant to Section 20(a) of the Exchange Act against Officer Defendants.

390.     The Officer Defendants, by virtue of their executive leadership positions in Farfetch, had the power and authority to cause Farfetch to engage in the wrongful conduct complained of herein, and to control the contents of Farfetch's annual and quarterly reports, press releases, and earnings call statements.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

391.     As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Farfetch's actual organic growth and growth strategies, and to correct promptly any public statements issued by Farfetch which had become materially false or misleading.

392.     Because of their positions of control and authority as senior executive officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases, earnings calls, and public filings which Farfetch disseminated in the marketplace during the Class Period concerning Farfetch's purported organic growth and growth strategies.  Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the

Company, exercised control over the general operations of Farfetch, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.  The Officer Defendants, therefore, were "controlling persons" of Farfetch within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Farfetch securities.

393.    The Officer Defendants were also controlling persons of Farfetch through their participation in the preparation and dissemination of the Company's communications, and controlled the Company's business strategy and activities.  By reason of their control of Farfetch, the Officer Defendants were able to, and did, control the contents of the Company's disclosures during the Class Period, which contained materially untrue and misleading information and omitted material facts.

394.    Farfetch and the Officer Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

395.    By reason of their control of Farfetch, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Farfetch's violations of Section 10(b), and Rule l0b-5, to the same extent as Farfetch.

## COUNT III

### Violation of Section 20A of the Exchange Act
### (Against the Officer Defendants)

396.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

397. This Count is asserted for violations of §20A of the Exchange Act, 15 U.S.C. §78t1, on behalf of IAM and Oklahoma Firefighters and all other members of the Class, who purchased shares of Farfetch common stock contemporaneously with the sale of Farfetch common stock, by the Officer Defendants while they were in possession of material, nonpublic information, as alleged herein, including concerning Farfetch's true business and financial condition.

398. Section 20A(a) of the Exchange Act provides that:

Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

399. As set forth herein, the Officer Defendants violated §10(b) of the Exchange Act, Rule 10b-5 and §20(a) of the Exchange Act for the reasons stated in Counts I and II above. Additionally, the Officer Defendants further violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. §240.10b5-1) by selling shares of Farfetch common stock while in possession of material, nonpublic adverse information concerning Farfetch's true business and financial condition, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

400. Contemporaneously with the Officer Defendants' insider sales of Farfetch common stock, Plaintiffs and the other Class members purchased shares of Farfetch common stock on a national securities exchange and in an open and efficient market, while the Officer Defendants were in possession of material, nonpublic information they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning Farfetch's true business and financial condition.

401.    Plaintiffs and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

402.    By reason of the violations of the Exchange Act alleged herein, the Officer Defendants are liable to Plaintiffs and the other members of the Class who purchased shares of Farfetch common stock contemporaneously with the Officer Defendants' sales of Farfetch common stock during the Class Period.

403.    Plaintiffs and the other members of the Class, who purchased contemporaneously with the Officer Defendants' insider sales of Farfetch securities, seek disgorgement by the Officer Defendants of profits gained or losses avoided from the Officer Defendants' transactions in Farfetch common stock contemporaneous with the §20A Lead Plaintiffs and the other members of the Class.

404.    This action was brought within five years after the date of the last transaction that is the subject of the Officer Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Officer Defendants.

**PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933**

## XII.    SECURITIES ACT CLAIMS

405.    In this section of the Complaint, Lead Plaintiffs IAMNPF and Oklahoma Firefighters assert a series of strict liability and negligence claims based in the Securities Act on behalf of themselves and the members of the Class who purchased or otherwise acquired Farfetch shares either in or traceable to Farfetch's IPO, which occurred on or around September 20, 2018, and suffered damages as a result.

406.    Plaintiffs' claims under the Securities Act do not sound in fraud, and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

407.    As alleged below, Farfetch and the other Securities Act Defendants made a series of materially untrue statements and omissions of material facts in Farfetch's Offering Materials.

408.    Specifically, on or around September 20, 2018, Farfetch conducted its IPO pursuant to a Registration Statement that the Company filed with the SEC on August 20, 2018 and which, after two amendments, was declared effective by the SEC on September 20, 2018. On September 24, 2018, Farfetch filed a Prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.

409.    The Registration Statement was signed by or on behalf of the Securities Act Individual Defendants, identified below.

410.    By means of the Offering Materials, Farfetch offered, sold and solicited the same of more than 50 million Class A shares (which included the underwriters' exercise in full of their option to purchase an additional 6,636,562 Class A shares) at $20.00 per share, resulting in over $880 million in gross proceeds, which went up to just over $1 billion in gross proceeds after the Underwriter Defendants exercised their overallotment.

## XIII.   JURISDICTION AND VENUE

411.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l, 77o).

412.    This Court has jurisdiction over these claims under Section 22 of the Securities Act (15 U.S.C. §77v).

413.    Venue is proper in this Judicial District under Section 22 of the Securities Act (15 U.S.C. §77v(a)). Many of the acts and transactions alleged herein, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this Judicial District, and Farfetch's stock trades on the NYSE, located within this Judicial District.

414.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate wire and telephone communications, and the facilities of the NYSE, a national securities exchange.

## XIV.  SECURITIES ACT PARTIES

### A.    Securities Act Plaintiffs

415.    IAMNPF is a defined-benefit pension plan that provides retirement, disability, and survivor benefits to members of the International Association of Machinists and Aerospace Workers and their families, and has done so for over 55 years. IAMNPF oversees approximately $13 billion in assets on behalf of approximately 100,000 active participants. As stated in its previously filed Certification (ECF No. 25-1) and the Certification submitted herewith, IAMNPF purchased shares of Farfetch common stock traceable to the IPO and suffered damages as a result of the violations of the federal securities laws alleged in this action

416.    Oklahoma Firefighters is a public pension fund headquartered in Oklahoma City, Oklahoma that was founded in 1980 to provide retirement, disability and survivor benefit programs to active and retired firefighters in the State of Oklahoma. Oklahoma Firefighters is responsible for the retirement income of these employees and their beneficiaries. Oklahoma Firefighters manages more than $3 billion in assets for the benefit of over 25,000 members and beneficiaries.

As stated in its previously filed Certification (ECF No. 25-1) and the Certification submitted herewith, Oklahoma Firefighters purchased shares of Farfetch common stock traceable to the IPO and suffered damages as a result of the violations of the federal securities laws alleged in this action.

### B.     Securities Act Defendants

#### 1.     Farfetch

417.    Defendant Farfetch is incorporated under the laws of the Cayman Islands, and its stock trades on the NYSE under the ticker symbol "FTCH."  Farfetch became a publicly traded company through an initial public offering conducted in September 2018.  The IPO was conducted pursuant to a Registration Statement that was filed with the SEC on September 19, 2018 (as amended) and an incorporated Prospectus dated September 20, 2018 that registered 256,627,577 shares of Farfetch.  In the IPO, Defendant Farfetch (together with certain selling shareholders) sold 50,880,311 shares for total proceeds of approximately $1,017,600,000, before fees, costs, and expenses. Absent the selling shareholders' portion of the sales, Farfetch sold 40,246,453 Class A ordinary shares for proceeds of approximately $805 million, less the underwriting and other fees and expenses.  Farfetch's corporate headquarters is located in London, United Kingdom, and Farfetch common stock trades on the New York Stock Exchange under the symbol ("FTCH").

#### 2.     The Officer Defendants

418.    Defendant Neves was, at all relevant times, Farfetch's CEO and a Co-Chair of Farfetch's Board of Directors.  Neves founded the Company in 2008.  Neves signed the Registration Statement.  Each of those documents filed with the SEC contained false and misleading statements and omissions.

419.    Defendant Neves is a controlling person of Farfetch through his position as CEO and Co-Chairman, and his ownership of the majority voting rights of Farfetch.  As acknowledged

by the Company, "Neves controls Farfetch through ownership of 100% of the Class B [voting] common stock." Neves "holds approximately 76.6% of the aggregate voting power of our company" giving him "considerable influence over important corporate matters due to his ownership of [the Company]" such as "approving material mergers, acquisitions or other business combination transactions." As Farfetch explains in its SEC filings, the Company's Board of Directors "will not be able to form a quorum without Mr. Neves for so long as Mr. Neves remains a director." The Company also explained that "[b]ecause Mr. Neves beneficially owns more than 50% of the voting power of the Company, the Company is a 'controlled company' within the meaning of the rules of the NYSE."

420. Defendant Jordan was, at all relevant times, Farfetch's CFO. Jordan joined Farfetch in 2015. Jordan signed the Registration Statement, which contained false and misleading statements.

421. Defendant Robb was, at all relevant times, Farfetch's COO. Robb joined Farfetch in July 2010, and was responsible for the Company's marketing, operations, and overall customer strategy. Robb announced his resignation on August 8, 2019, the last day of the Class Period.

422. The Officer Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of Farfetch's operations, including its accounting and reporting functions, possessed and exercised the power and authority to control the contents of the Offering Materials; and were privy to confidential information concerning Farfetch and its business, operations and financial statements, and strategy. The Officer Defendants were directly involved in controlling the content and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these misstatements and omissions in violation

160

of the federal securities laws. The Officer Defendants are liable for the false statements and omissions pleaded herein under the Securities Act.

### 3. The Director Defendants

423. Defendant Court was a Director of Farfetch from July 2010 until he resigned as a Director on September 29, 2019. At relevant times, Court was the founder and managing partner of Felix Capital and the General Partner of Advent Ventures. At the time of the IPO, Felix Capital managed funds holding 580,180 Farfetch Class A ordinary shares, while Advent Ventures managed funds holding 27,288,125 Farfetch Class A ordinary shares. Court signed or authorized the signing of the Registration Statement as a director and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

424. Defendant Dana Evan was at all relevant times a Director of Farfetch. Evan signed or authorized the signing of the Registration Statement as a director and the authorized U.S. representative of Farfetch and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

425. Defendant Jonathan Kamaluddin was at all relevant times a Director of Farfetch. Kamaluddin signed or authorized the signing of the Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

426. Defendant Richard Liu was a director of Farfetch until February 27, 2019. Liu was the founder, Chairman, and CEO of JD.com, Inc. ("JD.com"). JD.com exercised the voting and investment power of its wholly-owned subsidiary, Kadi Group Holding Limited, which held 41,005,030 Class A ordinary shares of Farfetch. Liu signed or authorized the signing of the Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

427. Defendant Natalie Massenet was at all relevant times a Director of Farfetch. Massenet signed or authorized the signing of the Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

428. Defendant Jonathan Newhouse was a Director of Farfetch until March 8, 2019. At relevant times, Newhouse was the Chairman of Conde Nast International, which managed funds holding 14,838,410 Class A ordinary shares of Farfetch. Newhouse signed or authorized the signing of the Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

429. Defendant Daniel Rimer was at all relevant times a Director of Farfetch. Rimer is a partner within Index Ventures Group, which advised the Index Funds, holders at the time of the IPO of 28,359,930 Farfetch Class A ordinary shares. Rimer signed or authorized the signing of the Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

430. Defendant Michael Risman was at all relevant times a Director of Farfetch. Risman is the managing Partner and founding member of Vitruvian Partners LLP, which at the time of the IPO managed funds collectively owning 24,496,935 Farfetch Class A ordinary shares indirectly through Farhold (Luxembourg) S.a r.l. Risman signed or authorized the signing of the Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

431. Defendant David Rosenblatt was at all relevant times a Director of Farfetch. Rosenblatt signed or authorized the signing of the Registration Statement and is therefore liable

under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

432.     Defendants Court, Evan, Kamaluddin, Liu, Massenet, Newhouse, Rimer, Risman, and Rosenblatt (collectively, the "Director Defendants," and together with the Officer Defendants, the "Securities Act Individual Defendants"), because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of Farfetch's operations, including its accounting and reporting functions, possessed and exercised the power and authority to control the contents of Farfetch's Offering Materials.  The Director Defendants were directly involved in controlling the content and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these misstatements and omissions in violation of the federal securities laws. The Director Defendants are liable for the false statements and omissions pleaded herein under the Securities Act.

### 4.     The Underwriter Defendants

433.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

434.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

435.     Defendant Allen & Company LLC ("Allen & Co.") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, Allen & Co. was responsible for ensuring the

truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

436.    Defendant UBS Securities LLC ("UBS") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

437.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

438.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

439.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

440.    Defendant Cowen and Company, LLC ("Cowen & Co.") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, Cowen & Co. was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

441. Defendant BNP Paribas Securities Corp. ("BNP") was an underwriter of the IPO as specified herein. As an underwriter of the IPO, BNP was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

442. Defendants Goldman, J.P. Morgan, Allen & Co., UBS, Credit Suisse, Deutsche Bank, Wells Fargo, Cowen & Co., and BNP are collectively referred to as the "Underwriter Defendants." Farfetch, the Securities Act Individual Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

443. The Underwriter Defendants sold and distributed the shares in the IPO to the investing public pursuant to the IPO Prospectus. The extent of the Underwriter Defendants' participation in the IPO was as follows:

| Underwriter | Number of shares |
|---|---|
| Goldman Sachs & Co. LLC | 14,374,965 |
| J.P. Morgan Securities LLC | 12,520,130 |
| Allen & Company LLC | 5,564,502 |
| UBS Securities LLC | 4,637,085 |
| Credit Suisse Securities (USA) LLC | 2,144,120 |
| Deutsche Bank Securities Inc. | 2,144,120 |
| Wells Fargo Securities, LLC | 1,072,060 |
| Cowen and Company, LLC | 1,072,060 |
| BNP Paribas Securities Corp. | 714,707 |

444.    In addition, the Underwriter Defendants exercised an overallotment option to purchase and then offer an additional 6,636,562, approximately in the proportions above.

## XV.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS

### A.    The Offering Materials Contained Material Misstatements and Omissions

#### 1.    Misstatements And Omissions Relating To Farfetch's Segment Reporting

445.    To provide investors with meaningful information about the financial condition of an entity, the International Accounting Standards Board, as set forth in International Financial Reporting Standard 8 ("IFRS 8"), requires that financial results be presented for separate operating segments within an entity. The objective of presenting disaggregated information about segments of a business entity is to produce information sufficient to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates.

446.    IFRS 8, therefore, requires the presentation of segment information that assists financial statement users to understand an entity's performance, assess its economic characteristics, and make informed decisions about the entity.

447.    Pursuant to IFRS 8, ¶5, an "operating segment" is a component of an entity:

(a)    that engages in business activities from which it may earn revenues and incur expenses (including revenues and expenses relating to transactions with other components of the same entity);

(b)    [W]hose operating results are reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance, and

(c)    [F]or which discrete financial information is available.

448.    "Reportable segments" are operating segments that meet the criteria for separate reporting under IFRS 8. Pursuant to IFRS 8, ¶11(b) and ¶13, an operating segment is a reportable segment if *any* of the following quantitative criteria is met:

      (a)     Its reported revenue, including both sales to external customers and intersegment sales or transfers, is 10 per cent or more of the combined revenue, internal and external, of all operating segments.

      (b)     The absolute amount of its reported profit or loss is 10 per cent or more of the greater, in absolute amount, of (i) the combined reported profit of all operating segments that did not report a loss and (ii) the combined reported loss of all operating segments that reported a loss.

      (c)     Its assets are 10 per cent or more of the combined assets of all operating segments.

449.    As illustrated by the following facts, among others, Browns retail business was a discrete "operating segment" as defined in IFRS 8, ¶5.

450.    Following Farfetch's 2015 acquisition of Browns and throughout the relevant Class Period, Browns operated as a distinct subsidiary business entity that engaged in retail sales activities—both online and in-store—which generated revenues and incurred expenses.  Browns' "economic environment" was vastly different from the marketplace platform touted by Farfetch because its revenues and costs of doing business were derived from direct, first-party sales for which Browns carried inventory, whereas Farfetch's marketplace platform's revenues and costs were derived from the facilitation of transactions between third party sellers and consumers in exchange for a percentage commission, where no inventory was ever held by Farfetch.

451.    Overwhelming evidence shows that Browns should have been reported as a separate operating segment that satisfies each element of IFRS 8, ¶5.  Indeed, Browns filed a stand-alone Annual Report with the United Kingdom's registrar of companies for the years 2015 – 2019, a fact not disclosed in Farfetch's SEC filings.

452.     Each Browns Annual Report was "presented" by Browns' Board of Directors, which included Defendants Neves and Jordan for the relevant period.  Indeed, Defendant Neves signed the Browns Annual Report for 2015, 2016 and 2017 on behalf of the entire Board. Defendant Jordan signed the Annual Report for 2018 on behalf of the entire Board.

453.     In each Annual Report, Defendant Neves and Defendant Jordan, respectively, wrote: "The principal activity of [Browns] was that of retailing ladies' and mens' wear.  The directors anticipate this activity will continue." No distinction was made between Browns' in-store business and e-commerce business.

454.     Each Annual Report disclosed "discrete financial information" for the Browns retail business (both in-store and e-commerce), including revenue, cost of sales, gross profit, other operating income, and loss.  Moreover, unlike Farfetch, with its several pages of highly technical KPIs, Browns' business proposition and measure of success (or failure) was much more straightforward:

**Key performance indicators (KPIs)**

The directors monitor revenue and profits or losses as set out in the statement of profit or loss on page 10. The directors are of the opinion that disclosing additional key performance indicators, other than those above, is not necessary to understand the development, performance and position of the business.

455.     A comparison of Browns' UK-filed Annual Reports for 2017 and 2018 and Farfetch's Offering Materials and Form 20-F for 2018 reveals just how much of Farfetch's revenue was due to Browns Retail business:

| Segment | 2017 Revenue | % of Total Revenue | 2018 Revenue | % of Total Revenue |
|---|---|---|---|---|
| Total | $385,966,000 | | $602,384,000 | |
| As reported: | | | | |
| Farfetch (as reported minus Stores revenue) | $370,532,000 | 96% | $586,789,000 | 97% |
| Stores | $15,434,000 | 4% | $15,595,000 | 3% |
| If properly reported: | | | | |
| Farfetch (minus Browns) | $324,320,214 | 84% | $487,233,010.40 | 81% |
| Browns[9] | $61,645,786 | *16%* | $115,150,989.60 | *19%* |

456.    Browns Retail business also met another test for "reportable segment," because it accounted for more than 10% of Farfetch's reported gross profits during the Class Period.

| Segment | 2017 Gross Profits | % of Gross Profits | 2018 Gross Profit | % of Gross Profits |
|---|---|---|---|---|
| As reported: | | | | |
| Farfetch | $204,766,000 | 100% | $298,450,000 | 100% |
| If properly reported: | | | | |
| Farfetch | $172,752,608.80 | 84% | $247,898,725.40 | 80% |
| Browns[10] | $32,013,391.20 | *16%* | $50,551,274.60 | *20%* |

457.    In the Offering Materials and in the Company's Form 20-F for 2018, Farfetch identified four operating segments:

**Segment Reporting**

We have determined our operating segments ***on the same basis that we use to evaluate performance internally***. Our operating segments are: (1) Farfetch Marketplace, (2) Farfetch Black and White, (3) Farfetch Store of the Future and (4) Browns Stores. ***Farfetch Marketplace represents over 90% of revenue***; therefore, we are presenting only one reportable operating segment being the consolidated view of all operating segments noted above.

---

[9] Browns reports its financials in pounds sterling. These figures were converted to dollars using the conversion rate as of the date of filing for Browns' Annual Reports: September 20, 2018 (1 Pound Sterling = $1.3272) and September 30, 2019, respectively (1 Pound Sterling = $1.2293).

[10] Browns reports its financials in pounds sterling. These figures were converted to dollars using the conversion rate as of the date of filing for Browns' Annual Reports: September 20, 2018 (1 Pound Sterling = $1.3272) and September 30, 2019, respectively (1 Pound Sterling = $1.2293).

The Offering Materials contained an additional statement about the reportable operating segments:

> **Segmental and geographical information**
>
> The Group has identified four operating segments. ***This assessment is based on information reported to the Group's Chief Executive for the purpose of assessing segmental performance and resource allocation***.
>
> These are the Marketplace (which operates the Farfetch.com marketplace website and app), Farfetch Black & White (a white label website solution for luxury brands), Stores (operation of the Browns luxury boutiques) and Store of the Future (provision of technology solutions to retail outlets). ***The Marketplace represents over 90% of the Group's revenue, results and assets***. As such the Group has presented only one reportable segment.

458.   The statements above in ¶¶ 455-457 were false and misleading and failed to disclose material information throughout the Class Period, because Farfetch's segment reporting during the Class Period violated IFRS.  Farfetch's segment reporting during the Class Period violated IFRS 8 because Browns retail business was a separate operating segment under the clear terms of IFRS. The Browns retail business (e-commerce and in-store) should have been disclosed as a separate operating segment, as described in IFRS 8, ¶5, because it was an independent, separate operating segment under IFRS, and it should not have been artificially divided into two, with the physical locations grouped as "Stores," and the significant remainder of the revenue lumped together with Farfetch's Marketplace platform commission-based segment. Instead, separate segment information was required to be reported for the Browns' segment and the Marketplace segment (minus the Browns' revenue). If the entire Browns retail business were viewed as a whole, revenue from that operating segment accounted for ***far more*** than 10% of all of Farfetch's revenue, and would have been a mandatory operating and reporting segment under IFRS, ¶11.  Moreover, because the Browns first-party retail business and the third-party marketplace platform do not share similar economic characteristics—and in fact exhibit very

different gross margins—the two operating segments' financial results should not have been consolidated.

459. According to IFRS 8, ¶12, this consolidation is improper. Any aggregation is only potentially permissible if two operating segments (a) "exhibit similar long term financial performance;" (b) "if they have similar economic characteristics;"(c) if aggregation "is consistent with the core principle of IFRS" (to enable investors "to evaluate the nature and financial effects of the business activities in which it engages and the economic environment in which it operates."); and (d) have similar services and processes. Farfetch and Browns Retail did not meet the criteria for aggregation.

### 2. Misstatements And Omissions Relating To Farfetch's Business Model And Growth Strategy

460. The Prospectus contained false and misleading statements and omissions about Farfetch's third-party marketplace platform model and growth strategy that misled investors by concealing the Company's significant and growing reliance on its first-party retail business. The Prospectus described Farfetch's "marketplace business model" as one of its "Strengths" because "Our model allows us to offer the broadest and deepest selection of luxury fashion available online globally, *while incurring minimal inventory risk and without capital-intensive retail operations*. This allows for low capital expenditures, favorable working capital dynamics, minimal inventory holding and *an ability to drive stronger future margins than traditional inventory-taking business models*." The Prospectus also stated: "We generate income from transactions conducted on our platform, which, together with Browns In-Store Revenue, represents our GMV. *We primarily operate a revenue-share model where we retain commissions and related income from these transactions*." In addition, the Prospectus stated:

***We are a technology company at our core*** and have created a purpose-built platform for the luxury fashion industry. Our platform consists of three main components: applications, services and data.

**\*\*\*\*\***

Aggregating a large number of luxury sellers requires long and careful relationship building and acts as a significant barrier to entry. We have carefully nurtured these relationships for a decade. ***Our Marketplace model allows us to offer the broadest and deepest selection of luxury fashion available online globally, while incurring minimal inventory risk and without capital-intensive retail operations***.

461.    These statements above in ¶ 460 were materially false and misleading because, as set forth above, the Prospectus (i) concealed the financial contribution and impact of Farfetch's non-marketplace platform business—specifically, its Browns' first-party retail business—by consolidating its first-party and third-party business, in violation of IFRS 8; and (ii) misstated the Company's "minimal inventory risk" and "low inventory risk," and that the Company was "focused on being a technology platform for existing retailers as they grow their sales online via Farfetch," by concealing that Farfetch's first-party retail business was 16% of the Company's revenue (and over 15% of gross profits) in 2017, and had increased rapidly to compose nearly 20% of the Company's revenue (and over 20% of gross profits)) in 2018.

462.    These statements were highly material to investors and analysts. For example, BNP's Luca Solca and Simon Bowler explained that Farfetch's value lay in its role as a platform that "aggregate[ed] the inventory of its boutique partners without holding any inventory itself." An article in *Forbes* prior to the IPO noted that Farfetch's lack of inventory "is a great point of difference in the market which enables them to have a large assortment without the risk involved." *Fortune* similarly remarked that "What makes Farfetch's business model appeal is that it does not own the inventory sold on its website, but instead offers the web site to help the brands sell. That means Farfetch is spared from the complexities of inventory management that can include dealing with overstocks." On the day that Farfetch common stock began trading, and the offering price of

172

$20 per share skyrocketed up to close at $28.45 per share, *Forbes* reiterated its assessment of Farfetch's value with an article that described how "Farfetch never takes physical control of the products it sells" and that Farfetch's "platform business model is the key to that success."

463.    The Prospectus also contained false and misleading statements and omissions concerning the Company's financial growth strategy and use of the hundreds of millions of dollars of IPO proceeds.

464.    The Prospectus described the "key elements" of Farfetch's "Growth Strategies" as follows:

- "Improving consumer economics and growing our consumer base;"

- "Increasing product supply and our luxury seller base;"

- "Investing in new technologies and innovation;" and

- "Building the Farfetch brand."

465.    In addition, the Prospectus stated that Farfetch intended to "use the net proceeds from this offering and the concurrent private placement for working capital, to fund incremental growth and other general corporate purposes, including possible acquisitions," but stated that Farfetch "[did] not currently have any definitive or preliminary plans with respect to the use of proceeds for such purposes." Rather, in his letter to investors included in the Offering Materials, Defendant Neves explained: ***"We plan to continue investing aggressively in R&D. That, and growing our brand across geographies and categories, will be the focus of our investments in 2019 and beyond."***

466.    The Offering Materials also identified potential future acquisitions as a "Risk Factor," stating that: "We have acquired, and may continue to acquire, other companies or technologies, which could divert management's attention and otherwise disrupt our operations and harm our operating results."

467. The statements in ¶¶ 464-66 were materially false and misleading and omitted material facts. These statements created the false and misleading impression that the Company could and would achieve its growth targets by investing in its third-party technology platform business and growing that business organically, and omitted that it planned at the time of the IPO to grow through increasing Farfetch's risky and capital-intensive first-party business through inorganic acquisitions of existing third-party partners Stadium Goods and New Guards. These representations were material to investors, who understood from the representations that Farfetch could grow explosively, because it was purportedly pursuing a platform strategy (which had the capability for self-reinforcing or self-accelerating growth), and that this growth would not require large capital expenditure, the assumption of large inventory risk, or offering heavy promotional discounts. They also understood that Farfetch planned to pursue growth by investing in its core technology offering, and not by pursuing acquisitions, or growing the first-party business. However, as FE-1 explained, the Securities Act Defendants already had plans to expand and to conduct acquisitions at the time of the IPO.

### 3. Misstatements And Omissions Relating To Farfetch's Adjusted Platform Revenue And Third-Party Take Rate KPIs

468. The Offering Materials also contained materially false and misleading statements concerning Farfetch's promotional strategy and its effects on certain of Farfetch's key metrics. The Offering Materials stated that "Promotional incentives, which include basket promo-code discounts, *may periodically be offered* to end consumers" and that the promotions "are treated as a deduction to revenue." The Prospectus further noted that "Cash is collected by the Group from the end consumer using payment service providers" and "Within two months of the transactions, this is remitted to the relevant seller (net of commission and recoveries)." The Offering Materials

similarly stated that "Promotional incentives *may be periodically offered* to consumers. When we bear the costs of promotional incentives, these costs are recognized as deductions to revenue."

469.    The Offering Materials also described as a "risk factor" the ability for "*Retailers and brands set their own prices for the products they make available on our Marketplace, which could affect our ability to respond to consumer preferences and trends*."  The Prospectus went on to describe that Farfetch "*do[es] not control the pricing strategies of our retailers and brands* (other than Browns)."

470.    The statements above in ¶¶ 468-69 were materially false and misleading, and failed to disclose material facts. Farfetch's "promotional incentives" were not offered "periodically," because, since no later than June 2018, the Company had begun offering promotional incentives and site-wide discounts "constantly" in order to inorganically inflate sales and attract new customers.  This constant stream of promotions was a marked departure from the Company's historic practice of offering discounts only twice a year during summer and end of year.  In addition, these promotions were initiated by Farfetch, and, where the Company's brand and boutique partners would often equally share the costs of the twice-annual sales and promotions, the brand and boutique sellers required Farfetch to cover the costs of all or most of these new, "constant" promotions by deducting the costs of the promotions from Farfetch's take rate, or commission.  Further, it was materially false and misleading for Farfetch to state that it "do[es] not control the pricing strategies of [its] retailers and brands" when it did control the pricing of products offered by means of promotions Farfetch initiated.

471.    In addition, the Offering Materials identified the following "key operating and financial metrics" for Farfetch:

| | Six months ended June 30, | | Year ended December 31, | | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2015 | 2016 | 2017 |
| | | (in thousands, except as otherwise noted) | | | |

| Selected Other Data(1): | | | | | |
|---|---|---|---|---|---|
| **Consolidated Group:** | | | | | |
| GMV | $394,506 | $631,235 | $381,809 | $585,842 | $909,826 |
| Revenue | 172,571 | 267,508 | 142,305 | 242,116 | 385,966 |
| Adjusted Revenue(2) | 138,811 | 216,957 | 113,688 | 193,605 | 311,784 |
| Adjusted EBITDA(2) | (13,972) | (49,075) | (47,375) | (53,380) | (58,079) |
| Adjusted EBITDA Margin(3) | (10.1%) | (22.6%) | (41.7%) | (27.6%) | (18.6%) |
| **Platform:** | | | | | |
| Platform GMV | $387,175 | $624,044 | $374,915 | $573,174 | $894,392 |
| Adjusted Platform Revenue(2) | 131,480 | 209,766 | 106,794 | 180,937 | 296,350 |
| Platform Gross Profit(4) | 90,494 | 133,587 | 69,355 | 111,762 | 196,581 |
| Platform Order Contribution Margin(4) | 46.7% | 44.0% | 33.0% | 35.0% | 43.0% |
| Third-Party Take Rate | 33.7% | 31.7% | 30.0% | 31.3% | 32.9% |

472. The Offering Materials stated that "Adjusted Platform Revenue . . . ***best represents the economic value being generated by the platform***," and further explained: "[W]e provide fulfilment services to Marketplace consumers and receive revenue from the provision of these services, ***which is by and large a pass-through cost with no economic benefit to us, and therefore we calculate our Adjusted Revenue excluding Platform Fulfilment Revenue***." Further, as set forth in the IPO Offering Materials, Third-Party Take Rate was calculated based on Adjusted Platform Revenue.

473. The metrics reported above in ¶ 471 were materially false and misleading and omitted material facts. The Revenue metric and the others reported above were materially false and misleading because they reflected improper consolidation in violation of IFRS 8, as described in detail above. *See* ¶¶ 445-59.

474. Further, the statement in ¶ 472 that Adjusted Platform Revenue "best represents the economic value being generated by the platform" was materially false and misleading, because Adjusted Platform Revenue did not reflect the "constant" promotions being offered that reduced the economic value of the transactions being conducted on the platform, and because it omitted the fact that Adjusted Platform Revenue failed to reflect the economic effect of promotions. In addition, the statement in ¶ 472 that Platform Fulfillment Revenue was "by-and-large a pass-through cost" was materially misleading, because Platform Fulfillment Revenue included deductions for promotions that directly and negatively impacted reported revenue.

### 4.    Material Omissions Relating To Items 303 And 105

475.    Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required the IPO Offering Materials to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, required, in the IPO Offering Materials' "Risk Factors" section, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

476.    The failure of the IPO Offering Materials to disclose the true extent of Farfetch's dependence on first-party sales and its reliance on promotions to drive sales violated 17 C.F.R. § 229.303(a)(3)(ii) because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated 17 C.F.R. § 229.105, because these specific risks were not adequately disclosed, even though they were some of the most significant factors that made an investment in Farfetch shares speculative or risky.

477.    Further, Farfetch included "Risk Factors" in the Offering Materials that were materially false and misleading when made.  Specifically, Farfetch stated that "We . . . may in the future seek to acquire or invest in other companies or technologies that we believe could complement or expand our brand and products, enhance our technical capabilities, or otherwise offer growth opportunities." This statement was materially false and misleading, omitted material facts, and violated the requirements of Item 105 of Regulation S-K. As FE-1 stated, to increase Farfetch's GMV and revenue and to meet their growth targets for the Company, Farfetch would have to engage in  acquisitions.  Indeed, not only were these acquisition likely at the time of IPO, FE-1 explained that no acquisitions of that scale could have happened without the successful IPO

proceeds.   Thus, the need to conduct acquisitions was already realized, rather than a mere possibility, rendering the above "Risk Factor" false and misleading when made.

478.    The Offering Materials also described as a "risk factor" the ability for "***Retailers and brands set their own prices for the products they make available on our Marketplace, which could affect our ability to respond to consumer preferences and trends***."   This statement was materially false and misleading, omitted material facts, and violated the requirements of Item 105 of Regulation S-K. Farfetch exerted significant control over pricing and pricing strategies for transactions occurring on the Farfetch platform, specifically in the form of discounts that it offered to customers to attract and retain them. These discounts were significant in scope, and were initiated by Farfetch—not by its retail and brand partners.

## B.    The Securities Act Defendants Failed To Exercise Reasonable Care Or Conduct A Reasonable Investigation In Connection With The IPO

479.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete and not misstated in all material respects.

480.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.   Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involves: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the

company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

481.   Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

482.   The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

483.   The Underwriter Defendants could not simply rely on the work of Farfetch's outside auditors because the investing public relies on underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. The Underwriter Defendants must conduct their own, independent (and reasonable) investigation. Had the Underwriter Defendants conducted a reasonable investigation, they would have known that the Offering Materials contained material misstatements and omissions concerning Farfetch's business and operations, including concerning its key performance metrics and business strategies.

484.   Similarly, the Securities Act Individual Defendants who signed the Registration Statement failed to conduct a reasonable investigation into the statements contained in the Registration Statement and documents incorporated therein by reference, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

Had the Securities Act Individual Defendants conducted a reasonable investigation, they would have known that the Offering Materials contained material misstatements and omissions about Farfetch's business and operations, including concerning its KPIs and business strategies.

485.    The Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience, yet they failed to reasonable inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags," including, among other things, the facts that Farfetch's segment reporting was inconsistent with its U.K. reporting for Browns, and that Farfetch had initiated a program of non-seasonal, constant promotional activity at the time of the IPO, the effects of which would not be accurately reflected in the Company's KPIs and other financial metrics.

## XVI.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT IV

### Violation of Section 11 of the Securities Act
### (Against Farfetch, Neves, Jordan, the Director Defendants, and the Underwriter Defendants)

486.    Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

487.    This Count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Materials. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the Offering..

488.    Lead Plaintiffs assert this Count pursuant to §11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the common stock sold pursuant or traceable to the IPO, and who were damaged thereby, against the above-referenced Securities Act Defendants.

489.    As alleged above, the Offering Materials contained untrue statements and omissions of material fact concerning, among other things, Farfetch's business model, growth strategy, and financial results.

490.    As an issuer of the registered securities, Farfetch is strictly liable for the untrue statements of material fact and material omissions alleged in this Count.

491.    None of the other Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities. As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of Farfetch common stock sold through and/or traceable to the Offerings.

492.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Materials and within three years of their effective date..

493.    By reason of the foregoing, the Defendants named in this Count are liable under §11 of the Securities Act to members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the Offering Materials.

## COUNT V

### Violation of Section 12(a)(2) of the Securities Act
### (Against Farfetch and the Underwriter Defendants)

494.    Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

495.    This Count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Materials. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the Offering. For purposes of asserting this Count, Lead Plaintiffs do not allege that Farfetch and the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12 claim.

496.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the common stock sold pursuant or traceable to the Offering Materials, and who were damaged thereby, against Farfetch and the Underwriter Defendants.

497.    Farfetch was a statutory seller of Farfetch stock that was registered in the IPO pursuant to the Registration Statement and sold pursuant to the Prospectus. Farfetch signed the IPO Offering Materials, assisted in preparing the IPO Offering Materials, participated in the selection of the Underwriter Defendants, and sold, offered and/or solicited the sale of 50,880,311 shares in the IPO. In sum, Farfetch was a seller, offeror, and/or solicitor of sales of the securities that were sold in the IPO pursuant to the IPO Offering Materials.

498.    The Underwriter Defendants were statutory sellers of Farfetch sellers of Farfetch stock that was registered in the IPO pursuant to the Registration Statement and sold pursuant to the Prospectus.  By means of the IPO Offering Materials, the Underwriter Defendants sold a total of 50,880,311 shares of Farfetch stock that were registered in the IPO to members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the IPO by means of the IPO Offering Materials.

499.    The IPO Offering Materials, including the incorporated Prospectus, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein. These statements include, among other things, representations concerning Farfetch's purported organic growth and growth strategies.

500.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Materials and within three years of their effective date.

501.    By reason of the foregoing, Farfetch and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to the members of the Class who purchased stock in the IPO, and who were damaged thereby.

## COUNT VI

### Violation of Section 15 of the Securities Act
### (Against the Securities Act Individual Defendants)

502.    Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

503.    This Count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Materials. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the Offering. For purposes of asserting this Count, Lead Plaintiffs do not allege that the Securities Act Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

504.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who have asserted claims pursuant to Sections 11 and 12(a), against the Individual Defendants.

505.    The Securities Act Individual Defendants were at all relevant times controlling persons of Farfetch within the meaning of Section 15 of the Securities Act.  Each of the Securities Act Individual Defendants served as the most senior executive officers of Farfetch prior to and/or at the time of the IPO.  The Securities Act Individual Defendants participated at all relevant times in the operation and management of Farfetch, and conducted and participated, directly and indirectly, in the conduct of Farfetch's business affairs. As directors and officers of a publicly owned company, the Securities Act Individual Defendants had a duty to disseminate accurate and

184

truthful information with respect to Farfetch's actual organic growth and growth strategies. Because of their positions of control and authority as directors and officers of Farfetch, the Securities Act Individual Defendants were able to, and did, control the contents of the IPO Offering Materials, which contained materially untrue financial information and omissions.

506.    By reason of the foregoing, the Securities Act Individual Defendants are liable under Section 15 of the Securities Act, to the same extent that the Securities Act Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiffs and the other members of the Class.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding Lead Plaintiffs and the other members of the Class damages, including interest;

C.      Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

D.      Awarding Lead Plaintiffs such other or further relief as the Court may deem just and proper.

## XVIII.  JURY DEMAND

Lead Plaintiffs, on behalf of the Class, hereby demand a trial by jury.

DATED:      August 11, 2020          */s/ Lauren A. Ormsbee*
                                     **BERNSTEIN LITOWITZ BERGER**
                                     **& GROSSMANN LLP**

                                     John C. Browne
                                     Hannah Ross
                                     Lauren A. Ormsbee

Michael M. Mathai
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
JohnB@blbglaw.com
Hannah@blbglaw.com
Lauren@blbglaw.com
Michael.Mathai@blbglaw.com

*Counsel for Lead Plaintiff I.A.M. National Pension
Fund and Lead Counsel for the Class*

John D. Zaremba
**ZAREMBA BROWN PLLC**
40 Wall Street
52nd Floor
New York, NY 10005
Telephone: (212) 380-6700
jzaremba@zarembabrown.com

*Additional Counsel for Lead Plaintiff I.A.M.
National Pension Fund and the Class*

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**

By: */s/ Gregory M. Castaldo*

Gregory M. Castaldo
Joshua E. D'Ancona
Michelle Newcomer
Raphael Janove
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
mnewcomer@ktmc.com
rjanove@ktmc.com

*Counsel for Lead Plaintiff Oklahoma Firefighters
Pension and Retirement System and Lead Counsel
for the Class*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Ryk Tierney, on behalf of IAM National Pension Fund, hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of the IAM National Pension Fund.  On June 10, 2020, the Court appointed IAM National Pension Fund and Oklahoma Firefighters Pension & Retirement System Lead Plaintiffs in this matter. I previously filed a Certification Pursuant to the Federal Securities Laws on November 18, 2019, in connection with the motion for appointment as Lead Plaintiff.

2. I have reviewed and authorize the filing of the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, to be filed on August 10, 2020.

3. IAM National Pension Fund did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

4. IAM National Pension Fund Lead Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the class. IAM National Pension Fund will endeavor to provide fair and adequate representation and work directly with the efforts of class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

5. IAM National Pension Fund's transactions in Farfetch Limited securities that are the subject of this action are set forth in the chart attached hereto.

6. IAM National Pension Fund is currently serving as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Allegheny County Employees' Retirement System, et al. v. Energy Transfer LP, et al.*, Case No. 2:20-cv-00200-GAM (E.D. Pa.)

7. IAM National Pension Fund will not accept any payment for serving as a representative party on behalf of the Class beyond IAM National Pension Fund's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _8ᵗʰ_ day of August 2020.

Ryk Tierney
Executive Director
IAM National Pension Fund

**IAM National Pension Fund**
**Transactions in Farfetch Limited**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 5/16/2019 | 6,315 | 22.6924 |
| Purchase | 5/16/2019 | 244 | 22.6050 |
| Purchase | 5/16/2019 | 7,309 | 22.6092 |
| Purchase | 5/16/2019 | 24,364 | 22.6657 |
| Purchase | 5/16/2019 | 7,309 | 22.6000 |
| Purchase | 5/16/2019 | 35,782 | 22.6854 |
| Purchase | 5/17/2019 | 7,309 | 22.6331 |
| Purchase | 5/17/2019 | 2,437 | 22.7950 |
| Purchase | 5/17/2019 | 13,683 | 22.7840 |
| Purchase | 5/17/2019 | 4,873 | 22.7400 |
| Purchase | 5/17/2019 | 2,115 | 22.5800 |
| Purchase | 5/17/2019 | 19,491 | 22.7472 |
| Purchase | 5/20/2019 | 14,618 | 22.3500 |
| Purchase | 5/20/2019 | 487 | 20.9820 |
| Purchase | 5/20/2019 | 745 | 21.6500 |
| Purchase | 5/20/2019 | 11,813 | 21.3488 |
| Purchase | 5/23/2019 | 9,692 | 21.1556 |
| Purchase | 5/24/2019 | 1,434 | 21.8649 |
| Purchase | 5/24/2019 | 3,101 | 21.8742 |
| Purchase | 5/24/2019 | 1,660 | 21.8203 |
| Purchase | 5/24/2019 | 1,593 | 21.8223 |
| Purchase | 5/28/2019 | 3,249 | 22.1983 |
| Purchase | 5/28/2019 | 143 | 22.3050 |
| Purchase | 5/28/2019 | 2,336 | 22.1263 |
| Purchase | 5/29/2019 | 446 | 21.7500 |
| Purchase | 5/29/2019 | 4,770 | 21.8096 |
| Purchase | 5/29/2019 | 2,467 | 21.7462 |
| Purchase | 5/29/2019 | 413 | 21.9346 |
| Purchase | 5/30/2019 | 4,864 | 21.5081 |
| Purchase | 5/30/2019 | 505 | 21.2325 |
| Purchase | 5/30/2019 | 676 | 21.6119 |
| Purchase | 6/4/2019 | 508 | 19.0000 |
| Purchase | 6/4/2019 | 1,015 | 19.3175 |
| Purchase | 6/4/2019 | 2,873 | 19.1493 |
| Purchase | 6/4/2019 | 507 | 19.0200 |
| Purchase | 6/5/2019 | 1,374 | 19.0631 |
| Purchase | 6/5/2019 | 10,336 | 19.1102 |
| Purchase | 6/5/2019 | 1,209 | 19.1000 |

**IAM National Pension Fund**
**Transactions in Farfetch Limited**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/5/2019 | 1,440 | 19.1717 |
| Purchase | 6/5/2019 | 3,200 | 19.0409 |
| Purchase | 6/6/2019 | 322 | 19.8350 |
| Purchase | 6/6/2019 | 190 | 19.5000 |
| Purchase | 6/6/2019 | 15,601 | 19.7263 |
| Purchase | 6/6/2019 | 3,204 | 19.8460 |
| Purchase | 6/6/2019 | 554 | 19.5200 |
| Purchase | 6/10/2019 | 3,906 | 19.7306 |
| Purchase | 6/10/2019 | 1,041 | 19.8700 |
| Purchase | 6/10/2019 | 12,976 | 19.8320 |
| Purchase | 6/11/2019 | 2,053 | 21.0650 |
| Purchase | 6/11/2019 | 3,648 | 20.6667 |
| Purchase | 6/11/2019 | 9,648 | 20.7278 |
| Purchase | 6/11/2019 | 5,477 | 20.7449 |
| Purchase | 6/12/2019 | 5,965 | 21.3891 |
| Purchase | 7/15/2019 | 8,384 | 20.4534 |
| Purchase | 7/15/2019 | 1,134 | 20.4950 |
| Purchase | 7/15/2019 | 1,630 | 20.5035 |
| Purchase | 7/16/2019 | 1,043 | 20.5548 |
| Purchase | 7/16/2019 | 1,855 | 20.7242 |
| Purchase | 7/17/2019 | 15 | 21.2813 |
| Purchase | 7/17/2019 | 10 | 21.3115 |
| Purchase | 7/18/2019 | 130 | 21.2902 |
| Purchase | 7/18/2019 | 9 | 21.3150 |

## CERTIFICATION

The Oklahoma Firefighters Pension & Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff"), declares, as to the claims asserted under the federal securities laws that:

1.      Lead Plaintiff did not purchase the securities that are the subject of this action at the direction of Lead Plaintiff's counsel or in order to participate in any private action.

2.      Lead Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Lead Plaintiff's Class Period purchase and sale transactions in the Farfetch Limited securities that are the subject of this action are attached in Schedule A.

4.      Lead Plaintiff has full power and authority to bring suit to recover for its investment losses listed in the attached Schedule A.

5.      Lead Plaintiff has fully reviewed the facts and allegations of the Consolidated Class Action Complaint for Violations of the Federal Securities Laws and authorizes its filing.

6.      I, Chase Rankin, Executive Director, am authorized to make legal decisions on behalf of Oklahoma Firefighters.

7.      Lead Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the class.

8.      Lead Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

9.      Oklahoma Firefighters is currently serving or has served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in:

*Weiner v. Tivity Health, Inc., et al.*, No. 3:17-cv-1469 (M.D. Tenn.)

*In re Campbell Soup Co. Securities Litigation*, No. 1:18-cv-14385 (D.N.J.)

*In re Nektar Therapeutics Securities Litigation*, No. 4:18-cv-6607 (N.D. Cal.)

*In re Weight Watchers International, Inc. Securities Litigation*, No. 1:19-cv-2005 (S.D.N.Y.)

*Employees' Retirement System of the Puerto Rico Electric Power Authority v. Conduent Inc., et al.*, No. 2:19-cv-8237 (D.N.J.)

*Oklahoma Firefighters Pension & Retirement System v. United States Steel Corp., et al.*, No. 2:19-cv-470 (W.D. Pa.)
(filed initial complaint; not appointed lead plaintiff; case consolidated with *Vrakas, et al. v. United States Steel Corp., et al.*, No. 2:17-cv-579 (W.D. Pa.))

*Logan v. ProPetro Holding Corp., et al.*, No. 7:19-cv-217 (W.D. Tex.)

*In re Farfetch Ltd. Securities Litigation*, No. 1:19-cv-8657 (S.D.N.Y.)

*In re Resideo Technologies, Inc. Securities Litigation*, No. 0:19-cv-2863 (D. Minn.)
(appointed class representative)[1]

*Alameda County Employees' Retirement Association, et al. v. Portola Pharmaceuticals Inc., et al.*, No. 3:20-cv-367 (N.D. Cal.) (additional plaintiff)

*In re Six Flags Entertainment Corp. Securities Litigation*, No. 4:20-cv-201 (N.D. Tex.)

10.     Oklahoma Firefighters sought to serve (but either withdrew its motion or was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in:

*Tung v. Bristol-Myers Squibb Co., et al.*, No. 1:18-cv-1611 (S.D.N.Y.)[2]

*West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc., et al.*, No. 1:19-cv-1323 (N.D. Ill.)

11.     Lead Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs

---

[1] Order for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel, *In re Resideo Techs., Inc. Sec. Litig.*, No. 0:19-cv-2863 (D. Minn. Jan. 27, 2020), ECF No. 38.
[2] *Giugno v. Bristol-Myers Squibb Co., et al.*, No. 3:18-cv-878 (N.D. Cal.) was voluntarily dismissed in favor of *Tung v. Bristol-Myers Squibb Co., et al.*, No. 1:18-cv-1611 (S.D.N.Y.).

and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of August 2020.

**Oklahoma Firefighters Pension & Retirement System**

By: _____

Chase Rankin
Executive Director

**SCHEDULE A**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 5/16/2019 | 3,172 | $22.69 |
| Common Stock | BUY | 5/16/2019 | 12,238 | $22.67 |
| Common Stock | BUY | 5/16/2019 | 3,671 | $22.60 |
| Common Stock | BUY | 5/16/2019 | 3,671 | $22.61 |
| Common Stock | BUY | 5/16/2019 | 122 | $22.61 |
| Common Stock | BUY | 5/16/2019 | 17,973 | $22.69 |
| Common Stock | BUY | 5/17/2019 | 6,873 | $22.78 |
| Common Stock | BUY | 5/17/2019 | 1,062 | $22.58 |
| Common Stock | BUY | 5/17/2019 | 1,224 | $22.80 |
| Common Stock | BUY | 5/17/2019 | 9,790 | $22.75 |
| Common Stock | BUY | 5/17/2019 | 2,447 | $22.74 |
| Common Stock | BUY | 5/17/2019 | 3,671 | $22.63 |
| Common Stock | BUY | 5/20/2019 | 245 | $20.98 |
| Common Stock | BUY | 5/20/2019 | 375 | $21.65 |
| Common Stock | BUY | 5/20/2019 | 5,932 | $21.35 |
| Common Stock | BUY | 5/20/2019 | 7,343 | $22.35 |
| Common Stock | BUY | 5/23/2019 | 4,870 | $21.16 |
| Common Stock | BUY | 5/24/2019 | 721 | $21.86 |
| Common Stock | BUY | 5/24/2019 | 800 | $21.82 |
| Common Stock | BUY | 5/24/2019 | 1,558 | $21.87 |
| Common Stock | BUY | 5/24/2019 | 834 | $21.82 |
| Common Stock | BUY | 5/28/2019 | 1,632 | $22.20 |
| Common Stock | BUY | 5/28/2019 | 1,174 | $22.13 |
| Common Stock | BUY | 5/28/2019 | 72 | $22.31 |
| Common Stock | BUY | 5/29/2019 | 2,396 | $21.81 |
| Common Stock | BUY | 5/29/2019 | 1,239 | $21.75 |
| Common Stock | BUY | 5/29/2019 | 223 | $21.75 |
| Common Stock | BUY | 5/29/2019 | 207 | $21.93 |
| Common Stock | BUY | 5/30/2019 | 339 | $21.61 |
| Common Stock | BUY | 5/30/2019 | 2,442 | $21.51 |
| Common Stock | BUY | 5/30/2019 | 254 | $21.23 |
| Common Stock | BUY | 6/4/2019 | 255 | $19.00 |
| Common Stock | BUY | 6/4/2019 | 255 | $19.02 |
| Common Stock | BUY | 6/4/2019 | 510 | $19.32 |
| Common Stock | BUY | 6/4/2019 | 1,442 | $19.15 |
| Common Stock | BUY | 6/5/2019 | 608 | $19.10 |
| Common Stock | BUY | 6/5/2019 | 5,193 | $19.11 |
| Common Stock | BUY | 6/5/2019 | 690 | $19.06 |
| Common Stock | BUY | 6/5/2019 | 723 | $19.17 |
| Common Stock | BUY | 6/5/2019 | 1,608 | $19.04 |
| Common Stock | BUY | 6/6/2019 | 160 | $19.84 |

| | | | | |
|---|---|---|---|---|
| Common Stock | BUY | 6/6/2019 | 7,841 | $19.73 |
| Common Stock | BUY | 6/6/2019 | 95 | $19.50 |
| Common Stock | BUY | 6/6/2019 | 278 | $19.52 |
| Common Stock | BUY | 6/6/2019 | 1,610 | $19.85 |
| Common Stock | BUY | 6/10/2019 | 6,516 | $19.83 |
| Common Stock | BUY | 6/10/2019 | 1,961 | $19.73 |
| Common Stock | BUY | 6/10/2019 | 523 | $19.87 |
| Common Stock | BUY | 6/11/2019 | 4,844 | $20.73 |
| Common Stock | BUY | 6/11/2019 | 1,031 | $21.07 |
| Common Stock | BUY | 6/11/2019 | 2,751 | $20.74 |
| Common Stock | BUY | 6/11/2019 | 1,832 | $20.67 |
| Common Stock | BUY | 6/12/2019 | 2,996 | $21.39 |
| Common Stock | BUY | 7/15/2019 | 4,170 | $20.45 |
| Common Stock | BUY | 7/15/2019 | 564 | $20.50 |
| Common Stock | BUY | 7/15/2019 | 811 | $20.50 |
| Common Stock | BUY | 7/16/2019 | 11,175 | $20.72 |
| Common Stock | BUY | 7/16/2019 | 6,282 | $20.55 |
| Common Stock | BUY | 7/17/2019 | 196 | $21.28 |
| Common Stock | BUY | 7/17/2019 | 138 | $21.31 |
| Common Stock | BUY | 7/18/2019 | 1,718 | $21.29 |
| Common Stock | BUY | 7/18/2019 | 119 | $21.32 |