**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FARFETCH LIMITED
SECURITIES LITIGATION

Case No. 1:19-cv-08657-AJN-BCM

<u>CLASS ACTION</u>

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 5

    A.    Defendants' Statements Regarding The Growth Potential of Farfetch's Platform And The Company's Lack of Dependence on First-Party Sales ............. 5

    B.    Farfetch's Accounting Metrics And Key Performance Indicators Falsely Portray The Success of Its "Unique" Business Model ........................................... 10

    C.    The Officer Defendants Offload Their Shares Just before Farfetch's Deception Is Revealed to The Market .................................................................. 14

    D.    The Truth about Farfetch's Business Is Revealed in August 2019, Erasing $2 Billion of Shareholder Equity ..................................................................... 14

LEGAL STANDARDS ................................................................................................. 15

ARGUMENT ............................................................................................................. 16

I.      THE EXCHANGE ACT CLAIMS ARE ADEQUATELY PLED ................................ 16

    A.    Defendants Misled Investors about Farfetch's Business ...................................... 16

        1.    Defendants' False And Misleading Statements about Farfetch's Marketplace Focus And Growth Strategies Are Actionable ..................... 16

        2.    Defendants' Arguments about Farfetch's Statements on Growth Strategy, First-Party Sales, And Promotions Fail ...................................... 19

    B.    Defendants' Self-Devised KPIs Were Materially Misleading And Violated Applicable Accounting Standards ...................................................................... 22

        1.    Defendants' KPIs Painted A False Picture of The Marketplace Platform's Success ................................................................................... 22

        2.    Defendants Violated IFRS 8 to Exaggerate Growth of The Marketplace And to Obscure The Truth about First-Party Sales .............. 24

    C.    Defendants' Failure to Disclose Known Trends And Significant Factors as Required Under Regulation S-K Was Misleading ............................................... 26

    D.    Defendants Fail to Identify Any Opinion Statements, Puffery, or Forward Looking Statements ....................................................................................... 28

    E.    Defendants Acted with Scienter ........................................................................ 31

    F.    Plaintiffs Adequately Allege Loss Causation ...................................................... 34

    G.    The Complaint States A Section 20A Claim ....................................................... 36

II.    THE SECURITIES ACT CLAIMS ARE ADEQUATELY PLED ................................ 37

    A.    Plaintiffs Have Adequately Pled Standing under Section 11 ................................ 37

B.     Plaintiffs Have Adequately Alleged Standing under Section 12(a)(2) ................. 39

III.    CONTROL PERSON LIABILITY .................................................................................. 40

CONCLUSION ............................................................................................................................. 40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)........................................................................28, 29

*Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*,
   2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) .............................................21, 22

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
   568 U.S. 455 (2013)..............................................................................................36

*In re Barclays Bank PLC Sec. Litig.*,
   2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017).....................................................27

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................21

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
   2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ......................................................30

*Cai v. Switch, Inc.*,
   2019 WL 3065591 (D. Nev. July 12, 2019) ........................................................22

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014).................................................................................34

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. Mar. 30, 2020) ..........................................*passim*

*Dorchester Inv'rs v. Peak Trends Tr.*,
   2003 WL 223466 (S.D.N.Y. Feb. 3, 2003)..........................................................39

*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003).................................................................................34

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 428 (S.D.N.Y. 2013)..................................................................30

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017)...................................................................................20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009)..................................................................24

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).............................................................29, 31

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................18, 33, 34

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
  94 F. Supp. 2d 491 (S.D.N.Y. 2000)......................................................................30

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................................................................29

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)..................................................................................36

*Gavish v. Revlon, Inc.*,
  2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004).......................................................19

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).....................................................32, 33

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018)....................................................................30

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)....................................................................39

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)..............................................................................24, 25

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................................19, 35

*In re Lehman Bros. Sec. & Erisa Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)....................................................................24

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)....................................................................18

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)................................................................18, 19

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010)....................................................................36

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990)..................................................................................22

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
 761 F.3d 245 (2d Cir. 2014)........................................................................1, 17, 22

*Nguyen v. New Link Genetics Corp.*,
 297 F. Supp. 3d 472 (S.D.N.Y. 2018)....................................................................18

*In re OPUS360 Corp. Sec. Litig.*,
 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) .........................................................40

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020).................................................27, 28

*Perry v. Duoyuan Printing, Inc.*,
 2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) .............................................38, 39, 40

*In re Petrobras Sec. Litig.*
 116 F. Supp. 3d 368 (S.D.N.Y. 2015).....................................................................37

*In re Pfizer Inc. Sec. Litig.*,
 584 F. Supp. 2d 621 (S.D.N.Y. 2008).....................................................................36

*Robb v. Fitbit Inc.*,
 216 F. Supp. 3d 1017 (N.D. Cal. 2016) .................................................................30

*In re Salix Pharm., Ltd.*,
 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)....................................................30, 31

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001).....................................................................................31

*In re Smart Techs., Inc. S'holder Litig.*,
 295 F.R.D. 50 (S.D.N.Y. 2013) ..............................................................................38

*Stratte-McClure v. Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015).................................................................................26, 27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
 531 F.3d 190 (2d Cir. 2008)....................................................................................31

*In re Tenaris S.A. Sec. Litig.*,
 2020 WL 6018919 (E.D.N.Y. Oct. 9, 2020)...........................................................27

*In re Vivendi Universal, S.A. Sec. Litig.*,
 381 F. Supp. 2d 158 (S.D.N.Y. 2003).....................................................................36

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
 2016 WL 2757760 (S.D.N.Y. May 11, 2016) .........................................................26

*Wyche v. Advanced Drainage Sys., Inc.*,
   2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ..........................................................................26

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ..................................................................................30

**Statutes**

15 U.S.C. § 78t-1 ......................................................................................................................36

**Other Authorities**

17 C.F.R. § 210.4-01(a)(1)-(2)..............................................................................................25, 26

17 C.F.R. §§ 229.105, 229.303 ................................................................................................26

Comm'n Guidance Regarding Mgmt.'s Discussion & Analysis of Fin. Condition
   & Results of Operations,
   Securities Act Release No. 8350, Exchange Act Release No. 48960,
   2003 WL 22996757 (Dec. 19, 2003) ..................................................................................27

Int'l Fin. Reporting Standard 8 ....................................................................................... *passim*

## TABLE OF ABBREVIATIONS

The following terms are used in this memorandum:

| | |
|---|---|
| Browns | Browns (South Moulton Street) Limited, British fashion and luxury goods boutique and online store acquired by Farfetch in 2015 |
| Class Period | Period from September 20, 2018 through August 8, 2019, inclusive |
| Complaint | Consolidated Amended Complaint (ECF No. 39), cited as "¶¶ _". Unless otherwise indicated, capitalized terms have the meaning ascribed to them in the Complaint. |
| Director Defendants | Frederic Court, Dana Evan, Jonathan Kamaluddin, Richard Liu, Natalie Massenet, Jonathan Newhouse, Daniel Rimer, Michael Risman, and David Rosenblatt |
| Exchange Act | Securities Exchange Act of 1934 |
| Farfetch or the Company | Farfetch Limited |
| FE | Former employee |
| Form 20-F | Farfetch's SEC Form 20-F for FY 2018, filed on March 1, 2019 |
| FY | Fiscal year, ending on December 31 |
| GAAP | U.S. Generally Accepted Accounting Principles |
| GMV | Gross Merchandise Value, total dollar value of orders processed |
| IASB | International Accounting Standards Board |
| IFRS | International Financial Reporting Standards |
| Individual Defendants | Officer Defendants and Director Defendants, collectively |
| IPO | Initial Public Offering |
| KPIs | Key performance indicators |
| MTD | Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint (ECF No. 59) |
| Offering Materials or OM | September 20, 2018 Registration Statement and September 20, 2018 Prospectus, collectively |
| Officer Defendants | José Neves, Elliot Jordan, and Andrew Robb, collectively |
| Plaintiffs or Lead Plaintiffs | International Association of Machinists and Aerospace Workers National Pension Fund ("IAMNPF") and Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), collectively |
| Platform Fulfilment Revenue | Revenue from shipping and customs clearing services, net of consumer promotional incentives |
| Platform GMV | Platform Gross Merchandise Value, total dollar value of orders processed on the platform |
| Platform Services Revenue or Adjusted Platform Revenue | Combined revenue from commissions on third-party sales and online first-party sales |

| Proposed Class | All persons and entities who purchased or otherwise acquired Farfetch common stock (1) in or traceable to the IPO; or (2) on the open market during the period from September 20, 2018 through and including August 8, 2019, and who were damaged thereby. Excluded from the Class are Defendants, other officers and directors of Farfetch at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest |
|---|---|
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| Q1, Q2, Q3, Q4 | First, second, third, fourth quarters, respectively, of the fiscal year |
| Registration Statement | Farfetch's registration statement filed on September 20, 2018 |
| Roadshow | Two-week marketing effort held on September 6-19, 2018 |
| Roadshow Presentation | Video and slide deck for potential investors presented during the Roadshow |
| RSU | Restricted stock unit |
| Rule | Federal Rule of Civil Procedure |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933 |
| Securities Act Defendants | Farfetch, Securities Act Individual Defendants, and Underwriter Defendants, collectively |
| Securities Act Individual Defendants | Director Defendants and Officer Defendants, collectively |
| Underwriter Defendants | Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Allen & Company LLC, UBS Securities LLC, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Wells Fargo Securities, LLC, Cowen and Company, LLC, and BNP Paribas Securities Corp. |
| YNAP | Yoox Net-a-Porter, a first-party retailer and Farfetch's top online competitor |

## PRELIMINARY STATEMENT

The federal securities laws prohibit executives of publicly listed companies from making statements that mislead investors as to material undisclosed facts. It is black-letter law that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). The Securities Act[1] applies this rule to the registration statement and prospectus related to an IPO with particular force, making "[i]ssuers . . . subject to 'virtually absolute' liability under section 11 [of the Securities Act]," and holding "the remaining potential defendants under sections 11 and 12(a)(2) . . . liable for mere negligence." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 401 (S.D.N.Y. Mar. 30, 2020) (Nathan, J.). Defendants violated the Securities Act and Exchange Act by misrepresenting online luxury-goods dealer Farfetch's business model, growth strategy, and financial condition in an effort to inflate its stock price in connection with its September 2018 IPO and the roughly ten-month Class Period thereafter—all while Farfetch's senior-most executives, Defendants Neves, Robb, and Jordan, rushed to dump shares and reap personal fortunes.

Farfetch's IPO was wildly successful: it raised over $1 billion at an $8 billion valuation, even though the Company had never turned a profit in its ten years of existence. Farfetch's chief selling point to investors was its unique "marketplace" or "platform" business model, whereby it facilitated third-party commerce—sales between luxury retailers and consumers—and purportedly took roughly one-third of the proceeds of every transaction, all without the risk of carrying inventory. ¶¶ 32, 58-60, 76-77. Defendants claimed this differentiated Farfetch from its luxury e-commerce competitors. For example, Neves declared: "[E]veryone else is operating on a retail model, but we are a platform, not a shop . . . we are the only global luxury platform at scale." ¶ 40.

---

[1] Except as noted, all emphasis is added and all internal citations and quotation marks are omitted.

Defendants emphasized that Farfetch's "marketplace business model" allowed it to earn revenues "while incurring minimal inventory risk and without capital-intensive retail operations," yielding "stronger future margins than traditional inventory-taking business models." ¶ 70; *see also* ¶ 56.

Defendants boasted that Farfetch's marketplace model was poised for explosive growth, stating during the Roadshow that its "platform" positioned the Company to "take this $100 billion" anticipated online luxury market. ¶ 63. Defendants claimed Farfetch's growth would be organic—describing the platform as a low-cost "flywheel" that would spin out expanding revenues, and attributing Farfetch's apparent "high growth at scale" in 2018 to "network effects enjoyed by our superior marketplace model"—and explained that IPO proceeds would be used to make investments to reinforce that third-party platform. ¶¶ 79, 91-92, 98.

Meanwhile, Defendants minimized the first-party retail segment of Farfetch's business, which, at the time of the IPO, centered around Browns—a luxury boutique Farfetch acquired in 2015. ¶¶ 135-36. Farfetch downplayed Browns's significance, referring to it as merely an "incubator" for developing platform technologies. ¶ 34. Similarly, in February 2019, Neves claimed first-party retail at Farfetch was just a "surgical tool" to "create buzz." ¶ 102. Defendants stated that first-party "Stores" sales would be a mere sliver of Farfetch's overall business—in the "single digits." ¶¶ 95, 102. Pre-IPO, Jordan declared: "***There's no growth in Stores within the plans for Farfetch***," ¶ 57, while Neves stated: "[W]e are not a retailer." ¶ 91; *see also* ¶ 105.

Investment and industry analysts embraced this low-risk, high-growth story. Around the IPO, reports cheered Farfetch's platform model and inventory-light approach. *See, e.g.,* ¶ 82 ("Farfetch is a pure-play platform . . . . [It] never takes control of the inventory it sells . . . . [Its] platform business model is the key to that success."). Analysts noted that "the economics surrounding [Farfetch's] marketplace model . . . present very compelling long-term margin

opportunities," ¶ 84, and touted Defendants' purported "priority" focus on growing the platform. ¶ 49. Analysts similarly accepted Defendants' Class Period representations about Farfetch's financial performance, as measured by "Key Performance Indicators." *See, e.g.,* ¶ 96 (Wells Fargo: "[V]ery strong results that demonstrate the momentum in the business, the strength of their operating model and the robust long-term opportunities available"); ¶ 103 (J.P. Morgan: "[S]trong 4Q results," citing KPIs). After opening at $20 per share in the IPO, Farfetch's stock price skyrocketed, trading well above that level throughout the Class Period. ¶¶ 80, 97, 104.

The truth about Farfetch's business, however, was materially different than what Defendants portrayed. Before and during the Class Period, Farfetch became increasingly reliant on first-party sales: revenues from Browns sales were not a "single digit[]" percentage of Farfetch's revenues, but roughly *17-19%*—a fact Defendants masked through improper accounting devices directed by Neves and Jordan. ¶¶ 130-34. Moreover, at the time of the IPO, Farfetch actively planned to grow its first-party business, including by long-planned acquisitions that would be financed with IPO proceeds. ¶¶ 135-40. Farfetch also relied on near-constant promotions to prop up its ostensible platform performance—a fact Defendants actively hid by manipulating Farfetch's KPIs so as to "protect[]" the Company's apparent strength. ¶¶ 141-56.

Meanwhile, the Officer Defendants sold massive amounts of their Farfetch stock just before the revelation of Farfetch's true business model and financial condition. ¶ 185. In a spree of sales between April and August 2019, the three Officer Defendants reaped approximately *$68 million*. ¶¶ 190-94. Notably, they stopped selling shares just before the fraud was revealed, and sold no more shares for months afterwards. ¶ 198.

When Defendants' disclosures on August 8, 2019 revealed the truth—including Farfetch's significant further step into first-party retail through the $675 million acquisition of "megabrand"

New Guards Group, its lackluster platform growth, and its heavy reliance on costly promotions to drive sales—the market reacted swiftly. ¶¶ 165, 180. Analysts called out the "highly-surprising" disclosures—including "an extremely high level of promotional activity," growing first-party revenues that were "counter to the company's core 'asset-light' business model," the massive New Guards acquisition that appeared to be a "strategic[] mov[e] further outside the core marketplace strategy," and other results showing that "organic growth is decelerating significantly"—and slashed their price targets for Farfetch as much as 55%. ¶¶ 175-78, 181-82. Farfetch's stock price cratered, losing approximately 45% of its value the next trading day. ¶ 173.

In the face of these facts, Defendants resort to denigrating the Complaint as a "strike suit," MTD 1, and ignoring or mischaracterizing the facts and claims it details. Defendants' insubstantial arguments for dismissal all fail.

*First*, Defendants' claim that Plaintiffs "have not identified a single false statement" ignores the Complaint's detailed allegations. MTD 2, 12. For example, Plaintiffs do not allege Farfetch was no longer "a technology company," as Defendants' straw-man argument would have it, MTD 13, but rather that Defendants purposely concealed Farfetch's significant reliance on first-party retail. The falsity of Defendants' misstatements on that score—as well as, e.g., whether Farfetch engaged in "constant" promotions and misrepresented its "take rate" income—is exhaustively pled, including through the reports of FEs with direct relevant knowledge, and confirmed by the strong reaction of the market after Defendants' alleged corrective disclosure.

*Second*, contrary to Defendants' arguments, MTD 3, 24-34, Plaintiffs plead the scienter of the Officer Defendants through detailed allegations, including that Neves, Jordan, and Robb personally directed senior Farfetch employees to misrepresent the significance of first-party revenues in the Company's Offering Materials and post-IPO financial filings. The FEs' first-

person accounts of culpable behavior are reinforced by the tens of millions of dollars of Farfetch common stock the Officer Defendants unloaded in the four months just prior to the Class Period's end. And, of course, scienter is not an element of Plaintiffs' Securities Act claims.

*Third,* Defendants' loss causation arguments—that no information corrective of the alleged misstatements was ever disclosed, MTD 34-36—fail because they ignore what actually happened immediately following the alleged corrective disclosure, when analysts reported their dismay at learning the very information Plaintiffs allege Defendants had concealed until that day.

*Finally*, Defendants hardly address Plaintiffs' Securities Act allegations, asserting only shopworn standing arguments that ignore applicable, contrary case law.

The motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.   Defendants' Statements Regarding The Growth Potential of Farfetch's Platform And The Company's Lack of Dependence on First-Party Sales

Throughout the Class Period, Defendants made numerous false and misleading statements about Farfetch's growth strategies and lack of reliance on first-party sales.

Defendants touted Farfetch's third-party marketplace platform as its distinguishing feature, the key to its revenues and growth, and the overarching selling point for Farfetch stock in and after the September 2018 IPO.[2] They assured investors Farfetch's North Star would be the organic growth of that platform—not a costly expansion of the Company's limited first-party retail business, which Defendants actively minimized. Based on this story, Farfetch's IPO was a smash hit, raising over $1 billion at a valuation over $8 billion. ¶ 80.

---

[2] Defendants described Farfetch in the Offering Materials and in a Roadshow in September 2018, in which Neves, Jordan, and the lead underwriters traveled the U.S. and U.K. to stoke investor interest. ¶ 50. In a Roadshow Presentation including a video and slide deck, Company executives, early investors, and brand partners touted Farfetch's prospects. *See, e.g.* ¶¶ 52, 62 (*Vogue* editor-in-chief Anna Wintour describing Uber and Apple as "the same as Farfetch.").

Defendants' first alleged false and misleading statements were made in connection with the IPO, when they touted Farfetch's signature business model as a platform for third-party sales. For example, the Offering Materials stated that the marketplace business model . . . allows us to offer the broadest and deepest selection of luxury fashion . . . ***while incurring minimal inventory risk and without capital-intensive retail operations*.**" ¶¶ 67, 70, 234, 460. Likewise, Neves touted Farfetch's "considerable [competitive] advantage" as the "one marketplace" for "a $300 billion industry," stating, "***[e]veryone else is a retailer*.**" ¶¶ 29, 53-54, 236.[3] Defendants repeated similar statements throughout the Class Period. For example, Neves contrasted Farfetch to its largest competitor, YNAP, claiming that the two companies presented "***really a retailer versus marketplace situation*" and that, because (unlike YNAP) "over 95% of our revenue comes from Marketplace," Farfetch had "*essentially . . . completely a different business model*." ¶¶ 112, 319; *see also, e.g.,* ¶¶ 105, 308 (Robb: "Our approach is different to traditional e-Commerce or offline retailer. For instance, *we do not buy any products* . . . ."); ¶¶ 234, 460.

Defendants explained that Farfetch earned a hefty commission, or "take rate," on third-party transactions. The Offering Materials claimed a historical take rate of 30-32%, ¶¶ 72, 235, 460, 471, and Defendants reported similar take rates in subsequent quarters. *See, e.g.,* ¶¶ 277-78 (Jordan reporting a "stable" 32% take rate in Q4 2018); ¶ 313 (30% take rate in Q1 2019).

Moreover, Farfetch claimed it earned its superior take rate revenue without the risks of ordinary retailers, such as inventory risk. The Offering Materials described Farfetch's business model as driving "stronger future margins than traditional inventory-taking business models."

---

[3] Jordan similarly stated that Farfetch was not a retailer, but "a technology platform for existing retailers" with "low inventory" and "no inventory risk across our third-party sellers," and that "***our revenue is generated from connecting sellers and consumers together*.** . . ." ¶¶ 53, 56, 230, 233; *see also, e.g.,* ¶¶ 237, 269.

¶¶ 235, 460. In a September 21, 2018 interview posted to *Bloomberg.com*, Neves declared that the Company's growth plan was "really to leverage Farfetch's distributed inventory model because *we are not a retailer – we don't own inventory*." ¶¶ 91, 263; *see also*, *e.g.*, ¶ 274. In its Form 20-F, Farfetch similarly boasted about the unique "Strengths" of its platform, such as its difference from "*traditional inventory-taking business models*" and "*minimal inventory risk*." ¶¶ 291-92.

In addition, Defendants touted Farfetch's growth prospects due to its unique model. For example, Neves explained on the Q3 2018 earnings call that the platform's growth dynamic—"the self-reinforcing network effect of our marketplace"—was "a powerful flywheel that we believe will enable us to be the category leader" and differentiated Farfetch from its competitors. ¶¶ 92, 268, 270, 296.[4] Defendants also asserted that Farfetch's future growth would *not* rely on first-party retail. For example, during the Roadshow, Jordan stated that "*[t]here's no growth in Stores within the plans for Farfetch*." ¶¶ 57, 60, 245.

Defendants further emphasized that, post-IPO, the Company would invest to support organic marketplace growth, and disclaimed any plans to grow by acquisition. ¶¶ 57, 78-79. The Offering Materials represented that expanding Farfetch's platform and consumer base were "key elements" of its "Growth Strategies," and that Farfetch did not have even "preliminary plans" to conduct acquisitions with the IPO proceeds. ¶¶ 243, 464.[5] Similarly, when an analyst asked about uses for the capital raised in the IPO and Farfetch's "top three investments" in 2019 during the Q3

---

[4] *See also* ¶ 98 (Neves, explaining Farfetch's "*sustained high growth at scale is a function of the network effects enjoyed by our superior Marketplace model*").

[5] Likewise, in a letter to investors in the Offering Materials, Neves stated that investing in research and development "*and growing our brand . . . will be the focus of our investments in 2019 and beyond*." ¶ 465. Similarly, Farfetch's "strategy" for growth as presented at the Roadshow and later repeated in the Form 20-F, the Q4 2018 earnings call, and a June 2019 presentation to investors echoed the focus on organically expanding the platform, and avoided mention of increasing first-party sales, promotions, or acquisitions. *See* ¶¶ 58, 74-77, 142, 241, 251, 279, 294, 322, 468.

2018 earnings call, Neves named "technology," "build the Farfetch brand," and customer "retention and loyalty," but said nothing about acquisitions. ¶¶ 94-95.[6]

Industry and investment analysts and the media celebrated Farfetch's unique marketplace offering and growth dynamics as reasons to invest. During the IPO, media and analysts credited Farfetch's platform for high investor interest. ¶¶ 83-86. *CNBC* observed that "investors placed their bet on the company's technology and unique niche in high-end luxury" and Farfetch's "***marketplace business model alleviates its inventory risk***." ¶ 81. *Forbes* predicted "great possibilities for Farfetch," emphasizing that its "***platform business model is the key to that success***." ¶ 82. And Wells Fargo noted that third-party sales comprised the "vast majority of FTCH's transactions" and provided "an extremely high-margin revenue stream (since FTCH does not own the inventory and does not record the [costs] related to the merchandise)." ¶ 84.

Defendants maintained this position even after Farfetch announced the acquisitions of Stadium Goods ($250 million) and Toplife ($50 million) in December 2018 and February 2019. During a February 28, 2019 earnings call, Neves reiterated Farfetch's commitment to growing the third-party marketplace, reaffirming that Farfetch would remain a "90%-plus third-party business," and that "long term" first-party business would remain in the "single digits." ¶ 102. He also downplayed Farfetch's reported increase in first-party business, explaining it remained merely a "surgical tool" to generate "[buzz] in the Marketplace" and market "data." ¶¶ 100-02, 282-84.

---

[6] On the same call, Jordan downplayed the significance of an increase in first-party sales, explaining that "[o]ver the longer term," first-party sales would moderate at 5% of revenues and the Company's growth rates "will return back in line with the overall growth rates of the platform." ¶¶ 95, 268, 271. Defendants further assured investors that the uptick in first-party sales during Q4 2018, and Q1 2019 was an aberration and would moderate to 5% of their revenues going forward. *See, e.g.*, ¶¶ 95, 101-02, 122, 271, 282, 284, 317, 349.

Even after these acquisitions, analysts accepted Defendants' representations that the organic, platform-based growth plan remained unchanged, and credited the platform for Farfetch's seemingly strong results. For example, after a May 2019 earnings call, UBS reported that the results "reinforc[ed] a few key narratives - FTCH continues to produce upside . . . as its platform scales," ¶ 110, and Wells Fargo concluded that "***the model continues to work***" and that "***we see the scalability of the model that can develop over time***." ¶ 111.

In reality, Defendants' statements about Farfetch's growth plans and business model were materially misleading: they omitted and concealed that Farfetch's growth strategy relied significantly on acquisitions and first-party retail—the very approaches Defendants had expressly downplayed during and after the IPO. They also misled investors about the extent of Farfetch's ongoing reliance on first-party sales as a source of Company revenues.

Revenue from Browns's retail business was a much larger piece of Farfetch's business than Defendants claimed, totaling ***one-sixth*** of Farfetch's revenues in 2017, and ***nearly one-fifth*** of total revenues in 2018. ¶ 116. FE-1, Farfetch's former Senior Manager of Financial Reporting, who was responsible for drafting much of the Offering Materials and who interacted directly with Jordan and Neves, confirmed that, by the time of the IPO, Farfetch's "***[f]irst party sales ha[d] increased and increased***"—even as "***Farfetch was selling its IPO to tech investors***" who were "***interested in the company being inventory-less and focused on the tech platform***." ¶ 119. To the extent that investors could discern that Farfetch's first-party sales increased during the Class Period, Defendants repeatedly assured the market that such growth was temporary, and that future first-party sales would taper. *See, e.g.*, ¶¶ 95, 101-02, 122, 271, 282, 284, 317, 349.

Moreover, the Offering Materials falsely stated that, at the time of the IPO, Farfetch did not have even "preliminary plans" to use the IPO proceeds for acquisitions. ¶¶ 78, 244, 465.[7] But FE-1 reported, **based on interactions with Neves and Jordan** in his role as a senior finance executive at Farfetch, that by the time of the IPO, the Company had already decided to acquire new companies to drive growth. ¶ 139. This was corroborated by statements by Stadium Goods's co-founder that, starting in **early 2018**, "we had a bunch of incredible conversations with the Farfetch guys" regarding the acquisition, ¶¶ 138-40, and the fact that the relatively advanced stage of formal due diligence for the $250 million acquisition, which closed in January 2019, started immediately after the IPO. ¶ 140. Moreover, FE-1 reported that due diligence for the $675 million New Guards acquisition began in February 2019, and that **no acquisitions** of that scale would have been feasible in early 2019 **without** the successful IPO proceeds. ¶¶ 139-40.

### B.    Farfetch's Accounting Metrics And Key Performance Indicators Falsely Portray The Success of Its "Unique" Business Model

Throughout the Class Period, Defendants also repeatedly misled the market about the company's true financial performance. As the Complaint alleges, Farfetch devised a bespoke set of KPIs to falsely portray the strength of the Company's business and finances. Farfetch urged investors to evaluate the Company using these KPIs, including: (1) "Platform GMV"—the total dollar value of orders processed on the platform; (2) "Platform Services Revenue"[8]—the revenues Farfetch claimed to earn for the sale of the goods on its marketplace platform (and which Farfetch explained "best represents the economic value being generated by the platform"), ¶ 300; (3) "Third-party Take Rate"—the commission Farfetch purported to receive from third-party sales,

---

[7] Defendants also misleadingly disclosed as a Risk Factor in the Offering Materials and the Form 20-F that Farfetch "**may** continue to acquire, other companies . . . ." ¶¶ 305, 477.

[8] This KPI was called "Adjusted Platform Revenue" in the Offering Materials. ¶¶ 255, 471.

reflected as a percentage of the total sale amount; and (4) Adjusted EBITDA—a non-GAAP metric primarily used to indicate a company's profitability. ¶¶ 53, 142. Farfetch's Offering Materials and financial filings presented the Company's past and current results in terms of these KPIs, showing that its take rate was consistently at least 30% and the marketplace platform was growing quickly. ¶¶ 72-73, 255-56, 266, 298, 300, 313, 471-72. Defendants also highlighted its KPIs on earnings calls. ¶¶ 94-95, 98, 276-77, 280. For instance, on the February 28, 2019 earnings call, Jordan stated "*our Q4 platform services revenue . . . grew 68% year-on-year as a result of the stronger GMV growth and a stable third-party take rate of 32%.*" ¶ 98; *see also*, *e.g.,* ¶¶ 106-07, 315-16.

But unbeknownst to investors, throughout the Class Period, Defendants used these KPIs to conceal numerous serious headwinds, including the fact that promotions were significantly eating into Farfetch's claimed revenues. *First,* while the Offering Materials and Form 20-F stated that Farfetch extended discounts and promotions only "*periodically*," well-placed FEs confirmed that these costly promotions were essentially *constant* from at least June 2018 and throughout the Class Period. ¶¶ 143-47, 251, 294, 468. Defendants concealed the significant negative effect of this slew of promotions on Farfetch's revenues and commission rates by manipulating the calculation of the Company's KPIs. ¶ 142.

When Farfetch offered a discount on products sold through its site, it would cover all or part of that discount through a direct reduction to its take rate, thereby reducing its commission. ¶¶ 148-50. But Farfetch did not deduct the cost of promotions from its Third-party Take Rate KPI. As FE-1 explained, Farfetch "protected" that KPI by deducting the costs of promotions from a separate Platform Fulfillment Revenue metric—which was described as revenues generated from shipping and customs duties, and which Defendants downplayed as "by and large a pass-through cost with no economic benefit to us." ¶¶ 148, 153, 256. Similarly, Farfetch recorded Platform

Services Revenues without adjusting it to reflect promotional discounts, even though the money customers saved due to promotions never changed hands on the platform. ¶¶ 151-53. These manipulations artificially "protected" Farfetch's heralded KPIs from reflecting the true costs of its promotional activity.

*Second,* as recounted by FE-1 and corroborated by other FEs, Defendants manipulated Farfetch's Adjusted EBITDA to conceal its poor Q4 2018 and Q1 2019 performance. In March 2019, Farfetch unexpectedly revoked employees' cash bonuses and replaced them with some $32 million in short-term RSUs. ¶¶ 157-61. Cash bonuses are an accounting charge that is required to be deducted from EBITDA, whereas RSUs—which normally vest over a longer period of time— are not. ¶ 158. On May 15, 2019, Farfetch announced its Adjusted EBITDA was down 28% year over year, amounting to a loss of approximately $30 million; but had the Company paid its customary cash bonuses, it would have reported an Adjusted EBITDA loss of roughly ***$62 million***, with an Adjusted EBITDA Margin of ***-42.6%*** in Q1 2019. ¶ 164. Because swapping short-term RSUs for cash bonuses was a "misleading" mechanism that "deliberately inflates the EBITDA measure" and was "done solely to avoid a cash bonus expense," FE-1 directly expressed serious concerns to Jordan (who directed the gambit) about the RSUs, to no avail. ¶¶ 161-64.

*Third*, Farfetch's KPIs were materially misleading because they did not adequately distinguish between first- and third-party sales, in violation of applicable IFRS. ¶ 68. As recounted by FE-1, Neves and Jordan sought to hide Browns's steadily increasing first-party revenue, as the third-party sales on Farfetch's signature platform were growing only sluggishly. ¶ 129.

To achieve this end, Farfetch manipulated the way it divided its operations into four operating segments,[9] as required by IFRS 8. The segments included the "Marketplace," which "operates the Farfetch.com marketplace website and app," as well as "Stores (operation of the Browns luxury boutiques)." ¶ 212. But unknown to investors, the Marketplace segment actually (and improperly) included Browns's first-party *online* sales, while the Stores segment included only sales occurring at Browns's physical stores. ¶ 130. Artificially splitting Browns revenues in this manner significantly impacted Farfetch's financial reporting: by allocating Browns online *first-party* sales to the *third-party* Marketplace segment, Defendants made it appear that "[t]he Marketplace represents over 90% of the [operating segments'] revenue, results and assets," ¶¶ 69, 211-12, 288, 457, and that Browns Stores' revenue was less than 10% of Farfetch's overall revenues. This allowed Farfetch to appear to meet IFRS requirements for consolidation, such that it did not need to report standalone financial information for Browns and could therefore mask the Company's dependence on first-party sales revenue. ¶¶ 212, 229.

These machinations concealed and mispresented Farfetch's significant and growing dependence on first-party sales. Farfetch reported that first-party Stores revenue amounted to only 4% of its total 2017 revenues, and 3% of the total in 2018. ¶ 133. But Browns's total first-party retail revenues amounted to $46.2 million in 2017 and doubled to $99.5 million in 2018, ¶ 130, and if Stores revenue had properly included Browns's first-party online sales, Stores would have constituted *16%* and *19%* of Farfetch's total revenues for 2017 and 2018, respectively. ¶ 133. In addition, the inclusion of Browns's first-party online sales inflated Farfetch's Platform Services Revenue by *19%* in 2017, and *26%* in 2018, dramatically exaggerating the performance of the

---

[9] The other two were "Farfetch Black & White (a white-label website solution for luxury brands) and Store of the Future (provision of technology solutions to retail outlets)." ¶ 69.

supposedly third-party platform. ¶ 134. Had Farfetch complied with IFRS 8, investors would have realized Farfetch's growing reliance on the Browns first-party retail business, the true, lower growth levels of the marketplace platform, and that Farfetch was increasingly reliant on first-party sales, with all their customary risks—all facts contrary to Defendants' public statements touting a completely different and significantly more attractive business model.[10]

### C. The Officer Defendants Offload Their Shares Just before Farfetch's Deception Is Revealed to The Market

In the four months just prior to the end of the Class Period, Neves, Robb, and Jordan sold significant portions of their Farfetch common stock holdings to the market, reaping as much as *$68 million*. ¶¶ 87, 90, 185-98.[11] They stopped selling shares immediately before the relevant truth was revealed, and sold no more until the following year. ¶ 198.

### D. The Truth about Farfetch's Business Is Revealed in August 2019, Erasing $2 Billion of Shareholder Equity

Information correcting Defendants' alleged fraud came to light on the evening of August 8, 2019, when, in two press releases and its Q2 2019 earnings call, Farfetch announced:

- That it had acquired New Guards Group, a first-party retailer, for $675 million—an amount greater than Farfetch's revenue for all of 2018, ¶¶ 165-66;

- An $89.6 million loss for Q2 2019, significantly higher than its Q2 loss of $17.6 million in the prior year, blamed largely on increased promotional pricing, ¶ 170;

- That the Company lowered its guidance for Q3 Platform GMV growth from 40% to 30-

---

[10] For these reasons, Defendants' certifications that the Offering Materials and Form 20-F "fairly presents, in all material respects, the financial condition and results of the operations of the Company," were materially false. ¶ 306.

[11] While Plaintiffs provided a range of stock sales to account for some ambiguity in whether certain sales were actually effectuated, ¶¶ 190-95, Defendants do not dispute that those sales occurred and indeed adopt the higher sales figures in their brief. MTD 24, 26.

35%, and for FY19 from 41% to 37%-40%—even though the revised guidance *included*

expected *increases* in GMV from the Company's previous acquisitions—thereby revealing

that *organic* marketplace growth had plummeted, and that the Company was more reliant

on first-party sales than investors had been led to believe, ¶¶ 6, 169[12]; and

- That COO Robb had unexpectedly resigned only ten months after Farfetch had become a
  public company, after serving nine years at the Company, ¶ 172.

Analysts reacted negatively to the revelation of Farfetch's heavy reliance on acquisitions,

first-party sales, and promotions, which clashed with its previous assurances about the third-party

platform business model, as well as Farfetch's poor financial results. ¶¶ 175-78 (Wells Fargo cut

price target nearly 50%, noting first-party results "run[] counter to the company's core 'asset-light'

business model," acquisitions "added significant complexity to the model," and that Farfetch

"seem[s] to be rapidly hitting a wall (and resorting to aggressive promotional activity); ¶ 180

(BTIG cut price target and reported that New Guards deal "*adds a lot of non-marketplace*

*characteristics to FTCH stock*," and identified "[i]ncreasing promotions . . . [,] inventory write-

downs[,] and customer engagement initiatives" as driving disappointing results). The market was

also shocked: Farfetch's stock price fell nearly 45%, or $8.12 per share, injuring investors by

erasing *nearly $2 billion* of shareholder equity in one day. ¶ 173.

## LEGAL STANDARDS

"On a motion to dismiss under Rule 12(b)(6), a court must accept[] all factual allegations

in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Evoqua*, 450

F. Supp. 3d at 395 (alterations in original). To survive a motion to dismiss for failure to state a

claim, the complaint need only "state a claim to relief that is plausible on its face." *Id.*

---

[12] On the earnings call, Jordan admitted that Farfetch had lowered its guidance because the prior
guidance could only have been achieved "at the cost of very, very heavy promotions." ¶ 171.

## ARGUMENT

**I.      THE EXCHANGE ACT CLAIMS ARE ADEQUATELY PLED[13]**

A claim under Section 10(b) of the Exchange Act and Rule 10b-5 requires "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 417. As set forth below, the Complaint has adequately alleged Exchange Act claims.

**A.      Defendants Misled Investors about Farfetch's Business**

**1.      Defendants' False And Misleading Statements about Farfetch's Marketplace Focus And Growth Strategies Are Actionable**

The Complaint adequately alleges that Defendants made materially false and misleading statements downplaying the importance of Farfetch's first-party business, touting its marketplace model, and asserting that Farfetch's growth strategy would continue to be focused on growing the Company's platform and third-party sales—not on increasing first-party sales, acquisitions, or constant promotions and discounts. ¶¶ 233-37, 240-45, 263, 268-71, 274, 279-80, 282-84, 291-92, 294-96, 308, 315, 319, 322-23, 460, 465, 468. During the Roadshow, Jordan falsely stated: "There's no growth in Stores [i.e., first-party sales] within the plans for Farfetch," ¶¶ 57, 60, 245, while the Offering Materials falsely stated that the Company "[did] not currently have any definitive or preliminary plans with respect to the use of proceeds for" acquisitions. ¶¶ 67, 70, 234, 244, 292, 460, 465. Defendants repeated similar falsehoods throughout the Class Period, *see, e.g.*,

---

[13] The following subsections I.A through I.D address the falsity challenges relevant to both the Exchange Act and the Securities Act claims. As many of the false statements are the basis for claims under both, the arguments below contain parallel citations to false statements in the Securities Act section of the Complaint. In addition, Plaintiffs have included an annotated version of Defendants' Appendix A, which, for each false statement, references both the sections below that respond to Defendants' arguments, as well as pertinent Complaint paragraphs. Ex. A.

¶¶ 91, 263 (Neves: "[W]e are not a retailer – we don't own inventory."); ¶¶ 105, 112, 308, 319; *see also* ¶¶ 92, 98, 105, 112, 268, 270, 280, 285, 308, 296, 315, 319, and assured investors that the uptick in first-party sales during Q3 2018, Q4 2018, and Q1 2019 was an aberration and would moderate to 5% of revenues going forward. *See, e.g.*, ¶¶ 95, 101-02, 122, 271, 282, 284, 317, 349.

These statements misrepresented the significance of first-party sales, acquisitions, and promotions in Farfetch's current performance and growth plans—actionably, as "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *JinkoSolar*, 761 F.3d at 250. In reality, Farfetch's historical "growth" had been driven by first-party sales to a far greater degree than represented, and its growth strategy relied substantially on expansion of first-party retail, including through acquisition. Indeed, unknown to investors, revenue from first-party sales totaled ***one-sixth*** of Farfetch's total revenues in 2017, and shot up to ***nearly one-fifth*** in 2018. ¶ 116. And by the time of the IPO, Farfetch had already planned to increase its first-party retail business via its $250 million acquisition of Stadium Goods, which closed just four months after the IPO in January 2019. ¶¶ 95, 138. FE-1's reports corroborate these allegations. ¶¶ 118, 137-40.

Contrary to Defendants' assertions, Plaintiffs' allegations are not based on FE-1's "speculative musings" or "fraud by hindsight." MTD 17. Rather, they reflect the detailed observations of a senior executive who worked directly with Neves and Jordan, personally drafted large portions of the Offering Materials, and worked on Farfetch's acquisitions. ¶¶ 118, 137-40. FE-1 reported that, before the IPO, Defendants planned to conduct acquisitions and built up corporate finance and strategy teams precisely to facilitate them, and that FE-1 understood, ***based on direct conversations and interactions with Neves and Jordan***, that Farfetch would have to conduct acquisitions to meet growth targets. ¶¶ 118, 137-40. These accounts are not remotely based on hindsight. *See Evoqua*, 405 F. Supp. 3d at 406-07 ("[A] plaintiff may rest on information

provided by anonymous sources . . . when they 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'").[14] Moreover, they are independently supported by a Stadium Goods founder's public statement that deal talks started in early 2018. ¶ 138. FE-1 also personally worked on due diligence, starting in February 2019, for Farfetch's $675 million acquisition of first-party retailer New Guards, and explained how that acquisition was necessarily in discussions before the diligence period. ¶ 140.[15]

Defendants also falsely represented that Farfetch's growth would not be driven by promotions or discounts, instead asserting Farfetch offered promotions only "***periodically***." ¶¶ 142, 251, 294, 468. However, as recounted by multiple FEs who worked in customer relations and personally observed as much, by June 2018, Farfetch had begun offering a constant stream of promotions to prop up revenues. ¶¶ 141-56.

Defendants' argument that "none of the FEs provides any details about the nature of the promotions," MTD 19, misses the mark; the Complaint provides more than enough facts "to support the probability that a person in the position occupied by the source would possess the information alleged." *See Evoqua*, 450 F. Supp. 3d at 414; *New Link*, 297 F. Supp. 3d at 484.[16]

---

[14] *See also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) (same); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) ("misstatements of existing fact are not mere fraud by hindsight"). Defendants' reliance on *Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) is misplaced. *See* MTD 17. The CWs there were "low-level employees" who failed to identify any specific facts that contradicted the defendants' statements, and all but one had no contact with the individual defendants. *Am. Express* 724 F. Supp. 2d at 460.

[15] Defendants' accusations of FE-1's improper motivations, based on a document drafted by their counsel, are unsupported and, in any event, immaterial. *See* MTD 17, n.9. Notably, Defendants do not contend that FE-1 lied or even threatened to fabricate any facts.

[16] Defendants' authorities involved meager witness allegations unlike those here. *See* MTD 19; *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014) ("No CW sets forth facts that

For example, Plaintiffs allege that FE-2, a Customer Service Advisor from 2017 through June 2019, personally observed how in 2017, Farfetch ran only two sales per year, but by the summer of 2018 and through at least June 2019, "there was basically some kind of promotion all the time." ¶ 143. These allegations are corroborated by FE-3, a Customer Service Manager from April 2018 through April 2019, who oversaw the entire North American service team and managed 70 employees. ¶ 144. FE-3 observed a parade of promotions that started before the IPO and explained how Farfetch lacked sufficient staff to manage the increase in call volume due to these promotions. ¶¶ 144-46. FE-4 similarly witnessed this heavy promotional activity throughout the Class Period in his role as a senior product executive in the Product Department's Loyalty Program. ¶ 147.

In sum, the Complaint amply alleges that Defendants made materially misleading statements about Farfetch's core business and growth strategy throughout the Class Period.

### 2. Defendants' Arguments about Farfetch's Statements on Growth Strategy, First-Party Sales, And Promotions Fail

Improperly re-casting Plaintiffs' allegations, Defendants ignore these false and misleading statements, asserting the irrelevant point that Farfetch is a "technology"-reliant firm, and claiming that certain general disclosures of the first-party retail component of its business and the possibility of acquisitions and promotions somehow negate their material Class Period misrepresentations. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003) ("Defendants . . . must take the Complaints as they are written."). Their arguments fall flat.

*First*, Defendants incorrectly argue their alleged misrepresentations concerning Farfetch's business model were not false or misleading because, properly understood, these statements merely asserted that Farfetch was a technology-driven business. *See, e.g.,* MTD 13 ("Plaintiffs do

---

suggest that any of the alleged statements were false *when they were made.*") (emphasis original); *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004) (allegations were "totally unparticularized").

not . . . plead any facts supporting the notion that Farfetch abandoned its leading technology platform."). This is a red herring. Defendants' statements were false not because they misrepresented Farfetch's technology focus or that Farfetch had "abandoned" its marketplace model, but because they misleadingly: (1) represented that the platform's third-party sales were the key to Farfetch's growth, differentiating it from competitors reliant on first-party retail, and driving its sky-high valuation; and (2) concealed the Company's heavy reliance on first-party sales and promotions, as well as its strategy to grow through acquisitions.

Defendants also ignore analyst commentary showing that Farfetch's differentiation through its third-party marketplace model was key to investors. ¶ 84 (Wells Fargo describing, at time of IPO, how third-party sales, which comprised the "vast majority of FTCH's transactions," provided "an extremely high-margin revenue stream (*since FTCH does not own the inventory and does not record the [cost of goods sold] related to the merchandise*)"); ¶ 103 (Deutsche Bank reiterating "Buy" rating and increasing price target from $28 to $31 after seeing Farfetch Form 20-F, explaining that Farfetch was "unique … the *only pure-play luxury marketplace with global scale*" with "a compelling business model"); *see also* ¶¶ 81-83, 110-11, 180-82.

*Second*, Defendants contend Plaintiffs "ignore" that Farfetch technically disclosed some first-party sales and the possibility of future acquisitions and promotions. *See* MTD 14-16. But these disclosures were themselves misleading. Indeed, in February 2019, Neves falsely assured investors that the first-party business was "only 8%" of Farfetch's business and "long term would be single digits." ¶¶ 284-85; *see Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 140 (2d Cir. 2017) ("The falsity inquiry requires an examination of defendants' representations, taken together and in context.").

Contrary to Defendants' argument, *see* MTD 14-15, Farfetch's "disclosure" of Browns's 2017 revenue, buried on page 71 of the Offering Materials, does not insulate Defendants from liability. That disclosure obviously did not reveal that Farfetch's first-party revenues had steadily increased throughout ***2018*** as a component of overall revenue, nor that Farfetch intended to increase first-party sales through inorganic acquisitions of retailers. ¶ 116.[17] And, while Defendants note that Farfetch's Class Period earnings disclosures showed an increase in first-party sales, they ignore their repeated assurances to investors that the uptick was an aberration, first-party sales would "moderate" in the long term and be no more than "single digits," and the Company's strategy remained focused on organically growing third-party sales. Analyst reaction following the New Guards acquisition disclosure confirms that the market did not know what Defendants now claim was always apparent. *See, e.g.,* ¶ 182 (analyst: "[I]t is hard to understand what is organic [growth] vs. inorganic . . . based on what the company disclosed").

Further, while Defendants point to general statements in the Offering Materials that Farfetch "***may*** use IPO proceeds to engage in ***possible*** acquisitions" and "routinely evaluate[s] acquisitions and collaboration opportunities that will expand [its] business and further [its] strategic objectives," MTD 16, they ignore that the Offering Materials explicitly stated that the Company "[did] not currently have" even "preliminary plans with respect to the use of proceeds for" acquisitions. ¶¶ 244, 305, 465, 477.[18] Indeed, the disclosures Defendants cite are in fact

---

[17] *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) is inapposite. *See* MTD 14-15. Unlike here, the disclosures in *ACA Capital* specifically informed the public that it "had significantly increased" and "intend[ed] to continue to grow" a certain line of business "as part of its future business strategy." *Id.* at *8 (alteration in original).

[18] Defendants misplace their reliance on this Court's decision in *Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, 2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) (Nathan, J.), where the company disclosed the *possibility* of relisting its shares on an exchange, but the complaint's allegations "d[id] not support an inference of anything more than a possibility" that the company

actionable because acquisitions were already in the works. ¶¶ 244, 305, 465, 477; *see Evoqua*, 450 F. Supp. 3d at 412 (a "hypothetical disclosure about potential future problems" does not cure a false or misleading statement about present facts); *Cai v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (registration statement's "discuss[ion] that hybrid cloud solutions are a remarkable growth opportunity and that Switch expects to take advantage of that opportunity" did not adequately reveal that "Switch *had already changed* its sales strategy").[19]

Finally, Defendants argue their statements regarding promotions were not misleading because Farfetch disclosed that the Company engaged in promotions. But Defendants' statements misleadingly represented that promotions were limited in scope—"[p]romotional incentives . . . *may periodically* be offered to end consumers"—when they were, in fact, pervasive. ¶¶ 74-77, 142, 251, 294. Defendants' strained reliance on the supposed literal truth of these statements, MTD 19 & 19 n.11, is unavailing. *See McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *JinkoSolar*, 761 F.3d at 251 (holding that risk disclosures must be read in context of "comforting statements in the prospectus").

## B. Defendants' Self-Devised KPIs Were Materially Misleading And Violated Applicable Accounting Standards

### 1. Defendants' KPIs Painted A False Picture of The Marketplace Platform's Success

Defendants also misled investors through a complex web of self-created KPIs that Farfetch urged investors to rely on in order to understand the Company's business, emphasizing "Third-

---

[19] might do so. *Id.* at *7; *see* MTD 16. In contrast, the Complaint here plainly alleges that acquisitions were intended and already planned—not mere possibilities—at the time of the relevant statements.

[19] Defendants cite case law showing their duty to disclose. *See* MTD 18 n.10 ("It is 'well established that a company has no . . . duty to disclose changes to its business plans—*unless the company had 'hyped' a specific plan, thereby inducing investors to believe* that alternative[] [plans] were excluded.'" (quoting *Friedman v. Endo Int'l plc*, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (alterations in original)).

party Take Rate," "Adjusted EBITDA," "Platform GMV," and "Platform Services Revenue" (referred to in the Offering Materials as "Adjusted Platform Revenue," which "best represents the economic value of the platform."). ¶¶ 53, 142, 242, 255-56, 266, 300, 313, 317, 471-72. As FE-1 explained, Farfetch "protected" its Third-party Take Rate and Platform Services Revenue KPIs from revealing the true costs of its undisclosed, constant promotional activities by deducting promotional costs from its Platform Fulfillment Revenue KPI, which Defendants downplayed as consisting largely of pass-through revenues (i.e., revenues that did not inure to the Company) arising in connection with shipping and customs duties. ¶¶ 148-53. While Farfetch regularly touted a Third-party Take Rate of 30% or more, its true take rate and revenue was much smaller, as the costs of its promotions eroded Farfetch's commissions. ¶¶ 71, 256, 300, 338, 472. Similarly, Farfetch misleadingly recorded Platform Services Revenue that failed to reflect promotional discounts. ¶¶ 148-53, 306-07 (Defendants' Form 20-F certifications).

Defendants counter that "Farfetch fully disclosed the components of each of the non-IFRS KPIs," and contend the Offering Materials noted that Platform Fulfillment Revenue included "promotional incentives." *See* MTD 19-20 & 20 n.12. This vague language provides no defense. Defendants cite nothing that disclosed how promotional activities affected Third-party Take Rate and Platform Services Revenue, the metrics Farfetch repeatedly told investors to evaluate to measure the success and growth of its platform. *See, e.g.*, ¶¶ 98, 277 (Jordan bragging, during the Q4 2018 earnings call, that "***Q4 platform services revenue . . . grew 68% year-on-year as a result of the stronger GMV growth and a stable third-party take rate of 32%***"). Defendants cite no disclosures that told investors the truth: that Platform Services Revenue was overinflated because it did not include promotional costs and included *online* first-party retail sales, and that, due to heavy promotional activities, Farfetch's take rate was far less than 32%. Burying potential

information in a complicated web of self-designed KPIs is far from what the law requires. *See In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 314 n.382 (S.D.N.Y. 2011) ("information disclosed to investors 'need not be considered part of the total mix reasonably available to them if 'the true [sic]' is 'buried.'"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 324 (S.D.N.Y. 2009) ("investors need not cobble together information from various parts of the Registration Statement to uncover material information").[20]

Furthermore, in March 2019, Defendants artificially inflated another important metric, Adjusted EBITDA, by unexpectedly revoking employee cash bonuses despite having sufficient cash on hand to pay them. ¶ 161. As recounted by FEs, Farfetch replaced these bonuses with some $32 million worth of short-term RSUs. ¶¶ 159-61, 342. Cash bonuses would have been deducted from the Company's EBITDA, but by switching compensation to RSUs, Farfetch avoided an adjusted EBITDA decrease, despite FE-1's vocal criticisms to Jordan that this was misleading. ¶¶ 161-63. This deception allowed Farfetch to minimize its increasing losses: Farfetch reported a Q1 2019 Adjusted EBITDA loss of approximately $30 million, when the Company's true performance was, in fact, more than twice as poor. ¶¶ 162-64, 310-11.

### 2. Defendants Violated IFRS 8 to Exaggerate Growth of The Marketplace And to Obscure The Truth about First-Party Sales

Plaintiffs also adequately allege that Defendants manipulated Farfetch's financial reporting under IFRS 8 to hide the Company's increasing reliance on first-party sales and that this violation is presumptively misleading and inaccurate. ¶¶ 207-30, 445-59; *see Ind. Pub. Ret. Sys. v. SAIC,*

---

[20] Defendants argue FE-1's allegations are "conjecture and editorializing," but the Complaint sets out specific facts to support the misleading nature of the challenged KPIs. *See* MTD 20. Defendants also contend these KPIs could not be false because Farfetch's outside auditor "approved" this reporting. *Id*. However, FE-1 reports this was a "compromise" after the auditor rejected Farfetch's initial attempt to avoid deducting promotions from revenue. ¶¶ 154-55.

*Inc.*, 818 F.3d 85, 93 (2d Cir. 2016); 17 C.F.R. § 210.4-01(a)(1)-(2). Under IFRS 8, Farfetch's financials should have clearly delineated between revenues attributable to platform third-party sales as opposed to Browns first-party sales.

IFRS 8 directs companies to report financial results for each "operating segment" of the business. ¶¶ 125, 207. IFRS 8, ¶ 5, defines an "operating segment" as a component of the business with "discrete financial information" and "whose operating results are regularly reviewed by the entity's chief operating decision maker to make decisions about resources to be allocated to the segment and assess its performance." *See* ¶ 208. Farfetch's Offering Materials and Form 20-F included as operating segments "Marketplace (which operates the Farfetch.com marketplace website and app)" and "Stores (operation of the Browns luxury boutiques)." ¶¶ 211-12. However, the "Stores" segment contained only Browns's sales at its physical stores. Despite being first-party sales, Browns's online sales were reported as part of the "Marketplace" segment, combined with third-party platform sales. ¶¶ 127-30, 136.

Neves and Jordan deliberately chose to fold Browns's online first-party sales into the Marketplace segment in order to obfuscate the overall significance of Browns first-party sales, and FE-1 personally was instructed to combine these revenues over FE-1's objection. *Id*. However, under IFRS 8, all of Browns's revenues—both online and from physical stores—should have been recorded in a single segment because Browns was a distinct entity: Browns had its own board of directors and CEO, and Neves regularly reviewed and assessed Browns's performance separately from the rest of Farfetch. ¶¶ 128, 217. Browns also reported its entire financial results to Neves and filed its own annual reports in the United Kingdom, and therefore had "discrete financial information," under IFRS 8. ¶¶ 126, 128, 216.

As a result of violating IFRS 8 and splitting Browns's sales between Stores and Marketplace, Farfetch reported that 2017 and 2018 Stores revenue amounted to only 4% and 3% of its total revenues, respectively, and boasted that "***Marketplace represents over 90% of revenue***." ¶¶ 131, 211-12, 233, 288-89, 456-57. This misled investors as to the true significance of first-party sales for Farfetch. If Farfetch had accurately included the first-party Browns's online revenues in the Stores segment, Farfetch would have been forced to disclose that first-party revenues actually constituted ***16%*** and ***19%*** of its total revenues for 2017 and 2018, respectively. *Id*. Moreover, by violating IFRS 8 and not reporting Browns's financial revenues separately, Farfetch made its KPIs misleading because they did not allow investors to distinguish accurately between revenues from first- and third-party sales. For instance, the inclusion of Browns's first-party online sales inflated Farfetch's Platform Services Revenue by ***19%*** in 2017, and ***26%*** in 2018, exaggerating the success of Farfetch's marketplace platform. ¶¶ 134, 229-30, 289, 310, 312-13, 456. This information was indisputably material.[21] *See, e.g.*, *Evoqua*, 450 F. Supp. 3d at 415-17 (an overstatement of 0.37% revenue could be material).

### C.   Defendants' Failure to Disclose Known Trends And Significant Factors as Required Under Regulation S-K Was Misleading

Plaintiffs also adequately state claims based on Items 303 and 105 of Regulation S-K. 17 C.F.R. §§ 229.105, 229.303; *see Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103-04 (2d Cir.

---

[21] Defendants do not contest materiality but argue that Plaintiffs "plead no facts" to support the IFRS violation and that FE-1 offers only a "difference of opinion." *See* MTD 15-16. But FE-1's personal involvement in Farfetch's accounting violations, backed by his knowledge of the facts supporting this violation, easily distinguish it from Defendants' authorities, all of which involved confidential witness opinions wholly unsupported by facts. *See* MTD 15; *see, e.g., In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) (CW's "personal view" that the company was not competitive lacked factual support); *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) (CW failed to allege "contrary views were communicated to the company or its officers").

2015); *Panther Partners Inc. v. Jianpu Tech. Inc*., 2020 WL 5757628, at *7-9 & *7 n.5 (S.D.N.Y. Sept. 27, 2020).[22] "The same facts underlying an Item 303 violation may also support an Item [105] violation, . . . and a court's rationale for determining the former may also support the same determination of the latter." *In re Barclays Bank PLC Sec. Litig.,* 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017), *aff'd,* 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).[23]

At the time of the IPO, Defendants knew: (1) of Farfetch's increasing reliance on first-party retail sales, as opposed to the low-inventory third-party marketplace platform sales which Farfetch marketed as the Company's growth driver during the IPO; (2) of its plans to use IPO proceeds to acquire first-party retailers to drive further growth; and (3) that Farfetch had been (and would continue) boosting GMV and revenues through aggressive promotions and discounts. ¶¶ 262, 304, 476. These known trends and uncertainties unfavorably and materially impacted the Company's true valuation and business prospects—including by exposing Farfetch to the very costs and risks of first-party sales it claimed it did not bear unlike its competitors—and augured very different growth prospects than Defendants portrayed. Defendants' failure to disclose these

---

[22] While Defendants assert that Item 303 does not apply to foreign registrants using Form F-1, MTD 22, this hyper-technical argument elevates form over substance. Form F-1 requires registrants to furnish the information required by Part 1 of Form 20-F, Item 5, which courts and the SEC alike have interpreted as "calling for the same disclosure[s] as Item 303." *See Panther Partners,* 2020 WL 5757628, at *7 & *7 n.5; *In re Tenaris S.A. Sec. Litig*., 2020 WL 6018919, at *9 (E.D.N.Y. Oct. 9, 2020) (holding that in adjudicating Item 5, "courts may look for guidance to the disclosure duty under Item 303"); Comm'n Guidance Regarding Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, Securities Act Release No. 8350, Exchange Act Release No. 48960, 2003 WL 22996757, at *1 n.1 (Dec. 19, 2003). Thus, courts have applied Item 303 to foreign issuers. *See Panther Partners*, 2020 WL 5757628, at *9 (Section 11 claim adequately pled against foreign issuer based on Item 303 violation). "[E]ven in the absence of a specific disclosure obligation, there is a general requirement that a registration statement disclose facts 'necessary to make the statements therein not misleading.'" *Id*. at *7-8 (the "inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid").

[23] When *Barclays* was decided, the disclosures required by Item 105 were listed under Item 503. *See Panther Partners*, 2020 WL 5757628, at *7, n.6.

known trends and significant risks violated Items 303 and 105, and is actionable under the Exchange Act and the Securities Act. *See Panther Partners*, 2020 WL 5757628, at *6-9.

Contrary to Defendants' assertion, MTD 22, none of these facts or trends, or their impact on Farfetch's financial condition and prospects, were adequately disclosed to investors. For example, Farfetch's disclosure of: (1) the Browns acquisition in 2015; (2) revenue and inventory costs attributable to Browns sales; (3) the number of Browns employees; (4) or other passing "references" to Browns did not reveal that Farfetch's growth was increasingly dependent on its first-party business. *See* Section I.A.1, *supra*. Likewise, equivocal statements that Farfetch "may" use IPO proceeds for "possible acquisitions" did not reveal the Company's existing plans to grow by acquiring first-party retail businesses—particularly in light of Defendants' simultaneous representations touting plans for organic growth and disclaiming even "preliminary" plans to conduct acquisitions. *See* Section I.A.2, *supra*. Finally, Defendants' assertion that Plaintiffs fail to adequately plead Defendants' actual knowledge of these trends wholly ignores the Complaint's allegations, including allegations that Defendants purposefully structured Farfetch's financial reporting to hide the Company's reliance on first-party sales. *See* Section I.B, *supra*.

### D.    Defendants Fail to Identify Any Opinion Statements, Puffery, or Forward Looking Statements

Defendants also try to argue that certain statements are not actionable because they are opinion statements, puffery, or forward looking, *see* MTD 21 & 21 n.13, but these arguments are unavailing. *First*, Farfetch's statements to investors that their KPIs accurately measured the Company's performance, ¶¶ 11, 142, 256, 300, 338, 472, are not mere opinions, but rather contain "embedded factual statements that can be proven false." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015)). For example, Defendants plainly made false and

misleading statements by telling investors that the Platform Services Revenue metric "best represents the economic value being generated by the platform," even though this KPI included first-party sales and did not account for the costs of heavy promotional activities.[24]

*Second*, Defendants' purportedly "puffing" statements about Farfetch's business model "are 'not so general that a reasonable investor could not have relied upon them in evaluating whether to purchase' [Farfetch] stock."[25] *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018). To the contrary, statements regarding the nature of Farfetch's unique model ***were the precise reason*** Farfetch's IPO was so successful and the market valued its stock so highly—a fact reflected in contemporaneous market commentary. *See id.*; ¶¶ 81-84, 103, 180-82. Moreover, Farfetch's statements about its marketplace's current success—based on its misleading KPIs and inclusion of first-party revenues from Browns—and Defendants' projections for future growth of the platform "[a]re more than mere puffery because they were grounded in historical facts (false revenue numbers) that . . . defendants allegedly knew to be false and because they were plausibly designed to mislead investors into believing that [Farfetch]'s present (as well as its future) was rosier than reality." *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017).

*Third*, to the extent Defendants' Appendix A—not the MTD itself—identifies certain statements as forward looking, the PSLRA safe harbor "does not apply to statements made in

---

[24] Defendants' Appendix A, ECF No. 59-1, argues incorrectly (and improperly, as it amplifies Defendants' arguments beyond their briefing) that certain statements on Farfetch's business model and growth strategy are opinions. Such statements contained "embedded" facts about Farfetch's true business and strategy, and thus are actionable. *See Abramson*, 965 F.3d at 175.

[25] For example, Defendants cite Jordan's statement that "Farfetch is obviously a technology business" and its "financial model . . . is all about investing in that technology," MTD 21 n.14, but ignore the specificity with which he described the "technology business." *See* ¶ 233 (detailing the platform model and its third-party retail focus, and how the model is "*low inventory.*").

connection with an initial public offering, such as an IPO prospectus." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018) (citing 15 U.S.C. § 77z-2)).

Additionally, Defendants' post-IPO statements regarding the growth of its marketplace and third-party sales "were not vague, forward-looking statements of optimism, but 'involved the representation of existing facts'" and, thus, do not qualify for safe harbor protection. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 465 (S.D.N.Y. 2013).[26] As explained above, *see* Section I.A.1, *supra*, increased first-party sales and attendant inventory risk, heavy promotional activities, and acquisitions "were not mere possibilities" but had "already come to fruition." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020). Even if these statements can be deemed forward looking, Farfetch's inadequate disclosures do not provide any meaningful cautionary language, because they did not inform the public that, contrary to Defendants' representations, acquisitions were already planned, first-party sales would continue to increase, and promotions were happening constantly, not periodically. *See In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("To be eligible for the safe harbor, 'the relevant cautionary language must be prominent and specific, and must directly address exactly

---

[26] Defendants contend statements made prior to the Class Period "are nonactionable as a matter of law." MTD 12 n.5 (citing *Wilder v. News Corp.*, 2014 WL 1315960, at *7 (S.D.N.Y. Mar. 31, 2014)). They do not cite—and counsel is not aware of—any case applying this rule to statements made at an IPO roadshow, and courts regularly consider the falsity of such statements even when they occur pre-Class Period. *See, e.g., Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 506 (S.D.N.Y. 2000) (roadshow statements materially false or misleading); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1028 (N.D. Cal. 2016) ("plaintiffs have alleged factual misstatements made by Fitbit … **before** … the IPO"). Rule 10b-5 applies to false and misleading statements made "in connection with the purchase or sale of any security," which must include IPO roadshows, lest issuers be permitted to make false statements to drum up IPO interest with impunity. *Cf. Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 964, 966 (N.D. Cal. 2005) (normal rule in securities fraud action that liability cannot attach to statements made before or after class period does not apply where prior statement could not affect security's value until class period began).

the risk that plaintiffs claim was not disclosed.'"). Finally, the safe harbor also does not apply because, as discussed next, Defendants knew their statements were false and misleading. *See id.*

### E.    Defendants Acted with Scienter

Plaintiffs adequately plead scienter, through both "facts showing that a defendant had both motive and opportunity to commit the fraud," and "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *comScore*, 268 F. Supp. 3d at 550.

*First*, the Complaint alleges strong evidence of conscious misbehavior or recklessness. The Officer Defendants—Farfetch's only three officers—controlled the Company and personally made or approved the alleged misstatements. ¶¶ 344-51. As recounted by FE-1, the Officer Defendants deliberately hid first-party sales, constant promotions, and major planned acquisitions. ¶¶ 331-43. They were also personally involved in decisions to violate IFRS, report misleading KPIs, and use RSUs to artificially inflate EBITDA, in order to further their false story about the Company. ¶¶ 337-43. The Officer Defendants' scienter shows Farfetch's scienter as well. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (corporate scienter shown by pleading individual defendant's scienter).

Defendants do not argue the Officer Defendants lacked knowledge of the truth of Farfetch's operations and business strategy, but instead try to negate scienter by asserting that Farfetch's disclosures were adequate. *See* MTD 28. But because the disclosures in question were themselves deficient and misleading, as discussed above, this argument fails.

*Second*, the Complaint's allegations regarding the Officer Defendants' suspicious stock sales adequately alleges their motive and opportunity to commit fraud. *See Evoqua*, 450 F. Supp. 3d at 419 ("A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) (factors considered in finding "insider trading

activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling").

Here, the Officer Defendants wasted no time following the IPO lock-up period, disgorging their holdings of liquid common stock, which, as their Form 144s reflect, had been awarded in connection with the IPO and through stock awards from the Company. ¶ 187.[27] *See* Exs. B-D. Specifically, between April and August 2019—while Farfetch's stock price was artificially inflated by Defendants' misrepresentations, and after Farfetch had begun conducting due diligence on the New Guards acquisition—Neves, Robb, and Jordan offloaded significant portions of their Class A holdings of Farfetch common stock, collectively reaping tens of millions of dollars. ¶¶ 185-98, 328-30.[28] Indeed, Neves sold between *up to 84%* of his disclosed Class A shares,[29] Robb offloaded *over 50%* of his shares, and Jordan offloaded *20%* of his shares. ¶¶ 190-95. *See, e.g., George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012) (strong evidence of scienter where, *inter alia*, two of the seven individual defendants "sold over 25 percent of their shares" during the class period). Notably, after Farfetch's stock's precipitous drop in

---

[27] Jordan also misrepresented in June 2019 that insiders were barred from normal trading from June 7, 2019 through early August—even as the Officer Defendants were selling shares. ¶ 187.

[28] Because Farfetch is a foreign issuer, insiders need disclose only their proposed trades of the issuer, and, concurrent with that disclosure, any trades within the past three months. *See* Exs. B-D. While there is no publicly available Form 144 to confirm whether Defendants executed the *proposed* trades indicated on their Form 144s in the Class Period, Defendants do not dispute that these sales occurred. Moreover, Defendants' argument that allegations of an "intent to sell shares" does not establish scienter, MTD 26, falls flat: here, the proposed trades specifically demonstrate Defendants' *motive* to make as much profit on their inside information before the truth came out.

[29] Defendants incorrectly assert that Neves sold only 4% of his holdings. MTD 26. Defendants' percentage appears to be based on Neves's 100% ownership of *Class B stock*, a different security with super-voting rights that ensures Neves's control of the Company. ¶ 351.

August 2019, none of the Officer Defendants sold *a single share* of their personally held stock for at least another five months. ¶ 198.[30]

Defendants falsely assert that these sales cannot support an inference of scienter because they occurred pursuant to 10b5-1 plans entered into in March and May 2019. MTD 27. But a 10b5-1 plan does not negate scienter when, as here, it "is entered into—or strategically amended—to take advantage of an inflated stock price or insider information." *China Auto.*, 2012 WL 3205062, at *9. Defendants entered into their first 10b5-1 plans in March, *during* the lock-up period and while Farfetch was *already* conducting due diligence to acquire New Guards and otherwise misleading the market. *See* ¶ 140. These plans allowed the Officer Defendants to offload significant amounts of their shares just before the stock dropped on the truth's revelation. ¶ 330.

Finally, Defendants fail to advance a more compelling inference of non-fraudulent intent. They posit that "Farfetch entered into lucrative opportunities to continue its growth and expand its business" and lowered its guidance in response to competition. *See* MTD 33-34. This theory overlooks that, while Defendants painted a very different public picture of the Company's performance and growth drivers, Farfetch's first-party sales kept increasing, it was constantly offering promotions, and it was pursuing planned acquisitions that were hidden from investors.

Considered holistically, the Complaint adequately alleges scienter. *See, e.g.*, *Freudenberg* at 201 ("Because Plaintiffs have alleged that Defendants were aware of or had access to information contrary to their public statements, that the misstatements concerned [the business's] core operations, that Defendants violated GAAP provisions, and that Defendants benefited from

---

[30] Defendants also argue that Plaintiffs fail to allege "any purported profits" they reaped from these sales. *See* MTD 27. But here, as their Form 144s reflect, the Officer Defendants offloaded their stock awards, not stock they purchased, so obviously there is no purchase price to offset the gross proceeds. *See* Exs. B-D.

the misrepresentations through stock sales, Plaintiffs have adequately pled scienter.").

### F.    Plaintiffs Adequately Allege Loss Causation

To plead loss causation for their Section 10(b) claim, Plaintiffs must allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Pleading loss causation is "not meant to impose a great burden upon a plaintiff," who must "only plead a short and plain statement" pursuant to Rule 8(a) that provides "'some indication of the loss and causal connection that the plaintiff has in mind.'" *Freudenberg*, 712 F. Supp. 2d at 202 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005)). Loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

The Complaint alleges quintessential loss causation facts. On August 8, 2019, through public statements released to the market, Farfetch revealed information squarely related to the alleged fraud: its $675 million acquisition of New Guards Group—which represented a further significant expansion of the Company's first-party business—as well as financial performance numbers that revealed disappointing deceleration of organic platform growth and previously-undisclosed heavy reliance on promotions to drive sales, as well as the departure of key executive Robb. ¶¶ 165-84, 364. Farfetch's stock price fell in response, as analysts covering the Company zeroed in on the surprising new negative information, *see, e.g.,* ¶¶ 167, 171, 173-79, 365, and slashed price targets for its stock. *See, e.g.,* ¶¶ 180-81. These allegations connect the alleged fraud to investors' losses, and adequately plead loss causation under Rule 8(a). ¶¶ 165-84, 363-66.

Defendants first argue that the disclosure of the New Guards acquisition could not be corrective because it did not disclose "that Farfetch was no longer primarily a technology company." MTD 35. This argument fails because it rests on Defendants' risible

34

mischaracterization that this case concerns whether or not Farfetch would continue as a "technology" company. Defendants distort the alleged fraud. Plaintiffs contend Defendants misled the market by minimizing Farfetch's reliance on first-party sales, constant promotions and acquisitions in its business model, and presenting KPIs that obfuscated its true financial condition—not that Farfetch was not a technology company in any sense. *See* Section I.A.2, *supra.* Immediate market and analyst reaction also shows that the alleged corrective information revealed the misleading nature of Defendants' statements. ¶¶ 167, 171, 173-84, 365.

After the alleged corrective disclosure, analysts remarked, among other things, that: (1) the acquisition of "megabrand" New Guards ran "counter to the company's core 'asset-light' business model," ¶¶ 175, 180; (2) signaled the Company was "strategically moving further outside the core marketplace strategy," ¶ 182; (3) the "aggressive promotional activity" was "a head-scratcher," ¶ 176; and (4) the guidance and results showed that "organic growth is decelerating significantly." ¶ 177. *See also* ¶ 180 (New Guards deal adds "a lot of non-marketplace characteristics" to Farfetch). The New Guards acquisition in particular was not like the Company's prior, smaller, acquisitions of Toplife and Stadium Goods, but rather, according to an industry watcher, "a completely different matter." ¶ 183. Defendants cannot establish a lack of loss causation by re-defining Plaintiffs' alleged fraud and then saying the alleged corrective disclosure failed to correct their concocted misstatements. *See Initial Pub. Offering*, 241 F. Supp. 2d at 332 (rejecting defendants' attempt to "refashion and redraft much of the Complaints, then argue for the dismissal of claims that are not in those Complaints").

Defendants next argue the New Guards announcement and the disclosure of extensive promotional activities were not corrective because they were "consistent" with what the market already knew about Farfetch, including through prior public disclosures. MTD 35-36. Defendants'

contention that the alleged corrective disclosure contained no new information is a "truth-on-the-market" defense that is improper at the pleading stage. *See Ganino v. Citizens Utils. Co*., 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is ***intensely fact-specific*** and is ***rarely an appropriate basis for dismissing*** a § 10(b) complaint."). The extent to which "news of the truth had entered the market and dissipated the effects of prior misstatements[] is a ***matter for trial***." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds* 568 U.S. 455, 482 n.11 (2013).

Regardless, Defendants' premature argument is belied by extensive allegations Defendants simply ignore. Plaintiffs describe market reaction showing deep surprise about the announcement in light of Defendants' prior statements, *see* Section I.A.2, *supra*, which fatally undermines Defendants' truth on the market contention. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (analyst reactions to alleged correction of fraud relevant to whether truth was on the market). The significant stock price decline following the alleged corrective disclosure, which is alleged to be substantially explained by the new information it contained, ¶¶ 173, 365, does too. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("defendants' claim that the market knew or should have known of Vivendi's liquidity crisis is belied by the precipitous [stock] drop" after alleged corrective disclosures). The truth was not on the market, and Plaintiffs' loss causation allegations more than suffice.

## G.    The Complaint States A Section 20A Claim

The Complaint adequately states a Section 20A claim for insider trading because it adequately alleges both a primary violation of the Exchange Act and that Plaintiffs purchased securities "contemporaneously" with the Officer Defendants' trades on insider information. *See In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 642 (S.D.N.Y. 2008); 15 U.S.C. § 78t-1. Plaintiffs IAMNPF and Oklahoma Firefighters purchased 228,182 shares and 16,702 shares, respectively,

of Farfetch common stock at artificially inflated prices in transactions that Defendants concede were contemporaneous with many of Neves's and Robb's insider sales. ¶¶ 203-05.

## II.     THE SECURITIES ACT CLAIMS ARE ADEQUATELY PLED

To state a claim under Sections 11 and 12(a)(2) of the Securities Act, Plaintiffs must plead false and misleading statements in offering materials, but not scienter, reliance, or causation. *Evoqua*, 450 F. Supp. 3d at 417. The Complaint adequately alleges that Defendants made materially false and misleading statements in the Registration Statement, that Farfetch is strictly liable for these material false and misleading statements, and that the remaining Securities Act Defendants failed to reasonably investigate the accuracy of the Offering Documents. ¶¶ 455-57, 460, 464-72, 476-78, 479-85. This is true whether Rule 9 or Rule 8(a) applies. Defendants raise only two arguments unique to the Securities Act, related to standing, both of which fail.

### A.     Plaintiffs Have Adequately Pled Standing under Section 11

Plaintiffs' allegation that they "purchased shares of Farfetch common stock traceable to the IPO," ¶¶ 415-16, "is enough to confer standing at this stage to assert a § 11 claim." *Evoqua*, 450 F. Supp. 3d at 403; s*ee In re Petrobras Sec. Litig*. 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) ("At this stage, plaintiffs are not 'required to explain *how* their shares can be traced.'") (emphasis in original).

Defendants' speculation that Plaintiffs will be unable to trace their shares to the IPO because it is "more likely" that Plaintiffs purchased "some" of the "lock[ed] up" shares off-loaded by Company insiders in March 2019, should be rejected. *See* MTD 39. It is undisputed that before the IPO, there was no market for Farfetch common stock, and the Registration Statement was the only one effective throughout the Class Period. Here, the Registration Statement states, "[a]fter giving effect to the Reorganization Transactions, the sale of Class A ordinary shares in this offering and the concurrent private placement, we will have 250,001,015 Class A ordinary shares

outstanding (or 256,637,577 if the underwriters exercise their option to purchase additional Class A ordinary shares in full). . . . [which] will be freely tradable without restriction under the Securities Act," except as subject to the terms of the lock-up arrangements. ECF No. 56-2 at 55.[31] Therefore, "all investors in the open market—whether their shares are traced to th[ose] offered on [the date of the IPO] . . . or to th[ose] tradable after the 180-day lock-up," "can trace their purchases to shares registered by the one and only Registration Statement." *Perry v. Duoyuan Printing, Inc*., 2013 WL 4505199, at \*10-11 (S.D.N.Y. Aug. 22, 2013).

Even if "lock[ed] up" shares were not traceable to the IPO, that would not defeat standing, as Defendants do not establish that *all* the shares Plaintiffs purchased were "lock[ed] up." *See In re Smart Techs., Inc. S'holder Litig*., 295 F.R.D. 50, 62 (S.D.N.Y. 2013) (rejecting defendant's assumption that no aftermarket purchaser can trace any share to IPO). Instead, they speculate that because the amount of "lock[ed] up" shares tradable at the time of Plaintiffs' purchases outnumber those issued on the IPO date, Plaintiffs must have purchased "lock[ed] up" shares. MTD 39. Accepting this illogical conjecture would require the Court to draw improper merits conclusions. *See Evoqua*, 450 F. Supp. 3d at 395 (declining to consider merits of defendants' traceability arguments based on timing of plaintiffs' aftermarket purchases on motion to dismiss).

Defendants' assertion that Plaintiffs' contemporaneous trading allegations establish their lack of standing under Section 11 rests on the same flawed presumption. Even if Plaintiffs' contemporaneously-purchased shares were not traceable, these shares do not account for all of the shares purchased by Plaintiffs and, thus, cannot defeat their standing.[32]

---

[31] This includes the 50,880,331 shares offered on the IPO date, as well as the 205,757,266 additional shares tradable after the lock-up period expired. ¶ 231.

[32] Plaintiffs allege that IAMNPF purchased 228,182 shares, and Oklahoma Firefighters purchased 16,702 shares, contemporaneously with Farfetch insiders' fraudulent stock sales. *See* ¶¶ 203, 205.

**B.**     **Plaintiffs Have Adequately Alleged Standing under Section 12(a)(2)**

Section 12(a)(2) standing exists where a plaintiff adequately alleges the defendant was a "statutory seller." *Evoqua*, 450 F. Supp. 3d at 403-04. To assess statutory seller status, courts consider: participation in the preparation and signing of a registration statement, promotion of the IPO through road show presentations, and participation in the decision to hire underwriters. *Dorchester Inv'rs v. Peak Trends Tr.,* 2003 WL 223466, at *2-3 (S.D.N.Y. Feb. 3, 2003).

Here, Plaintiffs amply allege that Farfetch and the Underwriter Defendants were statutory sellers of Farfetch stock. ¶¶ 497-98. Farfetch prepared and signed the Offering Materials, ¶¶ 409, 497, and participated in the selection of IPO underwriters, ¶ 497, and the Underwriter Defendants would have assisted in preparing the Offering Materials through their due diligence processes and responsibility for verifying that essential facts and information disclosed therein. ¶¶ 480-483. Plaintiffs further allege that Farfetch and the Underwriter Defendants: (1) solicited the purchase of Farfetch common stock issued in the IPO by marketing it directly to institutional investors at the Roadshow, in which the lead underwriters built their "book" of IPO orders, with Farfetch and the lead underwriters determining how many shares to sell and the offering price, ¶¶ 50-63; (2) sold, offered and/or solicited the sale of 50,880,331 shares in the IPO and overallotment, ¶¶ 65, 443-44; and (3) were motivated by their financial interests. ¶ 498. *See Evoqua,* 450 F. Supp. 3d at 404 (holding that similar allegations sufficed); *see also Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc*., 422 F. Supp. 3d 821, 857 (S.D.N.Y. 2019) (Nathan, J.) (Section 12(a)(2) standing adequately pled where defendants participated in preparing the registration statement and roadshows while motivated by financial gain); *Perry*, 2013 WL

These contemporaneous purchases reflect a mere fraction of the 306,891 and 167,465 total shares IAMNPF and Oklahoma Firefighters purchased, respectively, during the Class Period. *See id.* at ECF page nos.193-201 (Lead Plaintiff Certifications).

4505199, at *12 (Section 12(a)(2) standing shown where plaintiffs alleged underwriter defendants sold the shares in offering, negotiated IPO price, controlled registration statement and prospectus, "offered to engage in transactions to stabilize [and] otherwise affect the price of the common shares during and after" offering, and received $4 million).

Defendants ignore these allegations and instead contend Plaintiffs lack standing because they do not assert that they purchased Farfetch securities *directly* from Farfetch or any of the Underwriter Defendants or allege direct solicitation. But "privity … is no longer required," *Evoqua*, 450 F. Supp. 3d at 404, and allegations of solicitation may confer Section 12(a)(2) standing "regardless of whether [the defendant] actually interacted with the plaintiffs." *In re OPUS360 Corp. Sec. Litig.*, 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002); *Perry*, 2013 WL 4505199, at *10-11.

## III.      CONTROL PERSON LIABILITY

The Officer Defendants controlled Farfetch. Defendants do not dispute control, but argue the Complaint fails to allege a primary violation. *See* MTD 40. For the reasons discussed above, the Complaint states primary violations, and therefore the Officer Defendants are liable under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. *See Evoqua*, 450 F. Supp. 3d at 427. The Director Defendants are also liable under Section 15 as control persons because they directly participated in drafting, reviewing, approving and/or ratifying the material misrepresentations and omissions in the Offering Materials, signed the Offering Materials, and had control over their contents. ¶ 432; *Evoqua,* 450 F. Supp. 3d at 428-29.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated:  December 22, 2020    Respectfully submitted,

        **KESSLER TOPAZ MELTZER**
         **& CHECK, LLP**

        */s/ Joshua E. D'Ancona*
        Joshua E. D'Ancona
        Gregory M. Castaldo
        Michelle Newcomer
        Raphael Janove
        280 King of Prussia Road
        Radnor, PA 19087
        Tel: (610) 667-7706
        Fax: (610) 667-7056
        jdancona@ktmc.com
        gcastaldo@ktmc.com
        mnewcomer@ktmc.com
        rjanove@ktmc.com

        *Counsel for Lead Plaintiff Oklahoma*
        *Firefighters Pension and Retirement System and*
        *Lead Counsel for the Class*

        **BERNSTEIN LITOWITZ BERGER**
         **& GROSSMANN LLP**

        John C. Browne
        Hannah G. Ross
        Lauren A. Ormsbee
        Michael M. Mathai
        1251 Avenue of the Americas
        New York, New York 10020
        Tel: (212) 554-1400
        Fax: (212) 554-1444
        johnb@blbglaw.com
        hannah@blbglaw.com
        lauren@blbglaw.com
        michael.mathai@blbglaw.com

        *Counsel for Lead Plaintiff I.A.M. National*
        *Pension Fund and Lead Counsel for the Class*

        John D. Zaremba
        **ZAREMBA BROWN PLLC**
        40 Wall Street
        52nd Floor

New York, NY 10005
Telephone: (212) 380-6700
jzaremba@zarembabrown.com

*Additional Counsel for Lead Plaintiff I.A.M.*
*National Pension Fund*