UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/29/21
```

*In re Farfetch Limited Securities Litigation*,

19-cv-08657 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs, who purchased Defendant Farfetch's stock following its initial public offering in 2018, bring claims against the company, its executives, and the financial institutions that served as underwriters to the IPO for making materially false statements and omissions in violation of securities laws. Defendants move to dismiss Plaintiffs' complaint for failure to state a claim. For the reasons that follow, Defendants' motion is GRANTED.

## I.    BACKGROUND

### A.  Factual Summary

The following facts are drawn from Plaintiffs' Consolidated Amended Complaint and accepted as true for the purposes of this motion. Dkt. No. 39. Farfetch is a technology company based in London that focuses on the sale of luxury fashion and other luxury goods. *Id.* ¶ 2. According to Farfetch's executives, Defendant José Neves (CEO), Defendant Andrew Robb (COO), and Defendant Elliot Jordan (CFO), Farfetch is not a traditional fashion retailer but has a unique business model. *Id.* They claim that Farfetch is a third-party marketplace platform that connects luxury goods suppliers to consumers on its website, and that Farfetch's revenue comes

from the high commissions it receives on each sale.  Essentially, Defendants have touted

Farfetch as the Uber or Amazon of luxury fashion.  After its founding in 2008, Farfetch became

a very successful startup and was valued at $1 billion in 2015 after a round of private funding.

*Id.* ¶ 33.  Farfetch also acquired Browns, a first-party luxury fashion retailer, in 2015.  *Id.* ¶ 34.

In late 2017 and early 2018, Farfetch prepared to take the company public.  Farfetch filed

preliminary paperwork with the Securities and Exchange Commission and hosted a two-week

IPO roadshow, where the executives visited multiple cities to make marketing presentations to

potential investors.  *Id.* ¶¶ 40–42.  The company received lots of favorable press coverage

regarding its business model during this time, which was attractive to investors for a number of

reasons.  First, it had the potential to be a pioneer in the relatively untapped submarket of online

luxury fashion.  While e-commerce generally has exploded in the past few decades, including

online clothing sales, experts explain that the luxury market has lagged behind because many of

the sellers are boutiques that have struggled to make the online shopping experience as "alluring"

as shopping in a luxury store.  *Id.* ¶¶ 26–28.  Additionally, Farfetch's departure from the

traditional, first-party retailer model meant that Farfetch carries very little inventory and low

capital expenditures, and thus incurs very little financial risk.  *Id.* ¶¶ 30–35.

Farfetch filed its prospectus and registration document (collectively, "offering materials")

with the SEC on September 24, 2018.  *Id.* ¶ 64; Dkt. No. 56-2.  Defendants Goldman Sachs &

Co. LLC, J.P. Morgan Securities LLC, Allen & Company LLC, UBS Securities LLC, Credit

Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Wells Fargo Securities LLC,

Cowen and Company LLC, and BNP Paribas Securities Corp., served as underwriters to the IPO.

Dkt. No. 56-2 at 173.  As relevant here, Farfetch made various representations in these offering

documents.  First, Farfetch touted its innovative third-party platform marketplace and

distinguished itself from the inferior first-party sales model. Consol. Am. Compl. ¶ 66.  Second, Farfetch disclosed how it had divided the operating segments of its business for accounting purposes. *Id.* ¶ 69.  Third, Fartetch explained that it created various "key performance indicators" that Farfetch claimed best represented its economic value.  *Id.* ¶ 71.  Fourth, Farfetch explained its "growth strategies" and stated that it did not have any current plans for future acquisitions. *Id.* ¶¶ 71, 78

The IPO was highly successful.  Farfetch stock began trading on the New York Stock Exchange on September 21, 2018 at $27.00 per share, which was significantly higher than the initial target price of $15-$17 per share, and peaked at $30.60 per share, before closing at $28.45 per share.  *Id.* ¶¶ 65–67, 80. The IPO raised over $1 billion and Farfetch's total valuation following the IPO was over $8 billion. *Id.* ¶ 80.

After the IPO, Farfetch performed well financially for the year 2018 and analysts continued to react positively to news of Farfetch's steady growth.  The only exception was when Farfetch announced acquisitions of Stadium Goods and Toplife in late 2018 and early 2019, both traditional first-party retailers, for which analysts had tepid reviews.  *Id.* ¶ 101.

Starting in March and May of 2019, Defendants Neves, Robb, and Jordan began to sell some of their shares.  *Id.* ¶ 185.  They had been precluded from doing so until that time by lock-up agreements that were executed as part of the IPO.  *Id.* ¶ 187.  Each entered into a 10b5-1 trading plan with the SEC which scheduled a series of trades that would be executed so long as Farfetch stock did not fall below a minimum price. *Id.* ¶ 188.  Dkt. Nos. 56-27–56-30.  From March to August 2019, Defendant executives collectively made approximately $46.8 to $68 million in Farfetch stock sales.  *Id.* ¶ 185.

On August 8, 2019, the company's momentum slowed.  Farfetch issued two press release and held its second quarter earnings call that contained two important disclosures.  *Id*. ¶ 165.  First, Farfetch disclosed that it had acquired New Guards Group, a first-party sales entity, for nearly $675 million. *Id.* ¶ 166.  Farfetch also disclosed its second quarter 2019 financial results, which were quite poor.  Farfetch suffered a loss of $89.6 million, as opposed to $17.6 million in the prior-year period.  *Id.* ¶¶ 168, 170.  Farfetch also announced a lowered guidance for future projections:  instead of the 41% year-over-year Platform GMV growth previously projected, Farfetch announced that they projected a 30-35% growth for third quarter 2019 and a 37-40% for the fully year 2019.  *Id.* ¶ 169.  Analysts and investors reacted extremely negatively to the news and Farfetch's stock price fell by 45% in 24 hours.  *Id.* ¶ 173.

### B.  Procedural History

Following the plummet of Fafetch's stock price in August of 2019, stockholders filed suit against Farfetch in this Court.  In *Omdahl v. Farfetch Limited, et al.,* No. 1:19-cv-08657-AJN (S.D.N.Y. Sept. 17, 2019), Plaintiff Jeff Omdahl brought claims on behalf of himself and a class of others similarly situated under the Securities Act, and in *City of Coral Springs Police Officers' Retirement Plan v. Farfetch Limited, et al*., No. 1:19-cv-08720-AJN (S.D.N.Y. Sept. 19, 2019), Plaintiff City of Coral Springs brought claims on behalf of itself and a class of others similarly situated under the Securities Act and the Exchange Act for Farfetch Class A ordinary shares.  On June 10, 2020, the Court consolidated these cases and appointed Plaintiffs IAM National Pension Fund and Oklahoma Pension and Retirement System as lead Plaintiffs and their law firms as lead counsel.  Dkt. No. 31.

Plaintiffs filed their Consolidated Amended Complaint on August 11, 2020, bringing claims against Defendant Farfetch, Officer Defendants, and Defendant Underwriters for

violations of both the Securities Act and Exchange Act on behalf of a class of similarly situated

individuals who purchased Farfetch stock at any point from its IPO launch on September 20,

2018 through the date of the alleged disclosures on August 8, 2019. Dkt. No. 39. In sum,

Plaintiffs allege that Defendants made various materially false and misleading statements or

omissions to the public and in their offering materials. *Id.*

Defendants jointly filed a motion to dismiss Plaintiffs' complaint on October 23, 2020,

arguing that Plaintiffs had failed to state a claim for relief under either the Securities Act or the

Exchange Act. Dkt. Nos. 55–59. Plaintiffs filed an opposition and Defendants filed a reply.

Dkt. Nos. 63–66.

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief

can be granted, a plaintiff's complaint must provide "a short and plain statement of the claim

showing that the pleader is entitled to relief," that "give[s] the defendant fair notice of what

the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007). For purposes of the motion to dismiss, all of the "factual allegations contained in the

complaint" must be "accept[ed] as true." *Id*. at 572. Though these allegations need not be

"detailed," they must "state a claim to relief that is plausible on its face." *Id*. at 555, 570. A

complaint is facially plausible "when the pleaded factual content allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).

In securities fraud cases, the Private Securities Litigation Reform Act ("PSLRA")

requires a complaint to "specify each statement [or omission] alleged to have been misleading,

the reason or reasons why the statement [or omission] is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B).  Rule 9(b) of the Federal Rules of Civil Procedure, which applies to allegations of fraud, imposes a comparable requirement.

## III.   DICUSSION

Plaintiffs bring claims against Defendants under both the Securities Act and the Exchange Act.  As discussed below, Plaintiffs' Exchange Act claims must be dismissed because they have not plausibly alleged scienter, and Plaintiffs' Securities Act claims must be dismissed because they have not plausibly alleged that Farfetch's offering materials contained any materially false or misleading statements or omissions.

### A.  Exchange Act Claims

Plaintiffs assert claims for securities fraud against Defendant Farfetch and the Officer Defendants under the Exchange Act.  Plaintiffs allege that: (1) Farfetch and the Officer Defendants violated section 10(b) of the Exchange act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10-b5; (2) Officer Defendants violated section 20(a) of the Exchange Act by causing Farfetch to violate section 10(b) and 10-b5; and (3) Defendants violated section 20A of the Exchange Act for selling the securities to certain Plaintiffs as part of that scheme.

#### 1.  Plaintiffs' Section 10(b) Exchange Act and Rule 10b-5 Claims must be dismissed because Plaintiffs have failed to allege scienter.

"Section 10(b) makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors,'" *Novak v. Kasaks*, 216 F.3d 300, 305–06 (2d

Cir. 2000) (alterations in original) (quoting 15 U.S.C. § 78j(b)), and Rule 10b-5 specifies that this statute proscribes "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," *id.* (quoting 17 C.F.R. § 240.10b-5).

Therefore, in order to establish a claim for securities fraud under Rule 10b-5, a Plaintiff must allege that "in connection with the purchase or sale of securities, the defendant, acting *with scienter*, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (emphasis added) (citing *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir. 2000)). The "scienter requirement for a private action under Rule 10b-5 has been firmly established for at least a generation." *Novak*, 216 F.3d at 306. To satisfy this element, Plaintiffs must "plead the factual basis which gives rise to a strong inference of fraudulent intent." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27–28 (2d Cir. 2014). A strong inference of fraudulent intent may be established either by "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290–91 (2d Cir. 2006). Importantly, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

For the reasons that follow, the Court holds that Plaintiffs have not adequately plead facts showing that Defendants had both motive and opportunity, nor have they shown strong circumstantial evidence of conscious misbehavior or recklessness.

#### a.  Motive and Opportunity

To demonstrate motive and opportunity, Plaintiffs point to Defendants Neves, Jordan, and Robb's alleged "suspicious" trading activity in the months and weeks prior to the alleged corrective disclosures of Farfetch's abysmal quarterly financials and the major acquisition of traditional first-party retailer New Guards.

"[M]otive for scienter can be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford,* 794 F.3d 297, 309 (2d Cir. 2015) (cleaned up).  Insider stock sales at price inflated by materially false statements or omissions are a potential concrete benefit of a fraud on the market scheme.  *See In re N. Telecom Ltd. Sec. Litig.,* 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000).  However, "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).  "Insider sales may contribute to an inference of scienter where a plaintiff can show that the trading activity was unusual," such as where a "stock sale . . . is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,* 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (citing *Rothman*, 220 F.3d at 94).  Other factors include the portion of stockholdings sold and the number of insiders selling, or where trading was otherwise "dramatically out of line with prior trading practices." *In re Eaton Corp. Sec. Litig.,* No. 16-CV-5894 (JGK), 2017 WL 4217146, at *11 (S.D.N.Y. Sept. 20, 2017).

According to the complaint, after Farfetch's IPO, Defendant Neves owned 1,692,478 Class A shares and 42,858,080 Class B shares, Defendant Robb owned 1,746,942 Class A

shares, and Defendant Jordan owned 714,547 Class A shares.   Consol. Am. Compl. ¶¶ 65, 87,

186.  As part of the IPO, these defendants were subject to a 180-day lock-up agreement on

selling shares, which ended on March 20, 2019.  *Id.* ¶ 187.  Each Defendant entered into one or

more 10b5-1 trading plans in March or May 2019 that, after the lockup agreements expired,

would incrementally sell a portion of their holdings from March 2019 into the Spring of 2020.

*Id.*  ¶ 188; Dkt. Nos. 56-27–56-30).[1]  From April 2019 to July 2019, Defendant Neves sold

1,970,361 Class A shares, allegedly gaining approximately $44 million.  *Id.* ¶ 190. From April

2019 to August 2019, Defendant Robb sold 919,849 of his shares, gaining approximately $21

million.  *Id.* ¶ 192.  And finally, in June of 2019, Defendant Jordan sold approximately 150,000

shares, amounting to approximately $3 million in proceeds. *Id.* ¶ 195.   After Farfetch's stock

price dropped by 45% in August of 2019, Defendants did not sell any more shares until January

of 2020.  *Id.* ¶ 198.  Although Defendants' 10b5-1 plan had trades scheduled during this period,

all of the trades scheduled in the plan would only be executed at a certain minimum price, and

Farfetch stock did not rebound to that price until January 2020.  *See id.*; Dkt. No. 56-27–56-30).

　　　Accepting as true the allegations that Defendants made the above trades and finding all

available inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have not plausibly

alleged that "the trading activity was unusual" in "amount" or in "tim[ing]" so as to "suggest[]

that the seller is maximizing personal benefit from inside information." *City of Omaha Police &*

*Fire Ret. Sys.*, 450 F. Supp. 3d at 419 (citing *Rothman*, 220 F.3d at 94).

---

[1] Defendants submitted copies of the 10b5-1 trading plans as exhibits to their motion to dismiss.  "[O]n a motion to dismiss, a court may consider documents" that are "incorporated in it by reference" in the complaint, so long as "a plaintiff[] reli[ed] on the terms and effect of a document in drafting the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (cleaned up).  Plaintiffs discuss the terms and effect of 10b5-1 trading plans in their complaint and rely on them significantly in making their scienter allegations.  *See* Consol. Am. Compl. ¶¶ 188, 189, 197, 330.  The Court will therefore consider them as incorporated by reference.

First, as alleged the "amount" of trading described in the complaint cannot plausibly be characterized as unusual. *Id.* Plaintiffs do not allege that Defendants sold off a significant portion of Farfetch or of their own individual holdings. While they allege that Defendants collectively sold $63 million worth of shares, they also allege that by this time Farfetch had acquired $1 billion in funding and was valued at somewhere around $6-8 billion. Consol. Am. Compl. ¶¶ 4, 80. And while Neves allegedly gained $44 million and Jordan $3 million, according to Plaintiffs' complaint Neves retained 96%[2] of his holdings and Jordan retained 80% of his holdings. Courts have been unwilling to draw an inference of fraud from allegations that executives sold off significantly higher portions of their holdings. *See Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (motive and opportunity not plausibly alleged where the defendant sold off 65.6% of their shares); *Reilly v. U.S. Physical Therapy, Inc.,* No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (allegations that defendant sold 44% of their shares not sufficient to plausibly allege suspicious trading).

While Defendant Robb allegedly sold off 50% of his shares, which is the largest proportionally of the three, that amount is still within the range that Courts have found to be insufficient to plausibly allege motive and opportunity. *See Chapman*, 466 F. Supp. 3d at 411. And the complaint also provides a plausible alternative motive for Defendant Robb's trading activity that undermines any otherwise available inference of fraudulent intent, which is that he

---

[2] Plaintiffs claim that Defendant Neves sold "84% of his disclosed holdings." Consol. Am. Ampl. ¶ 191. Plaintiffs reach that number by counting only Defendant Neves' Class A shares and excluding his Class B shares when assessing his holdings in Farfetch. Plaintiffs provide no basis for this maneuver in their complaint or the briefings other than the fact that the Class B stock is "a different security with super-voting rights that ensures Neves' control of the company." Dkt. No. 63 at 41 n.29. But as Plaintiffs allege in their complaint, the Class B shares are readily convertible to Class A shares "at Neves' discretion." Consol. Am. Compl. ¶ 87. To say that Neves' only retained 16% of his holdings in Farfetch when in reality he retained a 96% ownership interest in the company (worth approximately $1.2 billion, according to the complaint, *id.*) is simply an untenable proposition.

left the company shortly after the trades were made.  *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865 (HB), 1998 WL 283286, at *6 & n.3 (S.D.N.Y. June 1, 1998) (determining on a motion to dismiss that plaintiffs did not "plead motive and opportunity" with respect to a certain executive in part because the decision to unload 81% of his shares was made in conjunction with his resignation and thus did not create a "strong inference of suspicious trading.") Thus, even accepted as true, Plaintiffs' allegations about the volume of Defendants' trading demonstrate that defendants remained heavily invested in Farfetch and that "their stock sales . . . were not calculated to maximize the personal benefit from undisclosed inside information."  *Reilly*, 2018 WL 3559089, at *14 (cleaned up).

In any event, courts agree that "[t]he mere fact that [insiders] sold a large quantity of stock during the Class Period, by itself, is insufficient to establish an inference of motive." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018); *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 586 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015). Even if the defendants had sold off greater portions of their holdings, Plaintiffs would still need to plausibly allege that the sales are connected to some kind of plan to defraud, for example by alleging that the timing of the sales matches up with the alleged material false statements or omissions.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 586 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

But Plaintiffs have not alleged facts showing that the timing of the sales was suspicious either.  As an initial matter, the trades were made pursuant to a 10b5-1 trading plan.  Ordinarily, "the use of a non-discretionary trading plan that sells fixed quantities of stock on pre-scheduled dates undermines any inference of scienter."  *Nguyen*, 297 F. Supp. 3d at 494.  In this case, while the alleged corrective disclosures and concomitant price drop occurred on August 8–9, 2019,

each defendant planned their trades well before that in March or May of 2019 and had also
scheduled trades to continue well after that, going all the way into mid-2020.

To be sure, Plaintiffs are correct that just because a defendant uses a 10b5-1 trading plan
does not automatically mean they lacked fraudulent intent.  10b5-1 trading plans that are entered
into *during* the alleged fraudulent activity, as is alleged here, are not a complete defense to
scienter because the insider might be aware of an impending price drop and could use a 10b5-1
plan to make his or her premeditated stock dump appear legitimate.  *See George v. China Auto.
Sys., Inc*., No. 11 Civ. 7533(KBF), 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012);
*Freudenberg v. E\*Trade Fin. Corp*., 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).  Moreover, the
fact that Defendants had allegedly scheduled trades to continue up until the middle of 2020 is
still compatible with a plan to defraud, because Defendants would have known that the trades
would not be executed under the terms of the 10b5-1 trading plan if the stock price fell below the
minimum price.  *See* Dkt. No. 56-27–56-30).

But the 10b5-1 trading plans nonetheless provide an important reference point for
Defendants' state of mind in this analysis.  While many of the stock transactions were allegedly
executed in the weeks immediately preceding Farfetch's alleged corrective disclosures, which
might on its own be suspicious, those trades had in reality been scheduled in March or May or
2019.  Thus, Plaintiffs need to plausibly allege facts from which there is a strong inference that
in or around March or May 2019 Defendants were aware that a price drop would be coming after
their allegedly fraudulent statements or omission were revealed and that they planned to execute
the trades before that happened.  But Plaintiffs do not provide specific facts demonstrating that
this was Defendants' state of mind in March or May 2019, nor do they allege any facts showing
that the timing of the Defendants' decision to schedule these trades "match[es] up closely with

[their] allegedly false and misleading statements." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 586.

One of Plaintiffs' primary arguments in this regard is that "Farfetch was already conducting due diligence to acquire New Guards" at the time Defendants entered into their 10b5-1 plans.  Dkt. No. 63 at 42.   But the fact that Defendants were in the early stages of a potential acquisition at the time they decided to sell their shares does not give rise to the requisite strong inference of fraudulent intent.  Plaintiffs do not provide any factual allegations showing that, at this moment in time, Defendants were aware that the New Group acquisition was actually happening, when it was happening, when it would be announced, and most importantly, that it would have a significant impact on the stock price.   In fact, other allegations in the complaint demonstrate that Defendants would not have had this expectation.  Plaintiffs allege that Farfetch had already made two other acquisitions of traditional first-party retailers in late 2018 and early 2019 and that, while there was some negative feedback, analyst perception of Farfetch remained relatively stable after Defendants disclosed those deals to the public.

Therefore, the Court holds that the allegations in the complaint with respect to Defendants' trading activity do not plausibly allege that Defendants had a motive and opportunity to defraud.

### b.  Conscious Misbehavior or Recklessness

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant."  *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001).  Conscious behavior means "a state of mind approximating actual intent, and not merely a heightened form of negligence—or actual intent." *Novak*, 216 F.3d at 312 (cleaned

up).  The question is whether Defendants "knew facts or had access to information suggesting that their public statements were not accurate."  *Id.* at 311.

Under this route, Plaintiffs' burden is higher.  If a "plaintiff has failed to demonstrate that defendants had a motive to defraud the shareholders, he must produce a stronger inference of recklessness" and "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d 131, 142–43 (2d Cir. 2001).  Thus, "[t]o survive dismissal under the 'conscious misbehavior' theory, the [Plaintiffs] must show that they alleged reckless conduct by the [Defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (cleaned up).

Plaintiffs' theory of conscious misbehavior or recklessness in the complaint is that "the Officer Defendants deliberately hid first-party sales, constant promotions, and major planned acquisitions" and other issues from the public in order to further a false narrative about the nature of Farfetch's business.  Dkt. No. 63 at 40.

These allegations are insufficient to plausibly allege conscious misbehavior or recklessness.  As discussed later in this opinion, *see* Section III.B *infra*, Plaintiffs' complaint demonstrates that the Officer Defendants disclosed to the public that Farfetch's revenue stream included first-party sales, that it might consider possible acquisitions in the future, and that it might engage in periodic promotional activities.  Plaintiffs also allege that those disclosures were incomplete and therefore misleading.  But a defendant's decision to make significant disclosures about the exact risk he or she is purportedly trying to hide is "inconsistent with a state of mind going toward deliberate illegal behavior or conduct which is highly unreasonable and which

14

represents an extreme departure from the standards of ordinary care." *Holbrook v. Trivago N.V.*, No. 17 CIV. 8348 (NRB), 2019 WL 948809, at *21 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).   Even if those statements in hindsight were incomplete and misleading, the fact that Officer Defendants intentionally put the public on notice of these risks related to their business model strongly negates an inference that they were acting recklessly or consciously to "deliberately hide" them.   *See Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015) (holding that "even if" statements were misleading, Plaintiffs had not "not adequately pleaded that the 10b-5 Defendants acted with scienter" in light of disclosures).

* * *

In sum, Plaintiffs have not plausibly alleged motive and opportunity or conscious misbehavior or recklessness.   The Court therefore holds that the complaint does not provide plausible allegations of a strong inference of fraudulent intent on the part of the Officer Defendants.

### 2.   Plaintiffs' Section 20(a) and Section 20A claims fail because they have failed to state a claim under 10(b).

Plaintiffs' remaining Exchange Act claims are against Officer Defendants for violating Section 20(a) by causing Farfetch to violate Section 10(b), and for violating Section 20A for "selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t–1(a). However, both of these claims require that Plaintiffs adequately plead an underlying 10(b) violation.   *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (citing *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)) (Section 20(a)); *Gruber v. Gilbertson*, No. 16-CV-9727, 2019 WL 4458956, at *3 (S.D.N.Y. Sept. 17, 2019) (Section 20A).   Because

Plaintiffs have failed state a claim for a violation of section 10(b), their section 20(a) and 20A claims must be dismissed.

### B.  Securities Act Claims

Plaintiffs bring claims against Defendants under the Securities Act for false and misleading statements under Section 11, 15 U.S.C. § 77k, Section 12(a)(2), 15 U.S.C. § 77, and Section 15, 15 U.S.C. § 77o.

"Section 11 creates a right of action for 'any person' acquiring a security offered pursuant to a misleading registration statement." *In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 344 (S.D.N.Y. 2003) (quoting 15 U.S.C. § 77k(a)).  Section 12(a)(2) "imposes liability under similar circumstances" as Section 11 "on issuers or sellers of securities by means of a prospectus." *Litwin v. Blackstone Grp., LP*, 634 F.3d 706, 715 (2d Cir. 2011).  Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" Section 11, *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (quoting 15 U.S.C. § 77o(a)), meaning that to "establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 [or 12] and control of the primary violator by defendants." *Id.* at 185–86; *see also* 15 U.S.C. § 77o(a).

"To allege a claim under Section 11" or 12(a) "of the Securities Act, a plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Arfa v. Mecox Lane Ltd.*, No. 10-cv-9053, 2012 WL 697155, at *4 (S.D.N.Y. Mar. 5, 2012), *aff'd,* 504 F. App'x 14 (2d Cir. 2012) (citing *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007)).   Intent is not

an element of this kind of claim, as Section 11 and 12(a) provide for strict liability. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).  Therefore "only a material misstatement or omission" need be alleged.  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 343.[3]  Even if statements are "not literally false, the 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 727 (quoting *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir.2010)).  The ultimate question is whether a "reasonable investor" would have been misled.  *Id.*

For the reasons that follow, the Court concludes that Plaintiffs have not alleged that the offering materials contained any materially false or misleading statements or omissions.  As such, Plaintiff's claims under Sections 11, 12(a), and 15 must be dismissed, and the Court need not consider Defendants' arguments with respect to standing.

### 1.  Statements or omissions regarding Farfetch's operating segments

The offering materials contained statements explaining Farfetch's operating segments. For example:

- "We have determined our operating segments on the same basis that we use to evaluate performance internally."  Dkt. No. 64-1 at 4.

- "Our operating segments are . . . the Marketplace (which operates the Farfetch.com marketplace website and app), Farfetch Black & White (a white label website solution for

---

[3] While intent is not a necessary element, the Second Circuit has explained that "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." *Rombach*, 355 F.3d at 171. Thus, "while a plaintiff need allege no more than negligence to proceed under Section 11 or 12(a), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Id.*  Plaintiffs' claims are subject to the heightened standard of Rule 9(b).  Although Plaintiffs assert in their complaint that they are not alleging fraud with respect to allegations under the Securities Act, "[a] plaintiff cannot evade the requirements of Rule 9 through artful pleading" and the Court must "consider whether the wording and imputations of the complaint are classically associated with fraud." *City of Omaha Police & Fire Ret. Sys*, 450 F. Supp. 3d at 401 (cleaned up).  Every statement that Plaintiffs allege to be false or misleading under the Securities Act they also allege to be false and misleading for the same reasons under the Exchange Act.  Moreover, in their opposition to Defendants' motion to dismiss, Plaintiffs do not argue that Rule 9(b) should not apply.  Therefore, the heightened pleading standard is appropriate here.

luxury brands), Stores (operation of the Browns luxury boutiques) and Store of the Future (Provision of technology solutions to retail outlets)." *Id.*

- "Farfetch Marketplace represents over 90% of revenue; therefore, we are presenting only one reportable operating segment being the consolidated view of all operating segments noted above." *Id.*

Plaintiffs allege that these statements are misleading. Their main issue with Farfetch's operating segments is how it accounted for sales from the Browns store, the first-party retailer that Farfetch acquired prior to its IPO in 2015. Consol. Am. Compl. ¶¶ 445–59. Revenues from the Browns store accounted for 16% of Farfetch's gross profits in 2017 and 20% of in 2018. *Id.* ¶ 128. Standing alone, Plaintiffs assert that the Browns' revenues were enough to be their own reportable operating segment, because they accounted for more than 10% of Farfetch's revenue. But Farfetch decided to split the Browns retail sales into two: e-commerce (i.e., online sales) and sales made in person at Brown's brick-and-mortar storefronts. Farfetch included the Browns' e-commerce sales in the Marketplace operating segment, which it defined as all sales made online. Browns' in-person sales were included in their own segment, which it called "Stores" and defined as "operation of the Browns luxury boutiques," which only accounted for 4% of gross profits in 2017 and 3% in 2018. As a result, the "Marketplace" segment accounted for over 90% of revenue in both years, and therefore none of the other segments, including "Stores," had to be reported.

The purpose of this maneuver, according to Plaintiffs, was to hide from the public the amount of revenue generated by Browns—a first-party retailer model of the kind to which Farfetch allegedly claimed it was superior. In reality, Farfetch relied upon Browns for approximately 15%-20% of its revenue instead of the 3-4% presented in its accounting

disclosures.  According to Plaintiffs, this would have signaled to the public that Farfetch in fact

was significantly more reliant on first-party sales than it had claimed.

The problem with this theory is that Farfetch expressly disclosed precisely what

Plaintiffs' claim it was trying to hide.  In those same offering materials, Farfetch stated exactly

how much of its revenue came from third-party sales, first-party sales, and Browns in-store sales

in 2017.  Dkt. No. 56-2, Exhibit B (Offering materials).[4]  "[A] securities fraud claim for

misrepresentations or omissions does not lie when the company 'disclosed the very . . . risks

about which [a plaintiff] claim[s] to have been misled.'" *In re Dynagas LNG Partners LP Sec.

Litig.*, 504 F. Supp. 3d 289, 308 (S.D.N.Y. 2020) (quoting *Ashland Inc. v. Morgan Stanley &

Co.*, 652 F.3d 333, 338 (2d Cir. 2011)).  The Court agrees that, in isolation, Farfetch's definitions

of operating segments could be misleading, but the question is whether a "reasonable investor"

reading the offering documents would have been misled into thinking that Farfetch relied

significantly less on first-party sales than it did.  *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp.

3d at 727.  Because Farfetch told them precisely how much it relied on first-party sales, no

reasonable investor could possibly have been misled in this manner.

Moreover, while Plaintiffs argue that Defendants violated the International Financial

Reporting Standard (IFRS) 8 with their reporting of operating segments, the only claims in this

case are for securities fraud and therefore Farfetch's accounting practices are only relevant to the

extent they were used to mislead investors.  Because Plaintiffs have not alleged that these

---

[4] Defendants submitted copies of the offering materials as exhibits to their motion to dismiss.  "[O]n a motion to dismiss, a court may consider documents" that are "incorporated in it by reference" in the complaint, so long as "a plaintiff[] reli[ed] on the terms and effect of a document in drafting the complaint." *Chambers*, 282 F.3d at 153. Plaintiffs rely heaving on the language in the offering materials throughout their complaint in forming their allegations. *See generally* Consol. Am. Compl.  The Court will therefore consider them as incorporated by reference.

groupings could have misled a reasonable investor, the Court need not assess whether the IFRS

was violated.

### 2. Statements or omissions regarding Farfetch's business model

The offering materials contained descriptions of Farfetch's business model as primarily a

third-party marketplace platform as opposed to a traditional first party retailer.  For example:

- "We are a technology company at our core and have created a purpose-built platform for
  the luxury fashion industry."  Dkt. No. 64-1 at 4.

- "Our Marketplace model allows us to . . . incur[] minimal inventory risk and without
  capital-intensive retail operations." *Id.* at 5.

- "Our model . . . allows for . . . an ability to drive stronger future margins than traditional
  inventory-taking business models." *Id.*

- "We primarily operate a revenue-share model where we retain commissions and related
  income from these transactions." *Id.*

Plaintiffs argue that these statements were false and misleading because they obscured

the degree to which Farfetch was operating as a first-party non-marketplace platform business.

In other words, as discussed above, Farfetch was touting itself as an innovative, third-party

platform and distinguishing itself from first-party retailers, but failing to disclose the extent to

which it was actually relying on those first-party retailers.

This theory fails as well.  First, none of these statements are literally false.  As Plaintiffs'

allege, the third-party "marketplace" platform accounts for the vast majority of Farfetch's

business, and therefore Farfetch does "primarily operate a revenue-share model" and that model

does provide certain benefits, such as low inventory risk.   Farfetch did not ever claim that it

makes *no* first-party sales.  And while statements can still be misleading even if "not literally

false," these statements would not "mislead prospective buyers" either.  *In re BioScrip, Inc. Sec.

Litig.*, 95 F. Supp. 3d at 727.  As discussed above, Defendants disclosed the fact that Farfetch

relied in part on first-party sales and even the exact amount of revenue it derived from those sales.

Moreover, many of the generalized, big-picture statements Defendants made about Farfetch's business model are non-actionable puffery. Puffery are statements that are "too general to cause a reasonable investor to rely upon them," such as "generalizations regarding [a company's] business practices." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 206 (2d Cir. 2009). The claim that Farfetch is "a technology company at its core," for example, is the kind of vague "corporate-speak" that no reasonable investor would rely on in any significant way. *See Nguyen*, 297 F. Supp. 3d at 488.

### 3.   Statements or omissions regarding Farfetch's growth strategies and the possibility of new acquisitions

Third, the offering materials contained statements regarding Farfetch's growth strategy and the possibility of future acquisitions. For example:

- The key elements of Farfetch's "Growth Strategies" are "Improving consumer economics and growing our consumer base;" "Increasing product supply and our luxury seller base;" "Investing in new technologies and innovation…. [which] includes continuing to enhance our Marketplace" and "Building the Farfetch Brand." Dkt. No. 64-1 at 6.

- "We intend to use the net proceeds from this offering and the concurrent private placement for working capital, to fund incremental growth and other general corporate purposes, including possible acquisitions." *Id.* at 7.

- "However, we do not currently have any definitive or preliminary plans with respect to the use of proceeds for such purposes. The amount of what, and timing of when, we actually spend for these purposes may vary significantly and will depend on a number of factors, including our future revenue and cash generated by operations and the other factors described in 'Risk Factors.' Accordingly, we will have broad discretion in deploying the net proceeds of this offering and the concurrent private placement." *Id.*

- "We plan to continue investing aggressively in R&D. That, and growing our brand across geographies and categories, will be the focus of our investments in 2019 and beyond." *Id.* (quoting Defendant Neves)

Plaintiffs contend that these statements were materially false and misleading because they "created the false and misleading impression" that Farfetch would achieve its growth targets by investing in its third-party technology platform business when, in reality, Farfetch was planning at the time of the IPO to achieve its growth targets via its high-risk, capital-intensive first-party sales platform business by acquiring Stadium Goods and New Guards. Consol. Am. Compl. ¶ 246. According to Plaintiffs, at the same time that Defendants stated in the offering materials that they did "not currently have any definitive or preliminary plans" for acquisitions, Defendants were "intending" or planning to acquire Stadium Goods and New Guards. *Id.* In support of their claim that these plans were in the works during the IPO, Plaintiffs allege that (1) an insider at Farfetch ("FE-1") had discussions and interactions with Defendants Neves and Jordan from which he understood that Farfetch would need to make acquisitions to meet its growth targets, (2) the timing of the due diligence for these acquisitions—September 2018 for Stadium Goods and February 2019 for New Guards—necessarily meant that discussions and preliminary planning for acquiring these targets must have occurred during the IPO period, (3) executives at Stadium Goods stated publicly in early 2018 that they had talks with Farfetch executives "going back more than a year prior," and (4) Farfetch built up its corporate finance and strategy teams leading up to the IPO. *Id.* ¶¶ 246–49, 135–40.

Assuming *arguendo* that Plaintiffs have plausibly alleged that Farfetch executives were in fact considering possible acquisition targets during the IPO, Plaintiffs still have not plausibly alleged that the offering materials contained any material false statements or omissions on this subject. To start, none of the alleged statements regarding growth strategies and possible acquisitions are literally false. If it were true that Farfetch were having internal discussions about the possibility of future acquisitions, that is not the same as a definitive or even

"preliminary" plan to acquire a target.  Nonetheless, Farfetch's statement that it did not have

even "preliminary plan[s]" to make acquisitions could lead a reasonable investor to believe that

the possibility of acquisitions was not being considered at all.  But that statement cannot be

considered in isolation.  Farfetch put investors on clear notice that "[w]e intend to use the net

proceeds from this offering . . . to fund incremental growth and other general corporate purposes,

*including possible acquisitions*" and that "the amount of what, and timing of when, we actually

spend for these purposes may vary significantly and will depend on a number of factors,

including our future revenue and cash generated by operations and the other factors. . .

[a]ccordingly, we will have *broad discretion* in employing the net proceeds of this offering."

Dkt. No. 64-1 at 7 (emphasis added).  In light of this express disclaimer of the exact risk that

Farfetch might use IPO proceeds to make future acquisitions at any time at their discretion, no

reasonable investor could be misled into thinking that Farfetch would not be acquiring new

targets after the IPO.

Lastly, to the extent that having discussions about acquiring first-party retailers Stadium

Goods and New Guards signified a meaningful shift in business strategy, that is not something

that Farfetch was required to disclose.  "It is . . . well established that a company has no such

duty to disclose changes to its business plans," *Friedman v. Endo Int'l PLC*, No. 16-CV-3912

(JMF), 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (citing *San Leandro Emergency Med.*

*Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 810 (2d Cir. 1996)), unless the

plaintiff plausibly alleges that "a company had stated its intention to adhere exclusively to a

particular strategy and then changed its strategy without informing investors."  *Id.* (cleaned up).

To the contrary, Farfetch made clear that the acquisition strategy was on the table in its offering

materials when it stated that it had already acquired Browns, a first-party retailer, and that

possible future acquisitions could occur at any time.

### 4. Statements or omissions regarding promotional activities and Farfetch's key performance metrics

Fourth, the offering materials contained statements regarding the use of promotional

activities and statements explaining Farfetch's key performance metrics.

- "Promotional incentives, which include basket promo-code discounts, may periodically be offered to end consumers. These are treated as a deduction to revenue."  Dkt. No. 64-1 at 8.

- "Farfetch's 'key operating and financial metrics' . . .  including GMV, Revenue, Adjusted Revenue, Adjusted EBITDA, Adjusted EBITDA Margin, Platform GMV, Adjusted Platform Revenue, Platform Gross Profit, Platform Order Contribution Margin, and Third Party Take Rate." *Id.* at 9.

- "We focus on Adjusted Platform Revenue, as we think this best represents the economic value being generated by the platform." *Id.*

- "To facilitate and grow our platform, we provide fulfilment services to Marketplace consumers and receive revenue from the provision of these services, which is by and large a pass-through cost with no economic benefit to us, and therefore we calculate our Adjusted Revenue excluding Platform Fulfilment Revenue." *Id.* at 10.

Plaintiffs argue that these statements were materially false and misleading, incomplete

and omitted key facts.  According to Plaintiffs, Farfetch's statement that it was engaging in

"periodic[]" promotional activities was false or misleading because it was in fact engaged in

*constant* promotional activities that were hurting the company's bottom line.  Further, Plaintiffs

allege that Farfetch designed its key performance metrics to hide the impact of these major

promotional activities on Farfetch's business.  Specifically, when Farfetch engages in

promotional activities such as discounts and promo-codes, Farfetch ordinarily internalizes the

cost of those promotions instead of the seller, and thus promotions decrease Farfetch's overall

revenue.  However, Farfetch created key performance metrics such as "Adjusted Platform

Revenue"—which Farfetch claimed was in fact the best measure of economic value generated by

the platform—that did not account for the impact of promotional activities on Farfetch's

business.  The way Farfetch pulled this off, according to Plaintiffs, is that Farfetch deducted the

costs of promotions from shipping revenue.  Platform Fulfillment Revenue, a metric that

included shipping revenue, however, was excluded when calculating Adjusted Platform

Revenue.  And the "Third Party Take Rate," another important metric that reflected the amount

of commission Farfetch received on third-party orders, was calculated based off of Adjusted

Platform Revenue.  The result was that Adjusted Platform Revenue, and thus Third Party Take

rate, did not reflect the serious impact of these increased promotional activities.

      This theory also falls apart in light of the remaining disclosures in the offering materials.

First, the Court agrees that in isolation the term "periodically" could potentially mislead a

reasonable investor into believing that promotions were less frequent at Farfetch than they

allegedly were.   But no reasonable investor reading the offering materials could have been

misled into believing that Farfetch would never engage in consistent or even significantly

increased promotional activities.  Farfetch disclosed that "[i]n order to acquire and retain

consumers, we have incurred and will continue to incur substantial expenses related to

advertising and other marketing efforts," including "promotions to drive sales," and Farfetch

warned investors that these efforts "may not be effective and may adversely affect our gross

margins."  Dkt. No. 56-2 at 34.  Moreover, Farfetch expressly warned investors that it might

have to significantly increase promotional activity, explaining that because the luxury fashion

industry is competitive and the online market for luxury goods is underdeveloped, "we may have

to incur significantly higher and more sustained advertising and promotional expenditures or

offer more incentives than we currently anticipate in order to attract additional online consumers

to our Marketplace and convert them into purchasing consumers." *Id.* at 31.  No reasonable investor could claim to be taken off guard when this exact outcome occurred.

Second, Farfetch's statements with respect to its key performance indicators were not materially false or misleading either.  It is true that Farfetch's prized analytic, Adjusted Platform Revenue, did not account for the cost of promotional activity.  But no reasonable investor could have been misled by that.  As an initial matter, Farfetch's claim that "we think" Adjusted Platform Revenue is the metric that "best represents the economic value being generated by the platform" is a clearly an opinion.   While "subjective statements of opinion can be actionable as fraud" where (1) "the speaker did not hold the belief she professed" or (2) "the speaker omits information whose omission makes the statement misleading to a reasonable investor[,]" *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 566 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019), neither has been adequately alleged here.  Defendants are entitled to their opinion that Adjusted Platform Revenue is the "best" metric for measuring the company's financial health so long as that opinion is not entangled in statements or omissions that would mislead investors to believe that the metric accounts for the risk of increased promotional activity when it in fact does not.

And Plaintiffs have not plausibly alleged that this statement of opinion was embedded with any materially misleading statement or omission of fact. The allegations in the complaint do now allow the inference that a reasonable investor could have believed that the Adjusted Platform Revenue metric accounted for the costs promotional activity based off the offering materials.  The offering materials defined "Adjusted Platform Revenue" as "Adjusted Revenue" minus in-person sales, then defined "Adjusted Revenue" and revenue minus "Platform

fulfillment revenue," and finally defined "Platform fulfillment revenue" as "revenue from shipping and customs clearing services . . . *net of consumer promotional incentives*."  Dkt No. 56-2 at 6–7. Thus, the definition of Adjusted Platform Revenue that was included in the offering materials expressly disclosed that promotional incentives were not accounted for.

Therefore, the offering materials sufficiently disclosed that (1) the cost of promotional activities are deducted from Farfetch's revenue, (2) there is a risk that Farfetch might have to significantly increase promotional activities to attract customers to the nascent online luxury fashion market and to stay competitive within the greater luxury fashion industry generally, and (3) the metric that Farfetch's believes is the "best" measure of its economic value does not include impact of promotional activity costs on revenue.   In light of these disclosures, Plaintiffs have not plausibly alleged that Defendants' statements were materially false or misleading.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' complaint is GRANTED.  Defendants' motion for oral argument is DENIED as moot. This resolves Dkt. Nos. 55 and 58.  The clerk is respectfully directed to enter judgment and close the case.

SO ORDERED.

Dated:  September 29, 2021
        New York, New York

_____
        ALISON J. NATHAN
        United States District Judge